**IN THE UNITED STATES DISTRICT COURT**

**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**


| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| **v.** | : | **CRIMINAL NO. 17-390-01-02** |
| **EDWIN PAWLOWSKI**<br>**SCOTT ALLINSON** | : | |


**O R D E R**

      AND NOW, this       day of       , 2018, upon consideration of the defendants' motions

for judgment of acquittal and for a new trial, and the government's consolidated response thereto, it is

hereby ORDERED that the defendants' motions are DENIED.


                     BY THE COURT:


                     _____

                     HONORABLE JUAN R. SANCHEZ
                     *Judge, United States District Court*

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| **v.** | : | **CRIMINAL NO. 17-390-01-02** |
| **EDWIN PAWLOWSKI** | : | |
| **SCOTT ALLINSON** | | |

### GOVERNMENT'S CONSOLIDATED RESPONSE TO DEFENDANTS' MOTIONS FOR ENTRY OF JUDGMENT OF ACQUITTAL AND FOR A NEW TRIAL

The United States of America, by its attorneys, William M. McSwain, United States Attorney for the Eastern District of Pennsylvania, and Anthony J. Wzorek and Michelle L. Morgan, Assistant United States Attorneys for the District, hereby responds to the defendants' motions for judgment of acquittal and for a new trial.

**The Motions**

Defendant Pawlowski argues that there is insufficient evidence to support the jury's verdict on any of the convicted counts.

Defendant Allinson claims that the government failed to prove each element of the convicted counts, made improper remarks in its closing argument, and constructively amended convicted Count 19. Allinson also submits that the interests of justice require that the motion for a new trial be granted.

2

**Standards of Review**

        Federal Rule of Criminal Procedure 29 provides that the district court, upon the motion of a defendant or upon its own motion, shall enter a judgment of acquittal if "the evidence is insufficient to sustain a conviction." Fed.R.Crim.P. 29(a). In ruling on a Rule 29 motion, the district court must determine whether any rational trier of fact could have found proof of the defendant's guilt beyond a reasonable doubt based upon the available evidence presented at trial. United States v. Smith, 294 F.3d 473, 478 (3d Cir. 2002), citing Jackson v. Virginia, 443 U.S. 307, 319 (1979).[1]

        The United States Court of Appeals for the Third Circuit has cautioned, however, that the district court "be ever vigilant in the context of ... [a Rule 29 motion] not to usurp the role of the jury by weighing credibility and assigning weight to the evidence, or by substituting its judgment for that of the jury." United States v. Flores, 454 F.3d 149, 154 (3d Cir. 2006); United States v. Boria, 593 F.3d 476, 480 (3d Cir. 2010). The trial court must view the evidence as a whole, and in the light most favorable to the government. United States v. Hoffecker, 530 F.3d 137, 146 (3d Cir. 2008). The government is further entitled to "the benefit of inferences that may be drawn from the evidence[,] and the evidence may be considered probative even if it is circumstantial." United States v. Patrick, 985 F.Supp. 543, 548 (E.D.Pa.1997), citing United States v. Pecora, 798 F.2d 614, 618 (3d Cir. 1986); see also United States v. Griffith, 17 F.3d 865, 872 (3d Cir. 1994).

        The proponent of a Rule 29 motion, therefore, bears a heavy burden to prove that the evidence presented by the government during trial was insufficient to support the verdict.  See United

---

[1]     The government incorporates all its arguments from the original Rule 29 hearing on February 26, 2018.

States v. Gonzalez, 918 F.2d 1129, 1132 (3d Cir. 1990). In fact, the Third Circuit has held that acquittal should "be confined to cases where the prosecution's failure is clear." Smith, 294 F.3d at 477 quoting United States v. Leon, 739 F.2d 885, 891 (3d Cir.1984). "The evidence need not unequivocally point to the defendant's guilt as long as it permits the jury to find the defendant guilty beyond a reasonable doubt." United States v. Pungitore, 910 F.2d 1084, 1129 (3d Cir.1990). Accordingly, "[a] verdict will be overruled only if no reasonable juror could accept the evidence as sufficient to support the conclusion of the defendant's guilt beyond a reasonable doubt." United States v. Salmon, 944 F.2d 1106, 1113 (3d Cir. 1991); United States v. Richardson, 658 F.3d 333, 337 (3d Cir. 2011); United States v. Starnes, 583 F.3d 196, 206 (3d Cir. 2009); United States v. Coleman, 811 F.2d 804, 807 (3d Cir. 1987).

Pursuant to Federal Rule of Criminal Procedure 33, a court may grant a new trial "if the interest of justice so requires." Fed.R.Crim.P. 33(a). A district court may, in its discretion, "grant a defendant a new trial only if it finds that 'there is a serious danger that a miscarriage of justice has occurred-that is, that an innocent person has been convicted.' " United States v. Rich, 326 F.Supp.2d 670, 673 (E.D.Pa. 2004)  (quoting United States v. Johnson, 302 F.3d 139, 150 (3d Cir. 2002)). Where multiple errors are alleged, a new trial may be granted only where the errors, "'when combined, so infected the jury's deliberations that they had a substantial influence on the outcome of the trial.' "United States v. Copple, 24 F.3d 535, 547 n. 17 (3d Cir. 1994)  (quoting United States v. Thornton, 1 F.3d 149, 156 (3d Cir. 1993)). Consequently, harmless errors that do not deprive the defendant of a fair trial are not a basis for granting a defendant's Rule 33 motion. See id. Although this standard is broader than the standard for acquittal under Rule 29, motions for a new trial are disfavored and "only granted with great

caution and at the discretion of the trial court." United States v. Martinez, 69 F. App'x. 513, 516 (3d Cir. 2003).

The trial testimony supporting each of the elements of each count, which must be considered in the light most favorable to the government, is set forth below. The testimony of the two main cooperators, Sam Ruchlewicz and Francis Dougherty, provided an overview of the overall conspiracy and spanned multiple schemes.

**Sam Ruchlewicz**[2] testified that he worked for Michael Fleck from January 2012 until July 5, 2015. (148)   He was first hired as a project manager/business development person. (150)  Fleck consulting had a business development side, Hamilton Development, and a political side, H Street Strategies. (154, 156-57)  Ruchlewicz saw a built-in conflict in Fleck Consulting because the political clients would often wish to raise money from the business clients and the business clients wished to obtain contracts from the political clients. (154-55)

Defendant Edwin Pawlowski, who was a client, was incredibly close to Mike Fleck. They spoke frequently and socialized together, including on vacation and on holidays. (156)  Fleck was Pawlowski's campaign manager. (159)  Ruchlewicz often acted as Pawlowski's driver when going to events. (160)  He, along with Pawlowski, would do "call time," calling up and requesting money from potential contributors. (161)  Ruchlewicz acted as the go-between between the Mayor and donors and vendors who supported the Mayor, acting as a buffer and providing a layer of separation. (162)  Clients of Hamilton Development included TEN, Northeast Revenue, and Spillman Farmer.(164)  By late 2013

---

[2]      Ruchlewicz testified on February 1, 2018, February 5, 2018, February 6, 2015, and February 8, 2015. All citations are from the transcripts for those dates.

to 2014, Mayor Pawlowski provided Fleck and Ruchlewicz with additional access to City Hall, giving him the ability to meet with various city officials to facilitate and manage the awarding of contracts to Hamilton Development clients. (165)  If they were "stonewalled," he or Fleck could call Pawlowski or Fran Dougherty and the problem would go away. (165)   Ruchlewicz described Pawlowski as a micromanager (166), including constantly checking with Fleck on contracts and the status of donors. (166)

To solicit campaign contributions, lists of individuals who currently had a contract with the city were obtained by the Mayor. (167)  The lists, including lists for law firms and engineering firms, were used to identify who should be called and how much money they would be expected to give. (167)  Pawlowski saw these lists, used these lists, (12, SR #390; SR #386a, 14)) and provided these lists on several occasions. (168)  In cases where people on these lists did not give money, Pawlowski escalated pressure on those individuals either personally or by directing Fleck and Ruchlewicz to do so. Pawlowski used phrases like "beat them up," "yell at them," to convey his wishes to Fleck and Ruchlewcz. In instances where contributors did not follow through and did not succumb to that pressure, they were not awarded contracts, or Pawlowski threatened to withhold future contracts from them. (235)

Pawlowski was paranoid about security, having his own office swept for bugs, encouraging Fleck to get his office swept, and using burner phones. (168)  The Mayor was most candid in talking to Ruchlewicz in person, and in places like an elevator or a restroom, where he felt that he could not be recorded. (169)

When Pawlowski decided to run for the Senate, he was very focused on raising as much money as possible. He set a goal of raising a million dollars by the end of June 30, 2015 (171), believing

6

that a large amount of money would discourage other candidates from entering the race and would establish himself as the prohibitive frontrunner. (172)

Ruchlewicz admitted being involved in exchanging political contributions for contracts. (182)  For example, Ruchlewicz said that Northeast Revenue was Pawlowski's favorite for the city contract to collect delinquent real estate taxes, and Pawlowski made that clear to people in the administration. (189-90)  Pawlowski considered Sean Kilkenny, an attorney at Friedman Schuman, associated with Northeast, as an important person in Montgomery County politics. (190)  This contract was being bid on at the same time that Pawlowski was contemplating running for Governor. (191)  Ruchlewicz approached Kilkenny for tickets to the Philadelphia Eagles playoff game after Fleck told him that the Mayor wanted tickets for the game. (191)  Kilkenny did provide tickets for the game and the Mayor and Ruchlewicz went to dinner with Kilkenny and John Rogers of Northeast Revenue at Del Frisco's Steakhouse before the game. (193-94; MF #2304, Exhibit A-19)  After the contract was awarded to Northeast in January 2014, on June 3, 2015, Ruchlewicz told Pawlowski that Northeast was dragging its feet in getting checks together, and Pawlowski told Ruchlewicz to ask Northeast for $20,000. (197)

The Mayor had other preferred vendors for specific contracts.  Matt McTish was a preferred vendor for the Mayor because he donated to almost every event that Pawlowski ran. (200)  The Mayor also favored Spillman Farmer for the design of the city pools contract. (208)  The Mayor hoped to secure donations from Spillman Farmer. (208)  The Mayor also favored The Efficiency Network (TEN)  for the city's Streetlights Contract, and he, Ruchlewicz, Fleck and Dougherty were aware of the fact that James Hickey, a consultant to TEN, authored an RFQ and an RFP that would favor TEN.  (211)

7

Patrick Regan and Troy Geanopulos of TEN were well-connected and politically influential in Pittsburgh and both had donated to Pawlowski's campaign in the past. (211)  When Pawlowski met with Patrick Regan on January 28, 2015 at Billy's Diner, they discussed the contract and then the Mayor left. But the Mayor or Fleck previously had told Ruchlewicz how much of a donation he should seek from Regan after the Mayor left the meeting. (214-16)  The Mayor was hoping that real-estate developer Jack Rosen would raise a significant amount of money for him, (234) and efforts were made to find a city contract for Rosen. Fran Dougherty told Ruchlewicz that the Mayor had instructed him to find a contract for Rosen's company, CIIBER. (235)

**Francis Dougherty**[3] also testified regarding the overall conspiracy and multiple schemes.  He testified that he was appointed managing director in Allentown by Mayor Pawlowski in 2006, and again in 2012, after he had left Allentown and worked for the Philadelphia School District. (36-37)  He resigned as managing director in Allentown in May 2016. (38)  He pled guilty to conspiracy to commit mail and wire fraud in relationship to the Allentown Streetlights Contract. (47)  As managing director, he worked closely with the Mayor. (39)

When Pawlowski ran for governor, Pawlowski traveled across the state trying to get local endorsements. When he ran for the U.S. Senate, he spent his time identifying ways and means of getting campaign contributions because money, rather than endorsements, was the real key to victory. (42)  The Mayor told his staff that he needed to raise "globs of money."  (43)

---

[3]     Dougherty testified on January 23, 2018, January 24, 2018, and January 25, 2018. All citations are from the transcripts for those dates.

8

Dougherty corroborated Ruchlewicz's testimony about Pawlowski's paranoia. According to Doughtery, the Mayor requested, and Dougherty provided, two security sweeps, looking for electronic eavesdropping devices, of the executive suite at City Hall, one in the early part of the gubernatorial run, and one during the Senate run. (45)

Dougherty also corroborated Ruchlewicz regarding the vendor lists. Pawlowski requested lists of law firms and engineering firms and the money spent by the City for work done by each since 2006. (49-55, Exhibits I-1, I-2, and I-11, SR #386a, SR #390) Pawlowski said that he would use those lists to solicit campaign contributions. (53) Pawlowski also asked for a list of all purchase orders over $10,000 for the City of Allentown between 2006 and 2015. (56, I-3, SR #35) Dougherty said that he recognized the conflict of Mike Fleck representing the Mayor as a political consultant and also representing companies that wanted to do business with the city. (74) He told the Mayor how he felt about this conflict, but in the Mayor's mind, he needed Mike Fleck. (74) The Mayor said that when Mike or Sam had a request for information, to treat it as if it was coming directly from the Mayor. (77)

The Mayor's intention to raise campaign contributions in exchange for city contracts was manifested itself in several schemes. The Street Lights Contract was worth approximately $3,000,000. The Mayor wanted <u>TEN</u> to win this contract. (79) The RFQ and RFP process was supposed to be confidential. (82) There were criteria in both RFQs and RFPs by which responses would be evaluated. (83) None of the criteria included how much money a person was willing to contribute to the Mayor. (83) If the contract was fixed as to who would be the winner, other bidding companies would lose money based upon the representations of the city that the process would be fair. (85) Dougherty said that the playing field in the Street Lights Contract was not fair, and that he misbalanced that playing

9

field at the Mayor's behest, (85) because this was a critically important contract for his political future. (86)  Dougherty received a thumb drive containing language favorable to TEN, (85-86) gave it to the Public Works Director, and said to use this language. (87)  The idea was that by including this language, TEN would win the contract. (88)  The Mayor wanted continuing updates concerning the contracting process. (87)  When Public Works did not include all the language that James Hickey and TEN wanted in the RFQ, Hickey and Ruchlewicz wanted to know what had happened. (89)  When Dougherty talked to the Mayor, he already knew about the problem and asked whom he needed to fire over this and told Dougherty to look into it. (89)  Dougherty sent an e-mail to Public Works Director Messinger asking him whom he had to fire. (90)   Subsequently, Dougherty received a phone call that informed him that TEN had failed to submit their RFQ before the deadline. (90)  Dougherty allowed TEN's RFQ to be filed late. (91)  TEN and Johnson Controls were short-listed as the two finalists to submit RFPs. Dougherty sent the RFP to TEN to give them a competitive edge at the request of Fleck, Ruchlewicz, Hickey, and Pawlowski. (92)  Pawlowski told Dougherty that once TEN got the contract, he expected that there would be a major fundraiser for him in Pittsburgh. (93)  TEN won the contract. After the City Hall search by the FBI, Pawlowski denied knowing anything about this contract to Dougherty. (94)

The CIIBER contract was perhaps only second to the TEN contract in importance to the Mayor and his political team. The Mayor wanted to get Jack Rosen, an extremely wealthy developer in New York, a contract. (144-45)  Ciiber marketed themselves as a cyber security company. Dougherty's task from the Mayor was to find work for Ciiber. (147)  The Mayor told Dougherty that it was critically important to his political future to get Rosen a contract so that Rosen would be an advocate of his and raise money in New York. (148-49)  Both the Mayor and Ruchlewicz originally said that they wanted a

10

$100,000 contract for Rosen's company. (149)  Because such a contract would have to be competitively bid under procurement thresholds, Dougherty and Leibert consequently structured the contract in phases, with the first phase being under $40,000. (149)  Future phases would have followed. (149)  The Mayor was elated after a contract was found for Rosen. (151)  After Allentown City Hall was searched by the FBI, the Ciiber contract was cancelled. (152)  After the search of City Hall, he believes that a list of companies and contracts was issued by the Solicitors Office, asking for applicable documents. After the search and the request for documents, Mayor Pawlowski never raised the Ciiber contract again as far as Dougherty could remember. (153)  He identified some of his handwritten notes related to the Ciiber contract. Exhibit I-7 said Rosen, get something, (30 to 65)  Exhibit I-8 stated Matt (Leibert)  5C, good to go. He also identified his voice on SR #11173 telling Sam Ruchlewicz that the Mayor instructed him to give a city job to Rosen. (158-160)

        The Mayor wanted Northeast Revenue to win the Delinquent Tax Collection contract. (161)  Northeast Revenue was an important company because Sean Kilkenny was associated with it, and he was considered the heir apparent to Marcel Groen, the then head of the Democratic Party in Montgomery County. Montgomery County was always considered critically important to statewide or national ambitions. (161-62)  When the Mayor had become aware that the evaluation committee was not originally choosing Northeast Revenue as the winner of the contract, he told Gary Strathearn, the Finance Director at the time, to fix it. (167)  Dale Wiles remained on the evaluation committee. The Mayor had talked about replacing Dale Wiles in 2013 because he was not happy with Wiles' job performance, but after the Evaluation Committee made its decision favoring Northeast Revenue in January/February 2014, the Mayor said that Wiles was a member of the team. (167)  One of the

11

Evaluation Score Sheets was changed  to get Northeast Revenue to win the contract. (172)  Any company that would have relied upon the representations as to qualifications that the city of Allentown put in the RFP, for both the Delinquent Tax Contract and the Street Lights Contract, would have been fooled. (169)

As to the contract to design the city's pools, the Mayor told Dougherty that it would be great to get Spillman Farmer some of the pool work. The Mayor said that they would be campaign contributors. (177)  Dougherty said that he told Rick Holtzman, who was the head of the Pools RFP Evaluation Committee, that the Mayor wanted Spillman Farmer to get the architectural design part of the contract. (178)  During the evaluation process of Spillman Farmer, Dougherty told the Mayor that Spillman had been trashed by a reference and the Mayor told Dougherty to talk to Ruchlewicz, and .Ruchlewicz provided Dougherty with another name. (180-181, SR #354)  Dougherty said that he normally does not get involved in the RFP process, so his actions in the Street Lights Contract and in the Pools Contract was highly unusual. (181)   No preferential treatment was given to other companies also bidding on this contract. (181)  The other competitors for the Pools contract did not know that the competition for this contract was not fair and honest. (184)

As to the inspection of 1324 North Sherman Street, a major contributor to the Mayor named Ramzi Haddad needed a certificate of occupancy, (193) and Dougherty went to Dave Paulus, the head of the city's codes department, and asked if Dave could expedite the inspections. In Mr. Paulus's updates on the inspection, he included the Mayor on some of the emails. (197-201, Exhibits C-2, C-3, C-4,)

The Mayor openly expressed dissatisfaction with a number of individuals and firms that he did not believe were being supportive enough of his campaign, and threatened to withhold or give work to them on the basis of their contributions.  Pawlowski told Dougherty that because attorney Ken Jarin was not giving enough money, he was not going to get any more labor work. (204, MF #13297) Pawlowski also told Dougherty that the law firm of <u>Stevens and Lee</u> was out of favor because they weren't giving him money towards what he asked for. (207)   Pawlowski also asked Dougherty to reach out to the law firm of <u>Norris McLaughlin</u> as to possible legal work with the Trexler Trust. (209-10) Sam Ruchlewicz asked Dougherty to talk to Susan Wild and tell her that all legal work to the law firm of Norris McLaughlin had to be funneled through Scott Allinson. (210)  Perhaps one to two weeks before the FBI search of City Hall, Dougherty spoke to Mary Ellen Koval who had heard that Fleck and Ruchlewicz were cooperating with the FBI and wearing wires. (211, 261)  Dougherty did not tell the Mayor until the morning of July 2, 2015.

Other witnesses who testified about multiple schemes included:

**<u>Mark Geosits</u>**[4] testified that he currently is the acting city engineer. He was on the Streetlights RFP evaluation committee along with Craig Messinger, Nelson Varughese and Jenny McKenna. Prior to his involvement with the committee, a request for qualifications had been prepared. (152)   He learned about the history concerning the preparation of the RFQ later on. He was not aware at the time of the reviewing of the RFQs that TEN had not filed their RFQ on time. (154)

---

[4]      Geosits testified on January 30, 2018.  All citations are to that day's transcript.

He was also on the Basin Street RFP evaluation committee with Craig Messinger and Richard Young. Geosits scored Michael Baker Engineering one point higher than McTish Kunkel. He said that Young thought that it was "time to give someone else a chance." Geosits testified that he then reviewed the scoring and determined that McTish's proposal was better than Michael Bakers'. (174-185) He was told that the administration favored McTish Kunkel for this contract and thought that relaying this information to him was inappropriate. (226-27)

Geosits was also on the Pools RFP evaluation committee along with Rick Holtzman, Michelle McGinnis, and Christy Alvord. After the initial technical review, he had the companies scored as MKSD first, Integrated Aquatics second, and Spillman Farmer third. (186-87, Exhibit E-14)  Three companies were then interviewed: Integrated Aquatics, Spillman Farmer, and MKSD. (186)   After the interviews, Geosits ranked Integrated Aquatics first. (194)  He did not hear about a negative reference for Spillman Farmer. (195)  Although he heard that the administration favored Spillman Farmer, he testified that that did not have any influence on him. (202)  Spillman Farmer got the contract. (196)

**Beth Ann Strohl**[5] testified that she worked as the purchasing agent for the city of Allentown from August 2014 until October 2017. (89)  Contracts valued at over $40,000 required a request for proposal (RFP)  (90)  Bidders submit a technical proposal and a cost proposal. Evaluations first are made based upon the technical component. The lowest cost proposal does not always win. (92) Evaluation committees ultimately recommend the contract winner, and the purchasing office formally awards the contract. Both rejection letters and award letters are typically mailed. (93)  Proposals are

---

[5]     Strohl testified on January 29, 2018. All citations are to the transcript from that date.

confidential and not generally shared from one bidder to another. (93)  Evaluation committees should not be sharing information with the managing director or the Mayor. (93)  An RFQ or request for qualifications is a precursor to an RFP, used when you want to prequalify someone before they actually submit a proposal. (95)   The city should not accept draft RFPs or RFQs from prospective bidders. (96)

For the Street Lights RFQ, Strohl had some revisions that she wished to make to the RFQ, but was told by Fran Dougherty not to make any substantive changes to the language. (98)  This had never happened before. (98)  When the RFQs were due, TEN failed to submit on time. (99-100) When TEN's submission failed to appear, Craig Messinger left her office and shortly thereafter, Fran Dougherty told her to accept two submissions, including TEN's, past the deadline. (100)  In the past, the deadline had always been a firm, with nothing accepted late. (100-01)   She did not feel that the process was fair as a result of accepting the submissions past the deadline. (101)

As to the Delinquent Tax Collection Contract RFP, she discussed the procedure with Dale Wiles and she believed that Wiles was being told to do things that he was not comfortable doing with the score sheets. (103)  She identified a note that she put on her file stating, "Per conversation with Gary and Fran Dougherty, award to Northeast." (104, Exhibit A-15)  This conversation would have been with Barbara Molitoris. (121)  Such directions from a department director or the managing director, when they were not on the evaluation committee, were unusual. (105)

She also identified an email sent to her by Spillman Farmer on June 29, 2015 indicating that they knew of the award of the pools contract to them. (106, Exhibit E-33)

Additionally, Purchasing was never involved in the award of the CIIBER contract. (107)

In approximately April 2015, Fran Dougherty asked her for a list of vendors with the city, specifically law firms and consulting or engineering firms, and the total amounts of money the city had paid them. (108) She assisted in preparing spreadsheets of that information and sent them to Dougherty. (108, Exhibit I-1)

16

### A.    Stevens and Lee (S&L)

**Count 1 (Conspiracy)**

**Count 11 (Bribery)  (Saidel—from 03/12/15 to 03/27/15)**

**Count 12 (Hobbs Act Extortion)  (Saidel—from 03/12/15 to 03/27/15)**

**Count 13 (Bribery)(Wieand and Stevens and Lee- 06/08/15)**

**Count 14 (Hobbs Act Extortion)(Wieand and Stevens and Lee- 06/08/15)**

**Summary**

Defendant Pawlowski makes a clear connection here between work and political contributions to Jonathan Saidel in his meeting with Saidel on March 12, 2015, and in a Pawlowski directed telephone call to Saidel by Ruchlewicz on March 27, 2015.  The connection between the city of Allentown work and campaign contributions was so explicit during the March 12, 2015 meeting that Saidel said that "It shocked me that he --- it was blatant, amateurish, and shocking all at the ---and sad all at the same time . . ." The telephone call to Saidel, suggested by Pawlowski to Ruchlewicz on March 27, 2015, confirmed the fact that Pawlowski expected at least $2,500 from Stevens and Lee to get them back in his good graces.

Defendant Pawlowski also made the connection between work and campaign contributions clear to Donald Wieand of Stevens and Lee. In his call to Wieand on June 8, 2015, Pawlowski told Wieand that he would be receiving a phone call from Solicitor Susan Wild before then asking Wieand for a campaign contribution. This reference to Wild was significant because when Wieand had met Pawlowski in January to request additional city work for Stevens and Lee, Pawlowski had told Wieand to get in touch with Susan Wild. As Wieand testified, he knew that if he said no to the

17

contribution request, he would never get a phone call from Susan Wild. As he further thought about the phone call he feared that he was stuck in a pay-to-play situation.

**Evidence of Explicit *Quid Pro Quo***

**Donald Wieand**[6] testified that that he is presently employed by the law firm of Stevens and Lee (S&L), (93), a firm with offices in Pennsylvania, Delaware, and New York. (96)  He had handled almost all civil rights cases for the City of Allentown in the early 2000's until 2008, (95) when the City contracted with Scottsdale Insurance to handle the civil rights cases. Wieand continued to handle cases that occurred before 2008, but that work ended by approximately 2012-2013. (97)  Wieand had handled approximately 45 to 50 cases for the city and had never lost a single case. (98)  Wieand identified a check from February 28, 2009. He said that while attending a petition signing party, he talked to Pawlowski, who asked him if Stevens and Lee would agree to be a sponsor for his fundraiser for his election committee. Wieand agreed to do so and testified that he had some concerns that if he said no, it probably would not help his relationship with the city. (100-01)

Weiand described Pawlowski as doing a good job but also being the most aggressive fundraiser that he's ever seen in the Lehigh Valley. (101)  Fundraising for Pawlowski was "just never-ending---the sort of a relentless fundraising machine that he was trying to put together." (101-02)

On January 15, 2015, Wieand had lunch with Pawlowski at the Roar Restaurant in Allentown. Wieand's purpose for setting up the lunch was to ask Pawlowski for some work for S&L. (114)  During this meeting, Pawlowski became angry when Wieand said that S&L was doing work in Reading. Pawlowski complained that S&L had thrown him under the bus. (115, 123)  Wieand said that

---

[6]       Wieand testified on January 22, 2018.  All citations are to the transcript from that date.

18

the atmosphere was so bad after this part of the conversation that he hesitated to even ask about getting

work with the City, but he asked anyway. (116)  He said that Pawlowski told him to call Solicitor Susan

Wild about getting legal work. (124)  After the meeting, no additional work came his way.

On or about June 8, 2015, Pawlowski surprised Wieand with a phone call from a

telephone number that Wieand did not recognize. He at first did not recognize Pawlowski's voice due to

the poor quality of the phone or the connection. Pawlowski started off by telling Wieand that he would

be getting a call from Susan Wild. Wieand's first reaction was that that was a good thing and that he

would be getting some legal work from the city. (129)  Wieand said that when Pawlowski then talked

about his Senate campaign and asked Wieand to contribute $1,000, he realized that there were strings

attached. Wieand agreed to contribute. He testified that he knew that if he said no, he would never get

that call from Susan Wild. (130)  After hanging up, Wieand said he became angry. He didn't believe that

Pawlowski would ever really come through with future legal work, and believed that Pawlowski was

just playing him. After he cooled off, he then thought that if Susan Wild called him with work, he was in

the middle of a pay to play situation, and he did not want any part of that. (131-32)  Wieand never sent a

check to Pawlowski despite an email from Lisa Rossi on June 8, 2015 requesting the $1,000

contribution. (132-33, 175, Exhibit F-7)  After the search of City Hall, Wieand heard nothing from

Pawlowski. (134)

**Jonathan Saidel**[7] testified that he is an attorney presently employed at the Rosen firm.

(195)  He has known Pawlowski since meeting him shortly after Pawlowski was elected Mayor of

---

[7]      Saidel testified on January 22, 2018 and January 23, 2018.  All citations are to the transcripts
from those dates.

Allentown for the first time. (186-87)  To get an appointment with Pawlowski, you had to go through

Sam Ruchlewicz or Mike Fleck. (188)  Ruchlewicz and Fleck were almost like an extension of the

government. (188)  Saidel said that this arrangement was unusual as his experience has been that after

election a chief of staff or an appointments secretary was usually used to arrange a meeting. (188)

On February 10, 2015, Ruchlewicz told Pawlowski that he had complained to Jonathan

Saidel about S&L sending a $100 check to Pawlowski and Pawlowski said that "it's like a slap in the

face."  Pawlowski told Ruchlewicz about his confrontation with Wieand at their luncheon meeting and

about Wieand's request for more City work. Pawlowski said that they (S&L)  really needed to make up

and not by just inviting him to some "crappy Pennsylvania Society dinner." Pawlowski also opined that

Saidel lied to him all the time, but that you just "kind of like him" because "he lies to you oh so well."

Ruchlewicz said that he is going to send out Mardi Gras invitations and Pawlowski said that "here's a

way for Stevens and Lee to show that they actually love me." When Ruchlewicz suggested $5,000,

Pawlowski said at the very least. "I gave them millions of dollars' worth of legal work and they treated

me like absolute crap." (204, SR #315f)

On March 12, 2015, Saidel, then of counsel to Stevens and Lee, met with Pawlowski in

order to convince Pawlowski to give some work to S&L. (191)  Saidel testified that, at this meeting,

Pawlowski linked campaign contributions by S&L with potential work that the firm would get from the

City.  Saidel said that it shocked him that Pawlowski combined them in the same paragraph. "It shocked

me that he --- it was blatant, amateurish, and shocking all at the ---and sad all at the same time . . ."

(193)

20

During the meeting, Pawlowski first complained to Saidel that S&L had been involved in a press release critical of him issued by the Reading City Council (concerning the Allentown water lease).  Saidel attempted to explain that S&L had nothing to do with what happened in Reading and told the Mayor that S&L wanted to be his close friends. (195, SR #347c)  Pawlowski complained that he had given S&L $1,000,000 of work in the past, that S&L ran over him with a bus, and that they only gave him a $25 contribution the last time he had a fundraiser. (191, 194)   Pawlowski also said that Stevens and Lee did good work. (194)

Pawlowski then said "I've asked them many times, you know, to help in other ways, and they turn around and give me a hundred bucks." Saidel said "I will tell you that life is a two way street, which you and I both understand."  Pawlowski, laughing, said "I understand, you guys are Republicans, but you know like when I asked you for City Council candidates and stuff and you turn around and give me a hundred bucks, kind of pissed me off." Saidel responded, "I can only tell you to think about that and I'm sure that they're wanna be helpful in Allentown, okay?" Pawlowski told Saidel that (Wieand) has done a good job and that he had no problem with him. He continued to say how angry he was with the press release. Pawlowski then said that he was willing to reconsider. (SR #347c)  Saidel said that when Pawlowski said that he would reconsider, it meant to him that if Stevens and Lee played ball with him, they would get additional work. (201)

After the meeting was over, as Pawlowski and Ruchlewicz were going down in the elevator, Pawlowski said to Ruchlewicz that he "probably shouldn't have said about the donation thing there. You don't know who is recording. It's true . . . every time I ask them for anything, they give like a dollar." (SR #347c)

Saidel stated that after the meeting, he did not tell Stevens and Lee about the request for money from Pawlowski, because he didn't want to be part of a *quid pro quo*. "They obviously had a relationship with the City of Allentown and were doing good work, and I didn't want to tell them that for them to continue, they have to give him money, which is, I assume was why, later on, I got that call from Sam Ruchlewicz that they gave a small amount of a contribution a number of weeks later." (202-03)

On March 27, 2015, Ruchlewicz told Pawlowski that Don Wieand gave a check for $25 at a recent event for Pawlowski's council candidates. Pawlowski suggested that they let Saidel know about that. Ruchlewicz left a message for Saidel to call him. Ruchlewicz said to Pawlowski that he took it that $25 would not be enough to endear S&L to Pawlowski, who replied, "If he helped them out with $2,500 it would have been a totally different story." About five minutes later, Saidel returned the call and Ruchlewicz put him on the speaker phone but Pawlowski was not acknowledged, nor did he take part in the conversation. Ruchlewicz told Saidel about the $25 check from Wieand and said "they're trying to be nicer to us, you know, a little nicer could be helpful." When Saidel said that guys from Reading think that $25 is big money, Ruchlewicz said that 25 is a great number with two zeros behind it. (203, SR #362b)

On June 15, 2015, in a recorded conversation between Michael Fleck and Pawlowski, they first discussed Jonathan Saidel approaching Fleck at Ruchlewicz' wedding and asking when Stevens and Lee was going to get work from the City. Pawlowski said that he thinks that they will give him some work in the future, but "if he can help us, that would be great." Fleck and Pawlowski agreed that Saidel never follows through on his promises to help Pawlowski. Fleck suggested saying to Saidel:

22

"So, do you think, if, you know, Stevens and Lee, you know, would like to get back in the good graces with the Mayor, this shouldn't be a heavy lift for you to put together twenty-five to fifty thousand dollars." Pawlowski said "Yeah. He's always been a cheerleader. He's always been there, but he never actually gives me any money. . . I mean, it's like, he's always been a nice guy to us but like what has he done?" When Fleck asked Pawlowski if anyone had told Stevens and Lee that they were going to get work, Pawlowski responded no and said laughing that "the way my system works, nothing's gonna happen until the 30th." When Fleck inquired whether Saidel knew Susan Wild and whether Saidel might be going behind Pawlowski's back to get work, Pawlowski said that Susan Wild had no clue. (203, MF #87)

### B.        Northeast Revenue Services (Northeast)

**Count 1: (Conspiracy)**

**Count 4: (Bribery)(Sean Kilkenny & Friedman Schuman, 12/18/13)**

**Count 5: (Bribery)(Sean Kilkenny &Friedman Schuman, 01/04/14)**

**Count 20: (Mail Fraud)(Portnoff Law Associates, 01/30/14)**

**Count 21: (Mail Fraud)(Linebarger, 01/30/14)**

**Count 22: (Mail Fraud)(01/30/14)**

**Count 29: (Wire Fraud)(Portnoff Law Associates, 12/06/13)**

**Count 30: (Wire Fraud)(Linebarger, 12/06/13)**

**Summary**

While the RFP for this delinquent real estate tax contract was pending, defendant Pawlowski requested a campaign contribution from Sean Kilkenny on or about December 18, 2013, approximately one week after he had made a similar request of Michelle Portnoff, another bidder on the contract, and been told by Portnoff that she did not think that the request was appropriate since the RFP was pending. As Kilkenny testified, he felt pressure to contribute to Pawlowski's gubernatorial campaign after the conversation with the Mayor. Pawlowski had complained to Kilkenny in the past that Michelle Portnoff had done nothing for him. Also while the RFP was pending, Pawlowski, through Ruchlewicz, asked Kilkenny and Northeast for tickets to the Philadelphia Eagles playoff game on January 4, 2014, and ate a meal at DelFrisco's Steakhouse on that same date paid for by Northeast. At that meal, Ruchlewicz, in the Mayor's presence, told Kilkenny that Northeast's proposal looked good.

24

Kilkenny said that he felt so uncomfortable about the cost of the dinner and Eagles tickets that he e-mailed Ruchlewicz shortly afterwards reminding him that the cost should be reported on Pawlowski's campaign finance report.

Pawlowski also made it clear to Michael Fleck and Gary Strathearn that he wanted Northeast Revenue to win this contract. The subsequent actions of Strathearn to assure that Northeast Revenue was awarded the contract made it clear that the qualifications and evaluation procedures outlined in the city's RFP were ignored and that the other competitors, Linebarger and Portnoff, were defrauded by the rigged process followed here.

**<u>Evidence</u>**

The RFP in this case, RFP 2013-33, (Exhibit A-4)  stated:

1.      That proposals will be handled confidentially by the City during the pre-award process;

2.       that the award will be made to that responsive and responsible proposer whose proposal, conforming to specifications, will be most advantageous to the City; price and other factors considered, such as delivery time, quality, service, etc.  The award may or not be made to the firm with the lowest cost;

3.      Under the title "Evaluation and Award Criteria" the RFP states that "In general, proposals will be evaluated in terms of the firm's ability to meet RFP requirements; the qualifications of the specified persons who would be performing the requested services; and the prior experience and reputation of the firm in similar projects. The award may or may not be made to the lowest cost proposal.

25

      **Michelle Portnoff**[8] testified that she is the owner of Portnoff Law Associates. (PLA) (124)  Between 2001 and 2014, excepting 2002, PLA had a contract with the city of Allentown to collect unpaid real estate taxes and certain municipal claims. (124, 127)  PLA  received a letter on November 12, 2013 from the City stating that Portnoff's contract with the City would not be renewed as of December 21, 2013. (129, Exhibit A-3)  Two years previously, PLA had received a similar non-renewal letter, but after a meeting with the city, the contract ultimately was renewed. (130-31, Exhibit A-2) Portnoff received notice that the city was going to issue an RFP for this contract, for the first time in the approximate fifteen years of the contract, and they responded to the RFP (136-37, Exhibit A-4), expending approximately eight hours in preparation time to answer the RFP, costing them approximately $2,000. The city sent PLA an addendum to the RFP by e-mail (139, Exhibit A-5) Portnoff responded to the RFP on December 12, 2013 (141, Exhibit A-7)

      Shortly before she submitted her proposal, Pawlowski called her and, when they talked, asked her for a contribution to his campaign. She refused to make a contribution because the RFP was pending and she thought that it was inappropriate to have such a discussion (141-42, Exhibit A-6) Portnoff was concerned that by refusing to give a contribution, her firm might not get the contract. (143) PLA did not get the contract. (146)   She identified Exhibit A-10 as the January 30, 2014 notification letter that the contract had been awarded to Northeast Revenue Services, "based upon their proposal." (146-47)

---

[8]     Portnoff testified on January 25, 2018. All citations are to the transcript from that date.

Case 5:17-cr-00390-JS   Document 196   Filed 06/01/18   Page 27 of 113

**Garret Stratliearn**[9] testified that he was the Allentown Finance Director for about five years until he was asked to leave by the Mayor in May 2015. (167)  When he was questioned by the FBI in May 2014 and August 2015, he was not truthful about his involvement in the awarding of a contract to Northeast Revenue. (168-169)  When he testified before the grand jury in September 2015, he again was not truthful. (170)   After obtaining an attorney, he testified a second time before the grand jury and testified truthfully. (171)  He subsequently pled guilty and is awaiting sentencing.

Stratliearn testified that he returned from sick leave in January 2014, at which time an RFP was open for the collection of delinquent real estate taxes. (173)  He was told by the Mayor that he wanted Northeast to win the Delinquent Tax Collection Contract because they were important to him. (174)

The original evaluation committee for the RFP was composed of Dale Wiles, Debra Bowman, and Karen Csanadi. (175)  The Committee was about to recommend Linebarger as the winner to Allentown's purchasing agent when Stratliearn became involved. He replaced Debra Bowman, who was his deputy, and told Wiles that they should reach out to references.  (177)   He told Wiles that they needed to change the score sheet. (178)  Stratliearn told Wiles that "the boss needs this, this is what he wants." (179)  On January 7, 2014, Mike Fleck told Stratliearn that the Mayor wanted Northeast to win the contract. (182, MF #2552)  In a conversation on January 8, 2014, he confirmed that Linebarger was the choice by the Evaluation Committee and that he was planning to join the committee. (183, MF #2632)  Stratliearn checked the references for Northeast Revenue and embellished the references. (185) He spoke to Mike Fleck on January 30, 2014 about obtaining a Spanish-speaking component for

---

[9]        Stratliearn testified on January 25, 2018. All citations are to the transcript from that date.

27

Northeast Revenue, which was required by the RFP. (186-87, MF #4427)  Fleck provided him with the name Ed Diaz that Strathearn could place on the evaluation sheet. (187-188)  As a result, Strathearn gave Northeast an additional 1.5 points, and scored Northeast higher than Linebarger. (188)  Northeast was awarded the contract. (190)

**Debra Bowman**[10] testified that she, along with Karen Csanadi and Dale Wiles, were on the evaluation committee for the RFP relating to the collection of delinquent real estate taxes. (53-54) There were five responses received to the RFP. (55, Exhibit A8F)  The committee scored the Linebarger proposal the highest, because Linebarger was a larger group, more professional, and had a Spanish-speaking component. (57-58)  The committee was set to award the contract to Linebarger without doing interviews, which were not required. At that point, Gary Strathearn, the Director of Finance, returned and took over, replacing Bowman on the committee. (59)  He told Bowman that he was taking over the review process and was going to start the entire process from scratch.  (68)  Northeast ultimately won the contract, which surprised Bowman. (61) After reviewing the Evaluation Committee competitive analysis summary, although her signature was on the report, she said that three numbers in Northeast's evaluation appeared changed, and these changes did not appear to be in her handwriting.

**Karen Csanadi**[11] testified that legal work was generally awarded by the solicitor's office without using the RFP process. (74.)  Prior to 2014, Portnoff Law Associates had the contract to collect delinquent taxes in the city of Allentown. Sometime in 2013, she became aware that Portnoff's contract would not be renewed (75)  and an RFP was issued. The original evaluation committee met in December

---

[10]     Bowman testified on January 25, 2018. All citations are to the transcript from that date.

[11]     Csanadi testified on January 25, 2018. All citations are to the transcript from that date.

2013 and January 2014 and ranked Linebarger in first place, Portnoff in second place, and Northeast in

third place. (78-81, Exhibit A8E)   The committee decided that Linebarger should get the contract (82)

That same day, after being told that the committee had selected Linebarger, Garrett Strathearn said that

he wanted to check with the Mayor to see if it was okay with him that the committee had not selected

Northeast. (82, 110)  Strathearn asked Wiles to hold off on the decision until he checked with Mayor

Pawlowski. (83)  In her prior experience with evaluation committees, she had never had to run the

committee's decision past the Mayor. Wiles later told her to get rid of her score sheet and submit a new

one reflecting Northeast as the preferred vendor. Wiles also said that they were setting up an interview

process for Linebarger and Northeast. Csanadi refused to change her score sheet. (87)   She did not tell

anyone of Wiles' request that she change her score sheet because she did not know whom she could

trust. (116)  A score sheet that appeared to be in Dale Wiles handwriting later showed Northeast

Revenue as the preferred vendor. (89, Exhibit A8C)  Additionally, Deborah Bowman was replaced on

the committee by Strathearn. (90)  The new committee, which included Mary Ellen Koval for the

interviews, met with Linebarger on January 23, 2014 and Northeast Revenue on January 24, 2014.  In

Csanadi's opinion, Strathearn made Linebarger's interview difficult and joked around with Northeast.

(93)  A new score sheet in Strathearn's handwriting, (Exhibit A8G)  gave Northeast higher scores than

Linebarger across the board. (96-97)  She did not think that Northeast appeared professional but they

were awarded the contract. (97)

**Dale Wiles**[12] testified that he had worked for the city of Allentown as an Assistant City Solicitor (52)  In 2013, City Solicitor Jerry Snyder told Wiles that the city was going to find a new law firm to collect real estate taxes, after Portnoff Law Associates had held the contract for years. Wiles himself would not have terminated Portnoff as he was comfortable with their work product. (75)  Portnoff was told at the end of 2013 that their contract would not be renewed.(55)  An RFP was sent out to solicit bids for the Collection of Delinquent Real Estate Taxes Contract, (55-56)  despite the fact that this contract was a private services contract and could have been awarded by the City Solicitor. (76)  On the Evaluation Committee were Wiles, Karen Csanadi, and Deb Bowman (59)  They each individually reviewed and scored the RFP responses. (59)  In December, Fran Dougherty inquired of Wiles how Northeast Revenue was doing on the RFP. (77)  In that same month, Jerry Snyder called Wiles at home and asked Wiles about the RFP. In January, the Committee met and agreed that Linebarger Goggin was the winner. (60)  Northeast's proposal had no Spanish-speaking component. (79)  Wiles did a compilation sheet showing the scores. Before the end of their meeting, Gary Strathearn walked in and started asking questions about the process. (61)  Strathearn asked which candidates the Committee liked. (61)  When told that the Committee liked Linebarger, Strathearn asked what they thought about Northeast Revenue. (61)  Strathearn suggested that the Committee interview Linebarger and Northeast (62), although the Committee had had no intention to conduct interviews. Wiles thought that he would lose his job if he opposed Strathearn. (79)  Strathearn replaced Deb Bowman on the Evaluation

---

[12]      Wiles testified as a defense witness on February XX, 2018. All citations are from the transcripts for that date.

Committee (65), took part in the interviews, and volunteered to do the reference checks. (66, 68) Strathearn later reported to the Committee that Northeast's references were all good but that Linebarger's references were not very good. Strathearn asked if the other Committee members would go with Northeast because it was a one-year contract that had three one-year renewals. (69)  They agreed to award Northeast the contract. Wiles never had any direct contact with the Mayor concerning this contract. (69)  Wiles fabricated score sheets to show Northeast winning the contract and Linebarger coming in in second place. (70)

      **Sharon Humble**[13] testified that she was the managing partner for the law firm Linebarger, Goggan, Blair and Sampson in Philadelphia until her retirement in January 2018. Linebarger collects delinquent taxes for many cities in the United States. (73-74)  They submitted an RFP for the Allentown Delinquent Tax Collection Contract in December 2013 and expected that their proposal would be fairly compared to other submitted proposals. (77)  Linebarger received an e-mail at its Texas office indicating that an addendum was being sent out to the bidders. (76, Exhibit A5)  They then were notified, by e-mail, via their Texas server, that they were on the short list and were invited to interview. (77-78, Exhibit A14)  During the interview, Garret Strathearn appeared angry and somewhat distant. (81)  They were notified by mail, on January 30, 2014, that Northeast had won the contract. (82, Exhibit A11)  Linebarger estimates that they spent approximately $31,000 to $32,000 during this RFP process. (83)  She testified that Linebarger would never have submitted a bid if they thought the award process was rigged. (84)

---

[13]     Humble testified on January 29, 2018.  All citations are to the transcript from that date.

**Sean Kilkenny**[14] testified that he previously worked as an attorney for the law firm of Friedman Schuman (Friedman)(8)  In 2013, he was considered the heir apparent to the chairman of the Democratic Party in Montgomery County, which was an influential county for persons seeking statewide office. (32)   He currently is the sheriff of Montgomery County, an office he won in November 2015. (33-34)

In 2013, Kilkenny met John Rogers of Northeast Revenue and they agreed to join in tax collection work, with Friedman doing whatever legal work was required. In Fall 2013, Northeast and Friedman each entered into a contract with Fleck Consulting, at $1,250 per month, to get municipal contracts. (9-11)

On October 25, 2013, Kilkenny and Darryl Boich, a marketing employee/silent partner for Northeast gave a presentation to Mayor Pawlowski, concerning the Delinquent Tax Collection Contract, during which Pawlowski stated that Portnoff had not done anything for him. Ruchlewicz later told Kilkenny that Pawlowski did not like Portnoff because Portnoff had never been generous with him. (11-14)

After Northeast submitted an RFP for the Delinquent Tax Collection Contract, Pawlowski called Kilkenny on or about December 18, 2013. Kilkenny remembered that he was supposed to go to a fundraiser for Pawlowski on that date but could not attend. Pawlowski was soliciting a campaign contribution for his gubernatorial campaign. (15, 68)  Kilkenny testified that the he felt

_____

[14]     Kilkenny testified on January 29, 2018. All citations are to the transcript from that date.

pressure to make the contribution because the RFP was pending. (18, 69-70)  He contributed $2,500

from the Pennsylvania Liberty Fund PAC. The check was dated December 18, 2013 (18, Exhibit A16)

      In addition to this monetary request, Sam Ruchlewicz called Kilkenny in late December

and said that Pawlowski wanted to go to the Eagles playoff game on January 4, 2014. (20-21)  Kilkenny

testified that neither he, his firm, nor Northeast had reserved seats for the game. (21)  He believed that

Northeast went to a ticket broker such as Stub Hub to obtain the tickets. (23)  Prior to the game, the

group, including Kilkenny, Rogers, Rogers' driver, Ruchlewicz, and Pawlowski, ate at Del Frisco's

Steakhouse in Philadelphia. Neither Ruchlewicz nor Pawlowski offered to pay for the dinner or the

tickets to the Eagles game. During the dinner, Ruchlewicz said that Northeast's proposal looked good

while Pawlowski remained silent. (22-23)  Kilkenny said that he felt so uncomfortable about the cost of

the dinner and Eagles tickets that he e-mailed Ruchlewicz shortly afterwards reminding him that the cost

should be reported on Pawlowski's campaign finance report. (23-24, Exhibit A-13)[15]

      Northeast was awarded the contract, which he estimated was worth approximately

$1,000,000 per year. (29)  After the contract was awarded, Northeast continued making contributions to

Pawlowski via the Pennsylvania Liberty Fund, contributing $5,000 on July 15, 2014 and $5,000 on

December 29, 2014, (29, Exhibit A16), and the contract was renewed at the end of 2014. (30)

---

[15]    Kilkenny estimated that the dinner cost $60 each and that the Eagles tickets cost $250.
Pawlowski neglected to mention this outing when asked in his July 2, 2015 interview whether he
received things like tickets from vendors.

**Barbara Molitoris Wagenhurst**[16] testified that she currently is employed as the city of Allentown's finance operations manager. (128)  She also served as a purchasing agent for the city for two years. She identified Exhibit A-25 as a chart of purchasing guidelines for the city of Allentown. (131)  For purchases by the city between $1.00 and $3,999, the city has to obtain one quote. (133)  For purchases between $4,000 and $9,999, the city needs two competitive quotes. (134) For purchases between $10,000 and $39,999, the city needs three competitive quotes.  The quotes eventually are presented to the purchasing office. Above $40,000 requires a request for proposal or a formal invitation to bid. (135)  Legal services contracts are an exception to these rules, and the solicitor controls them. (136)  For RFPs, the score sheets get sent to purchasing and purchasing sends out the award letters. She identified Exhibit A-12 as an example of an award letter.  (138)  This award letter reads that the awarding of the contract is made on the basis of the winner's proposal. (138)  She similarly identified Exhibits A-10 and A-11 as rejection letters, which also stated that the award of the contract was made based upon the winner's proposal. (140-42)  She also identified Exhibit A-4 as an RFP.  She stated that if a deadline in the RFP is amended, it is published. (143-44)  For this particular RFP, it read that the award would be made to that responsive and responsible proposer whose proposal, conforming to specifications, would be most advantageous to the City; price and other factors considered, such as delivery time, quality, service, etc.  The award may or not be made to the firm with the lowest cost. (144)  For qualifications that the city is looking for, the RFP lists firm name, headquarters address, type

---

[16]     Molitoris Wagenhurst testified on January 29, 2018. All citations are to the transcript from that date.

of entity, type of ownership, number of employees, gross earnings, all contracts the firm has had with the city, and any instances the last five years of contractual default. (144-45)

For evaluation of award criteria, the RFP states that "In general, proposals will be evaluated in terms of the firm's ability to meet RFP requirements; the qualifications of the specified persons who would be performing the requested services; and the prior experience and reputation of the firm in similar projects. (145)  There is no indication in the RFP that part of the evaluation will be if the company is friendly with the Mayor or if they are going to give campaign contributions to the Mayor's PAC. (145)   The RFP is designed to make the contract process fair and open. (146)  Interviews are not a requirement. That decision is made by the project manager. (146)  She testified that it is unusual for one member of an evaluation committee to be replaced by another person.

Specifically in regard to the Northeast contract, she overheard Dale Wiles tell Beth Ann Strohl that he had come from Gary Strathearn's office and that he now had to go and change the scores because the administration wanted Northeast Revenue. (147)

**Special Agent Scott Curtis**[17] testified and identified Exhibit J15, a timeline of major events in the investigation, including Pawlowski political campaigns, wiretap dates, cooperation dates and the search of Allentown City Hall. (166)  He also identified Exhibits A20- through A-24, which were campaign finance reports for the Pennsylvania Liberty Fund PAC (171-73), and A-29, a summary of contributions by Sean Kilkenny, John Rogers, and Darryl Boitch to the Pennsylvania Liberty Fund. (174), and contributions from the Fund to defendant Pawlowski. (175)  Curtis also testified that to his knowledge, the Philadelphia Eagles tickets and dinner at Del Frisco's Restaurant were never reported by

---

[17]    Curtis testified on January 29, 2018 and January 30, 2018. All citations are to the transcripts from those dates.

Pawlowski as any type of campaign gift or otherwise. (177)  Between July 17, 2013 and November 1, 2013, Mike Fleck placed 641 telephone calls to Pawlowski's cell phone, and Pawlowski placed 619 calls to Fleck's cell phone. In addition, Fleck texted Pawlowski 235 times and Pawlowski texted Fleck 179 times. (51-52)

**Admitted Intercepted Conversations**

On **December 31, 2013**, Fleck and Pawlowski discussed getting tickets for the Philadelphia Eagles playoff game from different sources. Fleck told Pawlowski that Kilkenny and Rogers were sending four upper level tickets and that he planned on giving these tickets to his wife and son. (MF #1888)

On **January 2, 2014**, Dougherty asked Fleck who the powers that be would want as the preferred choice on the tax collection contract and Fleck told him that Northeast would be the preferred one. (MF #1979)

On **June 1, 2015**, as the fund raising deadline of June 30, 2015 approached, Pawlowski told Fleck that Northeast had been less than helpful and that they needed to put a fundraiser together for him in Scranton and Wilkes Barre. He told Fleck to talk to Northeast and tell them that "Ed really needs your help. This is the time he needs your help." Pawlowski said that their contract just got better and everybody broke their backs. Pawlowski said that he was asking them for $45,000 or $50,000. (MF #70)

On **June 3, 2015**, Pawlowski complained about Northeast and said that it's ridiculous about them since he'd done lots for them. He whispered that they should contribute $20,000 and said that he was really pissed off. (SR #403)

36

On **June 4, 2015**, after a birthday dinner, Pawlowski complained to Fleck about Northeast, said he was getting tired of them, and that "It's easy to go back to Portnoff." (MF #75a)

On **June 15, 2015** Pawlowski agreed that he had taken "bullets" for Northeast and left a message for Sean Kilkenny asking for $25,000. (MF #87)

C.    **The Efficiency Network (TEN)**

**Count 1: (Conspiracy)**

**Count 15: (Bribery)(Patrick Regan—03/10/15)**

**Count 16: (Bribery)(Hickey—05/05/15)**

**Count 27: (Mail Fraud)(Johnson Controls—04/22/15)**

**Count 28: (Mail Fraud)(TEN—06/19/15)**

**Count 34: (Wire Fraud)(Johnson Controls—03/09/15)**

**Count 35: (Wire Fraud)(Johnson Controls—04/13/15)**

**Count 36: (Wire Fraud)(Johnson Controls—05/01/15)**

**Count 37: (Wire Fraud)(Johnson Controls—05/27/15**

**Count 40: (Honest Services Wire Fraud)(Johnson Controls—03/09/15)**

**Count 41: (Honest Services Wire Fraud)(Johnson Controls—04/13/15)**

**Count 42: (Honest Services Wire Fraud)(Johnson Controls—05/01/15)**

**Count 43: (Honest Services Wire Fraud)(Johnson Controls—05/27/15)**

**Count 44: (Honest Services Mail Fraud)(Johnson Controls—04/22/15)**

**Count 45: (Honest Services Mail Fraud)(TEN—06/19/15)**


**Summary**

This contract involved replacing all of Allentown's old street lighting with LED lights. The contract was worth approximately $3,000,000. Defendant Pawlowski was aware of and encouraged the machinations going on behind the scenes to assure that Patrick Regan and TEN won this contract. He

was aware of the fact that Hickey had been working on an RFQ/RFP that would favor TEN, that Craig Messinger and others from Allentown Public Works had changed the Hickey RFQ/RFP, that Fran Dougherty had "caught it,' that the RFQ was submitted late by TEN, and that Ruchlewicz had resolved that issue. As Pawlowski bluntly told Patrick Regan during their breakfast meeting, he had met with another vendor interested in the Streetlights contract, "[N]ot that I would ever hire them." While the RFP was pending, Pawlowski told Fleck that he wanted to get more money from Hickey once the ESCO was done but that he didn't want the money to be attributed to TEN.  On May 5, 2015, he also sent Ruchlewicz out to Hickey to get him to bundle as much as $50,000 in campaign contributions. Hickey clearly knew what Pawlowski's intent was, given that he objected to that amount of a contribution based upon how little work he had already received from Allentown, and talked about vendors who were opportunistic donors.

Additionally, all the extraordinary actions taken by Pawlowski and his co-conspirators to rig the process in favor of TEN, the most important of which was allowing TEN to file its RFQ late when they missed the RFQ deadline, demonstrated the fraud perpetrated on RFQ/RFP competitors such as Johnson Controls. The process was not fair as required under the published RFQ and RFP.

**Evidence**

**Jennifer McKenna**[18] testified that she worked in the compliance office of the Department of Public Works. (59)  She did not believe that this contract needed to be outsourced, instead believing that the contract could be handled in-house. (65)  She said that this contract had been an on-again, off-again, thing and that it was only in Spring 2015 that the administration decided that it

---

[18]     McKenna testified on January 30, 2018.  All citations are to that day's transcript.

wanted the project started again. The decision was made to put out a Request for Qualifications (RFQ).
The evaluation committee, composed of Craig Messinger, Nelson Varghese, McKenna, and Mark
Geosits, were all upset when they received an unsolicited RFQ, slanted to TEN, from Fran Dougherty.
(68-69)  The committee rewrote the RFQ, making it fair, Subsequently, she feared that she might lose
her job. (75)  Although TEN's response to the RFQ was late, and should have been disqualified, it was
nonetheless accepted. (84, Exhibit B-2)  The RFQ stated that deadline extensions would not be granted.
(85)  TEN and Johnson Controls subsequently responded to the RFP but Johnson Controls eventually
dropped out. (91-92)  The entire committee was relieved when TEN was selected. She had some fear of
losing her job if TEN was not selected. (92)   After the FBI raid at City Hall, the contract was terminated
with TEN. (125)

      **Michael Bayesa**[19] testified that he worked for Johnson Controls, an energy-saving
company (ESCO)  Johnson received an RFQ from the city of Allentown via an email on March 9, 2005.
(138, Exhibit B-3)  Johnson Controls submitted a proposal in this case. (131, Exhibit B-13)  Bayesa said
that they spent approximately $18,749 to get through the RFQ process. (133, Exhibit B-25)  Johnson
Controls received a letter from the city of Allentown stating that they were to receive an RFP on April
22, 2015, (139-140, Exhibits B-4) and they did receive the RFP (141, Exhibit B-5)  Up until this point in
time, Johnson Controls believed that the contracting process was fair and honest. (141)  Johnson
Controls also received an e-mail concerning an addendum to the RFP (142, Exhibit B-6), and an e-mail
inviting them to interview for the RFQ (145-46, Exhibit B-26)  In that addendum the city confirmed that

---

[19]     Bayesa testified on January 30, 2018.  All citations are to that day's transcript.

qualifications listed in the RFP would be used to determine the contract winner. (143-44)  Ultimately, Johnson Controls decided not to submit an RFP. (146)  Proceeding to an RFP would have cost approximately 3-4 times more. (135)  They were notified on June 19, 2015, both by mail and e-mail, that TEN was the contract winner. (144, Exhibit B-7)  Bayesa said that he would not have filed an RFQ if he had known that TEN had put together a ready-made RFQ. (137)  He was unaware that TEN had filed their RFQ past the RFQ deadline. (137)

**Special Agent Scott Curtis**[20] testified that an RFP was issued on May 1, 2015 and the contract was awarded to TEN on June 17, 2015. (68)  After the FBI raid of Allentown City Hall, the contract was not pursued by the city (71)  He also identified the voices in MF #102. (155)  During this conversation Pawlowski said, concerning Mary Ellen Koval, that they had to  make sure that she doesn't have any emails about Rosen stuff and 5C. The participants, including Pawlowski, also discussed rumors that Fleck was under FBI investigation. (158, 160)

**Craig Messinger**[21] testified that he has been the Allentown Public Works Director since approximately 2014. The city had been looking at replacing streetlights for quite a while. (18)  The Mayor was interested in this project for approximately six years. (19) Meetings had been held in the Managing Director's office about this project being as ESCO project, attended by Patrick Reagan, Mike Fleck, Fran Dougherty, and sometimes Sam Ruchlewicz. (22)  The city sat down with TEN

---

[20]     Curtis testified a second time on January 31, 2018. All citations are to the transcript from that date.

[21]     Messinger testified as a defense witness on February 15, 2018. All citations are from the transcripts for that date. Messinger was called by the defense in this case.

approximately three to four times before the RFQ went out. (43)  These meetings were not attended by

the Mayor. (21)  He was unaware of a meeting the Mayor had had with Patrick Reagan at the Hamilton

Kitchen on January 28, 2015. (44)  Messinger went up to Fran Dougherty's office and was handed an

RFP. (25)  He returned with the RFP to the Evaluation Team, told them what had happened, and put the

RFP in the recycle bin. (26)  Clearly, the favored entity was TEN. Messinger told Varghese to prepare

an RFQ. They met with vendors and talked to other cities about similar projects before the RFQ went

out. (28) After Public Works sent its own RFQ out, Dougherty called Messinger into his office and

asked if he had to fire him. (38)  Messinger came back to the Evaluaton Committee and told them about

this meeting and they were upset that someone could possibly get fired. (41)  Despite TEN missing the

deadline for the RFQ, the Evaluation Committee was told to consider the RFQ. (47)  Based upon their

scoring, the Evaluation Committee decided to send RFPs to TEN and Johnson Controls. (30)  No outside

influence was placed upon the committee to make that decision. (30)  Johnson Controls did not submit

an RFP but TEN did and they were judged qualified under the terms of the RFP. (32)

**Admitted Intercepted Conversations**

On **February 26, 2014:** Patrick Regan told Mike Fleck that he wanted to sit down

with Fran Dougherty concerning the RFP. Fleck said that Dougherty set up a process where Regan can

rewrite the RFP and give it to Hickey, who in turn will give it to Dougherty. Fleck said that Dougherty

did not want to meet, thereby giving him a degree of separation. Fleck told Regan that everything was

on track, and that they wanted the process to eliminate the competition. Fleck told Regan that they could

put things in the RFP favorable to TEN. Fleck suggested a section giving more points to companies who

42

had done a similar project already in the Lehigh Valley, which effectively was only TEN. Fleck said that we can make any changes that you want. (MF #6165)

On **October 2, 2014**:  Hickey told Ruchlewicz that there were some shenanigans taking place with the RFP, with someone trying to get Phillips the contract as a no bid contract. Hickey speculated that this is probably the doing of a mid-level bureaucrat because if they went to Dougherty or Pawlowski about this they'd be shot down.  Ruchlewicz agreed and said that the hammer is about to come down on some mid-level bureaucrat. In a later call, Ruchlewicz told Hickey that Phillips was dead per Fran. Fran told Ruchlewicz that the RFP was imminent and already drafted. Hickey told Ruchlewicz that he wrote the RFP back in August and laughed about it. Talking about the mid-level bureaucrats, Ruchlewicz said every now and then it's good to get someone's head on a stick. Hickey agreed and said then the rest of them snap into line. (SR #11925)

On **November 19, 2014**: Dougherty told Ruchlewicz that he was going to update the entire RFP. Ruchlewicz asked if Hickey gave him the changes. Dougherty said yes and my guy put other changes in which were not good. There were some things in there that hurt them, but it was fixed. (SR #205)

On **December 17, 2014**: Dougherty confirmed to Ruchlewicz that he got the okay from Hickey on the ESCO (Street Lights contract)  (SR #245)

On **January 28, 2015:** Breakfast meeting with Pawlowski, Patrick Regan, and Ruchlewicz. They discussed the street lights contract, including bonds, and the possibility of lighting up some Allentown buildings under the contract. Regan said that you will have flexibility to do whatever you want. During this conversation, Pawlowski asked Regan to send him the performance contract

43

language and said that he met with another interested company, "not that I would pick them or anything." (55)  After Pawlowski left, Ruchlewicz told Regan that the deal was lined up and ready to go Fran, Mary Ellen and Ed, everything was lined up, teed up. But it took some effort after some bureaucrats tried to change some shit. The RFP was exactly what Hickey wanted. Rest easy, the deal will be yours. Ruchlewicz then invited Regan to the Mardi Gras fundraiser and said that the Mayor was hoping for $2,500. Regan agreed to do that. Ruchlewicz said that the Mayor had some plans and "we need to ah, get our vendors to give back a little bit." Regan said "Sure." Ruchlewicz told Regan that the Mayor was going to be running for the Senate and raising money was what he was focused on right now. He told Regan that it goes a long way. Ruchlewicz acknowledged that Regan had been very supportive in the past. Regan said that he just liked the Mayor. (SR #294)   Regan contributes $1,500 on February 13, 2015. The memo line reads donation Mardi Gras. (58, Exhibit B-21)  This meeting occurred before the RFQ was issued. (58, 60)

On **March 6, 2015:** Ruchlewicz told Dougherty that the RFQ that was issued was wrong. It was not the one that Dougherty and Jim Hickey passed back and forth. Ruchlewicz said that it was the same document that went out in Harrisburg and they were not too upset about that because they (TEN)  wrote that one too. The big difference was that there was no street-scaping in this RFQ. Dougherty asked whether he should pull the RFQ back and said that he was furious. They discussed the fact that someone didn't want to follow instructions. In a later call, Ruchlewicz called Dougherty and said that he talked to Hickey and that they were okay with the issued RFQ. (SR #32664)

On **March 10, 2015:** Pawlowski asked Ruchlewicz what TEN was again. Ruchlewicz said that it was Patrick Regan and Troy Geanopulos. Ruchlewicz said that Pawlowski

should hit them for a lot because they came up light in their check. Pawlowski asked how light and Ruchlewicz said a thousand. Pawlowski then called Regan and the conversation was only heard from Pawlowski's side. He asked Regan if his company wanted to be a sponsor for the Pennsylvania Municipal League meeting in Allentown. Pawlowski said that he heard that TEN got a contract at Penn State. Pawlowski promised to send Regan a packet of information and asked Regan to let him know what they can do.[22] (62-63, SR #345)

Later in the conversation, Ruchlewicz complained to Pawlowski about Craig Messinger switching the RFQ after he spent three months with Jim Hickey trying to get it ready. (63-64) Pawlowski said that Fran caught it. Ruchlewicz said that Fran caught it the first time, but that Messinger put out the Harrisburg RFP. Pawlowski said "What?" (64-65, SR # 345) TEN contributes $5,000 to the City of Allentown, Office of the Mayor on March 13, 2015. (66-67, Exhibit B-22)   In a later conversation that day, Pawlowski told someone on the telephone that he heard that Messinger tried to again change the RFP after it was sent back.  Pawlowski said that Messinger had lost his trust. (SR #345b)

On **March 27, 2015**: Dougherty called Ruchlewicz and said that he was not happy because the RFQ was due today and TEN did not get their submission in. After some discussion, Dougherty agreed to let TEN have until Monday for the delivery of the RFQ, and said that one other company had a similar problem. Dougherty said "I have cover here." Ruchlewicz made arrangements to guarantee the delivery by Monday. (SR #35439)  Later that day, Ruchlewicz told Pawlowski about TEN

---

[22]      TEN contributes $5,000 to the City of Allentown, Office of the Mayor on March 13, 2015.

missing the deadline and Pawlowski asked if Ruchlewicz took care of the problem. Ruchlewicz confirmed that he had taken care of it. (SR #360)

On **April 9, 2015:** Ruchlewicz told Regan that TEN was short-listed. He then said that they were the clear front-runner so don't mess it up. Near the end of the conversation, Ruchlewicz asked Regan if they anticipated any projects in Philadelphia. When Regan said they anticipated an enormous opportunity in Philadelphia, Ruchlewicz said that Pawlowski was backing Senator Anthony Williams for Mayor and asked Regan if he would consider a small contribution. Regan said that he would have to check with Troy Geanopulos first. (SR #37939)

On **April 30, 2015**: Ruchlewicz told Hickey that Johnson Controls was on the short list. Hickey said that Johnson Controls was litigious so they had to be careful. Hickey said that the cake was already baked. (SR #37939)

On **May 5, 2015**: Pawlowski told Fleck that they were going to want more money from Hickey once the ESCO was done, but he didn't want the money directly from TEN. Fleck reminded him that the money would come from Rogers or Geanopulos and Pawlowski said that that was fine. Later in the conversation, Pawlowski said that "we gotta stop banging all my donors multiple times. They're really starting to, it's starting to hurt me now when I need them to give me money. . . They're getting fatigued and I want them to give me the max amount of money. I've. I've helped everybody you know, in the past. It's time to help me... (MF #44)

On **May 5, 2015**: Pawlowski told Ruchlewicz that he wanted Hickey to max out and bundle some things for him. He said that he wanted $50,000. (SR #391)

On **May 6,  2015**: after a breakfast meeting with others, Ruchlewicz and Hickey met outside the diner. Ruchlewicz told Hickey that Pawlowski wanted him to bundle some money for him. Hickey sarcastically asked for all my friends who have made money from Allentown? He said that all his people are already bundled. He said that they could probably get some money from Constellation and from Troy (Geanopulos)  but other than that "my guys are all opportunistic donors." He talked about an asphalt contract that he was seeking for a client in Allentown and said that if they won, they probably would contribute $500 or $1,000, but that that company was not a big political donor. Ruchlewicz said that Pawlowski needed money and that TEN would get the street lights contract. Hickey said that Troy was always good for a check. When Ruchlewicz suggested that they should double max by contributing for both the primary and the general election immediately, Hickey said that they are your clients so you have that conversation and I will reinforce it. When Hickey said that $20,000 was a lot of money to ask for, Ruchlewicz reminded him that the TEN contract was worth approximately $3,000,000. When Ruchlewicz said that Pawlowski wanted Hickey to max out on his contribution as well, Hickey said that that was not going to happen. He asked how well have I done in Allentown to contribute $5,400? "I've gotten a pittance from Allentown." He said that he would contribute some as he has done in the past. He then said that Ruchlewicz needed to understand that for everyone who does this opportunistically, it's a cost-benefit analysis. He then went on to tell Ruchlewicz how he maxed out in contributions to Mayor Callahan of Bethlehem in the past after his clients got millions in contracts. He said that he explained to Pawlowski the "paradigm of having your CM (Campaign manager)  control[ing] the vendor chain, so everyone in the vendor chain is friendly." He said that he'd give a steady stream of checks to Pawlowski but agreed with Ruchlewicz' statement that Pawlowski had to perform. He said that he set up a

47

framework for Pawlowski to raise money when he came into office because he was too incompetent to do it on his own. He suggested that Ruchlewicz needed to get the vendor list for professional services and use it to fundraise. He agreed with Ruchlewicz that it was absurd that firms like Stevens and Lee got a lot of work and contributed almost nothing. (SR #392)

        On **June 5, 2015**: At 8:12 p.m., Fleck told Regan that "we won the RFP." Regan asked how they were able to get the award so quickly since the RFP responses was only due at three o'clock that afternoon. Fleck said: "We may have talked to them ahead of time." Regan said "No, I understand that." Fleck said "They knew what they were gonna do." (MF #11671)

**D.**     **Rosen—Ciiber**

**Count 1: (Conspiracy)**

**Count 18: (Bribery)(Rosen—06/30/15)**

**Count 46: (Interstate Travel to Commit Bribery)(Rosen—02/06/15)**

**Count 47: (Interstate Travel to Commit Bribery)(Rosen—05/18/15)**

**Summary**

        Defendant Pawlowski sought to obtain significant campaign contributions from wealthy New York real estate developer Jack Rosen in exchange for contracts in the City of Allentown, commencing with a wholly unnecessary contract to improve the city's cyber-security. This contract was to be broken up into two phases, with an evaluation phase, costing $35,000, as the first phase, and an anticipated contract to fix cyber problems found during the evaluation to follow.

        Defendant Pawlowski discussed work for the city of Allentown and campaign contributions from Jack Rosen on February 6, 2015 ($25,000) and May 18, 2015 ($100,000), and Pawlowski accepted $30,000 from Rosen and Rosen family members on June 30, 2015. Pawlowski was so anxious to obtain Rosen as a big donor to his campaign, requesting that Rosen might contribute $100,000 for his campaign by July 31, 2015, that he searched for numerous projects for Rosen in Allentown. As Fran Dougherty stated, "The boss has to demonstrate that he can get something for 5C." Ultimately, Pawlowski settled on a contract in which CIIBER would evaluate the IT system in Allentown and the city would value the contract by how much money it had in the IT budget. This contract and work which was described as unneeded by Michael Hilbert may not even have been fully

49

understood by Pawlowski before he agreed to spending the city's money. Pawlowski was so anxious to obtain Rosen's campaign contributions that he even lied to Rosen about how the procurement process was proceeding. Both Rosen and Pawlowski received what they wanted, that is, a promise of work in return for a campaign contribution.

**Evidence**

       **Matthew Leibert[23]**  testified that he has been the chief information officer for Allentown since 2006. He attended a number of meetings with CIIBER, the first of which took place in early 2014. It was attended by Jack Rosen and Jordan Rosen. (263)  Ciiber was proposing to do an assessment of the city's cyber security. (262)  Leibert was told that Jack Rosen was going to do something big for the Mayor. (265)  He believes that it was Fall 2014, after a project had been postponed and he had $30,000 in his budget, that he was told to leave that money for the Ciiber contract. The Ciiber contract was a top priority for the administration.

       In February 2015, he was asked by Fran Dougherty to reach out to Ciiber and said that he wanted to see a proposal. (266)  Within two weeks, CIIBER provided a contract proposal which had no cost amount. (5)  Leibert eventually valued the contract at $35,000 because he had that amount of money kept aside for the contract. There was an understanding between Leibert and Dougherty that the contract had to be under the $40,000 bidding limit. (6)  The CIIBER proposal contemplated a second

---

[23]     Leibert testified on January 30, 2018 and January 31, 2018.  All citations are to the transcripts from those days.

phase of planning and a third phase of implementation of the plan. (8)   The contract was held up due to CIIBER's inability to get insurance coverage (11), and ultimately was never effectuated. (34)

Liebert also testified about the Mayor's efforts to delete electronic information.  In approximately 2014, Fran Dougherty told him that the Mayor wanted to know how to wipe clean his Ipad. (21)  Such a process would wipe the emails from the Ipad although they might still be retrievable forensically. (21-22)  The Mayor had more than one Ipad, and when he would get rid of an old one, it would be wiped clean and he'd get a new one. That could have occurred as many as four times. (43)

**Michael Hilbert**[24] testified that he was in charge of the 911 call center and the superintendent of communications/technical services until he retired in 2016. He attended an August 2014 meeting in which 5C, later known as CIIBER, made its pitch for a contract with the city. Upon leaving the meeting, Hilbert was convinced that their plan was not practical and not necessary. On May 11, 2015, he received an e-mail, saying it was from the Mayor, announcing a city-wide assessment of cyber information. Although there had been some penetrations of the city's cyber system, these problems were resolved by the city's internal IT department, and there was no need for a $35,000 contract for CIIBER. After the City Hall search conducted by the FBI, the CIIBER contract was cancelled.

**Admitted Intercepted Conversations**

---

[24]     Hilbert testified on January 30, 2018.  All citations are to that day's transcript.

On **January 7, 2014**: Pawlowski told Fleck that Rosen said that he would do $100,000 during their meeting. Fleck said that Rosen definitely wanted his help with that security company all over the state. (MF #2530)

On **January 8, 2014**: During a telephone conversation, Fleck told Rosen that he would look into the "security thing" and get Rosen an answer. Rosen said the question is whether there was some opening somewhere, somehow.  He said that as little as it is, when you get a toe hold in there, it's a lot easier. Fleck agreed, saying that all you had to do was get in the door, then you could slam it down. Rosen agreed. (MF #2704)

On **September 26, 2014**: Ruchlewicz called Dougherty for an update on the contract and Dougherty said that he was not sure that the contract was completed, but that they had identified some work for them to do. Dougherty said that "we're gonna give them a job, okay? That's my instructions from the Mayor." Ruchlewicz said "Excellent . . . By the end of the year, he'll be our largest donor." (SR #11173)

On **November 19, 2014**:  Dougherty told Ruchlewicz that the boss had to demonstrate that he could get something for 5C Security, Dougherty said that it was probably easier to do something with IT. (SR #205)

On **January 6, 2015**: conversation between Ruchlewicz and Pawlowski. Ruchlewicz told Pawlowski that Jordan Rosen said that he was going to be taking a $15,000 sponsorship for the Mardi Gras fundraiser. After talking about getting Jordan Rosen to Allentown, maybe getting him interested in some housing, and that 5C, the security company, was probably a good step, Ruchlewicz said that "We got them that deal" and Pawlowski responds "No.  I mean yeah . . . they

52

responded to an RFP. Yes. Yes, I know." Ruchlewicz and Pawlowski then left the office and entered the hallway and Pawlowski said that he had his office swept today. "I had no bugs but you never know what's going on." After Ruchlewicz told Pawlowski that they had their offices completely checked too, Pawlowski said that they should get the company that he used. Pawlowski then said "Cause this is the conversation that you just had (UI)"  Ruchlewicz said "I understand what you're saying and like, that's why I'm trying to be very very careful." Ruchlewicz then suggested that they get in the elevator because "that's probably the most secure thing in the world, right?" Pawlowski laughed and said "Don't know. But uh, yeah, just, just by saying yeah, we got the 5C deal, you know what I mean. You just don't want to say any of that stuff. You know? . . . You never know who's listening and if, either of those interns wants to really be a pissy at us someday and say 'Hey, the Mayor was talking about all these deals they had . . . you know what I'm saying? . . . You gotta be careful." (SR #264)

On **February 6, 2015**: In a conversation with Jack Rosen, Jordan Rosen, Pawlowski, and Ruchlewicz, Pawlowski asked Jack Rosen about setting up a meeting with Chuck Schumer; Pawlowski explained that he was looking for a contribution to this year's Mardi Gras fundraiser, and Ruchlewicz reminded Rosen that they "sent fifteen for Mardi Gras last year." Pawlowski explained that that money goes to his state PAC, and although he could not use it for a federal campaign, he could use it to support other state candidates.

Rosen then changed the subject and said "So what else is new in town? I know you sent some e-mail from your guys. So we passed the political fundraising discussion, so we can go to the next," and Pawlowski said yes. They then talked about 5C Security. Pawlowski said that "we're going to do the contract, okay." When Rosen asked if it was the one they proposed, Pawlowski said "I just told

them to do it, Jack, and I thought they would follow through and do it. So I'll find out exactly what's going on." The Rosens said that they proposed a contract with a cap of $20,000 and Pawlowski says "it would get your foot in the door so you got a contract." When Rosen asked if it would actually go through this time, and said that "You don't have to do it,"  Pawlowski said no and explained that they just passed a new budget and that it was already in the budget. Rosen said "So maybe this will go at nineteen . . . Pawlowski explained that "the nineteen thing is the way my city charter is set up for purchasing, okay. If I go over nineteen, I have to get multiple bids. And then there's no, you know, there's no guarantee that I can give it directly to you." Rosen went on to explain that they were doing the contract for nineteen whether they made money on it or not because if you have one job in Pennsylvania, you get more. They then discussed a number of potential real estate development projects for Rosen. Rosen then switched gears again and said "let's get off of business. I don't like talking about all that at the same time. Off of business, so once you've decided what you're going to do, then you need a fundraiser right?" Ruchlewicz explained that depending how we're going to do it, we need to put together twenty-five thousand pretty quickly for a poll . . . and then our goal . . .  would be to procure about a million bucks in the two months immediately after we decide to get that." After some further talk, Rosen said that contributing to Pawlowski's state PAC "is not going to excite our folks."

       When Ruchlewicz and Pawlowski left Rosen's office, Pawlowski cautioned: "Yeah we gotta be careful. I can't get uncomfortable when we start talking about hey, I'm just gonna give you this. Who has that contract process. I'm so scared nowadays like, who the hell knows who's wearing a wire, who's tapped, who's not. You know what I mean? I think I just gotta be, we just gotta be really careful when we talk about this stuff . . .  that's why I prequalified their DNA. You know, we do have a bidding

54

process that we have to go through . . . I don't wanna end up like one of these other idiots." When Ruchlewicz said that he didn't really worry about Jack Rosen, Pawlowski said "Yeah but I mean, who knows? I mean, he's you know he's tied in with a bunch of folks that I don't know."  (SR #308b)

On **March 10, 2015**: Pawlowski and Ruchlewicz first discussed the fact that neither of them knew what 5C actually did. Pawlowski said "I don't know what the hell they do."  When Pawlowski met with Jack Rosen, he offered him the possibility of the City rebidding the project at a City parking lot if he was interested.  Rosen asked whether his CIIBER contract had to go out to bid and Pawlowski said no. He claimed that they had to get three bids but "I think we got two of them plus there was nobody else there that could do what they were doing."  (SR #345, #345a)

On **May 18, 2015**: While Fleck and Pawlowski were traveling to New York to meet Jack Rosen and Ramzi Haddad, Fleck said they are going to be in New York City, away from the area where anybody knows us, and we should have direct and frank conversations with Rosen and Haddad. After today, Fleck said that Pawlowski should never meet with them again for anything that they needed help on. Pawlowski said that he thought that he should ask Rosen for $100,000 for now, because if we asked him for a million dollars, he would probably freak out. Pawlowski was unsure whether CIIBER had finished phase one of their contract with the City.[25] (MF #54.)

When they met with Rosen, Pawlowski told him that 5C's contract was starting, and that they were trying to line up all the departments . . . beat them all up and say they gotta share the information. Pawlowski said that getting all the departments to cooperate was a huge task. When Rosen

---

[25]        In fact, the contract never got off the ground because of insurance problems with CIIBER.

said that there was a list of things that they had to do to fix all the problems that come with the study, Pawlowski said that that is the next step. (MF #55)

Pawlowski then asked if they were done talking about business and Rosen said "Yes. Put up a Chinese wall." Pawlowski said that he was trying to get as much money as he can by June 30th. Pawlowski says "My hope is that you could help raise $100,000 in New York." Rosen says that we will raise you some money. The problem will be in getting New York people interested in Pennsylvania. (MF #55)

### E.   Ramzi Haddad

**Count 1: (Conspiracy)**

**Count 6: (Bribery)(Haddad—12/14)**

**Count 38: (Honest Services Wire Fraud)(12/19/14)**

**Count 39: (Honest Services Wire Fraud)(05/21/15)**

**Count 48: (Interstate Travel to Commit Bribery)(Haddad—05/18/15)**

**Summary**

The charged counts concern Haddad's application to get a zoning use change for his Sherman Street property in December 2014, and Haddad's complaint about delays in the City's inspection of Haddad's property on Sherman Street in May 2015.

Circumstantial and direct evidence showed that Pawlowski was involved in the expediting of Haddad's zoning issues on December 19, 2014.  On December 4, Ruchlewicz told Haddad that he had to grease the Mayor with $2,500.  Haddad said that he might need help with a zoning issue. On December 7, Ruchlewicz told the Mayor that Haddad might need zoning help. On December 10, 2014, Haddad paid $2,500 to Ruchlewicz and Ruchlewicz said that the Mayor would be able to help Haddad with the zoning issue. On December 17, 2014, Fran Dougherty committed to helping Haddad by the end of the year with the zoning issue if Haddad filed his papers, and by December 19, 2014, the zoning issue was resolved, days or weeks before it normally would have been without help.

As to the inspection issue, Pawlowski admitted at trial that he expedited the inspection of Ramzi Haddad's property on May 21, 2015.  Trial testimony showed that Haddad's inspection was

expedited to the disadvantage of others on the inspection list, and that Pawlowski talked about helping Haddad at the dinner of May 18, 2015, the same dinner that Pawlowski and Fleck discussed campaign contributions with Haddad. Pawlowski asked how much Haddad thought that he could get for them by the end of June, and Haddad answered somewhere around $25,000. Haddad said that he had $35,000 in his pocket for them. "I got $10,000 from my partnership cause you're nice to us here.  But you have to tell these morons at the city you know to a . . ."  Fleck asked if he was talking about Sherman Street. Haddad said, "Yeah. I mean this is bullshit. You know, for two months I've been waiting for them. I almost lost my customers, you know." Pawlowski said, "I'm working on them for you."

**Evidence**

   **Ramzi Haddad**[26] testified that he is a real estate developer. (257)  He has known Mayor Pawlowski since approximately 2004, and knows Michael Fleck and Sam Ruchlewicz as lobbyists. (259-261)  He was told that if he wanted to get business from the Mayor, he had to hire Mike Fleck. (262)  He pled guilty to conspiracy to commit bribery in this case. (262)  He purchased 1324 Sherman Street, Allentown, in December 2014. (264)  He needed to get a zoning application approved for the property from the zoning office. (265)  When he initially contacted Barbara Nemith from the zoning office, it appeared that there was going to be a delay until January. (267)  Haddad talked to Ruchlewicz about the delay. (269)  Ruchlewicz said that he could contact the Mayor in some way about this zoning issue. (269)  The issue was resolved in two days. (270, 24, Exhibit C-11)

---

[26]  Haddad testified on January 31, 2018 and February 1, 2018. All citations are to the transcripts from those     dates.

Haddad also had inspection issues in May 2015.  He needed a certificate of occupancy. (14)  He did not believe that the inspector was being responsive and he again called Ruchlewicz about the issue. (272)  On May 18, 2015, approximately three to four days before the inspection was done, Haddad met with Mayor Pawlowski and Mike Fleck in New York City. (274)  The Mayor had called Haddad and asked that he raise $25,000 for him for his Senate run. (276)  Haddad, the Mayor and Fleck discussed not talking on the phone, joking about going to prison, Haddad's $3,500 check for Pawlowski, whether Haddad could raise $25,000 by the end of June, and Haddad's need for the Mayor's help with Sherman Street. (279-286, MF 54, MF 55)  Haddad met with the Mayor on June 29, 2015, and gave checks to Pawlowski for $8,500 from his partners, the Brills. (5-6, Exhibit C-21)  Haddad also gave additional checks for $6,500 to Pawlowski, Exhibit C-22, sometime later. (7)  Haddad had at first not shown up for the June 29, 2018 meeting because he was not getting what he wanted. (9)  When the Mayor texted him that he was waiting and that he needed Haddad's help, Haddad thought that if he did not go, the Mayor would be vindictive. (10)  After looking at texts that Ruchlewicz had sent Haddad, Pawlowski told Haddad to delete them. (13)  Haddad also said that he had heard that Fleck was under investigation by the FBI before the meeting of June 29, 2018. (13)

**Barbara Nemith**[27] testified that she was the Zoning Supervisor of Allentown Planning and Zoning on December 19, 2014. In December 2014, Ramzi Haddad  owned the property at 1324 North Sherman Street in Allentown. (169)  Haddad contacted her about a permit for that property, (171) and she told him that he had to start with a zoning application. Managing Director Fran Dougherty also talked to her about the property (172)  Haddad submitted a zoning application on December 18, 2014,

---

[27]     Nemith testified on January 31, 2018. All citations are to the transcript from that date.

and it was approved on December 19, 2014. (176, Exhibit C-5)  Nemith testified that Exhibits C-6 and C-7 were e-mails that she sent to Fran Dougherty, giving him a synopsis of what was going on with 1324 North Sherman Street. (178, 180)  She sent these e-mails to Dougherty because, either through an e-mail, a phone call or a conversation, she became aware that Dougherty was interested in this particular situation.  Nemith exchanged e-mails with Haddad (182-184, Exhibits C-8, C-9, and C-10), and then sent an e-mail to Dougherty telling him that Haddad's zoning application had been approved for warehousing and warehouse sales. (185, Exhibit C-11)  Without Dougherty's interest in this matter, the zoning request could have taken days or even weeks to get approved. (201)

**David Paulus**[28] testified that he retired as the director of the City of Allentown's Building Standards and Safety Bureau. Part of his bureau's tasks included housing, rental property and construction inspections. (203)  There were times that he was asked to move inspections up by the Mayor or one of his assistants. (205)  Moving inspections may create problems for the city inspector and for the contractors waiting for him. (206)  If someone's inspection on a certain date was moved up to the first inspection, it could impact others on the schedule. Mayor Pawlowski seemed to have Ramzi Haddad, Abe Atiyeh and Nat Hyman as favorite real estate people. It seemed that he received a call from the Mayor about every project that Mr. Haddad had. (211)

Paulus identified an alteration permit application for electrical and plumbing work at Haddad's building at 1324 North Sherman Street from January 22, 2015. (212-13, Exhibit C-12)  He also identified an e-mail that he sent to Fran Dougherty on May 12, 2015 telling Dougherty that the plans were approved and the inspection of Haddad's property was set for May 21, 2015. (214, Exhibit

---

[28]     Paulus testified on January 31, 2018. All citations are to the transcript from that date.

C-2)  Dougherty then forwarded that email to Mayor Pawlowski. (215, Exhibit C-2a)  He suspects that

he sent his e-mail to Dougherty because of a phone call made to him by Dougherty. (216)

Paulus identified an e-mail that he sent on May 21, 2015 to Mayor Pawlowski. He

recalled Pawlowski calling him that morning and telling him to look into several building inspection

issues. By 12:34 p.m., Paulus responded to Pawlowski, and cc'd Dougherty, that "Mr. Ramsey's

Sherman Street property is scheduled for an inspection this afternoon. It was scheduled for today after

he resolved the issue from last week." (217, Exhibit C-3)  The next day, Paulus e-mailed Pawlowski and

Dougherty at 8:41 a.m. that "the inspection for Mr. Ramsey on Sherman Street went well. The next

inspection is scheduled for late next week." (218-19, Exhibit C-4)  Paulus' memory was that the

inspector squeezed in Haddad's inspection for May 21st. (219-20)

Paulus said that Haddad had the ability to contact Pawlowski directly about issues

involving his property. Haddad did not understand the process and how work was supposed to get done

and inspected. Haddad would call the Mayor to get his inspections moved up which caused disruptions

for Paulus's department.

**Thomas Rizzotto**[29] testified that he was an Allentown Building inspector for twenty-

three years. (245)  His immediate supervisors were Bill Harvey and Dave Paulus. (248)

He was responsible for the inspection at 1324 North Sherman Street. On May 21, 2015 that property was

scheduled for inspection. (249)  For the certificate of occupancy inspection, he was told by his

supervisors that he had to get out to the Haddad's property right away. (252)  That caused him to have to

shift things around, impacting other people who were already on the schedule. (252)

---

[29]     Rizzotto testified on January 31, 2018. All citations are to the transcript from that date.

**William Harvey**[30] testified that he had been a construction inspector for the city for almost eight years, and during that time he supervised Tom Rizzotto. (254)  In approximately May 2015, he had a conversation with his supervisor, David Paulus, in which Mr. Paulus indicated that he wanted to know what was holding up the inspection of 1324 Sherman Street.  As a result of that conversation, the inspection was expedited. (255)

**Admitted Intercepted Conversations and Emails**:

On **December 4, 2014**: Haddad asked Ruchlewicz, "Speaking of raising funds, who do I need to grease today?" Ruchlewicz said the Mayor, and when Haddad asked how much does he need, Ruchlewicz answered $2,500. Haddad says that he may need some zoning help. (SR #220)[31]

On **December 7, 2014**: Ruchlewicz told Pawlowski that Haddad may need help getting a zoning change for his warehouse. (SR #234)

On **December 10, 2014**: Haddad gave Ruchlewicz a check for $2,500. Ruchlewicz[32] told Haddad that he talked to the Mayor about Haddad possibly needing help with his

---

[30]     Harvey testified on January 31, 2018. All citations are to the transcript from that date.

[31]     In another attempt to expedite a zoning matter, on November 29, 2013, Haddad sent an e-mail to Pawlowski complaining that a hearing on his zoning application for a charter school at 555 Union Boulevard was taking too long and he was told that it might not be heard until as late as February. He asked for help in getting the application expedited.  Pawlowski e-mailed Barbara Nemith on the same day, attaching the Haddad e-mail and saying "If you could expedite this it would be appreciated." Nemith responded on December 2, 2013 that she would do what she could, "but with the holidays, Zoning Hearing Board member schedules, and MLK holiday in January, it gets a bit rough this time of year."  (Ex. C-24)

[32]     Ruchlewicz was cooperating at this point.

zoning problem. Ruchlewicz said "He said whatever you want, just done. Consider it done." Haddad again worries that tire storage will not be approved at his building, which was currently zoned "warehouse." Ruchlewicz assured him that "We'll fix it . . . The Mayor says we'll just do it. The zoning authority in Allentown rests with the Mayor."  When Haddad continued to be skeptical, Ruchlewicz said, "The Mayor has veto power over all the zoning. The Mayor can rezone anything in the city." When Haddad said that he was worried about the neighbors, Ruchlewicz continued, "The neighbors aren't going to fuck you. We'll sneak it through; we'll do whatever we have to do, we'll make it legal. Don't worry.  That's what we do. We'll back door it through the zoning people, we'll do whatever we have to do. . .The zoning officer works for us." (SR #231)

On **December 17, 2014:** Ruchlewicz told Dougherty that Haddad may need help getting an answer on Sherman Street. Dougherty said that he can commit to getting him an answer by the end of the year if he got his application in. Dougherty said that he would tell Barb (Nemith) to prioritize the review. Dougherty said that he would put Barb on alert. (SR #245)

On **December 19, 2014**: An e-mail from Barbara Nemith to Ramzi Haddad re "Building-Parking Lot Layout Revised" indicates that the zoning application for 1324 N. Sherman Street has been approved for warehousing and wholesale sales. Nemith sends that approval message to Dougherty. Dougherty responds and says that we need to ensure that there aren't a lot of trucks.

On **December 31, 2014**: Pawlowski, Dougherty, Ruchlewicz and Haddad were looking at a property. As Pawlowski and Dougherty got in their car to leave, Haddad thanked Dougherty for his help on Sherman Street and said that he would need Dougherty's help with Bill Harvey because

he needed to get his (building)  permits. Dougherty told Haddad to work with Harvey and that Dougherty would help with whatever he can. (SR #260)

On **February 4, 2015**: Haddad complained that he was not getting anything out of Pawlowski. When Ruchlewicz told Haddad that Pawlowski wanted him to raise $50,000, Haddad said that "I'm not working for free anymore. I hate carrying politicians. I don't; I give a lot of money out and I'm tired of it."  Later he said, "It's the same thing with the Mayor. If he wants me to raise him money, I'll raise him money. But he has to be nice to me. He can't discount me. I can't see myself giving you a dollar for fucking Mardi Gras until I get some action, you know." Later Haddad said, " I get a zoning change. You know what the zoning change was? It was great for him because now the building is being used. It wasn't against his (UI)  . . . ." Ruchlewicz said but it got done. (SR #303)

On **April 19, 2015**: Fleck and Pawlowski discussed Rob McCord's legal problems[33] and Fleck said, "We don't want to get Rob McCorded." Pawlowski said that Ramzi Haddad "scares me" and Fleck said that Pawlowski should stop meeting with him. Fleck said, "Like you got to keep helping him so, like . . . because you're doing like nine projects with him right now, right." Pawlowski agreed. Fleck suggested that Pawlowski no longer meet with Haddad, instead letting Ruchlewicz deliver messages. Fleck advised that the only time he should talk to Haddad is fundraising for the campaign. Pawlowski said that Fleck should have Ruchlewicz talk to Haddad to see if "we could separate the stuff out so that he's actually not the one giving the money. Since we're doing so many direct things with him, that would be great." Fleck suggested that they can use Eddie Brill for that.

---

[33]      Former Pennsylvania Treasurer and gubernatorial candidate who pled guilty to two counts of attempted Hobbs Act extortion.

Pawlowski said, "I just don't want him to show up, you know, as this big donor." Fleck suggested that when Haddad needed to talk to someone about the city, they could use Fran Dougherty as a buffer. "Because the last thing you want is to, on a conversation on the phone, and he's talking to you about you know hey, how's the garage coming?  Pawlowski said that was why he wanted some "burner phones." "Then I can just talk business on this phone, and then . . . anything fund related I can use a different burner." Fleck added "Then if anybody's ever trying to record you, they never get it, you know what I mean.  Pawlowski said exactly, that's the point. "That's the whole point of the burner phone."  When Fleck said that you don't use the same burner for more than a week, Pawlowski agreed and said "Yeah, or you just keep alternating burners."   (MF #26)

On **April 23, 2015**: Haddad told Ruchlewicz that Pawlowski called and asked him to raise $25,000 to $30,000. After complaining about the Mayor's lack of help in his many open projects, Haddad again acknowledged that the Mayor "helped us out with zoning and shit like that." (SR #384)

On **May 18, 2015**: On the way to New York City to visit Rosen and Haddad, Fleck and Pawlowski discussed their approach. Fleck said that they needed to have direct and frank conversations with Rosen and Haddad, but that after today, we should not meet with them again for anything that the Mayor needed help with, because that gets you into conversations that you don't want to be in with either one of them.

Later in the conversation, Pawlowski brought the subject up again, saying: "Ramzi we have to have a frank conversation with. He can never talk to me about these things again." Fleck responded, saying "Ramzi, let's talk about all your issues today, what you want, here's what we

65

want, here's what you want. And then we never talk about 'em again after today . . . And I think you should tell him right now, what things are not going to be doable and what things are doable." They discussed a number of things that Haddad was interested in.  Pawlowski said that "I was going to ask him to raise at least fifty." Fleck said "I was going to ask him to raise two fifty by the end of the year."

Fleck told Pawlowski that, on the twenty-first, Haddad's had some kind of inspection. Instead of fucking him over, if there's stuff wrong, he'd like just a letter and some time to work on it if there's anything wrong with the inspection. When Pawlowski asked in reference to what, Fleck said, "Sherman Street. Do you know what I'm talking about? They're inspecting Sherman Street." After saying that he can only do so much, Pawlowski said, "Okay, I got to find out who the inspector is. There's not much I can do. I'll try." When Fleck asked what Sherman Street was, Pawlowski said it's just some industrial property that he wants.  (MF #54)

On **May 18, 2015**: At the actual dinner meeting with Pawlowski and Fleck, Haddad said that he had a check for the Mayor but never delivered it that night. Fleck told Haddad that he should just go through all the things that were working and pending in Allentown, so that we don't have to have any conversations on the phone. Pawlowski said that he'd rather have Haddad talk directly to Fran because he was usually calling Haddad about fundraising, and if he mixed the two together, it was bad. He then said, "And I'm saying that more for me than you because I do it all the time."

Shortly later, Pawlowski asked how much Haddad thought that he could get for them by the end of June and Haddad answered somewhere around $25,000. Haddad said that he had $35,000 in his pocket for them. "I got $10,000 from my partnership cause you're nice to us here.  But you have to tell these morons at the city you know to a . . . " Fleck asked if he was talking about Sherman Street.

66

Haddad said, "Yeah. I mean this is bullshit. You know, for two months I've been waiting for them. I almost lost my customers, you know." Pawlowski said, "I'm working on them for you." Haddad said that they were coming on Thursday and if they were going to nitpick he was going to explode. He again complained that he could not collect some of the rent because of this delay. Pawlowski said that he was trying to get rid of some of those guys, with the biggest bonehead being Tom Rizzotto.  (MF #55)

On **June 29, 2015**, Fleck and Pawlowski were going through potential contributors that they wanted to call. Fleck said that they had a meeting with Haddad at two o'clock that afternoon. Pawlowski started off by saying that he could not do one of Haddad's schemes. But he said that he had helped Haddad on many things. Fleck said that the Mayor helped him on the Sherman Street zoning and inspections, getting the inspectors out to the location and Pawlowski said that he helped him every time on so many things. When Pawlowski thought that Haddad had stood him up, he said, "Listen, if he bones me, I, I'm gonna be pissed at him too, cause I have bent over backwards for this guy, on so many different occasions it's not even funny. And, you know, I'm tired of these folks.  I, I'm not gonna do, I'm not gonna do it anymore. I'm just tired of it. You, you help me when I need help. That's all I'm asking. I just need help now. I need to, get this thing done. You want to bone me over then fine. But don't expect, you know, for me to be at your beck and call from here on out."  (MF #95)

On **June 30, 2015:** Pawlowski and Fleck picked up a check from Haddad. Haddad told Pawlowski that he sent him that email reminder. After they left from Haddad, Pawlowski said that he erased Haddad's email. (MF #97)

F.      **Chew Street**

**Count 1: (Conspiracy)**

**Count 10: Bribery)(McTish—04/27/15)**

**Summary**

McTish testified about the April 27, 2015 meeting with Pawlowski in which the Mayor asked for a campaign contribution, discussed bridges, discussed the type of work that McTish did and said that if he could become U.S. Senator, "that would be very good for my business." McTish's experience with Pawlowski was that when he met with Pawlowski, McTish would talk about the work his firm liked to do, and Pawlowski would talk about upcoming Allentown work, his plans, and his fundraising campaign, all in the same conversation. Ruchlewicz and Fleck also drew the same connection for him between getting work in Allentown and making campaign contributions to the Mayor. Pawlowski seemed knowledgeable about his work and made McTish feel encouraged that he would have an opportunity to do work.   He would then slide right into how he needed McTish's help making a campaign contribution for the campaign. McTish said that he had this type of conversation with Pawlowski more than once and had similar conversations with Ruchlewicz. McTish said that he made campaign contributions in Allentown to remain competitive in public engineering contracts. He felt pressure to give primarily to Mayor Pawlowski. He said that he always looked at it that there was a relationship between getting work and making campaign contributions and he felt that doing nothing at all for Pawlowski's request for money for running for governor would upset Pawlowski. (145)  He did not believe that he could get work in Allentown without making donations to Mayor Pawlowski. (142)

68

**Evidence**

**Richard Young[34]** testified that he is a civil engineer and worked for the city of Allentown as Public Works Director from 2008 until 2014. (17-18)  In 2013, the city put out an RFP for construction inspection services on a Basin Street project. (19), a contract worth approximately $30,000 to $50,000. (25)  Concerning this contract, Managing Director Francis Dougherty told Young that they needed to do the engineering firm of McTish Kunkel a favor. (19)  Dougherty told Young that Pawlowski owed McTish a favor, and that was why the city had to find a contract for McTish. (24.)  As a result of this conversation, Young felt pressured to give the contract to McTish Kunkel (26)  At the time of the conversation, the Basin Street Inspection Project was available. Three companies already had submitted proposals: Remington Vernick, Michael Baker, and McTish-Kunkel. On the evaluation committee for the RFP with Young were Craig Messinger and Mark Geotsis. (25)  Young testified that he believed that Geotsis originally wanted Michael Baker to get this contract. McTish Kunkel was awarded the contract. (25.)

**Mark Geosits[35]** was an assistant engineer in the Public Works Department. He stated that he originally favored Michael Baker for this contract because he had a track record with them and had been satisfied with their work. After Young suggested to him that it might be good to give McTish a shot, he re-thought his position and agreed. It was only after the decision was made that Young told him that the Mayor wanted McTish to get the job.

---

[34]     Young testified on February 8, 2018.  All citations are to the transcript from that date.

[35]     Geosits testified on January 30, 2018. All citations are to the transcript from that date.

**Matthew McTish**[36] testified that he was a consulting civil engineer at McTish, Kunkel & Associates, an engineering firm, until August 2016, when his license was suspended. (35, 37)  He pled guilty to conspiracy to commit bribery in this case in relation to certain engineering contracts that his firm was awarded. (36)   McTish acknowledged that he and his brother made campaign contributions to Pawlowski on February 16, 2012 and February 24, 2012 (Exhibit D-6); and December 17, 2012, (Exhibits D-7 and D-8)  (39-41)  He was donating thousands of dollars to various political candidates and he expected to get work from Mayor Pawlowski. (44)  When he met with Pawlowski, McTish would talk about the work his firm liked to do, and Pawlowski would talk about upcoming Allentown work, his plans, and his fundraising campaign, all in the same conversation. (45)  Ruchlewicz and Fleck also drew the same connection for him between getting work in Allentown and making campaign contributions to the Mayor. (46)  Pawlowski seemed knowledgeable about his work and made McTish feel encouraged that he would have an opportunity to do work.  (47)  He would then slide right into how he needed McTish's help making a campaign contribution for the campaign. (47)  McTish said that he had this type of conversation with Pawlowski more than once and had similar conversations with Ruchlewicz. (47)  Ruchlewicz appeared to be friendly and close to the Mayor. (48)  If McTish wanted to contact the Mayor, he did it through Fleck or Ruchlewicz. (48)  On  December 13, 2013, the city of Allentown put out an RFP for construction inspection services for the Basin Street project. (53, Exhibit D-5)  When Pawlowski announced a run for Governor, McTish was asked to contribute $15,000. (54)  He contributed $1,000 on December 30, 2013. (54-55, Exhibit D-11)  With the Basin Street project

---

[36]     McTish testified on February 8, 2018. All citations are to the transcript from that date.

pending, he felt like he had no choice in making the contribution. (56)  He said that he always looked at it that there was a relationship between getting work and making campaign contributions and he felt that doing nothing at all for Pawlowski's request for money for running for governor would upset Pawlowski. (145)  He did not believe that he could get work in Allentown without making donations to Mayor Pawlowski. (142)  McTish ultimately was awarded the Basin Street contract, which was valued at approximately $52,000, via a letter dated April 2, 2014. (56, Exhibit D-4)

In December 2014, McTish learned about a new project on Chew Street in Allentown from Sam Ruchlewicz. (60-61)  Ruchlewicz told him about the project on December 4, 2014 and later in the same conversation asked him for a donation to Mary Ellen Koval. (62-63, SR #20305)  The next day, Ruchlewicz told Pawlowski that Koval and Dougherty had found McTish a project (Chew Street) and that Pawlowski should hit McTish up for Pawlowski's holiday party. (64, SR #223d)  McTish acknowledged making a $1,000 contribution to Koval on December 5, 2014 (65, Exhibit D-15), a $1,125 contribution to Pawlowski on December 19, 2014 (67, Exhibit D-16, and his brother making a contribution of $1,125 to Pawlowski on December 19, 2014. (67, Exhibit D-17)  On April 27, 2015, McTish met Pawlowski at a restaurant (69, SR #386), and Pawlowski asked McTish to raise $21,600 for his Senatorial campaign. After Pawlowski left, McTish told Ruchlewicz that the Mayor and he had discussed bridges. McTish said that the Mayor and he had discussed the type of work that McTish did and that Pawlowski said that if he could become U.S. Senator, "that would be very good for my business." (73)  McTish contributed $2,500 to Pawlowski on July 1, 2015. (76, Exhibit D-19)  He said that he made campaign contributions in Allentown to remain competitive in public engineering contracts. (80-82)  He felt pressure to give primarily to Mayor Pawlowski. (83)

**Ralph Eberhardt**[37] testified that he manages the Allentown office of Michael Baker International (Michael Baker), an engineering, architectural, and construction services firm. (8)  Michael Baker submitted an RFP for the Basin Street project issued by the city of Allentown in January 2014. The RFP called for providing construction inspection services for a construction project on Basin Street. (10)  They expended approximately $1,300 in preparing the RFP, which was eventually awarded to McTish Kunkel. He identified a letter sent by the city to Michael Baker (Exhibit D-3)  stating that McTish Kunkel had been awarded the contract.

**Thomas Beach** [38]  testified that he works for Remington and Vernick Engineers. They submitted an RFP on the city of Allentown's Basin Street project that cost them  approximately $4,000 to $5,000 to put together. (151)  They expected the RFP to be fair and would not have wasted their time bidding if they believed the selection process was rigged. He identified Exhibit D-2 as a letter addressed to his firm telling them that McTish Kunkel had been awarded the Basin Street project. (153)

**Admitted Intercepted Conversations and Emails**

On **August 25, 2013**: McTish sent an e-mail to his business development consultant and attached an e-mail from Mary Ellen Koval requesting $15,000 for the Mayor's re-election campaign. McTish e-mailed his consultant and said that he had probably given the Mayor over $10,000 through the years and was not getting any results. He said that he would give in the future, but only in small amounts. (Exhibit D-9)

---

[37]     Eberhardt testified on February 8, 2018. All citations are from the transcripts for that date.

[38]     Beach testified on February 8, 2018. All citations are from the transcripts for that date.

On **December 31, 2013**: Pawlowski complained to Fleck that McTish was not returning his calls. Pawlowski said that "Cause he doesn't' call you back and then he wants the world too." (MF #1918)

On **December 31, 2013**, McTish contributed $1,000 to Pawlowski for Governor, days before questions were due on the Basin Street RFP and about two weeks before he submitted his response to the RFP. (Exhibit D-11)

On **December 4, 2014**, in a conversation with Ruchlewicz, McTish was told that he was getting the Chew Street project even though an RFP had not yet issued. During the same call, Ruchlewicz also asked McTish to come to the Mary Ellen Koval fundraiser at the cost of $1,000. The next day, McTish did contribute $1,000. (SR #20305, Exhibit D-15)

On **December 5, 2014**, Ruchlewicz told Pawlowski, as they leave a holiday party, that Mary Ellen and Fran had found a project for McTish, the Chew Street project. Ruchlewicz said that he now wanted the Mayor to hit McTish up for the holiday party. Pawlowski said, okay, good. Ruchlewicz said that McTish said that he would be good for "this many" before. (SR #223d)

On **December 10, 2014**, Ruchlewicz told McTish that he told the Mayor that he was going to be contributing $2,500 and that the Mayor said that as soon as the Chew Street project came across, he'd rubber stamp it. (SR #230)

On **April 27, 2015,** McTish met with Mayor Pawlowski, Ruchlewicz, and Lisa Rossi at the Hamilton Kitchen restaurant. Ruchlewicz told McTish that Koval was looking out for him with the Chew Street project. When McTish questioned this information, Ruchlewicz told McTish that there was still potential for the project. At that same meeting, Pawlowski talked about his Senate run and

his need for money by June 30th. He asked McTish to raise $21,600 for him. (SR 386)  McTish

ultimately gave $2,500 to Pawlowski on July 1, 2015 to show his displeasure.  (SR #386, Exhibit D-19)

### G.      Pools

**Count 1: (Conspiracy)**

**Count 8: (Bribery)(Biondo—06/24/15)**

**Count 26: (Mail Fraud)**

**Count 31 (Wire Fraud)(Integrated Aquatics—12/19/14)**

**Count 32 (Wire Fraud)(Integrated Aquatics—01/14/15)**

**Count 33 (Wire Fraud)(Integrated Aquatics—01/14/15)**


**Summary**

        This contract was for consulting and engineering design services for the City's aquatic renovations of its pools. The contract to fix the pools was broken up into two parts. The first part was for design and architectural services. The second part was for a contractor to actually go and do the work. The complete project of design and construction was estimated to cost $3,000,000.  It included work on a spray park at Boyle Park; filtration and design of the pool at Mack Park; a total redesign and building of the Cedar Park pool; and work on Jordan Pool, Fountain Pool, and Urban Pool. The biggest issue was Cedar Park Pool which had to be closed when it was last filled because a main drain broke, causing the pool to lose a million gallons of water a month.

        The Mayor told Dougherty that it would be great to get Spillman Farmer some of the pool work. The Mayor clearly drew a connection between work and campaign contributions, as he told Dougherty that Spillman Farmer would be campaign contributors. This was due in part to Spillman's association with Sean Boyle.  Dougherty told Rick Holtzman, who was the head of the Pools RFP

Evaluation Committee, that the Mayor wanted Spillman Farmer to get the architectural design part of the contract. During the evaluation process of Spillman Farmer, Dougherty told the Mayor that Spillman received a bad reference and the Mayor told Dougherty to talk to Ruchlewicz.  Ruchlewicz then provided Dougherty with another reference. When the Mayor called Joseph Biondo of Spillman Farmer in early June 2015 before the contract had been awarded to ask him for a contribution, Biondo told the Mayor that he would have to "run it up the flagpole." When Pawlowski is exasperated by that response, Ruchlewicz told Pawlowski that he would call Biondo and tell him that he must contribute. When Biondo sent an email on June 29, 2015 to Lisa Rossi saying that Spillman would not be contributing "at this time" but may do so in the future, Pawlowski told Fleck that they were doing his pools and that Fleck should call them.

**Evidence**

The RFP in this case, RFP 2014-30, (Exhibit E-2), stated:

1.      That proposals will be handled confidentially by the City during the pre-award process;

2.      that the award will be made to that responsive and responsible proposer whose proposal, conforming to specifications, will be most advantageous to the City; price and other factors considered, such as delivery time, quality, service, etc.  The award may or not be made to the firm with the lowest cost;

3.      Under the title "Evaluation and Award Criteria" the RFP states that "In general, the proposal will be evaluated in terms of the project approach and understanding of the

objectives and constraints; the firm's ability to meet RFP requirements; management, team organization and skill of experience of key team members; the qualifications of the specified persons who would be performing the requested services; and the prior experience and reputation of the firm in similar projects." The award may or may not be made to the lowest cost proposal.

**Richard Holtzman**[39] testified that he is the Superintendent of Parks for the City. He has had that job for approximately six years and has worked for the City for approximately twenty-five years. As part of his current job he oversees the City's pools. (223)

An RFP was issued for the design and engineering work for the pools in 2014. (226) Three million dollars was set aside for this project. (225)  Holtzman was a member of the pool evaluation committee. Other members of the committee included Michelle McGinnis, the Park Maintenance Supervisor, who oversaw the pools and the maintenance of the pools and pool staff; Christy Alvord, a Recreation Events Specialist; and Mark Geosits, a City Engineer. (227-28)

The RFP responses were first evaluated individually by the members of the committee. After the scores were totaled, MKSD/Counsilman Hunsaker was in first place, Integrated Aquatics was in second place and Spillman Farmer (Spillman)  was in third place. (229-30, Exhibit E-14)  A tour of the pools was scheduled by email (230, Exhibit E11) and sent to MKSD and Integrated Aquatics. Interviews were conducted with the top three companies. (232)  Fran Dougherty told Holtzman to "take another look at Spillman Farmer." Holtzman believes that he relayed this information to the committee. Holtzman said that Dougherty's comment made him feel pressured to favor Spillman Farmer. (236-37)

---

[39]     Holtzman testified on February 8, 2018 and February 12, 2018. All citations are to the transcripts from those dates.

One of the references for Spillman contacted by Holtzman indicated that they had some problems with Spillman on a prior project.(238)   Holtzman told Dougherty about this negative recommendation and another reference was provided. (238)  Spillman Farmer ultimately was notified that they were being awarded the contract by letter on April 9, 2015 (244, Exhibit E-27) but the contract was not awarded until July 2, 2015. (243, Exhibit E-7)

After Spillman got the contract, they performed badly. The original project costs for the reconstruction of Mack Pool and Cedar Beach Pool was $1.8 million.  To date they have spent $3.4 million. (249)  Cedar Beach pool did not open until October 2017. (250)

**Christy Alvord**[40] testified that she was the recreation and events coordinator for Allentown' parks.  (207)  After funding was found to fix Allentown's pools, she was part of an evaluation committee that considered responses to the RFP. (209)  On the evaluation committee with her were Rick Holtzman, Michelle McGinnis, Mark Geosits, and Lindsay Taylor. (209)  Five companies submitted proposals, and after the technical review of the proposals, MKSD Architects was in first place, Integrated Aquatics in second place, and Spillman Farmer Architects in third place. (212)  The committee decided to do interviews, but before the interviews, she, Rick Holtzman, and Lindsay Taylor met with Managing Director Fran Dougherty, who told them "to take a closer look" at Spillman Farmer. (214)  They were confused by Dougherty's remark. (221)  Reference checks were made for all three companies and she did not hear about any negative reference checks for Spillman Farmer. (215)  If she had heard of a bad reference, it would have factored into her ultimate award of the contract. (216)

---

[40]        Alvord testified on February 8, 2018. All citations are to the transcript from that date.

Alvord testified that she did not think that the process was fair and impartial because Dougherty's remark influenced her personal decision. (222)

    **Joseph Biondo**[41] testified that he was a part owner of Spillman Farmer Architects. (133) Despite Spillman having a marketing department, they hired Fleck and Ruchlewicz to help introduce them to developers coming into the city of Allentown to do business. (134)  Spillman was aware that Fleck/Ruchlewicz also did fundraising for Mayor Pawlowski and knew that they had to proceed with caution. (136)  Spillman bid on a city of Allentown RFP that totaled somewhere in the area of $3,000,000, combining design and construction. (137)  Spillman partnered with Barry Isett Associates and Wade Associates on this RFP. (137)  On March 23, 2015, Ruchlewicz called him and told him that Nazareth had provided a bad reference for Spillman. (138)  Consequently, Spillman provided another reference. (138)  Spillman was awarded the contract and received a notification of award letter on April 9, 2015 (139, Exhibit E-27)  The date that the actual contract was signed was July 2, 2015. (140, Exhibit E-7)  Before the contract was signed, Mayor Pawlowski called Biondo, on June 2, 2015, and asked for a campaign contribution. (140)   Biondo told Pawlowski that he would "run it up the flagpole" and after discussing the request with a partner, they decided not to contribute. (140-41)  Biondo later received an e-mail on June 24, 2015 (141, Exhibit 5) from Lisa Rossi inquiring about the possible contribution to Mayor Pawlowski. Biondo responded on June 29, 2015 (Exhibit E-6)  that Spillman could not contribute "at this time."

---

[41]     Biondo testified on February 12, 2018. All citations are to the transcript from that date.

**Ben Hanbicki**[42] owns Integrated Aquatics. (171)  He submitted a proposal to the Allentown Pools RFP that came out in approximately December 2014. He received an email from the city's purchasing agent on December 19, 2014 which included the Pools RFP. (172, Exhibit E-1)  He received a second e-mail from the city purchasing agent on January 14, 2015 inviting him to tour the pools. (173, Exhibit E-3)  He estimated that he spent a couple thousand dollars putting his presentation together for the city. (175)  The city seemed very interested in his presentation but Spillman Farmer eventually got the contract. If he had been aware that Spillman Farmer had hired as a consultant the same company that was running the Mayor's campaign, he probably would not have bid on the contract. (175-76)

**Todd Chambers**[43] testified that he is a partner at MKSD architects, which put in a bid for the Allentown pool project in 2015. (177)  The firm generally relied upon the qualifications that were set forth in the RFP, and expected that the city was going to use those qualifications in awarding the contract. (177-78)  The cost to MKSD of preparing their bid was between $5,000 and $10,000. An e-mail from the city of Allentown's purchasing agent was received by them on January 14, 2015. (179-80, Exhibit E-3)  They did not get the contract. They expected that the process would be fair and would not have bothered submitting a bid if they knew that it was not fair. (180)

**Joseph Ramirez**[44]  testified that he owns Midatlantic Construction and Design company. He was awarded a contract by the city of Allentown to do renovations on the Mack and Cedar pools. He

---

[42]     Hanbicki testified on February 12, 2018. All citations are to the transcript from that date.

[43]     Chambers testified on February 12, 2018. All citations are to the transcript from that date.

[44]     Ramirez testified on February 12, 2018.  All citations are to the transcript from that date.

bid on the construction part of the pool work after Spillman Framer did the design work. He found many

problems with Spillman's work on Cedar pool, including drawings showing the pool walls as 12 inches

wide when they were actually 5½ inches wide, (190), no survey being done of the pool (190), electrical

work being done below the flood zone (195), and a miscalculation of the water volume. (195-96)  As a

result of issues with Spillman's drawings, change orders were submitted to the city for problems. The

initial contract was $1,800,000, but the cost is now up to $3,480,000. (197)  Midatlantic also has an

extended overhead claim for $600,000.  As a result of problems, the pool did not open in the summer of

2016 or 2017. (199)

**Kevin Campbell** testified that he is the president at Barry Isett and Associates (207)

They joined Spillman Farmer as part of their proposal. On June 30, 2015, Barry Isett individually made

a contribution of $1,000 to Pawlowski 2016 (207-08, Exhibit E-32)  by way of a debit card. This

contribution was prompted by an e-mail of June 29, 2015 from Sean Boyle inviting them to attend a

campaign fundraiser. (209-210; Exhibit E-36)

**Admitted Intercepted Calls**

On **March 23, 2015**, Ruchlewicz and Dougherty discussed the fact that Spillman

was one of the three companies being considered for the pools contract, that they had the cheapest

proposal, but that one of their references from Nazareth gave them a bad review. Dougherty said that

"The guy bashed the shit out of them. Saying you don't want this company. They've been very

unresponsive. That they fucked the project up. They got a very, very, and that's in their fucking

brochure. The guy trashed them. So I wanted to know whether there are other municipalities who can

81

talk. . .”  Dougherty went on to say that the bad review was upsetting to the main guy on the evaluation committee, because he felt like "well how responsive are they going to be with me." Dougherty asked for two municipalities that Rick could call. When Dougherty told Ruchlewicz that the other two companies in competition were Integrated Aquatics and MKSD, Ruchlewicz said "No MKSD.  Not helpful engines."  (SR #354)

On **March 23, 2015**, Ruchlewicz called Joseph Biondo of Spillman about 30 minutes after talking to Dougherty in the above conversation. He relayed the information that Spillman is the lowest bidder. But he also told Biondo about the bad reference, including the name of the person who gave the bad reference. Ruchlewicz asked for two additional municipalities that will give Spillman stellar references so that he could get the names over to the selection committee and have them call the new references. (SR #35090)

On **June 2, 2015,** Pawlowski received a phone call from Joseph Biondo from Spillman.[45] Pawlowski told Biondo that he was running for the U.S. Senate and thought that he had a good shot. He then asked Biondo if Spillman could do $2,700.  He then received Biondo's e-mail address.

After he hung up the phone, Pawlowski asked Ruchlewicz, evidently in response to Biondo's answer "I'll run it up the flagpole, what the hell does that mean . . . Get him the email and run it up the flagpole to give me twenty-seven hundred bucks." When Ruchlewicz said that they just got that pool project, Pawlowski responds "Yes, I know." He laughed and said "Better run it up the flagpole

---

[45]     Only Pawlowski's side of the conversation can be heard.

fairly quick, Joe." Ruchlewicz responded that he'd call Joe and tell him that he has to give money.  (SR #402)

On **June 24, 2015,** Lisa Rossi, Pawlowski's fundraiser, sent an e-mail to Joseph Biondo stating that she just wanted to follow up on his earlier conversation with Mayor Pawlowski about the possibility of making a contribution to the Senate campaign.  The message continued that the quarterly fundraising deadline was Tuesday, June 30th and that it was critical that the Mayor report with a strong fundraising number in order to prove to the national Democrats that he is in the race to win it. The message asked if he could make his donation before the deadline. The exact same message was repeated on June 29, 2015. (Exhibits E-5 and E-6)

On **June 29, 2015** In an email, Biondo responded and said that "Unfortunately I cannot contribute at this time. I support the Mayor and his run and will consider helping out with future events. Thanks for asking." (Exhibit E-34)

On **July 1, 2015** Pawlowski and Fleck discussed poor performers for contributors. Fleck told Pawlowski that Biondo had indicated that he was not contributing anything. Pawlowski said and he's doing all my pools right now. Pawlowski told Fleck that he thought that Fleck should call Biondo. (MF #99)

### H.   Norris McLaughlin and Scott Allinson

**Count 1: (Conspiracy)**

**Count 17: (Bribery-Soliciting-Pawlowski)(01/15 through 06/30/15)**

**Count 19: (Bribery-Offering-Allinson)(02/15 through 06/30/15**

**Summary**

Scott Allinson was an attorney at Norris McLaughlin & Marcus (Norris McLaughlin), who, during the course of his intercepted conversations, he made it clear that he wanted to be the main point of contact between the City and Norris McLaughlin, so that he could get the internal firm financial credit for any work coming the firm's way from the City. As referenced below, he also made it clear that this arrangement would benefit Pawlowski as well because checks to Pawlowski from the firm then would be more forthcoming. Pawlowski also understood this arrangement and agreed to it.

**Evidence**

**Admitted Intercepted Conversations**

On **December 30, 2013**, Pawlowski asked Fleck to get in touch with Allinson to contact Sorrentino and see if he would get them their money. (MF #1741)

On **February 5, 2014:** Fleck and Allinson had a telephone conversation in which Fleck complained to Allinson about Stevens and Lee. Fleck said to Allinson that "I'm just tired of Stevens and Lee because they're horrible when it comes to helping out." Fleck complained that despite them getting millions of dollars in criminal defense legal work for the City, when he asked for $25,000

84

toward Pawlowski's re-election, "the guy sent me a check for $500 . . . And you know what? they've been done in the city since then." Allinson said "Nothing?" and Fleck said that it was just rude. Allinson agreed and said "Well, that's bullshit." Fleck lastly contrasted the office for Stevens and Lee in Reading where "if you ask them for something in Reading you get the world. Anywhere else you get $500." (MF #5078)

On **September 8, 2014** Fleck told Allinson that the current Allentown Solicitor, Jerry Snyder, was going to retire at the end of the year. Fleck said that he recommended Graham, believed to be S. Graham Simmons, III, Esq., an attorney with Norris McLaughlin, for the job. Fleck said that he was telling Allinson this so that he could get credit. He mentioned that another person Pawlowski wanted to consider was Richard Somach of Norris McLaughlin, but that he was ineligible because he is the solicitor for Lower Macungie and some other suburbs. They speculated that one reason that the Mayor may love Somach is because Somach lets the Mayor use his house in Key West. They briefly discussed a situation from a couple of weeks prior where a lawsuit was given to Oldrich Foucek III from Norris McLaughlin, only to be taken away precipitously when Pawlowski wanted it to go to another fairly prolific contributor, Alan Kessler from Duane Morris. When the solicitor called Foucek up, he told Foucek that the Mayor picked someone else to handle the lawsuit.  (MF #19149)

On **December 10, 2014**, Allinson told Ruchlewicz that "this is really delicate, but I gotta talk our dialect of English, Sam." He started off by saying that Solicitor Jerry Snyder had a friendship and a professional relationship with Foucek for a long time and was instrumental in getting Foucek outside legal work for the City. Allinson said that while that was going on, he ran point whenever Pawlowski needed something. At fundraisers, sometimes Foucek would bring a check.

Allinson then went into the circumstances of the lawsuit first given to Foucek and then pulled back and given to Kessler at the direction of the Mayor. Allinson said that it was embarrassing and consequently he is not in a position to be asking people for money, when they were doing little work before the case was pulled. He also criticized Pawlowski's dropping from the governor's race only about one week after he received checks from Sorrentino and Foucek. He concluded by saying that "I'm not able to rally my troops with their checks."

Ruchlewicz asked if the firm would at least give a donation to the Second Harvest Food Bank and Allinson said that he didn't know yet. Ruchlewicz suggested that although not contributing to the Mayor, a contribution to the food bank would allow him to go back to the Mayor and say that at least they were able to make that contribution . . . let's get him something.

Allinson replied that "I know that . . . but the well is completely dry right now and so I'm just talking our dialect of English that, you know, we've been unbelievably supportive in the past and now, you know, the work's going everywhere but, but to our shop . . . This is a short term fixable issue."

Allinson then talked about the new solicitor, Susan Wild. He said "I'm very comfortable then, that when she is told that this is coming to Allinson, she can shut the fuck up." Ruchlewicz ended the discussion by promising that Allinson will get work, and that the Mayor recognized his continued support. (SR #21183)

On **December 12, 2014**, Ruchlewicz told Allinson that the solicitor for the Parking Authority was going to be terminated and that Richard Somach was going to get that appointment. Ruchlewicz said that Somach did not know yet and that they were coming to Allinson first with the news so he could get the credit. Ruchlewicz then asked for a contribution to the Mayor's

holiday party. Allinson agreed to be a sponsor for the party at $2,500 but explained that he will write the check around January 22, 2015 because the firm's fiscal year ends on November 30th and they divide their money up soon thereafter in December. (SR #21602)

On **December 17, 2014**, Ruchlewicz assured Allinson that he had talked with Pawlowski and Dougherty and that they were going to make sure that everybody at his firm knew that the reason they obtained the solicitorship to the parking authority was because of Allinson. (SR # 22142) On that same date, Pawlowski asked Somach if he would be interested in the Parking Authority solicitorship. (SR #245e)

On **January 6, 2015**, Ruchlewicz told Allinson that the Parking Authority solicitorship was moving along nicely and should be in place in 30 to 45 days.  Allinson confirmed in the same conversation that he would be contributing $2,500 to Pawlowski in late January 2016. (SR #23908)

On **January 22, 2015,** Allinson told Ruchlewicz that if he solved the Parking Authority situation, he would "get the golden goose." Ruchlewicz assured him that all the work for Allentown would go through him. Ruchlewicz said that Fleck and Pawlowski want Allinson to raise money and he said, "Well of course I am going to raise money, (SR #286)

On **January 23, 2015**, at a breakfast meeting, Ruchlewicz told Allinson that he and Fleck had talked to the Mayor and told him the importance of all work for Norris McLaughlin going through Allinson. Ruchlewicz told Allinson that the Mayor had no problem with this, and that the Mayor said that he would continue to give lots of work to Allinson but that he needed Allinson to be a fundraiser for him. (SR #287)

On **January 28, 2015**, in a meeting at Allinson's office, Allinson told Ruchlewicz and Fleck that Pawlowski called asking for money but that his firm is in a holding pattern for a short period of time. He brought up the fact that Pawlowski received $7,500 from the firm shortly before dropping out of the gubernatorial race and never offered to refund it. In addition, with Solicitor Jerry Snyder retiring and Susan Wild taking over as the new solicitor, the firm's Ollie Foucek doesn't believe that Wild will refer as much work to the firm. Allinson said that that's life. So he said that a request for $12,500 was a heavy stretch unless that was the Mayor's way of finding a good spot for us.

Fleck says "Bullshit," and suggested that Norris McLaughlin would get even more work from Wild because she could not refer cases to her firm Gross McGinley. Fleck and Ruchlewicz said that they thought that the hard feelings re the contributions for the gubernatorial race had been resolved, and Allinson said perhaps they were. Ruchlewicz mentioned that the Parking Authority Solicitorship was also good to go. Allinson then asked why the Mayor needed any more money for anything and some mention was made of a possible run for another office. Fleck reminded Allinson that the Mayor had discretion in awarding legal contracts. (SR #294)

On **January 30, 2015**, Ruchlewicz told Pawlowski that they had a strange meeting with Allinson concerning his fundraising and his proposed meeting with Susan Wild to discuss continuing to do City work. Ruchlewicz said that Allinson said that "We don't know if we want to give to the Mayor." Pawlowski responded, "Really! I've given him millions of dollars." Ruchlewicz said that Mike was fixing it, but Pawlowski wanted to know the reasoning for Allinson's statement. Ruchlewicz said that Allinson was concerned whether he would get any more work with the new solicitor and that they gave a lot of money in the governor's race right before Pawlowski dropped out of the race.

Pawlowski responded that relative to other law firms they've given almost nothing, and then says "Allinson for sure will get nothing now . . . You know, fuck them! And I'm not gonna make Somach solicitor or anything. Screw it all."  Ruchlewicz asked Pawlowski not to do anything until Tuesday when Allinson and Fleck were having drinks and Fleck said that we will talk to him and get everything fixed. Pawlowski complained about the firm screwing up his transition committee and getting him investigated by the IRS. Pawlowski then called Fran Dougherty to get a total of the amount of money that the City paid Norris McLaughlin for legal work since 2006. When he got off the phone with Dougherty, Ruchlewicz told him that he already had that figure, which was $1,008,437.  Pawlowski said "They're crazy. That's not enough for them?  When Ruchlewicz told him that amount did not include ANIZDA money, Pawlowski called Sara Hailstone to get a figure for that. (SR #296)  Later that day, Fleck told Pawlowski that he was going to "beat the shit" out of Scott Allinson. Pawlowski said that it was he who was talking about replacing the solicitor with Rich Somach, and Fleck said that he would tell Allinson that that does not have to be a reality. (SR #297)  Later in the conversation, Pawlowski asked Fleck if he was going to "light up" Allinson so that he did not have to do so.  (SR #297a)

On **February 3, 2015**, Ruchlewicz and Fleck met with Allinson. Fleck said that Sorrentino and Foucek have no right to be mad at the Mayor because the firm did over $300,000 in City work alone in the last year.  Fleck said that between 2006 to 2011, the firm did $300,000 total. He said then you and I developed a good relationship and your firm was doing a million dollars' worth of work. Fleck said that he did not want to sound like Rob McCord but he also researched what other firms gave to the Mayor and what work they received.  Fleck cited Alan Kessler as an example. He said that Kessler received approximately $340,000 worth of work in the last three years and has contributed

89

$30,000, had three fundraisers, and raised another $15,000. He also cited the Dilworth firm, which received a million dollars' worth of work but contributed $37,500.  Fleck addressed the concern about Pawlowski receiving checks one week before he dropped out of the race by saying that the Mayor was not talking about dropping out of the race when he met with Sorrentino and received the checks in December 2013, and they did not try to collect the other $12,500 that they say Sorrentino pledged. once they did drop out. Fleck said that the firm has to do better than making no contribution to Pawlowski this year. In trying to explain the mindset of his firm, Allinson said that Foucek would say that "We have nothing to do with the Mayor. Jerry Snyder is my guy. We're like good old friends. He's the one sending me the work."  Allinson made a pitch again about having all work for the firm funneled through him.  If I get a hundred percent of the kind of credit that turns into money, that goes out of my checkbook where you want it to go. So if it (work)  comes to me and I get billing credit, then I get the full stack of cash on the one side to do with it what I need to do, annually. Do you know what I'm saying to you? If it goes to anybody other than me, it will get fucked up. Allinson asked for 90 days to work things out. Later in the conversation, Ruchlewicz told Allinson that the number the Mayor had in mind was $10,000 for this year. Allinson said that's easy, then said "If . . .what is going to happen?" Ruchlewicz answered "All the work will come to you. The work will be yours."  (SR #301)

    On **February 11, 2015**, Ruchlewicz asked Allinson if he had set up his meeting with Susan Wild and advised Allinson that Fran went over to her and advised her of the ways of the world. "She may not like it. She doesn't have to love it. But she has to do it anyway." Ruchlewicz said to Allinson that they appreciated him. He also asked Allinson to contribute to the Mardi Gras fundraiser. As Ruchlewicz said, "I love you Scotty, but I love that even more." Allinson said "Yeah, I understand,

That's the way it works." Ruchlewicz said that the Mayor has taken care of all his problems. Ruchlewicz claimed that he talked to the Mayor and told him that Norris McLaughlin loved him and that "everything was gonna work out and we have to keep giving Scotty all the things that Scotty loves." When Alison asked if the Mayor was okay with that, Ruchlewicz said "He was like well, he's like yeah, good, as long as it's all worked out. He's like, I'm happy to support Scott. He's like, I always have. He's like, we've given him lots of stuff and we want to continue to do that." Allinson responded "Cool, alright, we'll make all that happen." (SR #27984)

On **February 13, 2015**, Ruchlewicz told Pawlowski that Allinson said that he understood that he had to show up at the Mardi Gras and brought a check to the party. Allinson asked Ruchlewicz to make sure that the Mayor knew he had brought the check. Ruchlewicz told Pawlowski that installment #1 is here so we can continue with Somach to the solicitor plan. After a pause, Pawlowski said "Good." (SR #319)

On **March 25, 2015**, Fleck assured Allinson that the solicitorship was going to go through him, but that on the day that Pawlowski announced that he was going to run for the Senate, he needed as many people as possible to write checks for $2,500. Allison said if he was cut out of the Allentown credit, he would tell people in his firm that the Mayor referred work out to like fourteen law firms and if they wanted to handle the work, they had to work with Mike and Sam and cobble some money together. He says "This isn't like we're being hired because we are good guys. It's not the way this shit works. I don't care how good you are." Fleck said that the only one that worked for was Stevens and Lee and when they fucked the Mayor over, they got fired. But now Saidel was working there and they were getting back in the rotation again. (MF #9)

91

On **March 30, 2015**, Fleck told Ruchlewicz that he had had a conversation with Allinson and thanked him for the $250 check at the Mardi Gras but thought that Allinson was going to raise more. Fleck said that he told Allinson that on the day Pawlowski announces his run for the Senate seat, he'd appreciate it if Allinson could give ten $2,500 checks from members of his firm. Allinson told Fleck that he would do it and that he was trying to work through the internal politics in his firm. He said that they had some concerns that there would be little work from the City once Susan Wild took over but that after meeting her they felt better.  Fleck said that he told Allinson that even if they got no work in the future they should still be happy to contribute based upon the work that they had received in the past. (MF #12)

On **March 31, 2015**, Pawlowski told Ruchlewicz that he was still working on the Parking Authority solicitorship for Somach. He also confirmed that the information re the job was going to go through Allinson. Ruchlewicz said that it was important that it went through Allinson because Allinson controlled the PAC money and he had to "quantify it to the thing so when they, you know, take the deductions out for the PAC, that it goes in so we can request money." Pawlowski responded "Gotcha." Ruchlewicz repeated: "It's very, very important that Scottie gets that call so he can do the internal deductions. So that when we call Scottie there's money in the little fund."  Pawlowski said I got you, and Ruchlewicz continued: "Otherwise we get two hundred and fifty dollar checks and the whole world goes boom." (SR #365c)

On **April 2, 2015**, Ruchlewicz told Pawlowski that the politics of Norris McLaughlin are that Somach is going to make a bunch of money. Allison was going to put money into

the PAC funds so they can write us the political checks. Allinson would leave us alone about not getting

work and he would also be at all of our fundraisers and not miss his numbers anymore.(SR #366)

On **May 12, 2015**, Allinson told Ruchlewicz that he and Sorrentino were going to

meet the Mayor on May 20th. He said that Pawlowski had left him a voice mail saying that he wanted to

get together to discuss his primary fight against Sestak, Allinson said that they would be plenty blunt.

Allinson complained that he has already eaten about $10,000 in time and expenses for his political

action committees and he did not think that Pawlowski valued that. He bemoaned the fact that they were

seeing nothing from the City other than Foucek being on the Anizda board and Ted being on the Parking

Authority board.  And Allinson was upset that he heard that Gross McKinley, Susan Wild's old law

firm, just accepted an engagement to represent the City, which he believes technically is a conflict. (SR

#38846)

On **May 20, 2015**, a sit-down meeting takes place  between Pawlowski, Fleck,

Allinson, and Matthew Sorrentino, the chairman of Norris McLaughlin. Pawlowski made his pitch as to

why he is a good Senatorial candidate and asked the firm to raise $25,000 before June 30th. Sorrentino

said that he had to hit up a couple of other people, but that it was doable. Allinson then started talking

about the problem of having clients and friends of the firm who were Republicans. Pawlowski then

suggested that those people can simply provide him $2,700 for the primary alone and sit out the general

election. As he said, in the primary I am running against Sestak, not Toomey. Sorrentino then said for

us, for our relationship with the city, and from a legal work standpoint, that's a really good talking point.

Fleck asked shortly thereafter, as the meeting was getting ready to break up, if there was

anything you guys need from us. Allinson told Fleck that they have to catch up real soon. Sorrentino

asked whether the Mayor was able to obtain funding for Talen Energy, which evidently was thinking about relocating to Phillipsburg, NJ. JG Petrucci, a developer, was looking to develop property in the Neighborhood Improvement Zone in Allentown and hoped that Talen would occupy the property as a tenant. Sorrentino represented JG Petrucci and inquired of Pawlowski about the funding from NIZ taxes. Pawlowski went into a rather long explanation about how he had discussed this issue with Governor Wolf and Katy McGinty and they evidently agreed that the money would be certified. At the end of the meeting, Sorrentino testified that Allinson asked him if he (Sorrentino) could ask other attorneys at Norris McLaughlin to donate to Pawlowski's campaign . Allinson didn't contribute because of his connections to Toomey supporters. (MF #58)

On **May 22, 2015**, Ruchlewicz and Allinson talked about other municipalities and candidates. Allison said that "I got a lot of hands in my pocket . . . and then Mike and Pawlowski sat down with Matt and myself the other day and he, he made in, you know, my view a very large ask to our firm for the primary . . . you know, 25,000 is a lot of fucking money when you're getting absolutely zero back from the city. I mean, I mean when I tell you bone dry, bone fucking dry." Ruchlewicz said that we'll have to change that. The Mayor will. (SR #39323)

On **June 16, 2015**, Pawlowski told Fleck that Rich Somach had been writing him about the solicitorship and suggested that Fleck call Allinson about this. Fleck said that "I think we made things abundantly clear on the timeline for things." (MF #12687)

On **June 17, 2015**, Fleck called Allinson and told him that although he knew that Allinson could deal with the internal politics of his office, and that the solicitorship would go through Allinson, he wanted Allinson to know that Rich Somach had called Pawlowski asking when he was

going to be appointed. Fleck said that Pawlowski told Somach that the deadline was June 30th and that he was working with Allinson and Sorrentino. (MF #12729)

On **June 29, 2015** Fleck and Pawlowski went through the list of contributors that they may need to call, Fleck told Pawlowski that Sorrentino came through with $17,300 of the pledged $20,000 and had promised to provide the additional $2,700. Fleck asked if they could now appoint Somach to the solicitorship of the Parking Authority. Pawlowski said it was not that easy as he was not allowed in the Parking Authority board meetings. They discussed another way to get the current solicitor to withdraw by telling Lehigh County Executive Muller about his conflict. (MF#95)

**Norris McLaughlin Attorneys**

**Richard Somach** testified that he is a partner at Norris McLaughlin law firm (10)  He started off as a contract worker with the firm but was made a partner after two years because of the income that he generated for the firm (12)  He had seen the Mayor around at different events but the Mayor had never been a client. In 2013-2014, he became aware of the fact that the Mayor wished to use Somach's vacation house in Key West. Pawlowski ultimately used Somach's house in April 2014. Somach reviewed text messages between him and Pawlowski. He acknowledged a text message from Pawlowski asking to use his house a second time in Spring 2015. Somach acknowledged inquiring of the Mayor numerous times about the possibility of his being appointed as the Allentown Parking Authority solicitor, on January 7, 2015, March 18, 2015, April 29, 2015, and May 26, 2015, but said he did it just out of "curiosity." (25)  These inquiries were made around the same time that the Mayor was using Somach's house for a second time for a ten day vacation (29)  Somach contributed $5,400, the maximum amount allowable, to Pawlowski on June 18, 2015, although he had no definitive answer yet

as to the appointment of a new Parking Authority solicitor (34)  After the search of City Hall on July 2, 2015, Somach does not recall sending anymore emails to Pawlowski about the Parking Authority solicitorship (37), and he does not recall the Mayor asking him to use his house again (38.)

 **Oldrich Foucek** testified that he was a partner at Norris McLaughlin.  He described the credit that a lawyer at the firm received for bringing business into the firm. Partners can get a bonus at the end of the year for bringing in more work than other partners if there are profits at the end of the year. Attorneys can write political checks out of those bonuses. (32-34)  Foucek acknowledged telling the FBI that Pawlowski was the type of person who would expect people to do a favor for him if he did a favor for them. (38)

 **Charles Smith** testified that he worked for approximately eight years at the Norris McLaughlin law firm. He made a contribution to Mayor Pawlowski in June 2015 after his boss, Matt Sorrentino, asked him to contribute. (46)  He has not contributed to Pawlowski since that time. (52)  He does not know if Allinson asked Sorrentino to go around to the other attorneys in the firm and ask them to contribute to Pawlowski. (54)

 **Matthew Sorrentino** testified that he was the chairman of the Norris McLaughlin law firm. He and Allinson met Pawlowski at the firm's offices and Pawlowski asked the firm to raise money. (86-87)  At the end of the meeting, Allinson asked Sorrentino if he could follow through on the Mayor's request to raise money. (102)  When Norris McLaughlin was served with a subpoena for documents, Sorrentino called Allinson to his office and Allinson mentioned the reason for the search warrant may relate to the Allentown Parking Authority solicitorship. (135)  Sorrentino believes that Allinson said that the Parking Authority would be putting out an RFP for the solicitorship. (136)  Allinson did not tell

Sorrentino that not only had he talked to Fleck and Ruchlewicz about this, but that they were in conversation with Pawlowski concerning this matter. (136)  Sorrentino also met with Richard Somach after the service of the search warrant, and Somach did not mention that he had had any conversations with anybody about the Parking Authority solicitorship or exchanged any text messages with the Mayor about that that position. (138)  He identified a November 21, 2013 check authorized by Allinson for $5,000 to the Allentown Future Fund from the firm without Sorrentino's knowledge to fund a New York City event for Pawlowski. (142-144, Exhibit K-6)  He acknowledged that Pawlowski discussed his efforts on the Talon project with them on the same day that Pawlowski came to their office and asked for money and that without Pawlowski going to Governor Wolf and Katie McGinty and talking to the people from Talon and Petrucci, the real estate project was not going to get done, and there would have not been additional money coming to Norris McLaughlin. (147-155)

**Other Testimony**

          **Celeste Dee**[46] testified that she worked for Michael Fleck's consulting businesses from 2012 until 2015, helping political candidates with their campaigns. (155)  In that capacity she worked with Ed Pawlowski when he was running for governor.  She did not work on fundraising for the Mayor with high-dollar donors. (157)   At times, when such meetings were to take place, she would be asked to leave the room. (157)  Pawlowski and Fleck were extremely close personally, even sharing vacations together. The appeared to speak to each other multiple times during the course of a day. (158)  Although Fleck and Pawlowski were best friends, Pawlowski also was the Mayor and the top priority. Probably in

---

[46]      Dee testified on February 8, 2018.  All citations are to that day's transcript.

2014, Pawlowski brought a thumb drive into Fleck's office. It contained the name of companies and the people who received contracts from the city for building the arena in Allentown. Fleck created a spreadsheet with the names and the amounts of each contract. (152, 176)  Fleck said that he would use these numbers to solicit donations for Pawlowski's political action committee.

She heard Pawlowski and Fleck talking about Michelle Portnoff's recent lack of campaign contributions to Pawlowski, and she heard the Mayor say that he did not owe Portnoff any loyalty due to the fact that she had really not been donating to his campaign. (164)

In approximately March 2015, Fleck told her that he was being investigated by the FBI. She confronted Fleck about him still being under investigation in May 2015 but did not believe his story that it had been taken care of. Dee consulted or talked with at least six other people about rumors that Fleck was still under investigation. (168-69)

**Diane Miller**[47] testified that she worked for Mayor Pawlowski for twelve years and found him to be a micromanager and very demanding. (39)  As his political aspirations grew, the office atmosphere became more stressful. (40)  It appeared to her that Sam Ruchlewicz and Michael Fleck had free access to City Hall. (47)  The Mayor told her to give Fleck complete access to his calendar. (48)  When Miller later complained to the Mayor about having to work with Fleck and Ruchlewicz, she was basically dismissed. (48)  Fran Dougherty told her that Michael Fleck was under investigation by the FBI. (51)

---

[47]      Miller testified on January 25, 2018. All citations are to the transcript from that date.

**Susan Wild**[48] testified that she was appointed Allentown's Ct ty Solicitor in January 2015. (58)  She has a general recollection of being told to call Scott Allinson about legal work in February 2015. (60-61; Exhibit J-5)  As part of her duties, she sent an email to all city employees regarding the FBI investigation on July 13, 2015, advising them of the duty to preserve documents and electronic communications responsive to the government's subpoena. (63, Exhibit W-1)  Entities included in the list were McTish Kunkel, TEN, T&M and Mark Neisser, Ramzi Haddad, James Hickey and Sovereign Enterprise, 5C Security and Jack Rosen, Norris McLaughlin & Marcus and Scott Allinson, Richard Somach, Stevens and Lee, and Sean Kilkenny. (64-65)  After July 2, 2015, she unilaterally terminated the contract with TEN and got no phone calls or emails from the Mayor about the termination. (66)  She also terminated the Ciiber contract and never heard from the Mayor concerning that termination. (67)  She believes that it was the Mayor who suggested that Judy Harris might be appropriate from Norris McLaughlin to handle the Trexler Trust matter for the City of Allentown. Based upon her practice, she believes that her contact with Judy Harris would have been close in time to June 15, 2015. (71)  She did have discussions with Harris, but she doesn't believe that Harris ever got back to her concerning the work. The work was eventually given to the law firm of Fitzpatrick, Lentz and Bubba. Billings on the Trexler Trust matter totaled over $7,000 by May 2017. (73, Exhibit J-11))

**Edwin Pawlowski**[49] testified that he had heard rumors that Mike Fleck was under investigation, was wearing a wire and was "taking everybody down," (241, 243), and that he had heard

---

[48]     Wild testified on February 12, 2018. All citations are from the transcripts for that date.

[49]     Pawlowski testified on February 22, 2018 and February 26, 2018. All citations are from the transcripts for that date.

this perhaps a couple of days before July 2, 2015. (242)  He admitted lying about 5C submitting an RFP on the cyber contract because he did not want a misperception in front of interns as to what had happened. (247-49, SR #264)  He admitted telling Ruchlewicz to tell Mark Neisser to contribute first and work would come later, but said that it was just talk between him and Ruchlewicz. (251-52, SR #402)  He admitted expediting Ramzi Haddad's inspection, getting it moved up. (258, MF #62a)  He acknowledged that although he was concerned about the emails that Sam Ruchlewicz had shared with Ramzi Haddad, when he was approached by the FBI, he did not mention the emails. (261,262)  When asked about TEN, he said that he knew some guy named Troy and did not mention Patrick Reagan.(265) When he went to New York to talk to Jack Rosen and talked about the cyber contract, he brought Fleck or Ruchlewicz, not IT people from the city. (278)  Although he told the FBI that he did not want there to be any hint of impropriety concerning contractors and vendors, he admitted eating a free dinner with Northeast at Del Frisco's Steakhouse on January 4, 2014. He stated that he never told any Evaluation Committee or any officer in the city what company he favored for a contract. (296-97)  Pawlowski told the FBI that he did not know who the principals of 5C were and that he never mentioned the name Jack Rosen. (298)  He admitted that it was not correct when he told the FBI that a contract was given to 5C a few weeks after the city's computers had been hacked. (300)

    Pawlowski said that he when he talked to the FBI he said that he never used lists of contractors in campaigns. (5)  Pawlowski identified his voice and Fleck's voice on MF #36 in which he talks about providing two pieces of paper to vendors, and tells them to write down on one piece the

amount of work that they have received from the city and write down on the second piece of paper what Pawlowski would like them to contribute.  He denied that he ever executed this scheme. (19)

When asked why he told the FBI during his interview that he was unaware of and did not direct that his office be swept for bugs, Pawlowski said that "I wasn't correctly telling the truth at that point," (21)  and acknowledged that this was a lie. Pawlowski stated that Mike Fleck called him all the time about everything. (42)  He said that he told Fleck to purge all the systems on the TEN and Northeast contracts. (45)  Pawlowski admitted that at the same time that he was asking to use Rich Somach's home in Key West, Somach was asking about being appointed to the Allentown Parking Authority solicitorship. (54)  He stated that he recognized the inherent conflict that Fleck had by representing vendors and being involved in his political fundraising. (76)  Pawlowski admitted helping Ramzi Haddad by asking Barbara Nemith to expedite a zoning issue approximately one year before the Sherman Street zoning problem. (89)

**Stipulations**: The government and the defense stipulated that the City of Allentown received federal benefits in excess of $10,000 in any one year period relevant to the indictment (Exhibit J, 16-A); that the records produced by the City of Allentown and various banks and corporate entities were public records within Federal Rule of Evidence 803(8)  and business records within Federal Rule of Evidence 803(6) and admissible at trial (Exhibits J 16B, 16C); that a proper chain of custody was maintained for all exhibits (Exhibit J, 16-D); that the wire transmissions in the form of electronic mail from representatives of the City of Allentown to representatives of Linebarger Goggan Blair Sampson LLP, MKSD Architects, and Johnson Controls were in interstate commerce. (Exhibit J, 16-E); and that

at all times relevant to the indictment, the City of Allentown sent all contract award and rejection letters to vendors by first class U.S. Mail.

**Defense Argument/Government Response**

The government submits that there was more than sufficient evidence to support the verdict in this case for all counts as to both defendant Pawlowski and defendant Allinson as reflected in the above summaries and recitation of the testimony.

Allinson additionally argues:

(1) **There was no explicit quid pro quo and no official act that defendant Pawlowski took, because the Pawlowski had no apparent authority over the Parking Authority Board in order to appoint a new solicitor.**

The statute under which Allinson was convicted makes it a crime for him to "give, offer, or agree to give anything of value to any person, with the intent to influence [in connection with an official action]" and makes it a crime for Pawlowski to "corruptly solicit or demand . . . or accept or agree to accept . . . anything of value from any person, intending to be influenced [in connection with any official action]."  18 U.S.C. § 666.  Thus, it is the intent to influence or be influenced that is relevant under the plain language; the statute contains no requirement that an official action take place.

Not surprisingly, then, the defendant agreed to the following jury instruction at trial:

> In considering this element, remember that the government must prove that Edwin Pawlowski intended at least to be influenced or rewarded, and that Scott Allinson intended at least in part to influence Edwin Pawlowski's actions, but the government is not required to prove that Edwin Pawlowski or the City of Allentown took any particular action. The government does not have to prove that Edwin Pawlowski accepted or received the bribe or that the bribe actually influenced the City of Allentown. It is not even

102

> necessary that Edwin Pawlowski has the authority to perform the act
> sought.

Jury Instructions at 48-49 (emphasis added). Having agreed to this instruction at trial, the defendant cannot argue to the contrary now.

It is clear from the words of defendant Allinson that he was engaged in an explicit quid pro quo. On December 10, 2014, in discussing the lack of work coming to Norris McLaughlin, he made a direct connection between campaign contributions and work. Allinson said, "I know that . . . but the well is completely dry right now and so I'm just talking our dialect of English that, you know, we've been unbelievably supportive in the past and now, you know, the work's going everywhere but, but to our shop . . . This is a short term fixable issue."

In talking about the Parking Authority solicitorship coming to Norris McLaughlin, on January 22, 2015 Allinson told Ruchlewicz that if he solved the Parking Authority situation, he would "get the golden goose." Ruchlewicz assured him that all the work for Allentown would go through him. Ruchlewicz said that Fleck and Pawlowski wanted Allinson to raise money and Allinson said, "Well of course I am going to raise money." On January 23, 2015, at a breakfast meeting, Ruchlewicz told Allinson that he and Fleck had talked to the Mayor and told him the importance of all work for Norris McLaughlin going through Allinson. Ruchlewicz told Allinson that the Mayor had no problem with this, and that the Mayor said that he would continue to give lots of work to Allinson but that he needed Allinson to be a fundraiser for him.

On February 3, 2015, Allinson explicitly made a pitch again for having all work for the firm funneled through him. "If I get a hundred percent of the kind of credit that turns into money, that goes out of my checkbook where you want it to go. So if it (work) comes to me and I get billing credit,

then I get the full stack of cash on the one side to do with it what I need to do, annually. Do you know

what I'm saying to you? If it goes to anybody other than me, it will get fucked up." Later in the

conversation, Ruchlewicz told Allinson that the number the Mayor had in mind was $10,000 for this

year. Allinson says, "that's easy," then says "If . . .what is going to happen?" Ruchlewicz answers "All

the work will come to you. The work will be yours."  On February 13, 2015, Ruchlewicz tells

Pawlowski that Allinson said that he understood that he had to show up at the Mardi Gras and brought a

check to the party. Allinson asked Ruchlewicz to make sure that the Mayor knew he had brought the

check. Ruchlewicz told Pawlowski that installment #1 was here "so we can continue with Somach to the

solicitor plan." After a pause, Pawlowski said, "Good."

        On March 25, 2015, Fleck assured Allinson that the solicitorship was going to go through

him, but that on the day that Pawlowski announced that he was going to run for the Senate, he needed as

many people as possible to write checks for $2,500. Allinson made it clear that he understood the terms

of the quid pro quo, pay to play, by saying that if he was cut out of the Allentown credit, he nonetheless

would tell people in his firm that the Mayor referred work out to like fourteen law firms and if they

wanted to handle the work, they had to work with Mike and Sam and cobble some money together.  He

said, "This isn't like we're being hired because we are good guys. It's not the way this shit works. I

don't care how good you are."

        On March 31, 2015, Pawlowski made it clear that he also understood the terms of the

quid pro quo and told Ruchlewicz that he was still working on the Parking Authority solicitorship for

Richard Somach of Norris McLaughlin. He also confirmed that the information concerning the work

was going to go through Allinson. Ruchlewicz said that it's important that it goes through Allinson

104

because Allinson controls the PAC money and he has to "quantify it to the thing so when they, you know, take the deductions out for the PAC, that it goes in so we can request money." Pawlowski responded, "Gotcha." Ruchlewicz repeated: "It's very, very important that Scottie gets that call so he can do the internal deductions. So that when we call Scottie there's money in the little fund." Pawlowski said, "I got you," and Ruchlewicz continues, "Otherwise we get two hundred and fifty dollar checks and the whole world goes boom."  Again on April 2, 2015, Ruchlewicz told Pawlowski that the politics of Norris McLaughlin were that Somach was going to make a bunch of money, "Allison is going to put money into the PAC funds so they can write us the political checks. Allinson will leave us alone about not getting work and he will also be at all of our fundraisers and not miss his numbers anymore."

The quid pro quo here is clear and unambiguous and leaves no uncertainty about the terms of the bargain. The agreement that the Parking Authority solicitorship would be awarded to Somach at Norris McLaughlin through Allinson, in return for which Allinson would ensure political contributions from the members of the firm to Pawlowski, is clear from the unambiguous language here. Additionally, the promise of additional legal work going to the firm through Allinson in return for which political contributions would be made to Pawlowski is not some "unspecified official action," but clear promises of additional legal contracts coming to Norris McLaughlin.[50] To suggest that a public official's

---

[50]    Defendant Allinson's fixation on the phrase  "legal contract trust work" is surprising and unwarranted. The phrase is not found in bribery Count 19 and is mentioned in only two of the listed 20 overt acts found in Count One. The defendant does not address the other references to legal work that he hopes to get from the City of Allentown found in Overt Act 117 (work for the City of Allentown), Overt Act 120 (Mayor said that he would continue to give lots of work to Allinson), Overt Act 124 (Allinson asked for all City of Allentown work to be funneled through him), Overt Act 127 (Mayor referring work to the firm), and Overt Act 125 (work from the City of Allentown).

unambiguous promise to give work in return for political contributions does not qualify as official acts is simply a misreading of <u>McDonnell v. United States</u>, 136 S.Ct. 2355 (2016).

### (2)  Government counsel  made an improper and prejudicial remark during closing argument.

The defendant submits that the following statement in closing argument made by the prosecutor and taken in isolation was inappropriate:

> Bribery happens with a wink and a nod and sometimes a few words, and an understanding between two people, we all know what's happening here. You're giving me this, I'm giving you that.

The defendant is wrong.

This statement of the law by the prosecutor is entirely correct, in that it invited the jury to look at actions, words, and the understanding between parties, including indirect and circumstantial evidence.  Under any rational reading, it did not suggest to the jury that a wink and a nod alone was sufficient, as the defendant asserts. The argument essentially told the jury that they should consider all factors to make out the intent required for bribery in the context of campaign contributions.

The defendant fails to provide the context of the prosecutor's phrase "wink and a nod," which notably is taken directly from *Evans v. United States*, 504 U.S. 255 (1992), in her argument:

> The Court is not going to instruct you on some magic phrase that has to be said that turns it into an explicit quid pro quo.  Why?  Well, because frankly, few people are stupid enough to say that out loud.  That's not the way the world works.  That's not the way bribery happens.  Bribery happens with a wink and a nod and sometimes a few words, an understanding between two people, we all know what's happening here. You're giving me this, I'm giving you that.
>
> You decide if there was an explicit quid pro quo on these bribery counts. You are the finders of fact.  And that includes conversations where there's

106

a discussion about contracts, and a few moments later, there's a discussion about campaign contributions.  You decide if that was an explicit quid pro quo that both parties clearly understood.

You decide, and again, considering the intent of the people, based on their words, based on their actions, based on their lack of action, based on the circumstances they were in . . . (Gov't Closing at 13) .

Further, the defendant ignores the additional argument by the prosecutor that

What this really comes down to is what was the intent of the people who were engaging in this exchange of one thing for the other.  And you're not going to have a CAT scan back there in the jury deliberation room so you can look inside their heads and see what they were thinking.  So what you'll have to do is evaluate what their intent was the way you would do that in your regular, everyday life.  Right?  Common sense.  What a person said, what a person did, what a person didn't say, what a person didn't do, what was the context in which they were speaking?  All of those things are what you should consider in evaluating their intent. (Gov't Closing at 8).

Moreover, although the defendant suggests that the government tried to blur what constitutes an explicit quid pro quo, the prosecutor expressly told the jury that the government had to show "a clear, unambiguous understanding between the parties that the campaign contribution was being offered in exchange for the official action by the mayor, which in most cases was giving a contract to a company, in the case of Ramzi Haddad, expediting his zoning and inspection issues." (Gov't Closing at 12).   Reading from the jury instructions, the prosecutor then explained that

what the Court is going to say is that an explicit quid pro quo is satisfied with something short of a formalized and thoroughly articulated contractual arrangement.  The explicitness requirement does not require an official specific statement that they will exchange official action for a contribution, but rather requires that the quid pro quo be clear and unambiguous, leaving no uncertainty about the terms of the bargain, thus you may find that the defendants entered into an explicit agreement, even if the terms were never stated out loud. Later, government counsel repeated that the explicitness requirement requires that the quid pro quo be

clear and unambiguous, leaving no uncertainty about the terms of the
bargain. (Gov't Closing at 12).

Further, defense counsel ignores that the prosecutor told the jury, "The Judge is going to
instruct you on the law after we've finished all these arguments, and his instructions control. So while I
might speak about the law or defense counsel might speak about the law, his instructions are the ones
that you follow." Government Closing at 4-5.[51] And indeed, the Court gave the standard instruction that
the arguments of counsel were not evidence and the Court's instructions controlled.

Finally, this closing argument complies with the Court's instruction, agreed to by all
parties, that "to determine a defendant's state of mind at a particular time, you may consider evidence
about what he said, what he did and failed to do, how he acted, and all the other facts and circumstances
shown by the evidence that may prove what was in his mind at that time. Jury Instructions at 27. Given
the full context and content of the prosecutor's argument as well the instructions by the Court, which the
jury was presumed to follow, there was no miscarriage of justice by the use of this isolated and
appropriate phrase. *See Weeks v. Angelone*, 528 U.S. 225, 234 (2000) ("A jury is presumed to follow its
instructions.").

### 3.      The government constructively amended Count 19 of the Indictment by arguing that the jury could convict on a different and broader factual basis than that alleged in the Indictment.

The defendant alleges that the language "in connection with the business, transaction, and
series of transactions of the City of Allentown involving something of value or more, namely, legal

---

[51]     The government finds the defendant's ad hominem attacks on government counsel unfortunate.

services contracts awarded to Law Firm #2", means that the alleged quid pro quo was for legal services contracts that had already been given or awarded. Because, the defendant alleges, the government did not show that contracts had been awarded in the past, a new trial should be granted.

The defendant is wrong. When all the language of Count Nineteen is considered, it is obvious that the defendant's skewed reading of the statute fails. Count Nineteen reads:

**THE GRAND JURY FURTHER CHARGES THAT:**

1.      Paragraphs 1 to 30, 32 and 33, and Overt Acts 113 to 132 of Count One of this indictment are incorporated here.

2.      From on or about February 2015 through on or about June 30, 2015, in Allentown, in the Eastern District of Pennsylvania, and elsewhere, defendant

**SCOTT ALLINSON**

corruptly gave, offered to give, agreed to give, caused, and attempted to cause others to give, something of value, that is, campaign contributions, to defendant EDWIN PAWLOWSKI and his political action committees, while PAWLOWSKI was the Mayor of Allentown and an agent of the City of Allentown, which received benefits in excess of $10,000 in the one-year period from January 1, 2015 to December 31, 2015, from federal programs involving a grant, contract, subsidy, loan, guarantee, insurance and other form of federal assistance, with intent to influence and reward defendant PAWLOWSKI in connection with the business, transaction, and series of transactions of the City of Allentown involving something of value of $5,000 or more, namely, legal services contracts awarded to Law Firm #2.

All in violation of Title 18, United States Code, Section 666(a)(2).

109

Paragraph One of Count Nineteen incorporates overt acts 113 to 132, which include the time frame of  February 2015 through on or about June 30, 2015. Those overt acts make it clear that the business, transaction, and series of transactions were anticipated contract awards, not contracts already awarded.  This fact is confirmed by looking at all the language of Count Nineteen. Breaking down the language to its basic components, Count 19 states that:

> The defendant
>
> Offered to give
>
> Campaign Contributions
>
> To the Mayor
>
> With the intent
>
> To influence/reward the Mayor
>
> In connection with business
>
> Involving Something of value of $5,000 or more, namely
>
> Legal Services Contracts Awarded to Law Firm #2

The defendant did not mention the language "with intent to influence" in his argument. That language, as charged, and in conjunction with the incorporated language, makes it clear that it was anticipated legal services that were included in this Count.  Indeed, use of the word "influence" is clearly prospective.

The defendant alleges both a variance and a constructive amendment to the indictment. A variance occurs " 'when the evidence at the trial proves facts materially different from those alleged

in the indictment.' " United States v. Vosburgh, 602 F.3d 512, 532 (3d Cir. 2010) (quoting United States v. Daraio, 445 F.3d 253, 259 (3d Cir. 2006)). A variance constitutes reversible error only where " 'it is likely to have surprised or has otherwise prejudiced the defense.' " Vosburgh, 602 F.3d at 532 (quoting Daraio, 445 F.3d at 262).

A constructive amendment occurs "where a defendant is deprived of his 'substantial right to be tried only on charges presented in an indictment returned by a grand jury.' " United States v. Syme, 276 F.3d 131, 148 (3d Cir. 2002), quoting United States v. Miller, 471 U.S. 130, 140 (1985). "The key inquiry is whether the defendant was convicted of the same conduct for which he was indicted." Daraio, 445 F.3d at 260 (internal quotations omitted). An indictment is constructively amended when the evidence and jury instructions at trial modify essential terms of the charged offense in such a way that there is a substantial likelihood that the jury convicted the defendant for an offense differing from the one alleged in the indictment. Id.

Cases finding a constructive amendment between the indictment and the proof at trial represent a more egregious set of evidentiary circumstances than those present here. For example, in Stirone v. United States, 361 U.S. 212 (1960), a leading case on this topic, the indictment alleged that the defendant, through extortion, unlawfully interfered with interstate commerce in the importing of sand into Pennsylvania. The evidence at trial showed not only the importation of sand, but also the exportation of steel from Pennsylvania. The district court even charged the jury that the defendant's guilt could rest on either the sand or steel. The United States Supreme Court held that there was an unconstitutional variance between the indictment and the proof. Id. at 217; see also United States v. Wozniak, 126 F.3d 105, 110-11 (2d Cir. 1997) (constructive amendment when district court charged

111

jury on evidence relating to marijuana transactions but indictment alleged only cocaine and methamphetamine transactions).

Considering all the language of Count Nineteen, there is no variance here and certainly nothing that surprised the defendant in his preparation of his defense. Additionally, because it was the same grand jury that returned the language of Count One of the indictment and Count Nineteen, there was no constructive amendment to the indictment.

## **CONCLUSION**

For all the above reasons, the government respectfully requests that the defendants' motions for judgment of acquittal and new trial be denied.

Respectfully submitted,

WILLIAM M. McSWAIN
United States Attorney

s/Anthony J. Wzorek
ANTHONY J. WZOREK
MICHELLE L. MORGAN
Assistant United States Attorneys

112

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that I caused a copy of the Government's Response to Defendants'

Motions to acquit and for a new trial has been e-filed and thereby served upon the following:

s/Anthony  J. Wzorek
ANTHONY J. WZOREK
Assistant United States Attorney