# IN THE UNITED STATES DISTRICT COURT

# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| **v.** | : | **CRIMINAL NO: 17-390** |
| **EDWIN PAWLOWSKI** | : | |

## GOVERNMENT'S SENTENCING MEMORANDUM

*[C]orruption strikes at the foundation of all law. Under our form of Government all authority is vested in the people and by them delegated to those who represent them in official capacity. There can be no offense heavier than that of him in whom sacred trust has been reposed, who sells it for his own gain and enrichment. He is worse than the thief, for the thief robs the individual, while the corrupt official plunders an entire city or State."*

Theodore Roosevelt, Third Annual Address to Congress
December 7, 1903

## I.     INTRODUCTION

On March 1, 2018, after a six-week trial, a federal jury convicted defendant Edwin Pawlowski of forty separate counts of bribery and bribery-related offenses. In committing each bribery, Pawlowski put his private interest – his ambition—ahead of the public's interest in good government. He systematically corrupted the contracting process in Allentown to serve his personal interests. Because of the egregiousness of the defendant's actions in soliciting bribes from individuals seeking city contracts, in violation of the trust placed in him by the citizens of Allentown, the United States of

America, by its attorneys, William M. McSwain, United States Attorney for the Eastern District of Pennsylvania, and Anthony J. Wzorek, Michelle L. Morgan, and Richard P. Barrett, Assistant United States Attorneys for the District, submits that the defendant should be sentenced within the sentencing guideline range of 155-188 months' imprisonment.

## II.    <u>THE VERDICT</u>

The federal jury convicted defendant Edwin Pawlowski of one count of conspiracy to commit wire fraud, honest services mail fraud, honest services wire fraud, bribery, and Travel Act bribery, in violation of 18 U.S.C. § 371; 11 counts of bribery/soliciting, in violation of 18 U.S.C. § 666(a)(1)(b); two counts of attempted Hobbs Act extortion, in violation of 18 U.S.C. § 1951; six counts of mail fraud, in violation of 18 U.S.C. § 1341; nine counts of wire fraud, in violation of 18 U.S.C. § 1343; two counts of honest services mail fraud, in violation of 18 U.S.C. §§ 1341, 1346; six counts of honest services wire fraud, in violation of 18 U.S.C. §§ 1343, 1346; three counts of Travel Act bribery, in violation of 18 U.S.C. § 1952(a)(3); and seven counts of material false statements to the FBI, in violation of 18 U.S.C. § 1001. Sentencing is scheduled for September 5, 2018.[1]

---

[1] By separate motion, the government will move to dismiss wire fraud counts 29, 31, 32, 38 and 39 only because the government believes that arguably insufficient evidence of interstate wires was presented during the trial to sustain these charges.

## III.   <u>BACKGROUND</u>

The evidence at trial showed that, in an effort to obtain contributions to his gubernatorial campaign and his campaign for the United States Senate, defendant Pawlowski repeatedly engaged in illegal pay-to-play, willfully trading City of Allentown contracts for campaign contributions. The impact of his actions was widespread. For example:

a.   Pawlowski used the power of his office to steer contracts to companies whose representatives contributed to his campaign, including: 1) Northeast Revenue, which obtained a city contract worth approximately $3,000,000 to collect delinquent real estate taxes; 2) The Efficiency Network, which was awarded a city contract worth approximately $3,000,000 to convert the city's street lights;[2] 3) CIIBER, which was awarded a city contract worth $35,000 for the first phase, with the potential for a much larger contract in subsequent phases, to update the city's cyber system;[3] 4) Spillman Farmer Architects, which received a city contract for consulting and engineering design services on the city's pool contract, with the entire pool project worth approximately $3,000,000 when considering both design and construction; and 5) McTish Kunkle, & Associates, which was promised a city contract to improve Chew Street.[4]  Pawlowski assured that each of these contracts was corruptly awarded in

---

2      This contract was never executed after the FBI searched Allentown City Hall on July 1, 2015.

3      This contract was never executed after the FBI searched Allentown City Hall.

exchange for campaign contributions.

b. Pawlowski aggressively solicited bribes from lawyers, engineers, and business people seeking either contracts with the City or favorable official action on their own private ventures. The people who paid campaign contributions received favorable official intervention by Pawlowski or promises by Pawlowski to deliver favorable action in the future. Over the 18-month period, ten different people were illegally solicited by Pawlowski, including: 1) Sean Kilkenny (12/18/13 and 01/04/14); 2) Ramzi Haddad (12/14); 3) Joseph Biondo (06/24/15); 4) Matt McTish (04/27/15); 5) Jonathan Saidel (03/12/15 to 03/27/15); 6) Donald Weiand (06/08/15); 7) Patrick Regan (03/10/15); 8) James Hickey (05/05/15 to 06/29/15); 9) Scott Allinson (01/15 to 06/30/15); and 10) Jack Rosen (01/15 to 06/30/15). Of these, Haddad, McTish, Regan, Hickey, and Allinson were all indicted for their own part in this pay-to-play scheme. All but Allinson, who was convicted after trial, pled guilty.

c. Pawlowski victimized businesses that refused to engage in his pay-to-play scheme, including Portnoff Law Associates, Linebarger Goggin Blair, Johnson Controls, Integrated Aquatics, and MKSD. These vendors, who relied on the City's promise of a fair competition for the contract, expended money developing responses to City of Allentown Requests for Proposals or Requests for Qualifications, when, in reality, the contracting process was rigged by Pawlowski to serve his pay-to-play scheme. Their

---

4       This contract was never executed after the FBI searched Allentown City Hall.

efforts to compete fairly for city contracts were entirely subverted by Pawlowski's corruption.

d.    Pawlowski's ambition-driven actions infected others in city government, converting otherwise loyal, law-abiding public servants into criminals. City of Allentown employees Francis Dougherty, Gary Strathearn, and Dale Wiles who, acting out of loyalty or fear of losing their jobs, did Pawlowski's bidding in the pay-to-play schemes. Having pled guilty, they now face the possibility of imprisonment because they followed Pawlowski's wishes.

e.    Pawlowski also attempted to induce private citizens Michelle Portnoff, Donald Weiand, and Jonathan Saidel into his pay-to-play scheme, but they all recognized his actions as inappropriate and refused to play with Pawlowski.

f.    Pawlowski effectively corrupted the contracting process in Allentown by generating a list of firms and individuals doing business with the City and using it to serve his private ambition. He converted the names on that list into targets of his corrupt solicitation. In other words, he systematically used a city resource to serve his private ends.

g.    Pawlowski's actions obviously also hurt the citizens of Allentown, who had a right to believe that the Mayor they elected would work for their benefit and not his own. Beyond the loss of city funds that ensued from Pawlowski's schemes, the loss of trust in local government looms larger. Democracy loses when citizens distrust their government, and now former Mayor Pawlowski gave the citizens of Allentown

ample reason to distrust him and the office of Mayor.

## III.   <u>**THE EVIDENCE**</u>

The evidence presented to the jury demonstrated that Pawlowski systematically corrupted the contracting process in Allentown by soliciting bribes from individuals seeking city contracts and using other public employees to facilitate his corruption.

In the <u>**Stevens and Lee**</u> scheme, Pawlowski pressured a lawyer working on behalf of the Stevens and Lee law firm to pay a bribe in the form of campaign contributions in return for securing legal work from Allentown.  Pawlowski made a clear connection between work and political contributions to Jonathan Saidel in his meeting with Saidel on March 12, 2015,[5] and in a Pawlowski-directed telephone call to Saidel by campaign consultant Sam Ruchlewicz on March 27, 2015.  The connection between the city of Allentown work and campaign contributions was so explicit during the March 12, 2015 meeting that Saidel said that "It shocked me that he --- it was blatant, amateurish, and shocking all at the ---and sad all at the same time . . ." Ruchlewicz's telephone call to Saidel, prompted by Pawlowski, confirmed the fact that Pawlowski expected at least $2,500 from Stevens and Lee to get them back in his good graces.[6]

---

[5]  After the meeting with Saidel was over, as Pawlowski and Ruchlewicz were going down in the elevator, Pawlowski said to Ruchlewicz that he "probably shouldn't have said about the donation thing there. You don't know who is recording. It's true . . . every time I ask them for anything, they give like a dollar."

[6]  On that date, Ruchlewicz told Pawlowski that Don Wieand gave a check for $25 at a

Pawlowski also made the connection between work and campaign contributions clear to Donald Wieand of Stevens and Lee in his call to Wieand on June 8, 2015. Pawlowski told Wieand that he would be receiving a phone call from City Solicitor Susan Wild, and then asked Wieand for a campaign contribution. This reference to Wild was significant because when Wieand had met Pawlowski in January to request additional city work for Stevens and Lee, Pawlowski told Wieand to get in touch with Susan Wild. As Wieand testified, he knew that if he said no to the June 8th contribution request, he would never get a phone call from Susan Wild. As he further thought about Pawlowski's phone call, Wieand feared that he was stuck in a pay-to-play situation.

In the **<u>Northeast Revenue</u>** scheme, Pawlowski solicited bribes in the form of campaign contributions from Sean Kilkenny, a representative of Northeast Revenue, in return for securing Allentown's delinquent real estate tax contract. While the Request for Proposals ("RFP") for this delinquent real estate tax contract was pending, Pawlowski requested a campaign contribution from Sean Kilkenny on or about December 18, 2013. This was approximately one week after he had made a similar request of Michelle Portnoff, another bidder on the contract who previously held the contract for over a decade, and Portnoff told Pawlowski that she did not think that the request was appropriate since the RFP was pending. As Kilkenny testified, he felt pressure to

---

recent event for Pawlowski's council candidates. Ruchlewicz said to Pawlowski that he took it that $25 would not be enough to endear S&L to Pawlowski, who replied, "If he helped them out with $2,500 it would have been a totally different story."

contribute to Pawlowski's gubernatorial campaign after the conversation with the Mayor. Pawlowski had complained to Kilkenny in the past that Michelle Portnoff had done nothing for him. Also while the RFP was pending, Pawlowski, through Ruchlewicz, asked Kilkenny and Northeast for tickets to the Philadelphia Eagles playoff game on January 4, 2014, and ate a meal at Del Frisco's Steakhouse on that same date, paid for by Northeast. At that meal, Ruchlewicz, in the Mayor's presence, told Kilkenny that Northeast's proposal looked good. Kilkenny felt so uncomfortable about the cost of the dinner and the Eagles tickets that he e-mailed Ruchlewicz shortly afterwards reminding him that the cost should be reported on Pawlowski's campaign finance report.

Pawlowski also made it clear to campaign consultant Michael Fleck and Garrett Strathearn, the City's Finance Director, and Assistant City Solicitor Dale Wiles, that he wanted Northeast Revenue to win this contract. The subsequent actions of Strathearn to ensure that Northeast Revenue was awarded the contract made it clear that the qualifications and evaluation procedures outlined in the city's RFP process were ignored, and that the other competitors, Linebarger and Portnoff, were defrauded by the rigged process followed here.[7]

The **TEN** scheme involved an RFP to replace all of Allentown's old street lighting with LED lights. The contract was worth approximately $3,000,000. Pawlowski was aware of and encouraged machinations behind the scenes to ensure that Patrick

---

[7] On June 15, 2015, while talking to Michael Fleck, Pawlowski agreed that he had taken "bullets" for Northeast and left a message for Sean Kilkenny asking for $25,000.

Regan and TEN won this contract, which they did. Pawlowski knew that James Hickey, a consultant for TEN, had been working on an RFQ/RFP that would favor TEN, that Craig Messinger and others from Allentown Public Works Department had changed the Hickey RFQ/RFP, that Fran Dougherty had "caught it," that Qualifications were submitted late by TEN, and that Ruchlewicz had resolved that lateness issue. As Pawlowski bluntly told Patrick Regan during a breakfast meeting, he had met with another vendor interested in the Streetlights contract, "[N]ot that I would ever hire them." While the RFP was pending, Pawlowski told Fleck that he wanted to get more money from Hickey once the contract was done but that he didn't want the money to be attributed to TEN. On May 5, 2015, before the contract was awarded, Pawlowski sent Ruchlewicz to Hickey to hopefully get him to "bundle" as much as $50,000 in campaign contributions. Hickey clearly knew what Pawlowski's intent was, given that he objected to that amount of a contribution based upon how little work he had already received from Allentown, and talked about vendors who were "opportunistic donors."

Additionally, all the extraordinary actions taken by Pawlowski and his co-conspirators to rig the process in favor of TEN, the most important of which was allowing TEN to file its Qualifications late when they missed the RFQ deadline, demonstrated the fraud perpetrated on RFQ/RFP competitors such as Johnson Controls. The process was not fair as required under the published RFQ and RFP.

In the **Rosen/5C/CIIBER** scheme, Pawlowski sought to obtain significant campaign contributions from wealthy New York real estate developer Jack Rosen in

exchange for contracts with the City of Allentown, commencing with a wholly unnecessary contract to improve the City's cyber-security. This contract was to be broken up into two phases, with an evaluation phase, costing $35,000, as the first phase, and an anticipated much larger contract to fix cyber problems found during the evaluation to follow.

Pawlowski discussed work for the city of Allentown and campaign contributions from Jack Rosen on February 6, 2015 ($25,000) and May 18, 2015 ($100,000), and Pawlowski accepted $30,000 from Rosen and Rosen family members on June 30, 2015.[8] Pawlowski was so anxious to land Rosen as a big donor to his campaign, requesting that Rosen might contribute $100,000 for his campaign by July 31, 2015, that

---

[8] Additionally, on January 6, 2015 in a conversation between Ruchlewicz and Pawlowski. Ruchlewicz told Pawlowski that Jordan Rosen said that he was going to be taking a $15,000 sponsorship for the Mardi Gras fundraiser. After talking about getting Jordan Rosen to Allentown, maybe getting him interested in some housing, and that 5C, the security company, was probably a good step, Ruchlewicz said that "We got them that deal" and Pawlowski responded "No. I mean yeah . . . they responded to an RFP. Yes. Yes, I know." Ruchlewicz and Pawlowski then left the office and entered the hallway and Pawlowski said that he had his office swept today. "I had no bugs but you never know what's going on." After Ruchlewicz told Pawlowski that they had their offices completely checked too, Pawlowski said that they should get the company that he used. Pawlowski then said "Cause this is the conversation that you just had (UI)" Ruchlewicz said "I understand what you're saying and like, that's why I'm trying to be very careful." Ruchlewicz then suggested that they get in the elevator because "that's probably the most secure thing in the world, right?" Pawlowski laughed and said "Don't know. But uh, yeah, just, just by saying yeah, we got the 5C deal, you know what I mean. You just don't want to say any of that stuff. You know? . . . You never know who's listening and if, either of those interns wants to really be a pissy at us someday and say 'Hey, the Mayor was talking about all these deals they had . . . you know what I'm saying? . . . You gotta be careful."

he searched for numerous projects for Rosen in Allentown. As Fran Dougherty stated, "The boss has to demonstrate that he can get something for 5C." Ultimately, Pawlowski settled on a contract in which Rosen's company, CIIBER, would evaluate the IT system in Allentown and the City would value the contract by how much money it had in the IT budget. This contract and work was described as unneeded by City IT manager Michael Hilbert. Pawlowski was so anxious to obtain Rosen's campaign contributions that he even lied to Rosen about how the procurement process was proceeding. Both Rosen and Pawlowski received what they wanted, that is, a promise of work in return for campaign contributions.

The **<u>Ramzi Haddad</u>** scheme concerned Haddad's application to get a zoning use change for his Sherman Street property in December 2014, and Haddad's complaint about delays in the City's inspection of Haddad's property in May 2015. Pawlowski was directly involved in expediting Haddad's zoning issues in December 2014 in exchange for a campaign contribution. On December 4, Ruchlewicz told Haddad that he had to "grease" the Mayor with $2,500, and Haddad said that he might need help with a zoning issue. On December 7, Ruchlewicz told the Mayor that Haddad might need zoning help. On December 10, 2014, Haddad paid $2,500 to Ruchlewicz and Ruchlewicz said that the Mayor would be able to help Haddad with the zoning issue. On December 17, 2014, Chief of Staff Francis Dougherty committed to helping Haddad by the end of the year with the zoning issue if Haddad filed his papers, and by December 19, 2014, the zoning issue was resolved, days or weeks before it normally would have been, without

help.

As to the inspection issue, Pawlowski admitted at trial that he expedited the inspection of Ramzi Haddad's property on May 21, 2015. Trial testimony showed that Haddad's inspection was expedited to the disadvantage of others on the inspection list, and that Pawlowski talked about helping Haddad at a dinner on May 18, 2015, the same dinner at which Pawlowski and Fleck discussed campaign contributions with Haddad. Pawlowski asked how much Haddad thought that he could get for them by the end of June, and Haddad answered somewhere around $25,000. Haddad said that he had $3,500 in his pocket for them. "I got $10,000 from my partnership 'cause you're nice to us here. But you have to tell these morons at the city you know to a . . ." Fleck asked if he was talking about Sherman Street. Haddad said, "Yeah. I mean this is bullshit. You know, for two months I've been waiting for them. I almost lost my customers, you know." Pawlowski said, "I'm working on them for you."[9]

---

9 In the beginning of this May 18, 2015 dinner meeting, Pawlowski, Haddad and Fleck discussed not talking on the phone and laughingly agreed that they did not want to go to prison.

A conversation between Fleck and Pawlowski on April 19, 2015, illustrates Pawlowski's efforts to buffer himself and try to avoid detection. Pawlowski discussed Rob McCord's legal problems and Fleck said, "We don't want to get Rob McCorded." Pawlowski said that Ramzi Haddad "scares me" and Fleck said that Pawlowski should stop meeting with him. Fleck said, "Like you got to keep helping him so, like . . . because you're doing like nine projects with him right now, right." Pawlowski agreed. Fleck suggested that Pawlowski no longer meet with Haddad, instead letting Ruchlewicz deliver messages. Fleck advised that the only time he should talk to Haddad is fundraising for the campaign. Pawlowski said that Fleck should have Ruchlewicz talk to Haddad to see if "we could separate the stuff out so that he's actually not the one giving

As to **Chew Street**, Pawlowski induced engineer Matthew McTish to contribute to his campaign for U.S. Senate by dangling before McTish the prospect of securing work on construction projects in Allentown, including Chew Street. McTish testified about an April 27, 2015 meeting with Pawlowski in which the Mayor asked for a campaign contribution, discussed bridges, discussed the type of work that McTish did, and said that if he could become U.S. Senator, "that would be very good for [McTish's] business." McTish's experience with Pawlowski was that whenever he met with Pawlowski, McTish would talk about the work his firm liked to do, and Pawlowski would talk about upcoming Allentown work, his plans, and his fundraising campaign, all in the same conversation. Ruchlewicz and Fleck also drew the same connection for McTish between getting work in Allentown and making campaign contributions to the Mayor. Pawlowski seemed knowledgeable about his work and made McTish feel encouraged that he would have an opportunity to do work. Pawlowski would then slide right into how he needed McTish's help making a campaign contribution for the campaign. McTish said

---

the money. Since we're doing so many direct things with him, that would be great." Fleck suggested that they can use Eddie Brill for that. Pawlowski said, "I just don't want him to show up, you know, as this big donor." Fleck suggested that when Haddad needed to talk to someone about the city, they could use Fran Dougherty as a buffer. "Because the last thing you want is to, on a conversation on the phone, and he's talking to you about you know hey, how's the garage coming? Pawlowski said that was why he wanted some "burner phones." "Then I can just talk business on this phone, and then . . . anything fund related I can use a different burner." Fleck added "Then if anybody's ever trying to record you, they never get it, you know what I mean. Pawlowski said exactly, that's the point. "That's the whole point of the burner phone." When Fleck said that you don't use the same burner for more than a week, Pawlowski agreed and said "Yeah, or you just keep alternating burners."

that he had this type of conversation with Pawlowski more than once and had similar conversations with Ruchlewicz. McTish said that he made campaign contributions in Allentown to remain competitive in public engineering contracts. He felt pressure to give primarily to Mayor Pawlowski. He always was being told that there was a relationship between getting work and making campaign contributions and he felt that doing nothing at all for Pawlowski's request for money for running for governor would upset Pawlowski. He did not believe that he could get work in Allentown without making donations to Mayor Pawlowski.

In the **Pools** scheme, the City issued an RFP for consulting and engineering design services for the renovations of its pools. The renovation was divided into two parts. The first part was for design and architectural services. The second part was for a contractor to actually go and do the work. The complete project of design and construction was expected to cost $3,000,000.

Pawlowski told Dougherty that it would be great to get Spillman Farmer some of the pool work. Pawlowski clearly drew a connection between the contract and campaign contributions, telling Dougherty that Spillman Farmer would be campaign contributors. This was due in part to Spillman's association with Sean Boyle. Dougherty told Rick Holtzman, who was the head of the Pools RFP Evaluation Committee, that the Mayor wanted Spillman Farmer to get the architectural design part of the contract. During the evaluation process of Spillman Farmer, Dougherty told the Mayor that Spillman received a bad reference, and the Mayor told Dougherty to talk to Ruchlewicz.

Ruchlewicz then provided Dougherty with another reference. When the Mayor called Joseph Biondo of Spillman Farmer in early June 2015, before the contract had been awarded to ask him for a contribution, Biondo told the Mayor that he would have to "run it up the flagpole." When Pawlowski was exasperated by that response, Ruchlewicz told Pawlowski that he would call Biondo and tell him that he must contribute. When Biondo sent an email on June 29, 2015 to Lisa Rossi saying that Spillman would not be contributing "at this time" but may do so in the future, Pawlowski told Fleck that they were doing his pools and that Fleck should call them.

In the **Pawlowski-Allinson** scheme, Scott Allinson was an attorney at Norris, McLaughlin & Marcus (Norris McLaughlin), who, during the course of his intercepted conversations, made it clear that he wanted to be the main point of contact between the City of Allentown and Norris McLaughlin, so that he could get the internal firm financial credit for any work coming the firm's way from the City. He also made it clear that this arrangement would benefit Pawlowski as well because checks to Pawlowski from the firm then would be more forthcoming. Pawlowski also understood this arrangement and expressly agreed to it.

During one rough time in the relationship, Pawlowski made his knowledge of the agreement and his intent clear. On January 30, 2015, Ruchlewicz told Pawlowski that they had a strange meeting with Allinson concerning his fundraising and his proposed meeting with Susan Wild to discuss continuing to do City work. Ruchlewicz said that Allinson said that "We don't know if we want to give to the Mayor." Pawlowski

15

responded, "Really! I've given him millions of dollars." Ruchlewicz said that Mike was fixing it, but Pawlowski wanted to know the reasoning for Allinson's statement. Ruchlewicz said that Allinson was concerned whether he would get any more work with the new solicitor and that they gave a lot of money in the governor's race right before Pawlowski dropped out of the race. Pawlowski responded that relative to other law firms they've given almost nothing, and then said "Allinson for sure will get nothing now . . . You know, fuck them! And I'm not gonna make Somach solicitor or anything. Screw it all." Ruchlewicz asked Pawlowski not to do anything until Tuesday when Allinson and Fleck were having drinks and Fleck said that we will talk to him and get everything fixed. Pawlowski complained about the firm screwing up his transition committee and getting him investigated by the IRS. Pawlowski then called Fran Dougherty to get a total of the amount of money that the City paid Norris McLaughlin for legal work since 2006. When he got off the phone with Dougherty, Ruchlewicz told him that he already had that figure, which was $1,008,437. Pawlowski said "They're crazy. That's not enough for them? When Ruchlewicz told him that amount did not include ANIZDA money, Pawlowski called Sara Hailstone to get a figure for that. Later that day, Fleck told Pawlowski that he was going to "beat the shit" out of Scott Allinson. Pawlowski said that it was he who was talking about replacing the solicitor with Rich Somach, and Fleck said that he would tell Allinson that that does not have to be a reality. Later in the conversation, Pawlowski asked Fleck if he was going to "light up" Allinson so that he did not have to do so.

Pawlowski's discussion with Fleck punctuates the corrosive aspects of his scheme that were evident in each of the pay-to-play scenarios the jury convicted him of masterminding.  In each of the scenarios, he inserted Fleck and Ruchlewicz—his political advisors—into the Allentown City contracting process.  In doing so, he effectively outsourced the city contracting function to his political operatives, whose views about who should get contracts predominated over the judgments of the city's contracting and engineering staff.  Moreover, the evidence in many of the scenarios showed that he embraced the language of force and threat when he engaged in pay-to-play.  To encourage contributions he told Fleck to "light up" Allinson, said he personally should "beat up" law firms for contributions, and threatened to "f[ ] him" when someone failed to follow through on a contribution. Finally, Pawlowski reveled in the belief that the city's contracting money was "his" money to hand out to political contributors.  In engaging Stevens and Lee for campaign contributions, he bragged that "he" had given the firm "millions of dollars of work," a point he repeated when he said, upon learning that Allinson may not make a large contribution, "Really? I've given him millions of dollars." These aspects, common in each of the scenarios, are potent evidence that Pawlowski put his private interest – his ambition—ahead of the public's interest in good government.

## III.    SENTENCING GUIDELINES

The United States Probation Department has calculated the defendant's sentencing guidelines range as 42-I. The PSI set the base offense level at 4, pursuant to

USSG § 2C1.1(a)(1). The PSI then increased the base offense level based on specific offense characteristic the Probation Department deemed applicable.

Because more than one bribe was involved, a two-level upward adjustment is imposed pursuant to § 2C1.1(b)(1).

Because Pawlowski was a public official, a four-level upward adjustment is imposed pursuant to § 2C1.1(b)(3).

Because the defendant was an organizer or leader of a criminal activity that involved five or more participants, a four-level upward adjustment is imposed pursuant to § 3B1.1(a).

Because the defendant obstructed justice, a two-level upward adjustment is imposed under §3C1.1.

Because the PSI finds the loss to be more than $1,500,000 but less than $3,500,000, a 16-level upward adjustment is imposed under §§ 2C1.1(b)(1) and 2B1.1(b)(1)(I).

According to the PSI, a total offense level of 42 with a criminal history category of I results in a guideline sentencing range of 360 months to life imprisonment. The PSI states that because the statutorily authorized maximum sentences are less than the maximum of the applicable guideline range, the guideline range is 360 months to 7,980 months.

Under the specific facts of this case, the government and the defendant disagree with the PSI's calculation of the loss under §§ 2C1.1(b)(1) and 2B1.1(b)(1)(I).

The government and the defense agree that the loss figure should be $107,749. The

agreed upon loss amount is calculated as follows:

--$13,500 paid by Ramzi Haddad for assistance with zoning.[10]

--a loss of $18,749 to Johnson Controls as a result of preparing an

RFQ for the Street Lighting contract when the contract was fixed to go to TEN.

--a loss of $35,000 for the CIIBER contract. This contract was

unnecessary for the city of Allentown, and the total value of the contract is an anticipated

loss. Under §2B1.1, Application Note 3, loss is the greater of actual loss or intended

loss.[11]

---

10      Under USSG § 2C1.1(b)(2), the value of the payment is included in loss. In this case, Haddad made the following campaign contributions/bribes to Pawlowski: $1,000 on 02/11/13; $2,500 on 09/26/13; $2,500 on 12/06/13; $2,500 on 03/03/14; $2,500 on 12/15/14; and $2,500 on 03/16/15. *See United States v. Quinn*, 359 F.3d 666, 679, (4th Cir. 2004)(when the value of the bribe exceeds the value of the benefit or the value of the benefit cannot be determined, the value of the bribe is used because it is likely that the payer of such a bribe expected something in return that would be worth more than the value of the bribe.)

11      Michael Hilbert testified that he was in charge of the 911 call center and the superintendent of communications/technical services for the City of Allentown until he retired in 2016. He attended an August 2014 meeting in which 5C, later known as CIIBER, made its pitch for a contract with the city. Upon leaving the meeting, Hilbert was convinced that their plan was not practical and not necessary. On May 11, 2015, he received an e-mail, saying it was from the Mayor, announcing a city-wide assessment of cyber information. Although there had been some penetrations of the city's cyber system, these problems were resolved by the city's internal IT department, and there was no need for a $35,000 contract for CIIBER. After the City Hall search conducted by the FBI, the CIIBER contract was cancelled.

--$2,500 in bribes by McTish Kunkle to obtain City of Allentown contracts.

--a $31,000 loss to Linebarger Goggin Blair as a result of preparing an RFP for the Delinquent Tax Collection Contract when the contract was rigged to go to Northeast Revenue.

--a $2,000 loss to Portnoff Law Associates as a result of preparing an RFP for the Delinquent Tax Collection Contract when the contract was rigged to go to Northeast Revenue.

--a $5,000 loss to MKSD as a result of their preparing RFPs for the Pools Contract when the contract was rigged to go to Spillman Farmer.

A loss figure of $107,749 results in an 8-level upward adjustment under § 2B1.1(b)(1)(E), which is the range for a loss between $95,000 and $150,000. Finding an 8-level upward adjustment rather than the PSI calculated 16-level adjustment results in a sentencing guideline range of 151-188 months imprisonment.

The defendant objects to the Probation Offices application of a 2-level upward adjustment for obstruction and argues that he was not aware of any official investigation at that time and that he was merely attempting to delete or purge text messages from Sam Ruchlewicz that he believed to be untrue.

The defendant is wrong. Under 3C1.1, Application Note 1, "Obstructive conduct that occurred prior to the start of the investigation of the instant offense of conviction may be covered by this guideline if the conduct was purposefully calculated,

and likely, to thwart the investigation or prosecution of the offense of conviction." *See*

*United States v. Weikal-Beauchat*, 640 Fed. Appx. 219, 221 (3d Cir. 2016).

As the PSI states, these efforts included using what the defendant termed as

burner phones to avoid being caught engaging in pay-to-play discussions, having his

office swept for listening devices, having his iPad wiped, speaking about writing dollar

figures on paper to hand to vendors so that audio recordings would not pick up his pay-

to-play intent, and insisting on conversing with his co-conspirators in person, in

elevators, and outdoors to avoid being recorded. In addition to this list of obstructive

efforts, Pawlowski also encouraged other city workers to use private e-mails to avoid

having to respond to public requests for these emails. These actions were purposely

calculated to thwart the investigation and prosecution of the offenses of conviction and

merit the two level upward adjustment for obstruction. Consequently, the government

agrees with the PSI's application of a 2-level upward adjustment for obstruction.

## IV.   ANALYSIS

The Supreme Court has declared: "As a matter of administration and to

secure nationwide consistency, the Guidelines should be the starting point and the initial

benchmark." Gall v. United States, 128 S. Ct. 586, 596 (2007). Thus, the Sentencing

Guidelines remain an indispensable resource for assuring appropriate and uniform

punishment for federal criminal offenses.

This Court must also consider all of the sentencing considerations set forth

in 18 U.S.C. § 3553(a). Those factors include: (1) the nature and circumstances of the

offense and the history and characteristics of the defendant; (2) the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (3) the need to afford adequate deterrence to criminal conduct, and to protect the public from further crimes of the defendant; (4) the need to provide the defendant with educational or vocational training, medical care, or other correctional treatment in the most effective manner; (5) the guidelines and policy statements issued by the Sentencing Commission; (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and (7) the need to provide restitution to any victims of the offense. 18 U.S.C. § 3553(a).

**Consideration of the 3553(a) Factors.**

      **(1)**    **The nature and circumstances of the offense and the history and characteristics of the defendant.**

      This case is about defendant's private ambition and his abuse of powers delegated to him by the citizens of Allentown.[12] Defendant Pawlowski, who had served a long tenure as mayor of Pennsylvania's third largest city, thirsted after either statewide or national office. After learning his lesson by not raising enough money during an aborted

---

[12] Unlike many defendants sentenced by this Court, Pawlowski had the benefit of a good family, both as he was growing up, and as an adult. He had the benefit of a good education, receiving a bachelor's degree from Moody Bible Institute and a master's degree from the University of Illinois. He had the benefit of a good paying job, making an annual salary of $95,000 at the time of his resignation, that allowed him to accumulate assets beyond those of many defendants who appear in court.

run for governor in 2013-2014, Pawlowski convinced himself that he needed $ 1,000,000 by July 1, 2015 in order to show national Democrats that he was a serious candidate and to scare other potential candidates out of the race for the Democratic Party nomination for the U.S. Senate. That fundraising need consumed him during the early months of 2015.

In addition to abdicating his own ethics in order to raise this money and serve his own private interest, Pawlowski also misused his public power to bend others under him in Allentown government, like Francis Dougherty, Gary Strathearn, and Dale Wiles, to do his bidding, and in the process, violate their own duty to the citizens of Allentown. As the Mayor, he also misused his public power to influence the contracting process in Allentown to obtain campaign contributions from people like Ramzi Haddad, Matthew McTish, Jack Rosen, Patrick Regan, John Rogers, and Sean Kilkenny.[13] Pawlowski tried to insulate himself from the dirty work that attends pay-to-play corruption by using others like Michael Fleck, Sam Ruchlewicz, and James Hickey to execute his scheme. Ultimately, however, it was Pawlowski who was the driving force behind the fundraising efforts. He recognized that he had crossed the line and could have ended the polluted process he ignited. He did not. Instead, Pawlowski snubbed his nose at the people of Allentown and put his own interests over theirs and over the vendors who expected a fair and honest shot during the city's bidding process.

---

13    In addition to campaign contributions, defendant Pawlowski also used his office to obtain such items as free football tickets and free meals from vendors, and the free use of a house in Key West, Florida from an attorney wishing to be appointed as the solicitor to the Allentown Parking Authority.

Regardless of Pawlowski's ambition of being Pennsylvania Governor or one of Pennsylvania's United States Senators, Pawlowski had a fundamental duty to serve the citizens of Allentown as long as he held the Mayor's office. Instead, he threw it all away with his corrupt endeavor. During one of his intercepted calls, Pawlowski suggested to Michael Fleck that perhaps they had bit off more than they could chew. He was correct. He bit off more than he could chew and then he spit it out on the streets of Allentown, leaving it for others to clean up the mess he created with his corrupt conduct.

Letters submitted to the Court reference the defendant's dedication to his family. It appears that the defendant made efforts to balance his private ambition to be mayor and to run for other public office with his family obligations, and, by many accounts succeeded, in these efforts. This suggests, of course, that the defendant managed to calibrate his personal, political ambition with his need to serve his family. In other words, he remained attentive to his family's needs while attending to his own ambition.

As an elected official overseeing the activities of the third largest city in Pennsylvania, Pawlowski needed to calibrate his same personal ambition with his public duty to the citizens of Allentown, in much the same way as he did so as a spouse and parent. The citizens he served and the employees he supervised were, by analogy, another family to whom he owed fidelity. By adhering to ethical and legal standards, he could have tended to his ambition while serving the city with honor and integrity. Each day, other public officials adhere to those standards and demonstrate that one can aspire

to elected office while successfully attending to the well-being of the citizens he or she was elected to serve. By choosing to engage in pay-to-play corruption, Pawlowski failed miserably.

The defendant's wrongdoing was made even more egregious because, when confronted by the FBI with questions about the contracting process in Allentown, he repeatedly lied. The jury's verdict was that he lied about staying out of the contracting process in Allentown; about trying to influence the awarding of contracts in Allentown to particular vendors; about telling the solicitor to award contracts to certain law firms; about never using a list of vendors and the amount of money they received in contracts from the City of Allentown to determine how much money those vendors should contribute to his political campaign; about claiming that he never took anything of value from anyone bidding on a City of Allentown contract; about never taking any official action to benefit Ramzi Haddad; and about stating that he had no role in selecting or not selecting the law firm Stevens and Lee for contracts with the City of Allentown. The defendant continued lying at trial and attempted to explain one of his prior lies to the FBI by stating that he "did not correctly state the truth."

**(2)**     **The need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense.**

**(3)**     **The need to afford adequate deterrence to criminal conduct, and to protect the public from further crimes of the defendant.**

The public has a right to expect that its public officials, and all who interact

with them, will conduct themselves in a fair and honest way when engaged in municipal business. The public also has a right to expect that business conducted by the City is designed to benefit the community and not to benefit the public official's private interests and the interests of his benefactors. Cases such as this one alienate people from their government and their elected officials and cause a distrust of government. The long-term effects of that alienation are difficult to measure, but no doubt stain the public's impression of government. After learning the facts of this case, it is understandable that people may feel that they cannot get a fair shake from their own government and opt out of the system. When the public's interest in honest government is dashed in a scheme such as the present one, it is the community as a whole that is injured. Honest government and respect for the law are rendered vulnerable to ridicule. The offenses here are serious ones and the punishment must be serious.

This case also calls out for clear general deterrence. Every public official giving out governmental contracts and every businessperson seeking work from local, state, and federal governments should recognize that the consequence for engaging in a bribery scheme is a serious period of imprisonment. The high profile nature of this prosecution, and the rank nature of the defendant's corruption, make this case an appropriate vehicle Court's message, one that should resonate with public officials statewide.

**(4)** **The need to provide the defendant with educational or vocational training, medical care, or other correctional treatment in the most effective manner.**

26

The defendant did not report any long-term illness or physical disability to the Probation Officer. He disavowed any history of mental illness or clinical diagnosis of a psychological disorder and no contrary information concerning his mental health was discovered during the Presentence Investigation. Consequently, medical care does not appear to be a concern.

The defendant has been employed since at least 1992. He has a master's degree, making educational and vocational training immaterial.

**(5)      The need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct.**

One factor the Court is to consider at sentencing is the importance of avoiding unwarranted sentencing disparities, as set forth in Section 3553(a). As an initial matter, this Section 3553(a) factor is not primarily concerned with sentencing disparities in a particular case; it is designed to ensure sentencing consistency among similarly situated defendants across the entire nation. See United States v. Parker, 462 F.3d 273 (3d Cir. 2006). [14]

---

14 Although Section 3553(a) focuses away from sentenced defendants in the same case, here are the defendants in this case and the sentences they received:

     a.      James Hickey pled guilty to one count of honest services mail fraud and one count of honest service wire fraud. As part of his plea, Hickey admitted to participating in a bribe in Allentown and a bribe in Reading.  Hickey, whose criminal conduct was less extensive than Pawlowski's, was sentenced in connection to a "C" plea for 18 months' imprisonment.  The guideline range applicable to his guilty plea was 18-24 months' imprisonment.

     b.      Patrick Regan pled guilty to one count of conspiracy to commit mail and wire fraud.  His conduct was less extensive than Pawlowski's in that it related to his representation of one client who was bidding on a project in Allentown.  The guideline range applicable to his guilty plea was 0-6 months' imprisonment. He received a two-year period of probation.

     c.      Scott Allinson was convicted by the jury of conspiracy to commit bribery and one count of

Defendant Pawlowski has submitted a chart referencing federal, state and local prosecutions of corrupt officials in an apparent effort to have this Court conform the sentence it imposes to the sentences handed down by other courts in this region. Apart from submitting the chart, Pawlowski's analysis of the appended cases is extremely limited. His points of comparison appear to be limited to the fact that each convicted defendant was an elected official and had no prior record before the sentence was imposed. He provides no useful insight into the applicability of sentencing guidelines, specific offense characteristics (such as loss to a victim or gain by the defendant, number of bribes, impact of a governmental function, number of coconspirators) or the peculiar facts of a case that may have led to the final sentence. It is also noteworthy that Pawlowski has not offered a view as to the correct guideline calculation that may control this case, thus further minimizing any comparison he wants to make. Indeed, the memorandum and appended document are arguably devoid of the critical analysis that could possibly assist the Court in considering Section 3553(a).

It is interesting that Pawlowski's chart ignores a prior corruption prosecution that arguably comes closest to this case – United States v. Kemp, 500 F.3d 257 (3d Cir. 2007). Corey Kemp, the former treasurer of the City of Philadelphia who received a 10-year prison sentence, could be considered in examining the issue of sentencing disparities. Kemp was convicted at trial in connection with his illicit

---

bribery. His criminal conduct was less extensive than Pawlowski's in that it related to his effort to secure legal work for the law firm he worked cor. Allinson's suggested sentencing guidelines range was 27-33 months' imprisonment. He was sentenced to 27 months' imprisonment.

relationship with attorney Ron White, who plied Kemp with gifts in exchange for Kemp's assistance in steering city contracts to White's allies and business associates. To be sure, Kemp was proven to be a corrupt public official who abused his office for personal gain. The evidence established that White arranged for Kemp to receive tickets to the NBA All-Star Game and related festivities; cash totaling $10,000; a $10,350 deck; transportation and tickets to the Super Bowl in San Diego as well as accommodations and meals; four tickets to a USA basketball game; trips to New York and Detroit; and numerous meals. White also promised to help Kemp advance his post-treasurer career.

Although Kemp was not an elected official and the bribes he accepted were not campaign contributions, the case involved the corruption of an entire city process, the contracting work of a large city government. The risk present in Kemp's corruption, had it not been exposed and prosecuted, is that it had the potential to corrode the contracting process that a city depends on. For this reason, the <u>Kemp</u> case may be a better metric in which to consider an appropriate sentence.

There is an important distinction between the Kemp case and this case, requiring this Court to consider imposing a higher sentence than the 10-year sentence imposed on Kemp. Kemp was an appointed official who served below the elected Mayor of Philadelphia, to whom he reported. The citizens of Allentown elected Pawlowski, the defendant here, to run the city. As the head of city government, his corruption could potential corrode all city functions. Lack of confidence in his ability to lead arising from his corruption effectively left the city leaderless. This magnifies the nature of his crime as

his betrayal runs directly to the voters of Allentown and warrants a sentence within the recommended guideline range of 155 to 188 months. [15]

## V.    GOVERNMENT'S RECOMMENDATION

When the citizens of Allentown elected Pawlowski to be Mayor of Pennsylvania's third largest city, they trusted that he would fulfill his sacred duty to them with honesty and integrity.  The jury convicted Pawlowski based on powerful evidence that he had betrayed that trust for his personal gain.  In making the City's contracting process servant to his ambition, he corrupted it and in the process committed a most serious offense.  After considering the serious nature of the offense and the other factors of § 3553(a), the government recommends a sentence within the sentencing guidelines range of 155-188 months imprisonment.

The government also recommends that the Court remand defendant Pawlowski to the custody of the U.S. Marshals immediately following the sentencing. Title 18, United States Code, Section 3143(a), provides as follows:

(a)    Release or Detention Pending Sentence

---

[15] Pawlowski implies that there is a sentencing ceiling, which a district court may not breach when imposing a sentencing on a corrupt elected official.  He cites, without much elaboration, the district court's 10-year sentence in U.S. v. Fattah. The conviction of now former Congressman Fattah certainly exposed an elected official's fraud and corruption and will always remain an important prosecution in this district. However, Pawlowski's analysis of its applicability to his case is missing. He fails to account for important considerations that may distinguish one defendant from another under the Guidelines, such as loss, number of bribes, disruption of governmental function, and the nature of the conduct.  Without this analysis, the defendant leaves the Court to speculate on how the defendants are similarly situated beyond the limited criteria on which the defendant focuses: an elected public official with no criminal record.

> Except as provided in paragraph (2), the judicial officer shall order that a person who has been found guilty of an offense and who is awaiting imposition or execution of sentence, other than a person for whom the applicable guideline promulgated pursuant to 28 U.S.C. 994 does not recommend a term of imprisonment, be detained, unless the judicial officer finds by clear and convincing evidence that the person is not likely to flee or pose a danger to the safety of any other person or the community if released under section 3142(b) or (c). If the judicial officer makes such a finding, such judicial officer shall order the release of the person in accordance with section 3142(b) or (c).

Based on this statute, to be released pending execution of sentence, the defendant must prove by clear and convincing evidence that he is not likely to flee or pose a danger to the safety of any other person or the community if released.

The defendant cannot sustain his heavy burden of proof here. The magnitude of the sentence imposed and the defendant's possession of the means to effectuate flight, makes the defendant a risk of flight. Consequently, the government recommends immediate remand.

**Respectfully submitted,**

**WILLIAM M. McSWAIN**
**United States Attorney**

**s/Richard P. Barrett**
**Assistant United States Attorney**
**Supervisor, Corruption Section**

**s/Anthony J. Wzorek**
**ANTHONY J. WZOREK**
**MICHELLE L. MORGAN**
**Assistant United States Attorneys**

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the Government's Sentencing

Memorandum has been filed on ECF and thus served upon:

Jack McMahon, Esq.
139 North Croskey Street
Philadelphia, PA 19103


s/Anthony J. Wzorek
**ANTHONY J. WZOREK**
**Assistant United States Attorney**



Date:  August 27, 2018.