## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| **v.** | : | **DOCKET NO.: 5:17-cr-00390** |
| | : | |
| **EDWIN PAWLOWSKI** | : | **HONORABLE JUAN R. SANCHEZ** |

---

### SUPPLEMENT TO RULE 29 AND RESPONSE TO
### GOVERNMENT SENTENCING MEMORANDUM

---

On April 20, 2018 the defendant, through counsel filed a written post verdict Rule 29 motion. This written motion was in addition to the oral motion and argument that was heard at the conclusion of the government's case that is currently held under advisement.

The following is a supplement to all of the above and also a response to the government's sentencing memorandum.

The government asserts in their sentencing memorandum in section III(b) the aggressive and illegal solicitation of bribes of numerous individuals. The government says they were not only aggressive but clear quid quo pro with a, explicit and unambiguous agreement to award these individuals contracts for campaign contributions. The truth in this mater is the sworn testimony of these various individuals at the trial. Instead of the governments spin and hyperbole the following is the <u>actual</u> testimony:

1)      Sean Kilkenny

        Regarding 12/18/13 Request

        **A.**      **Page 45 – Lines 9-25; Page 46 – Line 1**

            9 Q Okay. And so this December 18th request, did that come
            10 from the mayor himself?
            11 A I believe so, yes.

12 Q What I'm saying to you is when I say, was it a phone call
13 to you or was it just a request, an email? What -- political
14 requests can come in many forms. As you just said, it could be
15 the candidate calling which is sometimes done. It can be mass
16 emails. It can be parties that are -- you know, all the
17 different ways.
18 This December 18th, if you recall, do you remember what
19 the type of request that was done then?
20 A I don't recall.
21 Q Okay. So you don't know if you talked to the mayor or
22 not, correct?
23 A I believe he called me, and I got a follow-up email from
24 Sam Ruchlewicz.
25 Q Okay. You believe, but you're not sure?
1 A I'm not sure.

**B.      Page 47 – Lines 10-24**

10 Q And this December 18th request, whatever form it took,
11 since you don't really know, the form that it took, however,
12 you indicated to Special Agent Curtis that you did not see that
13 as any ethical problem providing a donation to Mr. Pawlowksi
14 during this contract process. That's what you told him, right?
15 A Yes.
16 Q And you didn't? You didn't see it as an ethical problem
17 in doing that under those circumstances, correct?
18 A No.
19 Q Okay. So you -- and let me understand this about this
20 PAC. So when you get this request that you didn't think was an
21 ethical problem, you're not sure how the request came in, you
22 nonetheless went to your firm who has a political action
23 committee, correct?
24 A Yes.

**C.      Page 52 – Lines 18-25; Page 53 – Lines 1-4**

18 Q Okay. When this request was made by the mayor, the one
19 you just described -- I mean, we're talking about you. Okay?
20 And you described it just as a simple request. Am I right?
21 A Yes.
22 Q Okay. There was no long discussion about it other than
23 what you just described as to the method of payment and the
24 means of payment rather than -- is that correct?
25 A Yes.
1 Q Okay. What I'm asking you is: There was no -- mayor
2 never put any strings on that in any way, shape, or form in
3 that conversation, did he?
4 A He did not.

**D.      Page 57 – Lines 11-16**

11 Q But he didn't say anything to you. In other words, the
12 mayor didn't say anything to you to force you to write that

13 check. He didn't say to you, "Look, if you want to get this
14 legal job, and you want this RFQ to go well, you better pony
15 up." He never said anything like that, did he?
16 A He did not.

## Regarding 01/04/14 Request

### A.      Page 59 – Lines 18-24

18 Q And there was this dinner at Del Frisco's beforehand, and
19 at this dinner -- and I think you've been clear in that all the
20 way through your testimony and your talks with the FBI. And
21 that is the mayor, at this dinner, never, ever, ever brought up
22 the idea of the contract that was pending at any time during
23 any of that dinner, did he?
24 A He did not.

## Phone Message Request

Hey Sean, Ed Pawlowski. Give me a call back when you get a chance.
6-1-0, 3-4-9, 4-1-1-1, 6-1-0, 3-4-9, 4-1-1-1. The reason I'm calling,
we're talking to John, he a, told us that you would be the one helping us
to, a, pull together and raise some dollars. Umm, I'm looking to see if
you guys can fo 25, umm, by a, the end of the month. A, it's really
important, umm, we have probably about 900,000 in commitments. I
need to get the money in the bank. I'm trying to get a million. If you
guys can do that, and pull me in some dollars by the end of the month a,
that would be stellar. Umm, I, I have the world looking at me at this
point, and if I do well and have a good number, the floos gates open up.
If I don't , I'm gonna get a call from Chuck Schumer kicking me in the
head. I really don't wanna get a call from Chcuk Schumer kicking me in
the head so I could really use your help umm, John said tha t, that a,
he's actually, you know, on Toomey's finance committee or something
so he can't help out. But a, a, but you can. So if you guys can, if you
can work and pull some dollars together a, by the 30th of June, which is
the end of the first reporting period in June. 6-1-0, 3-4-9, 4-1-1-1 is my
cell number. Again, Ed Pawlowski and I'm running for U.S. Senate.
Thanks, bye.

### B.      Page 62 – Lines 2-17

2 Q Okay. And in that, you heard the entire message that he
3 left to you. At any time during that message he left to you,
4 did he ever indicate anything about the contract that you guys
5 had together?
6 A No.
7 Q Did he ever put any strings upon this request that he made
8 for you on this message?
9 A No.
10 Q Okay. In fact, in this message, he says to you over a
11 number of times, "If you guys can do it, and if you can get
12 this together, it would be stellar," right?
13 A Yes.

14 Q Okay. And this kind of conversation that we heard here is
15 consistent with the request that he's made other times to you
16 that generated some of the money, correct?
17 A Sure.

### C.        Page 63 – Lines 18-19

18 Q Okay. You didn't bribe anybody, did you?
19 A I didn't.

## 2)    Joseph Biondo

### Regarding 6/24/15 Request

### A.      Biondo Pitch Tape (SR 402)

*(Government Exhibit)*
EP: Hello.
EP: Hey Joe, how are you?
EP: I'm doing well. Umm, how are things going, good?
EP: Good, good, good.
EP: You owe the pleasure cause I'm running for U.S. Senate Joe
[laughs]
EP: And I think I have a pretty damn good shot [laughs] ....
*(Defense Exhibit)*
EP: I think I got a good shot. I got a really
7 weak, weak opponent in the primary, uh, and when you
8 just look at the numbers- the math, quite honestly it
9 doesn't really work for Pat Toomey this time. There
10 was a four hundred and fifty thousand vote shift in
11 Pennsylvania in presidential years, uh, which 2016
12 will be. And he only barely won last time by fifty
13 thousand votes. Uh, but, I'm running, because quite
14 honestly, I think we need a - a (UI)that actually gets
15 stuff done. We used to have a Senator like Arnold
16 Spector that would fight to get projects in the state.
17 We have no one doing that anymore. We have no one
18 who's trying to get these projects in the state. We
19 got sixty four, you know thousand structurally deficient
20 bridges in the country, fifty four hundred are in
21 Pennsylvania and I don't hear anyone talking about it.
22 You know? We're talking about rail, there's not reason
23 why we can't have rail, six mile stretch we're talking
24 about to connect rail, you know. But- you know, you're
25 talking about multi state issues, multi jurisdictional
1 issues, multi you know, departmental issues, and
2 someone needs to drive those processes. Right? And I
3 just don't see anybody that- I love Bob Casey but I
4 don't see a driver. So that's why I'm running. And I'd
5 love your help, and your support.
*(Government Exhibit Continued )*
EP: Is there any way you can help out? Yeah, well, no I will, I mean
basically it is this, the max anybody can give in a federal race is $5400,

okay, that's the max cause it's a federal campaign.

EP: I was wondering if you guys can do $2,700? That's the max that can be given, that can be given in the primary, so, which is my main concern.

EP: Sure, what's your email address?

EP: Hold on, give me one second.

EP: JBiondo, uh huh, okay, I'll get it out to you right now.

EP: Alright. Thanks man.

EP: If you can help out I'd really, really appreciate it.

EP: Okay, great, thanks.

EP: Thanks, bye bye. [call ends 16:23:56]

EP: I'll run it up the flag pole, what the hell does that mean?

SR: What?

EP: Get him the email and run it up the flag pole to give me twenty-seven hundred bucks.

SR: Who's that?

LR: Biondo.

EP: Biondo. Yeah, Spillman Farmer.

SR: They just got that pool project.

EP: Yes, I know. [laughs] Better run it up the flagpole fairly quick, Joe. J .Biondo@SpillmanFarmer ...

SR: Hey Lisa, here's a number for you.

LR: Hold on, J.Biondo@SpillmanFarmer.

SR: I'll take care of it today. Send me a note on it and I'll call Joe and tell him he has to give money ...

**B.**     **Page 161 – Lines 20-25; Page 162 – Lines 1-5**
        **Biondo Trial Testimony**

20 Q Okay. Now, in listening to this, he was pitching -- and
21 in listening to the one that the Government produced, and
22 looking at their -- we have SR 402. And is there any reference
23 in his pitch to you, in the one that the Government showed or
24 the one that -- the gap that we just showed you, is there any
25 reference to your pool contract at all?
1 A No.
2 Q Okay. Any of his solicitation for money in the
3 conversation between the two of you had nothing to do with the
4 pool contract, did it?
5 A That's correct.

3)     Matt McTish

     Regarding 4/27/15 Request

        **A.     Page 125 – Lines 12-23**

12 Q And what you're -- and after that situation, he says to
13 you, "So I could use your help."
14 There is no mention there of you -- of getting your help
15 in return for any contract any way, shape or form in there, is
16 there? And if it is there, show it to me.
17 A There isn't in this text.

18 Q Right. That's what I'm asking about. In what I'm reading
19 in this meeting that the Government has produced, there is
20 nothing referencing any contracts or getting your help
21 financially or politically in return for any contract, is
22 there, in that?
23 A No.

**B.**     **Page 135 – Lines 18-22**

18 Q Okay. And at any time in that tape, during the time that
19 you were there, Lisa Rossi was there, Sam and the mayor, was
20 there anything that we heard that was anything to do with any
21 contracts that you had or were seeking?
22 A Not from what I could hear.

**C.**     **Page 136 – Lines 9-11**

9 Q Right. And -- but yet, there was no mention of any of
10 your contracts or potential contracts, were there?
11 A I didn't hear.

**D.**     **Page 141 – Lines 20-25**

20 Q Okay. So if I -- it's correct then that you gave this
21 check, as you said, for the potential of acquiring work, but
22 you gave it less money and you gave it late to show your
23 dissatisfaction with the lack of pay-to-play in Allentown,
24 right?
25 A That was part of it.

4)     Don Weiand
　　　　　　　　**A.**     **Page 173 – Lines 5-7**

5 Q Let me ask you the question -- I want to get what the
6 words were, okay? I want to get what he said.
7 A "You're going to get a call from Susan Wild."

　　　　　　　　**B.**     **Page 173 – Lines 17-19**

17 Q Okay. And he didn't say anything more about that, other
18 than what you just told us about that, correct?
19 A That's correct.

　　　　　　　　**C.**     **Page 178 – Lines 10-17**

10 A Yeah. And I meant by that, the candidate. When the
11 candidate calls you, it's tough to say no --
12 Q I understand that.
13 A -- directly to the candidate.
14 Q There's kind of a dynamic there. You can say no to an
15 operative easier than you can say it to the actual candidate.

16 Is that fair to say?
17 A Correct.

### D.       Page 179 – Lines 9-13

9 Q Okay. That there was no chance from the (indiscernible),
10 correct? That was your answer, and that's your testimony here
11 today, that you felt subjectively that that's what was going to
12 happen if you said no, correct?
13 A That was -- that's correct. That was my belief.

## 5)    Patrick Regan

### Regarding 3/10/15 Request

### A.       Phone call made to Patrick Regan on 3/10/15

EP: [places phone call to Patrick Regan; only one side of conversation heard] Hey Pat, Ed Pawlowski .. .I'm doing well ... Hey Pat, I don't know if I talked to you about this before, but the Pennsylvania Municipal League, you know that's, that's all the mayors and council people from all over the state, municipalities. They're having their statewide conference in Allentown this year, this summer. And a, I was wondering if you guys would want to be a sponsor. I think it's a great way to promote, you know, the company to every municipality across the state. Umm, you know, I wondered if you guys wanted to, wanted to be a sponsorship? ...
EP: I could, I could, I could send you like a whole packet, yup.
EP: Great, I'll send it over to you a, a, by next (UI).
EP: Everything's going good man. Excellent. How about you? How are things? How are things out your way?
EP: I heard you got a big deal, a big contract at Penn State; that's good.
EP: Awesome.
EP: Good. Congrats on that. That's great.
EP: Yeah, let, let me know what you can do, okay
EP: Thanks, appreciate it man. Talk to ya. Bye bye.

## 6)    Ramzi Haddad

### Regarding 12/14/13 Request

### A.       Page 69 – Lines 14-24

14 Q Okay. And the person that you were dealing with in
15 regards to getting whatever help ended up happening and I'm not
16 sure what that is, but whatever help occurred and whatever
17 problems you had, you relayed that to your person that you were
18 paying, Sam Ruchlewicz, correct?
19 A Yes.
20 Q Okay. And both as to the inspection that comes up later
21 in May and as to the zoning thing with Barbara Nemith, the

22 person that you contacted about the situation both times was
23 Sam Ruchlewicz, correct?
24 A Yes.

**B.**      **Page 62 – Lines 21-23**

21 Q Okay. So you were going through the normal channels.
22 You've dealt with Barbara Nemith before, correct?
23 A Yes.

**C.**      **Page 63 – Lines 6-10**

6 Q And so you're -- at this point in time, from what we see
7 here, this is a zoning matter, a one-page zoning application,
8 and that you're going through the normal channels to the normal
9 person that you've always dealt with. Am I correct so far?
10 A Yes.

**D.**      **Page 91 – Lines 14-25; Page 92 – Lines 1-2**

14 Q Okay. And Fran Dougherty says, and if that is indeed the
15 case and it's good to go, he has an answer by the year's end,
16 right?
17 A Yes.
18 Q Okay. And so Fran says, basically, to Sam that if you put
19 the application in like you say you are and it's good to do and
20 everything's fine, we'll get you an answer by the end of the
21 year, correct?
22 A Yes.
23 Q Okay. There's no talk about fixing it or anything like
24 that? Just moving --
25 A No.
1 Q -- up the time to do it, right?
2 A Yes.

**E.**      **Page 94 – Lines 19-21**

19 Q And she reviewed it in the normal course and we know what
20 happened, right?
21 A Yes.

**F.**      **Page 115 – Lines 20-23**

20 Q Yeah. And you wanted -- and you were telling the mayor
21 about your problem, that you wanted this guy to just come out
22 and show up and do his darn job, right?
23 A Yes.

**G.**      **Page 199 – Lines 19-22**

19 Q Okay. And what transpired after that was a totally
20 legitimate constituent service procedure from Ramzi Haddad,

21 correct?
22 A Yes.

7)      Jonathan Saidel

        Regarding 3/12/15 and 3/27/15

        **A. The March 12, 2015 Meeting** was recorded in its entirety. There was not a single request for any campaign donation at all. Quid Pro Quo, at its very basest level, requires some sort of money request. Absolutely none was requested at this 3/12/15 meeting. The meeting was about political advice and smoothing over a prior misunderstanding. There was simply no agreement of any kind.

8)      Norris McLaughlin

        Regarding 5/20/15 Request

        **A. Entire meeting of May 20, 2015** was taped by the government. No discussion at all about legal services for contributions.

Matthew Sorrentino

        Regarding 5/20/15 Request

        **A.      Page 119 – Lines 17-21**

17 Q And by saying it's doable, were you responding to him that
18 you in fact believed that based on that pitch and based on his
19 presentation to you, that raising some money might be something
20 that could be done?
21 A That's correct.

        **B.      Page 123 – Lines 11-20**

11 Q Okay. Now, after this meeting, then based on what you're
12 telling me about this meeting, and what we heard about the
13 meeting, without telling us about it, did the mayor ever
14 request contributions from you in connection with the awarding
15 of legal services?
16 A No, sir, he did not.
17 Q Okay. And did you have any explicit, clear, unambiguous
18 agreement to give campaign contributions in return for City of
19 Allentown legal work?
20 A No, sir. I did not.

9)      James Hickey

Never testified but government tapes recorded the following:

<u>Regarding phone conversation on 5/6/15</u>

### A.      **Government Recording**

"All of my people had been boned in Allentown. No one had gotten dick"

### B.      **FILE: SR#392a.010 – TS 0:04:28**

SR: Yeah, I hear you Jim.
JH: You know, and I- I can regale you with stories of Callahan in similar situations, where he not only would make the call, but go in and close the door of his Public Works Director and get down and dirty and (UI) with the guy, and make sure a job went the right way- Ed's never ever done that...

10)    Jack Rosen

Never testified and was never charged with any misconduct.

<u>Regarding 2/16/15 Meeting</u>

### A.      **FILE: SR#308b – Page 3**

SR: Nope.
EP: I cannot. But I can use it for other things. Okay, so, you know, my thought is that, you know, if, if I run for the federal office I can actually use my state money to help other candidates across the state to run their state campaign. You know, there's ways to use it.
JnR: But you're not raising any money for the federal PAC?
SR: We don't have a federal PAC yet.
EP: I don't have a federal PAC yet.
JR: Why don't you do that?
EP: As soon as I do that, then I've truly announced that Ive committed ... 14:40:20
14:42:10
JR: So what else is doing now, in Allentown? I know we, I saw some email from your guys, we're now, passed over, we passed political fundraising discussion, so we can move to the next-
EP: Yes.
JR: Okay, umm, your guys sent Erez a note or something? About talking to him about a-
EP: The Americus?
JR: 5C
JnR: No, SC Security.
EP: Oh yeah, yeah, yeah. Umm, yeah, we're gonna, we're, yes, I guess we're setting up a meeting with them to talk to them.
JR: Yeah.
EP: (UI)-

JR: Just tell me about it, because
EP: We're gonna do, we're going to do the contract, okay?
JR: The one we proposed or, Jordan said something about 11,000 or something?
SR: 35-
JR: 35?
SR: That was the number -
JR: Yeah-
SR: I thought 35 was the number.

## FILE: SR#308b – Page 7 – 15:51:21

JR: So if we're off, let's get off of business. I don't, you know, I don't like talking about both at the same time. So off of business. So once you've decided what you're going to do, then obviously you need a fundraiser right?
SR: Yes.
JR: Okay.
SR: We need umm-
JR: But you have to decide which one (ui)?
SR: We're a, so we're going to put together, depending how we're going to do it. Umm, we need to put together 25,000 pretty quickly, for a poll. Depending on, how the SDCC wants us to do it, but, umm, and then our goal, from our conversations with a, the SDC, would be to put together about a million bucks in the next two months immediately after we decide, to get that. So that's basically PA, basically Philadelphia, New York, D.C., and maybe a little bit of Pittsburgh money if we can scrape it out.
JR: Is there a deal where you can get money but other people won't come in too.
SR: Well, no, the theory is-
EP: I actually don't think anybody else is going to be coming in.
15:52:16
16:01:30
JR: Alright. Good to see you, alright?
EP: (UI)
JR: So, we'll be helpful.
EP: Alright. Thanks
SR: Thank you Jack.
SR: Alright. Down to Baked by Melissa and then over to the (ui).
EP: I didn't even know about the (UI). That's pretty cool.
SR: Yeah. I play around with it every once in a while. Well, that went well. [ enter elevator]
EP: Yeah, we gotta be careful. I can't, I get uncomfortable when we start talking about hey, we're just gonna give you this. Who has the contract process. I'm so scared now a days like, who the hell knows who's wearing a wire? Who's tapped? Who's not? You know what I mean? I think I just gotta be, we just gotta be really careful when we talk about this stuff.
SR: Yeah.


Regarding 5/18/15 Meeting

### B.     FILE: MF#55 – Page 3

JR: We ain't getting any younger. .. 14:31 :31
14:55:23
JR: So how is it going?
EP: .It's going good. Are we done talking other business?
JR: Yeah. Put up a Chinese wall.
EP: Yeah.
MF: Put up a Chinese wall. We don't have to do that.
EP: Umm, yeah, it's going well. I mean, we raised a lot of money in the last couple of days. Umm, been in for seven days. Umm, I hired a, who is the guy we just hired for our pollster?
MF: Mierman? Harry Reid's pollster.
JR: Yeah, I don't know names and shit.
MF: We hired Harry Reid's pollster, to start doing the stuff. A, we met with-
EP: Millman.
MF: Millman. We met with McQue from the super PAC, from Harry Reid's super PAC. To start talking about, you know, how they can be supportive and what George Norcross and those guys can do.
JR: Isn't Harry Reid retiring?
MF: What's that?
JR: Reid's retiring, no?
MF: Well, the super PAC is not retiring, and it's- [laughter]
JR: Well he's gonna continue to-
MF: Well no, the super PAC is kind of an entity. It's on its own. You know, we, the majority leader, whoever the next one is, maybe you know, will control that to a degree. You know what I mean? It's a general majority PAC. And that, that's how, you know, umm, that went really well and raised about 400,000 bucks to start with over the last two weeks-ish. You know, so things are headed in the right direction.
EP: (UI) a lot of primaries in the state of Pennsylvania-
MF: Yeah.
EP: There's no, the money I raise in Philly and they got all kinds of primaries all over the state.
JR: Take your jacket off if you want.

<u>Fleck - Pawlowski prior to the meeting</u>

### C.     FILE: MF#54 – Pages 1-3

MF: But the two biggest meetings for getting money in by June 30th are obviously, a, Mur-, Mur-, Ramzi and Rosen. And I looked over and I said, I looked at the stuff and I said look, so today we're in New York. We're, you know, we're away from the area where everybody knows us. We need to have, direct and frank conversations with Rosen and, and, and, and, what-ya-ma-call-it, and Ramzi. Because two reasons. One, if they're asking for anything that you don't feel comfortable with, we should just, you know, just say hey, we can never do that. Right? Because you don't know what the fuck, what the hell Rosen's going to want for.a million dollars? [laughs] God only knows, the crazy shit he's gonna ask for. You know what I mean? Hello?
EP: Yeah I'm here. So wha-, how do you suggest we broach that

conversation?

MF: Well, well I got some, I got a lot of ideas.

EP: Okay.

MF: But then, but then after today, then I don't think you should ever, except for like events and stuff, you should never meet with them again for that kind of, anything that you got to help with, right? Because that just gets you into conversations that you don't want to be in, with either Rosen or Ramzi, right? I mean, you know, and that way you don't have to have any conversations again. Ah, and, so Ed speak to (ui). They have, yeah, cause he's always talking-

EP: Ramzi?

MF: No, first I'm talking about Rosen.

EP: Okay.

MF: Because he's always talking about, like you know, like when we, when we talk to him, and I don't know if you remember this, 1;,ut he's always talking about all the shit that Cuomo and DeBlasio were doing to help him out. All that, you know what I mean? So I think, you know, I think he's used Allentown like a lot of people do from Philly. Like it's hick town or whatever. You know what I mean? We just need to make sure that he doesn't-

EP: I don't think so.

MF: You don't think so?

EP: No, I think he's we just got to find the right project.

MF: No, I wasn't even talking about from a project standpoint. I mean from a, government standpoint. We want him to make sure that you help him with whatever he needs, but he can't own you. He's got to understand that. I think he thinks he can own you at the end of the day.

EP: I don't. I never get that, I never get that sense from him.

MF: You don't think so. Alright.

EP: I get the sense from Ramzi, okay? That one I get the sense from, okay? But, you know, Jack, I've never picked up that vibe.

MF: Well yeah, really, and quite honestly, the guy that says to me what he wants, I trust more than the guy that doesn't.

EP: Well there, there is that.

MF: The guy who doesn't tell you what he wants. Because usually when, when he calls you for what he wants, it's usually something [laughs], you know what I mean, out of this world?

EP: Well, he's been respectful.

MF: He has been.

EP: And when, when I tell him, listen, you know, this is the parameters I have to work with and stuff, then, he's been respectful to that.

MF: So I've looked at a couple of things. Well, first of all, the ask from him, so what do we, did you talk to Lisa about the ask for Jack? Let's do Jack first.

EP: She thought we should ask him for fifty. I thought we should ask for a hundred.

MF: Okay. What? Forever?

EP: No, now, now.

MF: Okay, yeah, okay. Let's, okay, that seems logical.

EP: I'm sure if we asked for a million dollars-

MF: Well, that's what I would-

EP: He would freak out, right?

MF: Well, that's what I was going to say. Can you raise, help us raise a million by the end of the year? Not by June 30th. Maybe a hundred by June 30th. And rai-, cause he already told you he was gonna raise you a

million, right?
EP: Right.
MF: I mean, I was there when he said it. The next time you run Ed, if you're serious and you're all in, I'm raising you a million dollars. But I think that you're right. You can't say hey, I need a million dollars by June 30th. Because, I don't think that's possible because, a, first of all, some of the things that I can do to help him, like for instance, if he wants to be introduced to Reading, and also to Lehigh County for SC. I can introduce him to them, but I can't, I can't, you know, it takes time. It doesn't, it's not going to happen by June 30th. You know what I mean? Everything won't happen by June 30th. Umm, so I think that's, that's too much. Umm, brit we know, cause Sam told me from his meetings with him what-
EP: in Whitehall.
MF: Huh? Yeah, in White-, in Whitehall. Umm, what he, what he wants. So I, I know he wants, so, did they finish their phase one for the city yet?
EP: Phase one?
MF: Their like SC, did the study?
EP: I don't know. I'll find out.
MF: Yeah. Because if they, if they finished the study, I think he was wanting to implement like the shit that's all wrong. Right? If there is stuff. Like especially if, you were saying, cyber and other stuff. But I don't know if he completed phase one.
EP: That's a dam good question. I don't know.
MF: That is a dam good question,
09:26:50

The above are the testimony, the facts, and the truth in this matter. Calling it an aggressive solicitation of bribery and pay to play is simply words of the government that does not match the reality of the actual words of the participants.

In the recent precedential opinion by the 3rd circuit court of appeals regarding the case of the United States vs. Fattah, Nicholas, Brand and Vederman (Nos. 16-4397, 16-4410, 16-4411, 16-4427, 17-1346), the court stated that, the Supreme Court interpreted the term "official act" as defined in 18 U.S.C. § 201(a)(3). 136 S. Ct. at 2368.

The statute defines an "official act" as "any decision or action on any question, matter, cause, suit, proceeding or controversy, which may at any time be pending, or which may by law be brought before any public official, in such official's official capacity, or in such official's place of trust or profit." 18 U.S.C. § 201(a)(3).

The court stated that McDonnell lays out a clear path for the Government to follow in proving that an accused has performed an "official act."

First, the Government must "identify a 'question, matter, cause, suit, proceeding or controversy' that 'may at any time be pending' or 'may by law be brought' before a public official." 136 S. Ct. at 2368 (quoting 18 U.S.C. § 201(a)(3)).

The court further opined that the first step is divided into two sub-components. Step 1(A), the Government must "identify a 'question, matter, cause, suit, proceeding or controversy.' " Id. Step 1(B) then clarifies that the identified "question, matter, cause, suit, proceeding or controversy" be one that " 'may at any time be pending' or 'may by law be brought' before a public official." Id.

Under Step 1(A), a "question, matter, cause, suit, proceeding or controversy" must be "a formal exercise of governmental power that is similar in nature to a lawsuit before a court, a determination before an agency, or a hearing before a committee." Id. at 2372. Importantly, "a typical meeting, telephone call, or event arranged by a public official" does not qualify as such a formal exercise of governmental power. Id. at 2368.

Step 1(B) then requires the court to ask whether the qualifying "question, matter, cause, suit, proceeding or controversy" was one that " 'may at any time be pending' or 'may by law be brought' before a public official." Id. As the McDonnell Court clarified, " '[p]ending' and 'may by law be brought' suggest something that is relatively circumscribed—the kind of thing that can be put on an agenda, tracked for progress, and then checked off as complete." Id. at 2369; accord United States v. Repak, 852 F.3d 230, 252 (3d Cir. 2017) (quoting McDonnell, 136 S. Ct. at 2369). By contrast, matters described at a high level of generality—for example, "[e]conomic development," "justice," and "national security"—are not sufficiently "focused and concrete."

McDonnell, 136 S. Ct. at 2369.

Step 2 requires the Government to prove that the public official made a "decision" or took "an action" on the identified "question, matter, cause, suit, proceeding or controversy."

In the Fattah case, Fattah was charged with engaging in three categories of official acts, which we analyze in accordance with the McDonnell framework. In Counts 16–18 and 22–23, Fattah is alleged to have set up a meeting between Vederman and the U.S. Trade Representative, attempted to secure Vederman an ambassadorship, and hired Vederman's girlfriend, all in return for a course of conduct wherein Vederman provided things of value to Fattah.

The 3rd circuit court concluded that the first category of the charged acts—setting up a meeting between Vederman and the U.S. Trade Representative—is not unlawful, and that the second category—attempting to secure Vederman an ambassadorship—required reconsideration by a properly instructed jury. The third charged act—hiring Vederman's girlfriend—is clearly an official act. But because they could not isolate the jury's consideration of the hiring from the first two categories of charged acts, the court reversed and remanded the judgment of the District Court.

The Supreme Court has also held that Hobbs Act extortion under color of official right in the campaign contribution context requires a specific quid pro quo—a payment "made in return for an explicit promise or undertaking by the official to perform or not to perform an official act."

In reaching this decision, the Supreme Court reflected on the unique role of elections in a democracy: "to hold that legislators commit the federal crime of extortion when they act for the benefit of constituents . . . shortly before or after

When one looks at the charges and evidence in the case of the United States vs. Pawlowski, in light  the two step test outlined in McDonald by the Supreme Court and recently

affirmed by the 3rd circuit court of appeals, many of the overt acts charged to Pawlowski fail to meet the standards of the two step process.

Overt Act #1

**Zoning and Inspection of 1324 N Sherman Street**

In it's indictment the government in paragraph 19, "0n or about May 21, 2015, because of the inquiry made by defendant Edwin Pawlowski, a city of Allentown building inspector expedited the inspection of 1324 N. Sherman Street."

Outside of any evidence which demonstrated a specific quid pro quo—a payment "made in return for an explicit promise or undertaking by the official to perform or not to perform an official act." The government failed on all the steps outlined in McDonald.

In this act there was no 'question, matter, cause, suit, proceeding or controversy that 'may by law be brought' before a public official since zoning and inspection decisions do not come before the mayor for approval or review. In addition no "decision" or "action" identified "question, matter, cause, suit, proceeding or controversy as outlined in McDonald was described, only that an inquiry was made.  Thus the act fails to meet the test outlined by the courts on both steps.

136 S. Ct. at 2368. The McDonnell Court explained:

> *Setting up a meeting, hosting an event, or calling an official (or agreeing to do so) merely to talk about a research study or to gather additional information . . . does not qualify as a decision or action on the pending question of whether to initiate the study.*

Overt Act #2

### Collection of Delinquent Taxes and Municipal Claims

Again, outside of any evidence which demonstrated a specific quid pro quo—a payment "made in return for an explicit promise or undertaking by the official to perform or not to perform an official act." The government failed on one of the two steps outlined in McDonald.

While step one is clearly met, a contract pending before the mayor for approval, the government falls short on step two by failing to show any concrete evidence that the mayor made a "decision" or took "an action" on the identified "question, matter, cause, suit, proceeding or controversy, ie. The contract.

The 3rd circuit court has stated that McDonnell's Step 2 required a determination as to whether Fattah's efforts qualified as permissible attempts to "express[] support," or impermissible attempts "to pressure or advise another official on a pending matter." Id. at 2371.

They concluded that at trial, the jury was not instructed that they had to place Fattah's efforts on one side or the other of this divide. The jury might even have thought they were permitted to find Fattah's efforts— three emails, two letters, and one phone call—to themselves be official acts, rather than a "decision" or "action" on the properly identified matter of appointment. Such a determination would have been contrary to the dictates of McDonnell. Faced with such uncertainty, they could not assume the jury verdict was proper. Although the jury might not have concluded that Fattah's efforts were themselves official acts, and although the jury might not have concluded that those efforts crossed the line into impermissible attempts "to pressure or advise," they were unable to conclude that the jury necessarily did so. Nor could they, determine whether Fattah's efforts to secure Vederman an ambassadorship crossed the line.

Additionally the Supreme Court considered the scope and constitutionality of the honest services statute in Skillings vs. the United States and determined that "[t]o preserve the statute

without transgressing constitutional limitations," § 1346 criminalizes only "fraudulent schemes to deprive another of honest services through bribes or kickbacks." Skilling, 130 S. Ct. at 2928, 2931. The Supreme Court rejected the Government's argument that § 1346 should also encompass "undisclosed self-dealing by a public official . . . [such as] the taking of official action by the [official] that furthers his own undisclosed financial interests while purporting to act in the interests of those to whom he owes a fiduciary duty." Id. at 2932 (internal quotation marks and citation omitted). Because the Government in Skilling did not allege that Skilling accepted bribes or kickbacks, the Supreme Court determined that Skilling's honest services fraud conviction was flawed and vacated the Fifth Circuit's affirmance of Skilling's conspiracy conviction. Id. at 2934–35.

As in Skilling the government failed to prove that the mayor accepted any bribes or kickbacks as a result of the contracting process.

The governments contention that accepting campaign contributions is a form of bribe for services is in direct contraction to the supreme court's ruling in McCutcheon, et al. v. FEC. In the Court's plurality opinion, Chief Justice John Roberts wrote, "Congress may target only a specific type of corruption—'quid pro quo' corruption . . . Spending large sums of money in connection with elections, but not in connection with an effort to control the exercise of an officeholder's official duties, does not give rise to quid pro quo corruption. Nor does the possibility that an individual who spends large sums may garner 'influence over or access to' elected officials or political parties."

Finally the government failed to prove or present evidence that the mayor knowingly entered into an agreement for specific unlawful purpose charged in the indictment.

As outlined by the 3rd circuit in the United States v. Kates, 508 F.2d 308, 310-11 (3d

Cir.1975), "In order for us to sustain a [359 F.3d 287] defendant's conviction for conspiracy, the government must have put forth evidence `tending to prove that defendant entered into an agreement and knew that the agreement had the specific unlawful purpose charged in the indictment.'" Idowu, 157 F.3d at 268 (quoting Wexler, 838 F.2d at 91). Neither was proven by the government.

Overt Act #3

### Lighting Design and Installation Project

As in the previous overt acts, the government presented outside no evidence which demonstrated a specific quid pro quo—a payment "made in return for an explicit promise or undertaking by the official to perform or not to perform an official act." The government as in OA 2 failed on one of the two steps outlined in McDonald.

In this act step one is clearly met, a contract pending before the mayor for approval, but the government falls short on step two by failing to show any concrete evidence that the mayor made a "decision" or took "an action" on the identified "question, matter, cause, suit, proceeding or controversy, ie. The contract.

In paragraph 65 of the indictment it states, "On or about January 28, 2015, defendant Edwin Pawlowski and Patrick Regan discussed the street light contract at a breakfast meeting." Under McDonald clearly a permissible act.

In paragraph 66 of the indictment it states, "On or about January 28, 2015, after S.R. told Patrick Regan that the mayor had plans and that S.R. Needed to get vendors to give back "a little bit, " Regan Agreed. At no time did the government present evidence that the mayor knew of this conspiracy or condoned it, to the contrary, evidence was presented which showed the mayor clearly did not know or condone this ask for funds.

Thus a conspiracy under this overt act is unsustainable since a defendant's "participation in a scheme whose ultimate purpose a defendant does not know is insufficient to sustain a conspiracy under 21 U.S.C. § 846." United States v. Sliwo, 620 F.3d 630, 633-34 (6th Cir. 2010); accord United States v. Boria, 592 F.3d 476, 481-82 (3d Cir. 2010); United States v. Rodriguez, 392 F.3d 539, 545-46 (2d Cir. 2004).

Overt Act #4

**Contract awarded to Company #7 Cybersecurity**

The government could most likely show they could meet step one and two of the McDonald test, the mayor oversees the contracting process in this case since it was under $40,000 and approved the contract. No City contracting rules were violated and the contract was approved as prescribed by the city's charter.

What the government cannot and failed to prove was any evidence which demonstrated a specific quid pro quo—a payment "made in return for an explicit promise or undertaking by the official to perform or not to perform an official act." Instead the government presented circumstantial evidence that attempted to link legitimate campaign contributions to the approval of the contract.

Although circumstantial evidence alone can support a conviction, there are times that it amounts to only reasonable speculation and not to sufficient evidence." Newman v. Metrish, 543 F.3d 793, 796 (6th Cir. 2008); United States v. Cartwright, 359 F.3d 281, 291 (3d Cir. 2004) (evidence found insufficient where government asked the jury to make a series of inferences on weak facts where "countless other scenarios that do not lead to the ultimate inference the government seeks to draw" were also plausible).

The elements of a conspiracy may be proven entirely by circumstantial evidence, but each

element of the offense must be proved beyond a reasonable doubt." Wexler, 838 F.2d at 90; see also United States v. Idowu, 157 F.3d 265, 266-67 (3d Cir.1998) which in this case at the time of its closing arguments, the government failed to prove.

Overt Act #5

**Construction Inspection Services for Basin Street**

Due to the fact that the government presented absolutely no evidence of the mayor having any direct intervention regarding this contract, they failed to establish a basis for the two step process outlined by the courts.

As with the previous counts, the government failed to prove was any evidence which demonstrated a specific quid pro quo—a payment "made in return for an explicit promise or undertaking by the official to perform or not to perform an official act." Instead the government presented circumstantial evidence that attempted to link legitimate campaign contributions to the approval of the contract.

Again relying on a litany of circumstantial evidence to attempt to link campaign contributions with the contracts approval in direct violation of United States v. Cartwright, 359 F.3d 281, 291 (3d Cir. 2004)

Overt Act #6

**Consulting and Engineering Design Services for the
Aquatic Renovation Project**

As with the previous overt Act, the government presented absolutely no evidence of the mayor having any direct intervention regarding this contract and thus they failed to establish a basis for the two step process outlined by the courts.

The government again failed to prove that their was any evidence which demonstrated a

specific quid pro quo—a payment "made in return for an explicit promise or undertaking by the official to perform or not to perform an official act." Instead the government presented circumstantial evidence that attempted to link legitimate campaign contributions to the approval of the contract. Yet no contributions were made or received by the contractor and the contract was awarded on the basis of merit.

It is true that in the United States v. Bradley, 173 F.3d 225, 231 (3d Cir. 1999). "[T]he Government need only show that a public official has obtained a payment to which he was not entitled, knowing that the payment was made in return for official acts." Evans, 504 U.S. at 268. Put differently, "it is sufficient if the public official understands that he is expected, as a result of the payment, to exercise particular kinds of influence or to do certain things connected with his office as specific opportunities arise." Bradley, 173 F.3d at 231.

In this instance the government failed to show any understanding by the mayor of an expected illegal act or that any payment was made to influence such acts.

Overt Act #7

**Scott Allinson and Law Firm #2**

As with the previous overt Act, the government presented absolutely no evidence of the mayor having any direct intervention regarding this contract and thus they failed to establish a basis for the two step process outlined by the courts.

The government again failed to prove that their was any evidence which demonstrated a specific quid pro quo—a payment "made in return for an explicit promise or undertaking by the official to perform or not to perform an official act." Instead the government presented circumstantial evidence that attempted to link legitimate campaign contributions to the approval of the contract. Yet no contributions were made or received by the contractor and the contract

was awarded on the basis of merit.

In the United States v. Kates, 508 F.2d 308, 310-11 (3d Cir.1975)); see also Idowu, 157 F.3d at 268. "In order for us to sustain a [359 F.3d 287] defendant's conviction for conspiracy, the government must have put forth evidence `tending to prove that defendant entered into an agreement and knew that the agreement had the specific unlawful purpose charged in the indictment.'" Idowu, 157 F.3d at 268 (quoting Wexler, 838 F.2d at 91). None of this was proved during the government's arguments of the facts.

The government also misled the jury by raising the issue of the meeting with the governor in relation to Talen Energy Company.

In the United States vs. Caldwell it is made clear that a logical chain of inferences must be articulated so that the court is "assure[d] that the evidence is not susceptible to being used improperly by the jury."

The government also tried to state that the discussion of the appointment of Richard Somack to serve as the parking authority solicitor was akin to a quid pro qou agreement. Since the mayor had absolutely no power to appoint the solicitor, as with the Fattah case this charge fails step one of the Mcdonald test.

The 3rd circuit recently stated the following in relation to the Fattah case;

"At the outset, it is clear to us that, under Steps 1(A) and 1(B), a formal appointment of Vederman as an ambassador would qualify as a "matter" that "may at any time be pending" before a public official. The formal appointment of a particular person (Vederman), to a specific position (an ambassadorship), constitutes a matter that is sufficiently focused and concrete. The formal appointment of an ambassador is a matter that is "pending" before the President—the constitutional actor charged with nominating ambassadors—as well Senators, who are charged

with confirming the President's ambassadorial nominations. U.S. Const. art. II § 2 ("[H]e shall nominate, and by and with the Advice and Consent of the Senate, shall appoint Ambassadors . . . ."). It is beyond cavil that the formal appointment of an ambassador satisfies both sub-components of McDonnell's Step 1.

The same could be said as it relates to the mayors appointment of a parking authority solicitor and thus fails step one of the test.

In Rule 29, the court's responsibility is to ensure that the government has shouldered its burden and adequately proved its case. In this regard, the government must do more than prove that the defendant's participation in the crime charged is possible or even plausible. It must prove the defendant's guilt beyond a reasonable doubt. For example, a criminal conviction based upon piling inference upon inference cannot stand. And while the evidence need not exclude every reasonable hypothesis of innocence in order to sustain a guilty verdict, a conviction predicated on conjecture cannot be sanctioned by the court. Thus, in spite of the stringent standard of review, if the government fails to meet its heavy burden of proof, the reviewing court must set aside the verdict.

This is the case with this and the other overt acts and the governments failure to meet the burden of proof, relying instead the piling of  inference upon inference in an effort to mask their apparent lack of concrete evidence leading to a quid pro qou.

In addition, in all of these overt acts the government asserts mail and wire fraud.

To prove wire fraud, the Government must establish "(1) the defendant's knowing and willful participation in a scheme or artifice to defraud, (2) with the specific intent to defraud, and (3) the use of . . . interstate wire communications in furtherance of the scheme." United States v. Antico, 275 F.3d 245, 261 (3d Cir. 2001) (citation omitted), abrogated on other grounds by

Skilling v. United States, 130 S. Ct. 2896 (2010). Under 18 U.S.C. § 1346, "the term 'scheme or artifice to defraud' includes a scheme or artifice to deprive another of the intangible right of honest services." In Skilling, the Supreme Court considered the scope and constitutionality of § 1346, and held that the statute criminalizes only "fraudulent schemes to deprive another of honest services through bribes or kickbacks." 130 S. Ct. at 2928, 2931. The Court rejected an argument by the government that § 1346 also covers "undisclosed self-dealing by a public official . . . [such as] the taking of official action by the [official] that furthers his own undisclosed financial interests while purporting to act in the interests of those to whom he owes a fiduciary duty." Id. at 2932. Such an interpretation, the Court explained, would render the statute unconstitutionally vague. Id. at 2931.

Accordingly, a district court's failure to limit honest services fraud to schemes involving bribes or kickbacks now constitutes legal error. Riley, 621 F.3d at 323.5  To indict on mail or wire fraud, the Government must allege that defendants "devised or intend[ed] to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises" and used mail or wire to effect the scheme. 18 U.S.C. §§ 1341, 1343. None of this was proven in any of the above mentioned overt acts and thus the charges should be vacated.


**WHEREFORE**, defendant, through counsel prays the forgoing motion be granted.

Respectfully Submitted:

Date: 8/29/2018                              */s/ Jack McMahon*　　　　　　　

Jack McMahon, Esquire

Law Office of Jack McMahon
139 N. Croskey Street
Philadelphia, PA 19103

T: 215-985-4443
F: 215-985-4416
E: McMahonLaw@hotmail.com