IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | CRIMINAL ACTION |
| | : | |
| v. | : | No. 17-390-1 |
| | : | |
| EDWIN PAWLOWSKI | : | |

## MEMORANDUM

**Juan R. Sánchez, C.J.**                                                    **November 20, 2018**

On March 1, 2018, after a six-week trial, a jury convicted Defendant Edwin Pawlowski, the former mayor of the City of Allentown, of 47 counts of corruption-related offenses arising out of his orchestration of a pay-to-play scheme while in public office to fund his campaigns for Governor of Pennsylvania and the United States Senate. At the close of the Government's case, and again at the close of all evidence, Pawlowski moved for a judgment of acquittal pursuant to Federal Rule of Criminal Procedure 29. The Court reserved ruling on the motion. By Order of October 22, 2018, the Court granted Pawlowski's motion in part and denied it in part. Pursuant to Third Circuit Local Appellate Rule 3.1, the Court issues this Memorandum to summarize the basis for its rulings.

## BACKGROUND

In July 2017, Pawlowski and Co-Defendants Scott Allinson and James Hickey were charged by indictment with conspiring to commit mail fraud, wire fraud, honest services fraud, federal program bribery, and Travel Act bribery and with numerous substantive offenses, arising out of Pawlowski's wide-ranging pay-to-play scheme. As discussed in greater detail below, the scheme involved various sub-schemes whereby Pawlowski, directly and through his operatives, agreed to steer City contracts or provide other favorable official action to companies, law firms, and individuals in exchange for campaign contributions and other items of value. In addition to

the conspiracy charge (Count 1), Pawlowski was charged with 14 counts of federal program bribery (soliciting), in violation of 18 U.S.C. § 666 (Counts 2, 4-11, 13, 15-18); three counts of attempted Hobbs Act extortion under color of official right, in violation of 18 U.S.C. §§ 1951 and 2 (Counts 3, 12, 14); nine counts of mail fraud, in violation of 18 U.S.C. § 1341 (Counts 20-28); nine counts of wire fraud, in violation of 18 U.S.C. § 1343 (Counts 29-37); six counts of honest services wire fraud, in violation of 18 U.S.C. §§ 1343 and 1346 (Counts 38-43); two counts of honest services mail fraud, in violation of 18 U.S.C. §§ 1341 and 1346 (Counts 44-45); three counts of Travel Act bribery, in violation of 18 U.S.C. § 1952 (Counts 46-48); and seven counts of making false statements, in violation of 18 U.S.C. § 1001 (Counts 49-55).

Pawlowski and Allinson, an attorney whose law firm was seeking contract work from the City, proceeded to trial in January 2018.[1]  At trial, the Government sought to establish Pawlowski's orchestration of and involvement in the pay-to-play scheme through tape recorded conversations,[2] witness testimony, and documentary evidence.  The Government's proof showed that Pawlowski used and sold his public office to raise campaign funds for his political ambitions to become the Governor of Pennsylvania and a United States Senator.  In order to identify potential donors to his campaigns, Pawlowski generated lists of vendors that held City contracts and used those lists to determine the amount of campaign contributions to be solicited from the vendors.  Pawlowski also targeted vendors that were affiliated with politically-influential individuals in the Democratic party for City contracts and then solicited campaign contributions from these vendors.

---

[1] Hickey pleaded guilty to a single count of the Indictment prior to trial.

[2] For ease of reference, citations to the recorded conversations below are to the transcripts of those conversations rather than to the audiotapes themselves.  Although the transcripts were not admitted into evidence, they were used during trial as aids, and their accuracy is not contested.

To facilitate his pay-to-play scheme, Pawlowski deployed his campaign staff, campaign manager Michael Fleck[3] and campaign aide Sam Ruchlewicz, as his operatives. Francis Dougherty, the City's Managing Director, also worked closely with Pawlowski and assisted with Pawlowski's scheme. Pawlowski told Dougherty that Fleck and Ruchlewicz "represented him," and Dougherty thus took direction on City-related matters from them in addition to Pawlowski. Trial Tr. Day 3 at 76-77, Jan. 23, 2018. By late 2013 to 2014, Pawlowski had provided Fleck and Ruchlewicz—who would otherwise have no authority to conduct official City business—with direct access to City Hall, enabling them to meet with City officials to manage the awarding of City contracts on their own. Even though he used Fleck, Ruchlewicz, and Dougherty to help execute his scheme and provide a layer of insulation between him and those he sought to engage in his scheme, Pawlowski was "paranoid" about his conduct being detected. *See* Trial Tr. Day 9 at 168, Feb. 2, 2018. To further shield his conduct from being discovered, Pawlowski took additional precautionary measures, including sweeping his office for electronic eavesdropping devices, using burner phones, and speaking to his operatives in person to avoid being recorded. *See id.*

The evidence at trial connected Pawlowski to nine pay-to-play sub-schemes, involving (1) an agreement to expedite a zoning application and inspection for real estate developer Ramzi Haddad, in addition to the steering of City contracts (2) for the collection of delinquent real estate taxes to Northeast Revenue Service; (3) to revamp the City's street lights to The Efficiency Network; (4) to update the City's cybersecurity system to CIIBER; (5) for the design and construction of the City's pools to Spillman Farmer Architects; (6) for a street construction project

---

[3] In addition to his political consulting work, Fleck also had a general consulting business called Hamilton Development Partners, which represented private companies seeking to conduct business with local governments.

to McTish, Kunkle & Associates; and for legal services to the law firms of (7) Norris McLaughlin; (8) Stevens & Lee; and (9) Dilworth Paxson all in exchange for campaign contributions or other items of value.

Following a six-week trial, Pawlowski was convicted of 47 of the 54 counts against him.[4] At the close of the Government's case, and again at the close of all evidence, Pawlowski moved for a judgment of acquittal on all counts on the basis that the Government's evidence was insufficient to sustain his convictions.[5] On October 22, 2018, the Court granted Pawlowski's motion in part and denied it in part. The Court explains the basis for its rulings below.

**LEGAL STANDARD**

Under Federal Rule of Criminal Procedure 29, a defendant may move for a judgment of acquittal "[a]fter the [G]overnment closes its evidence or after the close of all evidence." Fed. R. Crim. P. 29(a). The court must grant the motion and enter a judgment of acquittal "of any offense for which the evidence is insufficient to sustain a conviction." *Id.* In evaluating a sufficiency of the evidence challenge pursuant to Rule 29, a district court must "review the record in the light

---

[4] The Dilworth Paxson scheme will not be discussed below as Pawlowski was acquitted of all counts relating to that scheme. In addition, Pawlowski's arguments as to Counts 29, 31, 32, 38, and 39 will not be addressed because these counts were dismissed on the Government's motion following sentencing.

[5] When Pawlowski moved for a judgment of acquittal at trial, he did not offer any argument as to why the motion should be granted as to Count 1, charging him with conspiracy to commit mail fraud, wire fraud, honest services mail fraud, honest services wire fraud, federal program bribery, and Travel Act bribery. Pawlowski also made no argument as to Count 1 in his written post-trial motion filed with the Court on April 20, 2018. On August 29, 2018, in his response to the Government's Sentencing Memorandum, Pawlowski filed a Supplement to his Rule 29 motion in which he argues there was insufficient evidence to prove each overt act charged in the Indictment. The Court construes his Supplement as an explicit challenge to the sufficiency of the evidence as to Count 1, and it will address these arguments below. *See infra* note 15. To the extent his arguments apply to the substantive offenses of the conspiracy, however, the Court will also address these arguments in the discussion of each sub-scheme.

most favorable to the [Government] to determine whether any rational trier of fact could have found proof of guilt beyond a reasonable doubt based on the available evidence." *United States v. Smith*, 294 F.3d 473, 476 (3d Cir. 2002) (internal quotation marks and citation omitted). When a court reserves ruling on a Rule 29 motion made at the close of the Government's case, the court must "decide the motion on the basis of the evidence at the time the ruling was reserved." Fed. R. Crim. P. 29(b); *see also United States v. Brodie*, 403 F.3d 123, 133 (3d Cir. 2005) ("[T]he District Court was required to, and properly did, determine whether an acquittal was appropriate based solely on the evidence presented by the [G]overnment."). The court must "review the evidence as a whole, not in isolation," *United States v. Boria*, 592 F.3d 476, 480 (3d Cir. 2010), and should not weigh the evidence or determine the credibility of witnesses, *United States v. Dent*, 149 F.3d 180, 187 (3d Cir. 1998). The Court "must uphold the jury's verdict unless no reasonable juror could accept the evidence as sufficient to support the defendant's guilt beyond a reasonable doubt." *United States v. Fattah*, 902 F.3d 197, 268 (3d Cir. 2018).

**DISCUSSION**

In his Rule 29 motion, Pawlowski argues a judgment of acquittal should be entered as to the counts of the Indictment charging him with attempted Hobbs Act extortion under color of official right, honest services mail and wire fraud, federal program bribery, and Travel Act bribery because the Government failed to prove an explicit quid pro quo, as required under *McCormick v. United States*, 500 U.S. 257 (1991), or that he took (or agreed to take) any "official acts" in exchange for a thing of value to satisfy *McDonnell v. United States*, 136 S. Ct. 2355 (2016). Relying on these arguments, Pawlowski asserts a judgment of acquittal should be entered as to the counts of the Indictment charging him with mail and wire fraud as well. He further argues the Government failed to prove he made false statements to agents of the Federal Bureau of

Investigation, and a judgment of acquittal should also be entered as to these counts.  The Court will address Pawlowski's arguments as to the attempted Hobbs Act extortion under color of official right, honest services mail and wire fraud, federal program bribery, and Travel Act bribery counts in Section A, mail and wire fraud counts in Section B, and false statements counts in Section C.

**A.      Attempted Hobbs Act Extortion, Honest Services Mail and Wire Fraud, Federal Program Bribery, and Travel Act Bribery**

As noted, in his Rule 29 motion, Pawlowski argues the Government failed to prove an explicit quid pro quo for each of the attempted Hobbs Act extortion under color of official right, honest services mail and wire fraud, federal program bribery, and Travel Act bribery counts, or that these counts involved an official act by Pawlowski.

To sustain a conviction for Hobbs Act extortion under color of official right, the Government must offer proof of a quid pro quo—i.e., that a public official "'receive[d] a payment in return for his agreement to perform specific official acts.'"  *United States v. Munchak*, 527 F. App'x 191, 193 (3d Cir. 2013) (quoting *Evans v. United States*, 504 U.S. 255, 268 (1992)); *see also In re Lueders' Estate*, 164 F.2d 128, 135 (3d Cir. 1947) (noting a "'[q]uid pro quo' in its common acceptance means 'something for something'").  Like extortion under color of official right, a conviction for honest services mail or wire fraud also requires proof of a quid pro quo, "that is, a specific intent to give or receive something of value in exchange for an official act." *United States v. Wright*, 665 F.3d 560, 567-68 (3d Cir. 2012) (defining honest services fraud in the context of a bribery theory).  Although the Third Circuit Court of Appeals has not decided whether proof of a quid pro quo is required for a federal program bribery conviction, *see United States v. Willis*, 844 F.3d 155, 164 (3d Cir. 2016), or Travel Act bribery, as discussed below, the parties agree that where the "quid," or thing of value offered, is a campaign contribution, the Government must prove a quid pro quo that is explicit—i.e., an *explicit* quid pro quo.

The requirement of an explicit quid pro quo derives from *McCormick v. United States*. In *McCormick¸* when a state elected official sponsored legislation benefiting a group of his constituents and received payments from an organization that represented the same constituents the legislation benefited, he was prosecuted and convicted for violating the Hobbs Act by extorting payments under color of official right. 500 U.S. 257 (1991). In reversing the conviction, the Supreme Court reasoned that allowing the Government to prosecute a politician's act that serves his constituents before or after campaign contributions are solicited or received "would open to prosecution not only conduct that has long been thought to be well within the law but also conduct that in a very real sense is unavoidable so long as election campaigns are financed by private contributions or expenditures, as they have been from the beginning of the Nation." *Id*. at 272. It thus held that the receipt of campaign contributions is actionable under the Hobbs Act as having been taken under color of official right "only if the payments are made in return for an explicit promise or undertaking by the official to perform or not to perform an official act." *Id*.

Although *McCormick* involved a prosecution for Hobbs Act extortion under color of official right, courts have applied its explicit quid pro quo requirement to prosecutions for honest services fraud and bribery when the thing of value offered in exchange for an official act is a campaign contribution. *See, e.g.*, *United States v. Ring*, 706 F.3d 460, 466 (2d Cir. 2013) ("[W]e assume without deciding . . . that *McCormick*, which concerned extortion, extends to honest-services fraud."); *United States v. Siegelman*, 640 F.3d 1159, 1172-74 (11th Cir. 2011) (assuming, without deciding, that *McCormick* extends to honest services fraud and federal program bribery); *United States v. Malone*, No. 03-CR-00500, 2006 WL 2583293, at *1 (D.Nev. Sept. 6, 2006) ("the Supreme Court's reasoning in *McCormick* [is] equally applicable to charges of honest services wire fraud where the 'scheme or artifice to defraud' involved the payment of campaign

contributions"); *see also United States v. Allen*, 10 F.3d 405, 411 (7th Cir. 1993) (finding extortion under color of official right and bribery "different sides of the same coin").[6]

In determining whether the Government has met its burden to prove an explicit quid pro quo, the relevant inquiry is "whether a rational juror could find that there was a quid pro quo and that the charged [d]efendant was aware of its terms." *United States v. Menendez*, 291 F. Supp. 3d 606, 624 (D.N.J. 2018) (emphasis omitted). "While the quid pro quo must be explicit, it need not be express"; thus, "political contributions may be the subject of an illegal bribe even if the terms are not formalized in writing or spoken out loud." *Id.* (emphasis omitted). The "'jury may consider both direct and circumstantial evidence, including the context [of the arrangement].'" *Id.* (alteration in original) (quoting *United States v. Carpenter*, 961 F.2d 824, 827 (9th Cir. 1992)).[7]

---

[6] The parties have also agreed an explicit quid pro quo is required for a Travel Act bribery conviction. The Travel Act makes it a federal offense for an individual to utilize the facilities of interstate commerce with the intent to "promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on, of any unlawful activity," *see* 18 U.S.C. § 1952(a)(3), and in this case, incorporates Pennsylvania's substantive law of bribery into federal law as the "unlawful activity." Because the unlawful activity here involves bribery in the campaign contribution context, the parties agree the more stringent standard is required.

[7] Shortly after the Supreme Court articulated the explicit quid pro quo standard in *McCormick*, it decided *Evans v. United States*, 504 U.S. 255 (1992), a case in which an elected county official—who accepted an unsolicited cash contribution and a check payable to his campaign in exchange for making favorable zoning decisions—was convicted of Hobbs Act extortion under color of official right. The official subsequently challenged his conviction on the basis that he did not solicit the benefits and the trial court's jury instructions did not sufficiently articulate the quid pro quo requirement if the jury found that the benefits he received were campaign contributions. *See id.* at 267. The Supreme Court held that an affirmative act of inducement was not required for the conviction and found the trial court's jury instructions satisfied *McCormick. See id.* at 268. In a concurring opinion, Justice Kennedy discussed the quid pro quo requirement, stating, "The official and the payor need not state the quid pro quo in express terms, for otherwise the law's effect could be frustrated by knowing winks and nods. The inducement from the official is criminal if it is express or if it is implied from his words and actions, so long as he intends it to be so and the payor so interprets it." *Id.* at 274.
    Following *Evans*, some courts have interpreted *McCormick*'s explicit quid pro quo standard by noting "explicit" is not interchangeable with "express," and instead have looked to the directness of the link between the quid and the quo or the degree of awareness of the exchange by

The "quo" aspect of the quid pro quo requirement was addressed by the Supreme Court in

*McDonnell v. United States*, 136 S. Ct. 2355 (2016). *McDonnell* narrowed the scope of conduct

that may qualify as an "official act" and held:

> an "official act" is a decision or action on a "question, matter, cause, suit, proceeding or controversy." The "question, matter, cause, suit, proceeding or controversy" must involve a formal exercise of governmental power that is similar in nature to a lawsuit before a court, a determination before an agency, or a hearing before a committee. It must also be something specific and focused that is "pending" or "may by law be brought" before a public official. To qualify as an "official act," the public official must make a decision or take an action on that "question, matter, cause, suit, proceeding or controversy," or agree to do so. That decision or action may include using his official position to exert pressure on another official to perform an "official act," or to advise another official, knowing or intending that such advice will form the basis for an "official act" by another official.

---

the parties involved. *See Menendez*, 291 F. Supp. 3d at 624; *United States v. Terry*, 707 F.3d 607, 612-13 (6th Cir. 2013) (noting that "specific," "express," and "explicit" do not add a new element to [] bribery statutes "but signal that the statutory requirement must be met," and "[a]s most bribery agreements will be oral and informal, the question is one of inferences taken from what the participants say, mean and do, all matters that juries are fully equipped to assess"); *Siegelman*, 640 F.3d at 1172 ("an explicit agreement may be 'implied from [the official's] words and actions'" (alteration in original) (quoting *Evans*, 504 U.S. at 274)); *United States v. Blandford*, 33 F.3d 685, 696 (6th Cir. 1994) (explaining that *Evans* instructed that by "'explicit' *McCormick* did not mean 'express,'" and "[e]xplicit . . . speaks not to the form of the agreement between the payor and the payee, but to the degree to which the payor and payee were aware of its terms, regardless of whether those terms were articulated"); *Carpenter*, 961 F.2d at 827 (explaining that "what *McCormick* requires is that the quid pro quo be clear and unambiguous, leaving no uncertainty about the terms of the bargain" and noting that to "read *McCormick* as imposing [a requirement that a defendant specifically state that he will exchange official action for a contribution] would allow officials to escape liability under the Hobbs Act with winks and nods, even when the evidence as a whole proves that there has been a meeting of the minds to exchange official action for money"); *see also United States v. Inzunza*, 638 F.3d 1006, 1014 (9th Cir. 2011) (noting that in the campaign contribution context, the connection between the explicit promise of official action and the contribution "may be circumstantial").

*Id.* at 2371-72.[8]  The Third Circuit Court of Appeals recently applied the *McDonnell* standard in an appeal by a former congressman who was convicted of bribery-related offenses in *United States v. Fattah*, and it held that the congressman's act of arranging a meeting with a United States Trade Representative for a friend did not qualify as an "official act" under *McDonnell*.  902 F.3d at 238.

Here, the Government presented sufficient evidence from which a reasonable jury could find beyond a reasonable doubt that the requirements of both *McCormick* and *McDonnell* were satisfied as to all counts involving attempted Hobbs Act extortion under color of official right, honest services mail and wire fraud, federal program bribery, and Travel Act bribery except Counts 11, 12, 13 and 14.  The Court will explain its reasoning by reviewing the evidence presented as it relates to each particular sub-scheme of which the counts are a part.

1324 Sherman Street

The first sub-scheme involves zoning and inspection for a property located at 1324 Sherman Street in the City of Allentown.  Count 6 charges Pawlowski with federal program bribery stemming from expediting a zoning application related to this property for real estate developer Ramzi Haddad in exchange for a $2,500 campaign contribution in December 2014.  Count 48 charges Pawlowski with Travel Act bribery based on his May 2015 trip to New York to solicit campaign contributions from Haddad in exchange for expediting an inspection for the Sherman Street property.

As to Count 6, Pawlowski argues the evidence showed the check Haddad gave to him in December 2014 was part of a longstanding pattern of donations with no connection to zoning

---

[8] The parties agree *McDonnell*'s definition of the term "official act" applies to the attempted Hobbs Act extortion and honest services fraud counts as well as the federal program bribery and Travel Act bribery counts in this case.

assistance. Pawlowski also contends Haddad communicated only with Ruchlewicz, Dougherty, and Zoning Supervisor Barbara Nemith about the zoning issue, and that Dougherty did nothing more than refer the issue to the appropriate City official, Nemith, who performed her job properly and legally. Because he had no part in the zoning matter, Pawlowski argues that there could be no explicit quid pro quo agreement under *McCormick*. As to Count 48, Pawlowski argues his and Haddad's discussion about Haddad's upcoming property inspection during the New York meeting was not connected to any discussion about campaign contributions. Finally, Pawlowski argues the Government failed to prove an official action under *McDonnell* as to both Counts 6 and 48.

The Court disagrees. Contrary to Pawlowski's assertions, a reasonable juror could conclude that Pawlowski and Haddad had two explicit quid pro quo agreements, whereby Haddad would give Pawlowski (1) $2,500 in exchange for Pawlowski's assistance with expediting a zoning application for his Sherman Street property; and (2) campaign contributions in exchange for assistance with an inspection on the same property. There was also sufficient evidence from which a jury could find that Pawlowski took official acts in exchange for these contributions as required by *McDonnell*.

Haddad testified that when he initially contacted the zoning office about the Sherman Street property in early December 2014, he was told his zoning request would not be acted on until January 2015, which would have been a lengthy delay for him. *See* Trial Tr. Day 8 at 267, Jan. 31, 2018. Shortly thereafter, Haddad spoke with Ruchlewicz on December 4, 2014, and asked, "[W]ho do I need to grease today?" Gov't's Ex. SR220T at 1. Ruchlewicz replied, "The mayor," explaining Pawlowski needed $2,500. *See id.* Haddad responded he might need help with a zoning issue. *See id.*

After their conversation, Ruchlewicz informed Fleck, Pawlowski, and Dougherty that Haddad needed assistance with a zoning issue. *See* Trial Tr. Day 9 at 221. When Haddad and Ruchlewicz spoke again on December 10, 2014, Haddad asked Ruchlewicz how much the contribution check should be for, and Ruchlewicz stated $2,500. *See* Gov't's Ex. SR231T at 2. After Haddad scoffed at the amount, Ruchlewicz explained he had already talked to Pawlowski about the zoning issue, and Pawlowski had agreed to intervene on Haddad's behalf: "[Pawlowski] said whatever you want . . . it's done. Consider it done." *Id.* Haddad wrote a check for $2,500 as requested and reiterated his concern that tire storage would not be approved at his building, which was zoned as "warehouse" at the time. *Id.* at 5. Ruchlewicz reassured him that Pawlowski would "fix it . . . [and] just do it. The zoning authority in Allentown rests with the mayor." *See id.* Haddad continued to be skeptical, but Ruchlewicz assuaged him by telling him the mayor had "veto power over all the zoning," he would do whatever he had to, and the zoning matter would "sneak" through because the zoning officer worked for the mayor. *See id.* at 5. After their discussion, Ruchlewicz apprised Dougherty that Haddad needed assistance with his building on Sherman Street and had a "time frame issue," and Dougherty responded he would direct Nemith to prioritize review of Haddad's application. *See* Gov't's Ex. SR245T at 1-3.

After Haddad submitted his zoning application, Nemith sent two emails to Dougherty providing him with updates concerning the application, *see* Gov't's Exs. C-6, C-7, and the application was approved the following day on December 19, 2014, *see* Gov't's Ex. C-10. Without Dougherty's intervention, this approval could have taken days or weeks to obtain. *See* Trial Tr. Day 8 at 201-02. Haddad later thanked Dougherty for his help with the Sherman Street property when he met with Dougherty and Pawlowski on December 31, 2014. *See* Gov't's Ex. SR260AT at 1.

A few months later, on April 19, 2015, Pawlowski acknowledged the impropriety of his relationship with Haddad, agreeing with Fleck that he did not want to get "Rob McCord'd"[9] and telling Fleck that Ruchlewicz should talk to Haddad to see if "we can separate the stuff out so that he's actually not the one giving the money. . . . Since we're doing so many direct things with him." Gov't Ex. MF26T at 1-2. Pawlowski further explained, "I just don't want him to show up, you know, as a big donor . . . ." *Id*. at 2. Fleck suggested that when Haddad needed to talk to someone about City-related issues, he use Dougherty as a buffer "[bec]ause the last thing you want is to get on, you know, on a conversation on the phone, and he's talking to you about, you know, hey, how's the garage coming?" *Id*. at 3. Pawlowski stated this was why he wanted burner phones because then he could "just talk business on [one] phone and then . . . anything fund related [would be discussed on] a different burner." *Id*. Fleck agreed with Pawlowski's proposal to use burner phones to avoid detection, adding, "[t]hen if anybody's ever trying to record you, they'll never get it, you know what I mean?" *Id*. Pawlowski responded, "Exactly, that's the point. That's the [] whole point of the burner phone, yes." *Id*.

The following month, on May 18, 2015, Pawlowski and Fleck drove to New York to meet with Haddad and Jack Rosen, a wealthy New York real estate developer. *See* Trial Tr. Day 8 at 274, 277. On the drive, Fleck and Pawlowski agreed they needed to have a frank conversation with Haddad about what each wanted from the other, and then never discuss those issues aloud again. *See* Gov't Ex. MF54-0921T at 1-2. They then discussed how much in campaign contributions Pawlowski should request from Haddad for Pawlowski's Senate race, *see* Gov't Ex. MF54-0933T at 1, and Fleck told Pawlowski that Haddad had an upcoming property

---

[9] Robert McCord was a former Pennsylvania Treasurer and gubernatorial candidate who pleaded guilty to two counts of attempted Hobbs Act extortion.

inspection, and that if the inspection uncovered any problems with his property, Haddad wanted "just a letter and some time to work on it," *see id*. at 2. When Pawlowski asked which property the inspection was in reference to, Fleck said, "Sherman Street. . . . Do you know what I'm talking about? They're inspecting Sherman Street." *Id*. Pawlowski immediately recognized the building, which was the subject of his zoning intervention, and responded he needed to find out who the inspector was, and that although there might not be much he could do, he would try. *See id*. When Fleck asked what Sherman Street was, Pawlowski explained it was one of Haddad's industrial properties. *See id*.

 At the May 18, 2015, meeting with Haddad, Pawlowski acknowledged he and Haddad needed to refrain from speaking to one another over the phone and joked about going to prison. *See* Gov't's Ex. MF55-1818T at 1-2. Later in the conversation, Pawlowski asked Haddad how much Haddad could raise for him by June 30—his United States Senate race fundraising deadline. *See id*. at 3. Haddad responded he had "[$35,000] in his pocket" and $10,000 more from some of his business partners for Pawlowski's campaign, *see id*. at 3, but made clear he expected Pawlowski's help with the upcoming Sherman Street inspection in exchange, explaining "you gotta tell these morons at the [C]ity . . . ." *See id*. at 3. Fleck asked if Haddad was talking about Sherman Street. *See id*. Haddad confirmed, explaining how he had already waited two months for the City to inspect the property and lost customers as a result of the delay. *Id*. Pawlowski responded he was working on the issue. *Id*.

After the meeting, Pawlowski intervened to ensure Haddad's inspection would take place and occur without any complications. On May 21, 2015, the City's Building Standards and Safety Bureau Director David Paulus and Pawlowski discussed the inspection of Haddad's Sherman Street property. *See* Trial Tr. Day 8 at 218. Later that day, Paulus wrote an email to Pawlowski,

on which Dougherty was copied, informing him that the Sherman Street inspection was scheduled for that afternoon. *See id*. at 217; Gov't's Ex. C-3. The next day, Paulus e-mailed Pawlowski and Dougherty, advising them "the inspection for Mr. Ramsey on Sherman Street went well." *See* Trial Tr. Day 8 at 218-19; Gov't's Ex. C-4.

On June 29, 2015, the day before Pawlowski's June 30, 2015, campaign contribution deadline, while discussing potential contributors with Pawlowski, Fleck mentioned an upcoming meeting with Haddad and asked if Pawlowski helped him with his Sherman Street zoning and inspection issues. *See* Gov't's Ex. MF95-225T at 1. Pawlowski confirmed he had helped Haddad with "everything," complained how he had "bent over backwards" for Haddad, and insisted Haddad and others needed to help him so he could "get this thing done," i.e., meet his fundraising goal. *See id*. After Pawlowski texted Haddad, Haddad agreed to meet with him, and the next day, Pawlowski and Fleck picked up a check from Haddad. *See* Trial Tr. Day 9 at 7-9.

This evidence is more than sufficient for the jury to have found beyond a reasonable doubt that two explicit quid pro quo agreements existed between Pawlowski and Haddad. As to Count 6, contrary to Pawlowski's assertion that Haddad's December 2014 check had no connection to zoning, the Government's evidence—including Haddad and Ruchlewicz's conversations—shows Haddad made a $2,500 contribution to Pawlowski in December 2014 with the expectation that Pawlowski would assist him with his zoning issue. The conversations also show that Pawlowski agreed, through Ruchlewicz, to assist Haddad with his zoning issue for the $2,500 campaign contribution.

As to Count 48, the evidence belies Pawlowski's contention that Pawlowski's assistance with Haddad's inspection was not connected to campaign contributions. The tape of the meeting between Pawlowski and Haddad reflects that Haddad offered Pawlowski campaign contributions

contingent on Pawlowski assisting with the Sherman Street property inspection. Rather than divorcing the two topics during their discussion, Pawlowski responded he was "working" on the inspection issue. A few days later, he personally involved himself in the matter by speaking to Paulus to ensure the inspection would take place without any complications, raising the inference that Pawlowski agreed to ensure Haddad's property inspection would occur in exchange for campaign contributions.

Pawlowski's additional argument that *McDonnell*'s official act requirement was not met as to Counts 6 and 48 fails for two reasons. First, the matters at issue, a zoning application and a property inspection, are both "specific, focused, and relatively circumscribed, such that [they] can be put on an agenda, tracked for progress, and then checked off as completed" to qualify as a "question" or "cause" that involves a formal exercise of governmental power under *McDonnell*. 136 S. Ct. at 2371.

Second, despite Pawlowski's contention that he took no decision or action to satisfy *McDonnell* because he did not personally act on Haddad's zoning application, a reasonable jury could have nonetheless found that he took official action. Based on the evidence, including Ruchlewicz informing Pawlowski about Haddad's zoning issue, Ruchlewicz's representations to Haddad that Pawlowski had agreed to solve Haddad's zoning problem, and Pawlowski's exclamations of the great lengths he had gone to help Haddad, a reasonable jury could have found that Pawlowski "exert[ed] pressure" on Dougherty and Nemith to perform an official act, i.e.— expedite Haddad's zoning application—or "advise[d]" them to do so, knowing or intending that such advice would result in Haddad's application being expedited. *See McDonnell*, 136 S. Ct. at 2371 (holding an official act "may include [the official] using his official position to exert pressure on another official to perform an 'official act' or to advise another official, knowing or intending

that such advice will form the basis for an 'official act' by another official"). While the Court agrees with Pawlowski that arranging a meeting between Haddad and Nemith or referring Haddad to Nemith would not qualify as an official act under *McDonnell*, the evidence shows Pawlowski's actions went beyond simply arranging a meeting here.

The same analysis applies to the inspection. Based on Pawlowski's representation to Haddad that he was "working" on the inspection issue, Pawlowski personally reaching out to Paulus to discuss Haddad's inspection, and Paulus's follow up emails to Pawlowski advising him of the inspection's status, a jury could reasonably find that Pawlowski used his official position to exert pressure on Paulus to perform an official act or advise him, knowing or intending that such advice would form the basis of official action as well. *See McDonnell*, 136 S. Ct. at 2371.

Northeast Revenue Service

The next sub-scheme involves the firm Northeast Revenue Service. Counts 4 and 5 charge Pawlowski with federal program bribery in connection with his solicitation of campaign contributions and other benefits in exchange for the award of a contract for the collection of delinquent real estate taxes to Northeast Revenue Service (Northeast). As to Count 4, Pawlowski argues the Government failed to present sufficient evidence to prove that, on or about December 18, 2013, he solicited campaign contributions from Sean Kilkenny, an attorney whose firm agreed to partner with Northeast for tax collection work, in exchange for awarding Northeast the delinquent tax collection contract. Pawlowski notes Kilkenny testified his December 18, 2013, campaign contribution check to Pawlowski was given without contingencies. As to Count 5, Pawlowski argues the other benefits he received, Philadelphia Eagles playoff game tickets and a dinner at Del Frisco's Steakhouse, were also not in exchange for the tax collection contract. He therefore contends there was no clear and unambiguous quid pro quo agreement between him and

Kilkenny as required by *McCormick* and that there was no evidence he made a decision or took any official action concerning the contract as required by *McDonnell*.

The Court disagrees. The Government presented evidence from which a jury could find that Pawlowski and Kilkenny had an agreement to exchange campaign contributions and other items of value for the tax collection contract, despite no overt conversation between Pawlowski and Kilkenny outlining the terms of this agreement. The evidence also supports the jury's finding of an official act.

The Government first presented evidence bringing to light Kilkenny's political importance to Pawlowski: Kilkenny was the heir apparent of the Democratic party in Montgomery County. *See* Trial Tr. Day 3 at 180. The support of Montgomery County, a wealthy county in Pennsylvania, was critical for politicians who had state-wide and national political ambitions. *See id.*

In 2013, around the time Pawlowski decided to run for governor, the City elected to issue a request for proposals (RFP)[10] for a contract to collect delinquent real estate taxes for the City, which was a contract to which the City had historically appointed Portnoff Law Associates, Ltd. (Portnoff Law). *See* Trial Tr. Day 5 at 124, 127, 130, 137, Jan. 25, 2018. Before an RFP was issued, in October 2013, Kilkenny and Northeast had a meeting with Pawlowski to market their services and discuss the delinquent tax collection contract. *See* Trial Tr. Day 6 at 12. During the meeting, Pawlowski expressed that Portnoff Law's owner, Michelle Portnoff, whose firm had the

---

[10] To secure a company to fulfil a contract for certain types of City work that was delineated in the City's purchasing ordinance, the City was required to issue an RFP. *See* Trial Tr. Day 6 at 90, Jan. 29, 2018. After the RFP was issued, bidders on the RFP would submit a technical proposal and a cost proposal, and an evaluation committee would then assess the bids to make a recommendation to the City's purchasing office as to which company should receive the contract. *See id.* at 92-93. The City's purchasing office would formally award the contract, but no contract was official until signed by the mayor. *See id.* at 93, 114. Legal services contracts, however, were generally an exception to the RFP process and were awarded directly by the City's solicitor's office. *See id.* at 111-14.

contract at that time, "had done nothing" for him. *Id*. After the meeting, Ruchlewicz informed Kilkenny that Pawlowski did not like Portnoff because she was "not generous" with him. *See* Trial Tr. Day 6 at 14.

Shortly thereafter, the City advertised its RFP for the delinquent tax collection contract. Before Portnoff submitted her firm's proposal, she received a phone call from Pawlowski asking her to contribute to his campaign for governor. *See* Trial Tr. Day 5 at 142-43. She declined to contribute and informed Pawlowski it was "inappropriate" to have this type of discussion, given the pendency of the City's RFP for a contract for which her firm would submit a proposal. *See id*. Despite Portnoff's admonition, after Northeast's submission of a proposal in response to the RFP, Pawlowski called Kilkenny and asked him to contribute to his gubernatorial campaign. *See* Trial Tr. Day 6 at 15. Kilkenny contributed on December 18, 2013, while Northeast's proposal was pending, because he "felt pressure" to do so. *See id*. at 18.

While Northeast's proposal was pending, Pawlowski, through Ruchlewicz, also asked Kilkenny and Northeast for tickets to a Philadelphia Eagles playoff game. *See* Trial Tr. Day 6 at 20-21. Kilkenny's colleague—John Rogers of Northeast—agreed to procure the tickets, and the day of the game, on January 4, 2014, Kilkenny, Pawlowski, Ruchlewicz, and others ate dinner at Del Frisco's Steakhouse in Philadelphia. *See id*. at 21-23. During the meal, Ruchlewicz, Pawlowski's campaign staff, told Kilkenny that Northeast's proposal for the tax collection contract "looked good" in Pawlowski's presence. *See id*. at 22-23. Neither Pawlowski nor Ruchlewicz offered to pay for the meal, which Northeast bought. *See id*. at 22. The football tickets and dinner were never reported by Pawlowski as any type of campaign gift. *See id*. at 177.

After the City's evaluation committee reviewed the proposals in response to the tax collection contract RFP, the committee decided to recommend that the law firm Linebarger,

Goggan, Blair and Sampson (Linebarger) be awarded the contract. *See* Trial Tr. Day 5 at 82. Karen Csanadi, a member of the committee, testified that after the committee had decided to recommend Linebarger, City Finance Director Garret Strathearn—who was not a member of the evaluation committee—told her he wanted to check with Pawlowski to see if it was acceptable to him if Northeast was not selected. *See* Trial Tr. Day 5 at 82.

When Pawlowski learned that the committee was not recommending Northeast for the contract, he told Strathearn that he wanted Northeast to win the contract because the firm was "important" to him. *See* Trial Tr. Day 5 at 174-75. Pawlowski then directed Strathearn to ensure that Northeast, not Linebarger, received the contract. *See* Trial Tr. Day 3 at 167-68. After Pawlowski spoke with Strathearn, a new evaluation committee, which included Strathearn, was convened. *See* Trial Tr. Day 5 at 90. Strathearn took steps to alter the committee's proposal ranking process to ensure Northeast's proposal would be ranked highest by the new committee. *See* Trial Tr. Day 5 at 176-78. As a result of Strathearn's efforts, the contract was ultimately awarded to Northeast. *See* Trial Tr. Day 5 at 146.

The Government also presented evidence of Pawlowski's expectations as a result of Northeast being awarded the contract. On several occasions in June 2015, Pawlowski expressed frustrations about Northeast's failure to contribute to his campaign. *See* Gov't Ex. SR403T at 1 (Pawlowski exclaiming to Ruchlewicz that he was "pissed off" about Northeast's lack of campaign contributions because he had "broken his back" over Northeast); Gov't Ex. MF75-1846T at 1 (Pawlowski telling Fleck he was "getting really tired of" Northeast and that it was easy to go back to Portnoff); Gov't Ex. MF87-1152T at 1-2 (Pawlowski agreeing with Fleck that he had taken "bullets" for Northeast and calling Kilkenny to solicit a $25,000 campaign contribution).

As to Count 4, a jury could reasonably conclude based on this evidence that Pawlowski—who both told Kilkenny that Portnoff "had done nothing for him" while discussing the tax collection contract with him and called Kilkenny to solicit a campaign contribution while Northeast's proposal for the contract was pending—entered into an explicit quid pro quo agreement with Kilkenny—who knew Pawlowski preferred vendors who were "generous" and who contributed to Pawlowski while Northeast's proposal was pending—to exchange the tax collection contract for campaign contributions. Pawlowski's expressed frustration at the lack of additional campaign contributions from Northeast and Kilkenny after the award of the contract to Northeast is further evidence of this agreement.

As to the Eagles tickets and meal at Del Frisco's Steakhouse, Count 5, no proof of an explicit quid pro quo is required here as the benefits provided to Pawlowski were not campaign contributions. Outside the campaign contribution context, the Government is only required to show proof of a quid pro quo, *see United States v. Antico*, 275 F.3d 245, 257-58 (3d Cir. 2001), which it has. The evidence shows Pawlowski requested and received free Eagles tickets and knowingly benefited from a paid-for meal while Northeast's proposal for the tax collection contract was pending before the City. In addition, Northeast's proposal for the tax collection contract was explicitly referenced at the meal by Ruchlewicz, Pawlowski's campaign staff, in front of Pawlowski and without objection from him—raising the inference that Pawlowski had mentioned the contract to Ruchlewicz and agreed with his campaign staff's assessment that Northeast's proposal "looked good." Based on this evidence, a jury could reasonably conclude that Northeast and Kilkenny provided Pawlowski with Eagles tickets and a meal in exchange for official action, including the tax collection contract.

As to Pawlowski's argument that he made no decision or took no action concerning the contract to satisfy *McDonnell*, the evidence shows Pawlowski not only told Strathearn that he wanted Northeast to win the contract, but also directed Strathearn to take steps to ensure Northeast would be awarded the contract when it appeared that the evaluation committee was going to recommend Linebarger for the contract. A jury could find such intervention to be an impermissible attempt to "exert pressure" on another official to perform an official act, i.e., award the contract to Northeast, or "advise another official," intending such advice would form the basis of an official act, both of which satisfy the official act requirement. *See McDonnell*, 136 S. Ct. at 2371.

The Efficiency Network

The Court next turns to the sub-scheme involving an important political stakeholder in Western Pennsylvania, The Efficiency Network. All counts concerning The Efficiency Network (TEN) relate to the award of a City contract for street lights. Counts 15 and 16 charge Pawlowski with federal program bribery, and Counts 40 through 45 charge Pawlowski with honest services wire and mail fraud. Specifically, Count 15 charges Pawlowski with soliciting a sponsorship for a Pennsylvania Municipal League meeting from a principal of TEN, Patrick Regan, in exchange for the street lights contract, and Count 16 charges Pawlowski with soliciting campaign contributions from one of TEN's political consultants, Co-Defendant James Hickey, in exchange for the award of the street lights contract. Counts 40 through 45 charge Pawlowski with sending emails and mails to other vendors and TEN in connection with the street lights contract bidding process.

As to Count 15, Pawlowski argues the phone call in which he makes a sponsorship solicitation from Regan contains no reference to any business or contract. As to Count 16, Pawlowski argues the Government failed to present evidence that he knew Hickey had any

involvement with TEN, which is further supported by the fact that his request for campaign contributions from Hickey makes no reference to TEN. To bolster his argument that no explicit quid pro quo agreement between him and Hickey existed, he points to a recording in which Hickey complained about not receiving City contracts and another recording in which Pawlowski said he could understand why Hickey might not want to give campaign contributions.

As to both Counts 15 and 16, Pawlowski contends any illegal agreements pertaining to awarding TEN the street lights contract were orchestrated by Ruchlewicz, not him. He also argues the Government failed to show he made a decision or took any action concerning the contract as required by *McDonnell*. As to Counts 40 through 45, the honest services wire and mail fraud counts, he argues the Government failed to prove any underlying fraud as there were no illegal agreements between him and Regan or Hickey.

Pawlowski's arguments are unpersuasive. The Government presented evidence that Pawlowski had (1) a quid pro quo agreement with Regan to exchange the street lights contract for a Municipal League meeting sponsorship from Regan; and (2) an explicit quid pro quo agreement with Hickey to exchange the street lights contract for campaign contributions. It also presented sufficient evidence from which a jury could find an official act. As there is sufficient evidence from which a jury could find that Pawlowski entered into these agreements and took official action, Pawlowski's arguments as to the honest services fraud counts also fail.

While Pawlowski's March 10, 2015, solicitation call to Regan made no mention of a contract, the evidence demonstrated this solicitation was part of Regan and Pawlowski's quid pro quo agreement, as they had discussed the street lights contract prior to the call. Prior to Pawlowski making the March 10, 2015, call, Pawlowski and Regan had a breakfast meeting where the City's street lights contract was discussed. *See generally* Gov't Ex. SR294-1000T. Ruchlewicz,

Pawlowski's campaign staff, was also present at the meeting, during which Pawlowski requested that Regan send him language that could be incorporated into the City's request for qualifications (RFQ)[11] for the street lights contract and informed Regan that although he had met with another provider about the contract, he would not "pick them or anything." *See id*. at 2-3. After Pawlowski left the meeting, Ruchlewicz told Regan the "deal was lined up," Pawlowski wanted him to attend his Mardi Gras fundraiser, and Pawlowski was "hoping for [a] $2,500 [contribution]" for his United States Senate run. *See id*. at 4-6. Regan agreed to contribute, and Ruchlewicz reiterated Pawlowski needed the City's vendors to "give back a little bit." *Id*. at 6. On February 13, 2015, prior to the issuance of the RFQ, Regan contributed $1,500 to Pawlowski's Mardi Gras fundraiser. *See* Gov't's Ex. B-21.

To ensure TEN would be favored in the RFQ and RFP process for the street lights contract, Dougherty provided Public Works Director Craig Messinger, a member of the street lights contract evaluation committee, with language favoring TEN to be incorporated in the City's RFQ and RFP for the street lights contract at Pawlowski's direction. *See* Trial Tr. Day 3 at 85-88. The evaluation committee disregarded the unsolicited language favoring TEN and opted to write an RFQ that was "fair" and did not favor any particular company. *See* Trial Tr. Day 7 at 68-70, 73, 75, Jan. 30, 2018. Thus, the RFQ that was ultimately issued did not contain the language favoring TEN. *See* Trial Tr. Day 3 at 89. After the issuance of this RFQ, Jennifer McKenna, another member of the evaluation committee, testified that she felt her job was "in jeopardy" as a result of not incorporating the language favoring TEN in the issued RFQ. *See* Trial Tr. Day 7 at 75-76.

---

[11] A request for qualifications is a precursor to an RFP and is used to prequalify a company before the company submits a full proposal in response to an RFP. *See* Trial Tr. Day 6 at 95.

On March 10, 2015, Ruchlewicz informed Pawlowski of the omission and complained to Pawlowski that he had spent three months with Hickey preparing the RFQ language favoring TEN. *See* Gov't's Ex. SR345-1001T at 3. Pawlowski was outraged that the evaluation committee had sent out a different RFQ, *see id.*, and asked Dougherty who needed to be fired over its omission, *see* Trial Tr. Day 3 at 89. Pawlowski called Regan that same day to ask if TEN would be a sponsor for the Pennsylvania Municipal League meeting in the City of Allentown and remarked on how TEN had recently received a large contract from Penn State. *See* Gov't's Ex. SR345-1001T at 1. On March 13, 2015, TEN contributed $5,000 to the City of Allentown, Office of the Mayor. *See* Gov't's Ex. B-22.

On March 27, 2015, the day the RFQ submissions were due, TEN failed to send in its submission. *See* Gov't's Ex. SR354439T at 1. Ruchlewicz and Dougherty discussed how to address the problem. *Id.* TEN was allowed to make an untimely submission, and when Ruchlewicz told Pawlowski about TEN missing the deadline, Pawlowski asked Ruchlewicz if he had taken care of the problem. *See* Gov't's Ex. SR360T at 1. Ruchlewicz assured Pawlowski that the problem was resolved. *See id.* at 2. Five other companies submitted responses to the RFQ in addition to TEN, and TEN and another company, Johnson Controls, were ultimately selected as the two finalists to submit proposals in response to an RFP for the street lights contract. *See* Trial Tr. Day 3 at 92. Once the RFP had been issued, Dougherty sent it directly to Hickey to give TEN a competitive edge at Pawlowski's behest. *See id*.

On May 5, 2015, before the street lights contract was awarded, Fleck told Pawlowski that Hickey would be sending campaign contributions, and Pawlowski responded he would want more money from Hickey once the street lights contract was awarded, but that he did not want the money to come directly from TEN. *See* Gov't's Ex. MF44T at 1. That same day, Pawlowski also told

Ruchlewicz he wanted Hickey to donate $50,000 in campaign contributions. *See* Gov't's Ex. SR391T at 1.

The following day, Ruchlewicz met with Hickey and told him that Pawlowski wanted him to contribute and TEN would be awarded the street lights contract. *See* Gov't's Ex. SR392-0921T at 1-2. Hickey responded that Ruchlewicz could first ask Regan and another principal of TEN, Troy Geanopulos, for contributions, and then Hickey would "reinforce" the request. *Id*. at 2. Ruchlewicz then told Hickey that Pawlowski wanted Hickey to donate. *Id*. at 3. Hickey stated he would contribute and explained how he was the one who taught Pawlowski how to "set up his own system to raise money" and have the "[campaign manager] control the vendor chain . . . [s]o everyone in the vendor chain is friendly." *Id*. at 3-4. He suggested Ruchlewicz obtain a vendor list and use it to fundraise. *Id*. at 4. Approximately one month after this meeting, the street lights contract was awarded to TEN. *See* Trial Tr. Day 8 at 68.

Based on this evidence, a reasonable jury could conclude both a quid pro quo agreement existed between Pawlowski and Regan and an explicit quid pro quo agreement existed between Pawlowski and Hickey. As to Count 15, which involves Regan and concerns Pawlowski's non-campaign contribution solicitation, only a quid pro quo is required. *See Antico*, 275 F.3d 157-58. When Pawlowski's solicitation—which occurred before TEN had submitted its response to the RFQ—is viewed in light of Pawlowski's campaign staff's presence at Regan's breakfast meeting with Pawlowski, Pawlowski assuring Regan that his company would be awarded the contract, and his campaign staff informing Regan that vendors "need to give back a little bit"—a jury could reasonably find that Pawlowski and Regan had an agreement whereby Pawlowski would award TEN the street lights contract in exchange for Regan "giving back" when requested.

As to Count 16, Pawlowski's efforts to cherry-pick certain portions of the record to support his argument that there was no explicit quid pro quo agreement between him and Hickey also fail. When the evidence is reviewed as a whole, there is ample evidence from which a jury could conclude that Pawlowski knew Hickey was affiliated with TEN and that an explicit quid pro quo agreement concerning the street lights contract existed between the two, including: (1) Pawlowski directing Dougherty to send Hickey the RFP for the street lights contract; (2) Fleck informing Pawlowski that Hickey would be sending a check and Pawlowski responding that he would want more money once the street lights contract was awarded; and (3) Ruchlewicz requesting campaign contributions on Pawlowski's behalf from Hickey—while mentioning the street lights contract and before the contract was awarded to TEN—and Hickey agreeing to donate.

The Government also presented sufficient evidence from which a reasonable jury could find an official act. In light of Pawlowski's repeated efforts to secure the street lights contract for TEN, including directing Dougherty to provide both an RFQ favoring TEN to the street lights contract evaluation committee and an RFP directly to Hickey, there is sufficient evidence from which a jury could find that Pawlowski exerted pressure through Dougherty on other officials, including evaluation committee members Messinger and McKenna, to award the street lights contract to TEN. *See McDonnell*, 136 S. Ct. at 2371. Because the Government proved Pawlowski entered into unlawful agreements with Regan and Hickey that resulted in an unfair contracting scheme, Pawlowski's arguments as to Counts 40 through 45 also fail.

CIIBER/5C Security

The next sub-scheme involves CIIBER/5C Security. Count 18 charges Pawlowski with federal program bribery for soliciting campaign contributions from Jack Rosen, a wealthy New York real estate developer, in exchange for steering a cybersecurity contract to Rosen's company,

CIIBER/5C Security. Counts 46 and 47 charge Pawlowski with Travel Act bribery based on Pawlowski's travels to New York in February and May of 2015 to discuss the cybersecurity contract with Rosen. Pawlowski contends the Government failed to prove an explicit quid pro quo between him and Rosen, relying on Rosen's request to put up a "Chinese wall," i.e., a communication barrier, between their conversations about business development and politics. He further argues the Government's pay-to-play theory fails as to this sub-scheme because Rosen contributed $30,000 in campaign contributions to Pawlowski to receive only a $35,000 contract.

Pawlowski's arguments are unpersuasive because the Government's evidence at trial demonstrated Pawlowski specifically sought to find a contract for Rosen so that he would be motivated to raise campaign funds for Pawlowski in New York. *See* Trial Tr. Day 3 at 144-45 (Dougherty's testimony describing Rosen as "an extremely wealthy, well-connected developer," who was "very active in Democratic circles [and] known as a prestigious fundraiser for the Clintons and [] the Gores"), 148-49; Gov't Ex. I-7 (Dougherty's contemporaneous meeting notes reflecting Pawlowski stating, "Rosen. Get something."); Gov't Ex. I-8 (Dougherty's contemporaneous meeting notes with Pawlowski characterizing City Information Technology Specialist Matt Leibert as saying, "5C[/CIIBER]. Good to go."); Gov't Ex. SR11173T at 1 (audiotape recording in which Ruchlewicz asks Dougherty for an update on the security contract, to which Dougherty responds, "[W]e're gonna give [CIIBER] a job, okay? That's [] my instructions from the mayor.").

Pawlowski took several steps to ensure that his plans to award Rosen a cybersecurity contract would remain covert. For example, during a January 6, 2015, meeting in Pawlowski's office, after Ruchlewicz and Pawlowski discussed Rosen's security company, Ruchlewicz reminded Pawlowski how he and Pawlowski "got them that deal." *See* Gov't Ex. SR264-RosenT

at 1-2. Pawlowski responded, "No. I mean yeah . . . they responded to an RFP. Yes. Yes, I know." *Id*. at 2. After they left the office, Pawlowski told Ruchlewicz he had his office swept for "bugs," indicating he was becoming worried about his conduct being detected, and explained the 5C deal should not be discussed aloud: "[J]ust by saying yeah, we got the 5C deal. You know what I mean? You just don't want to say any of that stuff. You know? . . . And if, either of those interns wants to be really pissy at us someday and say 'hey, the mayor was talking about all these deals they had.'. . . You know what I'm saying? . . . You gotta be careful." *Id*. at 3.

The next month, in February 2015, Pawlowski and Ruchlewicz met with Rosen in New York to discuss the cybersecurity contract. *See generally* Gov't's Ex. SR308BT. During this meeting, after discussing campaign contributions and Pawlowski's Mardi Gras fundraiser, Pawlowski informed Rosen, "[W]e're going to do the contract." *Id*. at 2-3. After discussing contract details and how the City's contracting process worked, Rosen told Pawlowski that it did not matter if he failed to make money on the contract because the contract would eventually lead to more business for him in Pennsylvania. *See id*. at 5. Rosen then signaled it was time to discuss contributions: "[L]et's get off business. I don't like talking about both at the same time," and then he and Pawlowski proceeded to discuss fundraising for Pawlowski. *See id*. at 7.

In the elevator ride with Ruchlewicz following the meeting, Pawlowski reflected on his discussion with Rosen and told Ruchlewicz to avoid verbalizing his pay-to-play scheme, cautioning: "[W]e gotta be careful. I can't, I get uncomfortable when we start talking about hey, we're just gonna give you this. Who has the contract process? I'm so scared [nowadays] like, who the hell knows who's wearing a wire? Who's tapped? Who's not? You know what I mean? I think I just gotta be, we just gotta be, we just gotta be really careful when we talk about this stuff." *Id*. at 7. Ruchlewicz agreed. *See id.*

In May 2015, during another meeting with Rosen in New York, Pawlowski informed Rosen that the contract was "lined up" and described how all his departments would convene the following week to assess security lapses. *See* Gov't's Ex. MF55-1425T at 1-2. Pawlowski then asked if he and Rosen were done talking about "other business," signaling that it was time to discuss contributions. *Id*. at 2. Rosen responded, "Yeah. Put up a Chinese wall." *Id*. at 3. Pawlowski then told Rosen how he would like to raise as much money as possible before June 30, and Rosen stated, "I think we will raise you some money." *Id*. at 4. In months following this meeting, Rosen and several of his family members contributed approximately $30,000 to Pawlowski's campaign. *See* Trial Tr. Day 10 at 118-21, Feb. 5, 2018.

In addition to Pawlowski and Rosen's own words as evidence of an explicit quid pro quo agreement, the Government presented City employees who testified that the cybersecurity contract was an unusual contract for the City, further suggesting the contract was created to provide work for Rosen's company and campaign contributions for Pawlowski. *See, e.g.*, Trial Tr. Day 7 at 240-41 (City Superintendent of Communications Michael Hilbert's testimony that the network information he was being asked to provide to CIIBER felt like "giving them the keys to our network kingdom" and the requests for a cybersecurity contract appeared to be flowing from the top down), 264-65 (City Information Technology Specialist Matthew Leibert's testimony that the CIIBER contract was not necessary for the City).

Based on the snippets of conversation the jury heard between Rosen and Pawlowski—where both the cybersecurity contract and campaign fundraising were discussed—Pawlowski's concern about discussing the "5C deal" aloud, and the City employees' testimony, a reasonable jury could have found an explicit quid pro quo agreement between Rosen and Pawlowski. Pawlowski's contention that a "Chinese wall" wall prevented a link between the cybersecurity

contract and the solicitation of campaign contributions is belied by his actual conversations with Rosen, which reveal the "Chinese wall" to be nothing more than an imaginary barrier. As to Pawlowski's argument that Rosen could not have entered into this unlawful agreement due to the value of the contract, Rosen admitted his motivation for entering into the agreement was to gain a foothold in the Pennsylvania market, not to make a large profit on the contract.

Spillman Farmer Architects

The next sub-scheme concerns Spillman Farmer Architects, an architecture company. Count 8 charges Pawlowski with federal program bribery for soliciting a $2,700 campaign contribution from Joseph Biondo, part owner of Spillman Farmer Architects (Spillman Farmer), in a June 24, 2015, email, in exchange for the award of a contract for the design and construction of several City pools. Pawlowski contends there is no evidence of an explicit quid pro quo agreement between him and Biondo because (1) his initial June 2, 2015, request for a campaign contribution—followed by the June 24, 2015, email from his campaign consultant—contained no reference to the pools contract or any other work; and (2) the pool contract was awarded to Spillman Farmer even though Biondo declined to give a campaign contribution. Finally, Pawlowski maintains he took no official action under *McDonnell* with respect to the pools contract.

The Court disagrees. The evidence presented by the Government was sufficient for a reasonable juror to find both that there was an explicit quid pro agreement between Pawlowski and Biondo, and Pawlowski took official action. Even before the RFP for the pools contract was issued, Pawlowski had explained to Dougherty that Spillman Farmer was important to him because its members would be campaign contributors. *See* Trial Tr. Day 3 at 177. Once the RFP for the pool contract was issued, Pawlowski set out to secure the pools contract for Spillman Farmer.

Dougherty, who not a member of the pools contract evaluation committee, initially informed Superintendent of Parks Richard Holtzman, a member of pools contract evaluation committee, that Pawlowski wanted the contract to be awarded to Spillman Farmer. *See* Trial Tr. Day 3 at 178-79. Holtzman responded they should wait for the committee's recommendation. *See id.* After the pools contract committee evaluated the proposals submitted in response to the RFP and interviewed the finalists, the committee's preference for the contract appeared to be Integrated Aquatics. *See* Trial Tr. Day 13 at 229-30, 233-36, Feb. 8, 2018. Dougherty was made aware of the committee's preference, and he told Holtzman to "take another look" at Spillman Farmer. *See* Trial Tr. Day 13 at 236. Holtzman conveyed this information to the other committee members and testified that he felt pressure to favor Spillman Farmer for the pools contract. *See id.* at 237. When Holtzman reached out to one of Spillman Farmer's references, however, the reference provided him with a negative recommendation. *See id.* at 238. Holtzman informed Dougherty, *see id.*, who informed Pawlowski, and Pawlowski directed Dougherty to discuss the matter with Ruchlewicz, *see* Trial Tr. Day 3 at 179-80.

Ruchlewicz subsequently called Biondo. He notified him that "everybody liked" his company's pools project bid and asked Biondo to provide him with another reference "as soon as possible" so that Spillman Farmer could be awarded the contract. *See* Gov't's Ex. SR35090T at 1-2. Biondo knew Ruchlewicz was not a representative of the City, and he testified that he had never received this type of "inside information" about a pending municipal contract. *See* Trial Tr. Day 14 at 139, Feb. 12, 2018. Nonetheless, Biondo agreed to provide Ruchlewicz, Pawlowski's campaign staff, with a new reference, *see* Gov't's Ex. SR35090T at 2, and Spillman Farmer was notified it was awarded the contract on April 9, 2015, *see* Trial Tr. Day 13 at 244-45.

Before the contract was officially signed by Pawlowski, on June 2, 2015, Pawlowski and Biondo spoke on the phone. *See* Gov't's Ex. SR402-1602T at 1-2. During this conversation, Pawlowski asked if Spillman Farmer could contribute $2,700 to his campaign. *See id.* Biondo responded he would have to "run it up the flagpole." *See* Trial Tr. Day 14 at 141. While Pawlowski did not reference the pool contract explicitly on the phone, he made clear to Ruchlewicz after the phone call ended that he expected contributions from Biondo and Spillman Farmer in exchange for the pools contract. After ending his call with Biondo, Pawlowski immediately exclaimed, "I'll run it up the flag pole, what the hell does that mean?" *See* Gov't's Ex. SR402-1602T at 2. When Ruchlewicz asked who Pawlowski had just spoken to on the phone, Pawlowski answered Biondo. *Id.* Ruchlewicz remarked that Spillman Farmer received the pools contract, to which Pawlowski laughingly replied, "Yes, I know. Better run it up the flagpole fairly quick," *id.*, suggesting that Biondo's donation, as per the parties' agreement, needed to be given before his June 30, 2015, fundraising deadline if the contract was going to be signed. Pawlowski's campaign staff emailed Biondo on June 24, 2015, asking about the possible contribution and informing him about the June 30, 2015, deadline. *See* Gov't's Ex. E-5. Biondo responded to the email on June 29, 2015, and stated he would not be contributing at that time. *See* Gov't's Ex. E-34. Pawlowski told Fleck to call Biondo again because "he's doing all my pools right now." *See* Gov't's Ex. MF99T at 1.

Based on this evidence, including Pawlowski's campaign staff directly calling Biondo— who did not question the call or the information relayed to and requested from him—and discussing the City's pools contract with him while his company's proposal was pending, a jury could find that Biondo, through Ruchlewicz, had an explicit quid pro quo agreement with Pawlowski. Furthermore, given Pawlowski's interference in the contracting process to ensure the

award of the pools contract to Spillman Farmer and expectations that Spillman Farmer contribute to his campaign after the award of the contract, a jury could infer that Pawlowski's June 24, 2015, email was an effort by Pawlowski to receive his end of the bargain before he officially signed the contract. While Biondo may have changed his mind about executing their agreement, a jury could still find he entered into the agreement with Pawlowski through his conversation with Ruchlewicz—who called Biondo at Pawlowski's direction.

As to Pawlowski's argument that there could be no agreement between him and Biondo because he signed the pools contract despite Biondo's failure to donate, this argument is undercut by the fact that the contract was signed on July 2, 2015, the day the Federal Bureau of Investigation raided City Hall to investigate Pawlowski. *See* Gov't's Ex. E-7. Given the timing of the raid and the signing of the contract, a jury could infer that Pawlowski signed the contract to avoid any appearance of impropriety.

Finally, the evidence also demonstrated Pawlowski (1) directly informed Dougherty and indirectly informed committee member Holtzman that he wanted the contract to be awarded to Spillman Farmer and (2) asked Dougherty to speak to Ruchlewicz about Spillman Farmer's negative reference. Based on this evidence, a jury could certainly find that Pawlowski's actions were an impermissible attempt to "exert pressure" on other City officials to perform an official act, i.e., award the contract to Spillman Farmer, or advise them, knowing or intending that such advice would lead them to award the contract to Spillman Farmer. *See McDonnell*, 136 S. Ct. at 2371.

McTish, Kunkel & Associates

McTish, Kunkel & Associates, an engineering firm, is involved in the next sub-scheme. Count 10 charges Pawlowski with federal program bribery for soliciting campaign contributions

from engineer Matthew McTish, a principal of McTish, Kunkel & Associates, on April 27, 2015, in exchange for an engineering contract. Pawlowski contends he and McTish did not enter into an explicit quid pro quo agreement, noting there was no agreement made during the April 27, 2015, recorded meeting and that there could not be an agreement for some unspecified future act, as alleged in the Indictment.

The Government presented evidence from which a reasonable juror could find an explicit quid pro quo agreement between Pawlowski and McTish. The Government first presented evidence of McTish and Pawlowski's relationship and McTish's familiarity with Pawlowski's pay-to-play schemes. McTish explained he and Pawlowski would often have discussions about the type of work his firm would like to do for the City and campaign contributions in the same conversation. *See* Trial Tr. Day 13 at 45 (McTish's testimony describing how Pawlowski would discuss engineering projects for the City with him and then "slide right in to how he needed my help making a campaign contribution for the campaign"). He believed he could not obtain work from the City unless he donated to Pawlowski and observed that "there was a relationship between getting work [from the City] and making campaign contributions." *See id.* at 142, 145.

One specific engineering project in which McTish was interested was the Chew Street project, a street improvement project along Chew Street. Pawlowski first learned of McTish's desire to be awarded this project prior to the April 27, 2015, meeting Pawlowski references. In December 2014, Ruchlewicz informed Pawlowski that he, City Controller Mary Ellen Koval, and Dougherty had found some work, the Chew Street project, for McTish pursuant to Pawlowski's request. *See* Gov't's Ex. SR223DT at 1. Pawlowski expressed his approval, and Ruchlewicz told him to "hit [McTish] up" for his holiday party. *Id.* Pawlowski agreed and said he would do so the following week. *See id.* A few days later, Ruchlewicz relayed to McTish that he had told

Pawlowski that McTish would be contributing $2,500 and that Pawlowski responded that as soon as the Chew Street project came across his desk, he would "give it the rubber stamp, sign it, seal it," and it would be McTish's. *See* Gov't's Ex. SR230T at 1. McTish then made campaign contributions to both Koval, *see* Gov't's Ex. D-15, and Pawlowski, *see* Gov't's Ex. D-17.

By the time Pawlowski and McTish met on April 27, 2015, however, McTish was angry because he had not yet received a contract for the Chew Street project. *See* Trial Tr. Day 13 at 61, 63, 69. Before Pawlowski arrived to his meeting with McTish on April 27, Ruchlewicz spoke with McTish to assure him that an RFP would be forthcoming for Chew Street and told him that Pawlowski would confirm this information. *See* Gov't's Ex. SR386-1258T at 1. After Pawlowski arrived, he gave McTish a campaign pitch regarding his run for Senate and asked him to donate $21,600 to his campaign by June 30, 2015. *See* Trial Tr. Day 13 at 72-77; Gov't's Ex. SR386-1258T at 2. McTish and Pawlowski then discussed bridges, roads, and infrastructure. *See* Trial Tr. Day 13 at 73. After McTish and Pawlowski spoke, Ruchlewicz asked McTish if he and Pawlowski were "squared away" and if he and Pawlowski had discussed bridges, which McTish affirmed. *Id.* That same day, McTish received an email from Pawlowski's campaign consultant, who was also at the lunch meeting, requesting campaign contributions. *See id.* at 74. McTish never received the Chew Street project, and he contributed $2,500 to Pawlowski's campaign after the June 30, 2015, deadline. *See id.* at 76.

Despite McTish never being awarded the Chew Street project, a jury could nonetheless find evidence of an explicit quid pro quo agreement between Pawlowski and McTish from the evidence as a whole. First, at the time of Pawlowski's April 27, 2015, campaign contribution solicitation from McTish, Pawlowski knew through Ruchlewicz that McTish wanted engineering work from the City and to be awarded the Chew Street project. Second, immediately prior to

Pawlowski's campaign pitch on April 27, 2015, Ruchlewicz discussed the Chew Street project with McTish, raising the inference that Ruchlewicz, as campaign staff, was acting as a buffer for Pawlowski and speaking on his behalf when he told McTish that Chew Street would still be awarded to him. Third, while there is no direct evidence that Pawlowski and McTish discussed Chew Street on April 27, they did discuss campaign contributions and City work. Ruchlewicz mentioning Chew Street to McTish immediately before McTish met with Pawlowski—who then discussed City work with McTish and asked for campaign contributions—suggests a link between the Chew Street project and campaign contributions. And fourth, after Pawlowski and McTish spoke, McTish confirmed to Ruchlewicz that he and Pawlowski were "squared away." Based on this evidence, in the context of Pawlowski and McTish's relationship and each being aware of what the other desired, one campaign contributions and the other the Chew Street project, a jury could infer that an explicit quid pro quo agreement existed between Pawlowski and McTish.

To the extent Pawlowski argues the Government failed to prove an official act under *McDonnell* because he never took any action to award McTish the Chew Street project, this argument fails as a public official need not make a decision or take any action on a "question, matter, cause, suit, proceeding, or controversy" to satisfy *McDonnell*; rather, it is enough that the official "agree to do so." *See McDonnell*, 136 S. Ct. at 2371. Here, the Government presented evidence that Pawlowski wanted McTish to be awarded an engineering contract, had his operatives find a specific contract for him, the Chew Street contract, and then agreed to "stamp, sign, and seal" it once it came across his desk. This evidence is sufficient for a jury to conclude that Pawlowski agreed to "make a decision" or "take an action" on the City contract to satisfy *McDonnell*. *See id.*

<u>Norris McLaughlin</u>

The next sub-scheme involves the law firm Norris McLaughlin. Count 17 charges Pawlowski with federal program bribery for soliciting campaign contributions from Co-Defendant Scott Allinson and his law firm, Norris McLaughlin, in exchange for a parking authority solicitorship contract. Pawlowski argues there was no explicit quid pro quo between him and Allinson, noting that a recording of a May 20, 2015, meeting in which he requested campaign contributions from Norris McLaughlin attorneys contains no mention of an exchange of a contract for campaign contributions. He further argues that prior to the May 20, 2015, meeting, he had expressly instructed Fleck to "not cross the line" during the meeting. In addition, he argues the Government failed to prove an official act under *McDonnell* because he did not intervene to award any solicitorship contract to Norris McLaughlin and, in fact, he had no actual authority to make such an award.

The Government presented sufficient evidence from which a reasonable jury could find an explicit quid pro quo between Pawlowski and Allinson and an official act under *McDonnell*. The Government's tape recordings showed that months before the May 20, 2015, meeting took place, Allinson, Fleck, and Ruchlewicz discussed how Allinson's law firm would receive the parking authority solicitorship contract in exchange for campaign contributions to Pawlowski on several occasions. *See, e.g.*, Gov't's Ex. SR21602T at 1-2 (December 12, 2014, audiotape recording in which Ruchlewicz informs Allinson that a partner at Norris McLaughlin, Richard Somach, would receive the parking authority solicitorship because Pawlowski "controls all the [parking authority] board members" and asks Allinson to help sponsor Pawlowski's upcoming holiday party); Gov't's Ex. SR286T at 1-3 (January 22, 2015, audiotape recording in which Ruchlewicz tells Allinson that his "parking authority problems" have been solved and asks for Allinson's help to raise money for

Pawlowski's United States Senate campaign); Gov't's Ex. SR287T at 1 (January 23, 2015, audiotape recording in which Ruchlewicz informs Allinson that he, Fleck, and Pawlowski had discussed their agreement); Gov't's Ex. SR301T at 5 (February 3, 2015, audiotape recording in which Allinson explains to Fleck that if he were to receive a phone call requesting that he oversee the parking authority solicitorship, then he would "get a hundred percent of the[] kind of credit that turns into money that goes out of [his] checkbook where [Fleck and Ruchlewicz] want it to go").

The Government also showed that Pawlowski was aware of these discussions, and the pay-to-play scheme received his approval. For example, after Allinson had dropped off a campaign contribution check at Pawlowski's Mardi Gras fundraiser on February 13, 2015, Ruchlewicz told Pawlowski, "Installment number one is in," referring to the check Allinson had dropped off. *See* Gov't's Ex. SR318T at 4. During the same conversation, Ruchlewicz informed Pawlowski that Allinson had told him to make sure Pawlowski knew Allinson had brought a check and that he had told Allinson they could continue with the "Somach to Solicitor plan," i.e., the plan to appoint Norris McLaughlin Attorney Richard Somach as the parking authority solicitor. *Id.* Pawlowski raised no questions about the information Ruchlewicz presented and noted his approval, responding "That's good." *Id.*

A couple months later, Pawlowski explained to Ruchlewicz that he was working on having the parking authority solicitorship assigned to Norris McLaughlin. *See* Gov't's Ex. SR365CT at 1. Ruchlewicz stressed the terms of the agreement—the solicitorship had to be awarded to Norris McLaughlin through Allinson even though Somach would receive the work because Allinson was the firm's managing partner and controlled the political action committee money. *See id.* at 2.

Pawlowski confirmed his understanding of the agreement, responding, "[T]hat's logical" and "[G]otcha." *Id.*

These conversations took place prior to the May 20, 2015, meeting Pawlowski references. At that meeting, Pawlowski made a campaign pitch to Norris McLaughlin attorneys, including Allinson, explaining why he would make a good candidate for Senate and asking the law firm to raise $25,000 in campaign contributions before June 30, 2015. *See* Gov't's Ex. MF58T at 1-2. The day before Pawlowski's campaign contribution deadline, June 29, 2015, Fleck told Pawlowski that Norris McLaughlin "came through" with $17,300 in campaign contributions, and Pawlowski responded, "Great. . . . Awesome." Gov't's Ex. MF95-0227T at 1. When Fleck then raised the issue of appointing Somach to the parking authority, Pawlowski did not question the connection between the appointment and the contributions, but noted he first needed to get "rid" of the current solicitor. *Id.* Pawlowski stated that although he did not control the board in charge of the parking authority, he could talk to the board, and he and Fleck then discussed alternate means of forcing the current solicitor to withdraw. *See id.* at 2.

When the May 20, 2015, meeting is viewed in light of these conversations, a reasonable jury could find there was an explicit quid pro quo agreement between Pawlowski and Allinson: Allinson would ensure campaign contributions were donated from Norris McLaughlin to Pawlowski in exchange for Somach's appointment to the parking authority solicitorship, a matter for which Allinson would receive origination credit.

A reasonable jury could also find the solicitorship contract to be an official act under *McDonnell*. While Pawlowski never took any action to award the solicitorship to Somach, under *McDonnell*, "it is enough that [Pawlowski] agree[d] to do so." *See McDonnell*, 136 S. Ct at 2370-71 (citing *Evans*, 504 U.S. at 268). From Pawlowski's conversations with Fleck and Ruchlewicz,

in which Pawlowski acknowledged and agreed Somach would receive the solicitorship in exchange for campaign contributions from members of the Norris McLaughlin law firm, a reasonable jury could find that Pawlowski agreed to take official action concerning the solicitorship.

Pawlowski's argument that the Government failed to prove an official act under *McDonnell* because he had no authority to take any official action on the parking authority solicitorship contract is also unpersuasive. Pawlowski's statement that he could talk to the board in charge of the parking authority concerning Somach's appointment could allow a reasonable jury to infer that Pawlowski either intended to "exert pressure" on members of the board in charge of the parking authority to appoint Somach or "advise" them on who to appoint as solicitor, knowing or intending such advice would form the basis of an official act. *See id*. at 2370-71.[12]

Stevens & Lee

The final sub-scheme involves the law firm Stevens & Lee. Counts 11, 12, 13, and 14 arise out of Pawlowski's solicitation of campaign contributions from two attorneys at Stevens & Lee in exchange for the award of legal work. Specifically, Counts 11 and 12 charge Pawlowski with federal program bribery and attempted Hobbs Act extortion under color of official right for soliciting campaign contributions from Jonathan Saidel, who was of counsel at Stevens & Lee. Counts 13 and 14 also charge Pawlowski with federal program bribery and attempted Hobbs Act

---

[12] In his Rule 29 Supplement, while discussing the Norris McLaughlin scheme but without any citation to the record, Pawlowski makes the cursory argument that the Government "misled the jury by raising the issue of [a] meeting with the [G]overnment in relation to Talen Energy Company." *See* Suppl. 24. Because the Court is not sustaining Pawlowski's conviction as to the Norris McLaughlin sub-scheme on any evidence related to Talen Energy, and it appears testimony related to Talen Energy was not presented in the Government's case-in-chief, *see Brodie*, 403 F.3d at 133 (explaining when a court reserves ruling on a Rule 29 motion made at the close of the Government's case, it must determine whether acquittal was appropriate based solely on the evidence presented by the Government), the Court does not address this argument.

extortion under color of official right based on his solicitation of campaign contributions from Donald Wieand, another attorney affiliated with Stevens & Lee. Pawlowski argues a judgment of acquittal should be entered as to all four counts because the Government failed to establish an explicit quid pro quo agreement between him and Saidel or Wieand or that he took any official act for either of them.

As to Saidel, Pawlowski contends there was no explicit quid pro quo agreement because he never requested campaign contributions from Saidel, and only stated he would "reconsider" giving work to Stevens & Lee at a March 12, 2015, meeting between the two. In addition, Pawlowski argues that to the extent he referred Saidel to City Solicitor Susan Wild to discuss legal work Stevens & Lee might be able to receive from the City, he did nothing more than arrange a meeting, which cannot constitute an official act under *McDonnell*.

As to Wieand, Pawlowski argues that while he requested a contribution at a meeting he had with Wieand in January 2015, there was no discussion of the contribution being made in return for any specific type of legal work; rather, Pawlowski only told Wieand that Wild would be calling him. Pawlowski further argues Wieand's contributions were not evidence of an explicit quid pro agreement as Wieand had contributed in the past. Pawlowski also argues that while Wieand testified that he agreed to contribute to Pawlowski during a June 8, 2015, solicitation call from him because he felt that he would not receive a call from Wild unless he gave, Wieand's unilateral, subjective belief that he needed to contribute to meet with Wild cannot form a clear and unambiguous agreement. Further, he again argues the only official act he could have taken was arranging a meeting between Wieand and Wild, which does not meet *McDonnell*'s definition of an official act.

The Court agrees with Pawlowski that the Government failed to prove an explicit quid pro quo agreement as to either Saidel or Wieand. The Government showed that Wieand met with Pawlowski in the City of Allentown on January 15, 2015, to ask Pawlowski to award some legal work to Stevens & Lee. *See* Trial Tr. Day 2 at 114, Jan. 22, 2018. At the meeting, Wieand asked Pawlowski about the possibility of receiving legal work from the City, but Pawlowski responded, "I don't deal with that. You're going to have to talk to Susan Wild." *See id.* at 124.

On February 10, 2015, Ruchlewicz told Pawlowski that he had complained to Saidel about Stevens & Lee sending a $100 check to Pawlowski because it was "like a slap in the face." *See* Gov't Ex. SR315FT at 2. Pawlowski told Ruchlewicz about his January 15, 2015, meeting with Wieand, Wieand's request for more City work, and stated Stevens & Lee needed to "make up" and send more campaign contributions. *See id.* at 2-3. Ruchlewicz said he was going to send out invitations for Pawlowski's Mardi Gras fundraiser, and Pawlowski observed the fundraiser was "a way for Stevens and Lee to show that they actually love me." *Id.* When Ruchlewicz suggested $5,000 as a target amount, Pawlowski responded "at the very least," noting he had given the firm "millions[] of dollars' worth of legal work," but the firm treated him like "absolute crap." *Id.*

A month later, on March 12, 2015, Saidel met with Pawlowski and Ruchlewicz in an effort to convince Pawlowski to award legal work to Stevens & Lee. *See* Trial Tr. Day 2 at 190-91. At the meeting, as Saidel attempted to pitch Stevens & Lee, Pawlowski complained he "had given [the firm] millions of dollars of work in the past," but the firm had only given him "a hundred bucks." Gov't Ex. SR347-1547T at 1. Saidel responded, "[L]ife is a two[-]way street, which you and I both understand." *Id.* Pawlowski agreed and stated he was willing to reconsider Saidel's request to give work to Stevens & Lee. *See id.* Later in the meeting, Pawlowski mentioned that he, Ruchlewicz, and Saidel should all meet with his new City solicitor. *See id.* at 4. At the end of

the meeting, Saidel asked if Pawlowski would "take care of the Stevens and Lee thing, to which Pawlowski responded, "Yeah . . . it's not a big lift." *Id*. at 5.

A few days later, Ruchlewicz mentioned to Pawlowski that Wieand only contributed $25 at a recent event. *See* Gov't's Ex. 362bT at 1. Irritated, Pawlowski suggested they let Saidel know about Wieand's meager donation and stated if Wieand would have donated $2,500, "it would have been a totally different story." *Id*. Ruchlewicz called Saidel, in Pawlowski's presence, and told him that "twenty[-]five is a good number if it has two zeros behind it." *Id*. at 2. Saidel responded he would take care of it. *See id*. at 3.

On June 8, 2015, Pawlowski called Wieand and told him he would be receiving a call from Wild. *See* Trial Tr. Day 2 at 128-29. Pawlowski then launched into a campaign pitch and asked Wieand to contribute $1,000. *Id*. at 129-30. Wieand agreed to contribute, believing that if he said no, he would not receive a call from Wild. *Id*. at 130. After the call, Wieand was angry because he thought Pawlowski was just "playing [him]" to obtain campaign contributions, but then he feared that he would be involved in a pay-to-play situation if he did receive a call from Susan Wild. *See id*. at 130. Wanting no part of such a situation, Wieand never sent a check to Pawlowski. *Id*. at 131-32.

A week later, on June 15, 2015, Pawlowski and Fleck discussed Saidel approaching Fleck at Ruchlewicz's wedding and asking when Stevens & Lee would receive work from the City. *See* Gov't's Ex. MF87-1140T at 1-2. Pawlowski laughed and noted that Stevens & Lee might receive some work in the future but the way his system worked, nothing would happen until after his June 30, 2015, campaign contribution deadline. *See id*. at 2.

While Pawlowski's conversations with Wieand and Saidel demonstrate he expected Stevens & Lee to engage in his pay-to-play scheme, they fail to show any agreement between the

parties or elucidate the terms of any alleged agreement. *See Menendez*, 291 F. Supp. 3d at 624 (explaining the "relevant inquiry to determine if the Government has met its burden with respect to [bribery] counts" that involve political contributions is "whether a rational juror could find that there was a quid pro quo and that the charged [d]efendant was aware of its terms").  At most, the evidence suggests that Saidel and Wieand agreed to contribute to Pawlowski in exchange for the possibility of receiving unspecified legal work from the City at some point in the future.  While such evidence may support a finding of a quid pro quo agreement in the non-campaign contribution context, more is required in the campaign contribution context. *Compare United States v. Kemp*, 500 F.3d 257, 282 (3d Cir. 2007) (explaining that "the [G]overnment need not prove that each [bribe] was provided with the intent to prompt a specific official act" and sustaining convictions for honest services fraud on a bribery theory when bribes were offered in exchange for a flow of favorable treatment outside campaign contribution context) *with McCormick*, 500 U.S. at 273 (explaining that when bribes are made "in return for an explicit promise or undertaking by an official to perform or not perform an official act," "the official asserts that his conduct will be controlled by the terms of the promise or undertaking" in the campaign contribution context). Here, the evidence does not support the finding that any campaign contributions or agreements to donate were made in exchange for Pawlowski's promise or undertaking to perform an official act. While Pawlowski did agree to "take care" of Stevens & Lee in his conversation with Saidel, this reference to some unspecified future action, in conjunction with Pawlowski's later statement that Stevens & Lee might receive legal contracts in the future, fail to reveal the quo of the explicit quid pro quo, i.e., the subject of Pawlowski's promise or undertaking.  Because the evidence is

insufficient to establish an explicit quid pro quo between Pawlowski and Wieand or Saidel, Pawlowski's motion for judgment of acquittal was granted as to Counts 11, 12, 13, and 14.[13]

## B.    Mail and Wire Fraud

Counts 20-22, 26-28, 30, and 33-37 charge Pawlowski with mail or wire fraud arising out of the Northeast, TEN, and Spillman Farmer schemes, which unfairly eliminated other companies or firms that were seeking the City contracts that were ultimately awarded to those entities.  A conviction for mail or wire fraud requires "(1) the defendant's knowing and willful participation in a scheme or artifice to defraud, (2) with the specific intent to defraud, and (3) the use of the mails or interstate wire communications in furtherance of the scheme." *Antico*, 275 F.3d at 261.

As to these counts, relying on the arguments he made as to the Northeast, TEN, and Spillman Farmer schemes above, the thrust of Pawlowski's argument is that the Government failed to prove mail or wire fraud because it did not provide any evidence of an explicit quid pro quo agreement between him and Kilkenny, Regan, or Biondo.  As an initial matter, the Court notes that an explicit quid pro quo or quid pro quo is not required for a mail or wire fraud conviction, and Pawlowski fails to provide any support for his assertions to the contrary.  Given that the Court has already found there was sufficient evidence from which a jury could find either a quid pro quo or an explicit quid pro quo where applicable, however, Pawlowski's argument fails nonetheless.

---

[13] As the Court granted Pawlowski's motion on Counts 11, 12, 13, and 14 on the basis that the Government failed to prove an explicit quid pro quo, it does not reach Pawlowski's arguments as to whether his actions qualified as an official act under *McDonnell*.

### C.    False Statements

Counts 49-55 charge Pawlowski with making false statements to agents of the Federal Bureau of Investigation.[14]  A false statement conviction requires that a defendant "knowingly and willfully . . . make[] a[] materially false, fictitious, or fraudulent statement or representation" in any matter within the jurisdiction of the Government of the United States.  *See* 18 U.S.C. § 1001(a)(2).  Pawlowski argues a judgment of acquittal should be entered as to each of these counts because the Government failed to prove his statements were false.

Pawlowski's arguments are unpersuasive.  As to Counts 49 and 50, the voluminous evidence described above regarding Pawlowski's pay-to-play scheme is more than sufficient for a reasonable juror to conclude that Pawlowski involved himself in the City's contracting process and influenced which companies, firms, and individuals received certain City contracts and that Pawlowski's denials of such involvement or influence were false.

As to Count 51, a jury could also conclude that Pawlowski's statement that he never directed City Solicitors to award certain law firms legal work were false.  The Government presented testimony from Jerry Snyder, the City Solicitor prior to 2015, about an instance in which Pawlowski called him at home and directed him to award a specific lawsuit to Duane Morris

_____

[14] Specifically, these counts charge Pawlowski with falsely stating he: (1) "stayed out of the contract bidding process in the City of Allentown" (Count 49); (2) "did not try to influence the awarding of contracts from the City of Allentown to particular vendors" (Count 50); (3) "did not tell the City of Allentown City Solicitor to whom to award City of Allentown contracts" (Count 51); (4) "has never used a list of vendors and the amount of money they have received in contracts from the City of Allentown to determine how much money those vendors should contribute to his political campaign" (Count 52); (5) "has never taken anything of value from anyone bidding on a City of Allentown contract, when he knew that he did take a free meal and tickets to a Philadelphia Eagles playoff game from a company bidding on a city contract" (Count 53); (6) "has never taken any official action to benefit Ramzi Haddad" (Count 54); and (7) "had no role in selecting or not selecting the law firm Stevens and Lee for contracts with the City of Allentown." (Count 55).  Indict. 59.

instead of Norris McLaughlin, the firm Snyder had already chosen. *See* Trial Tr. Day 14 at 263-65. In addition, Susan Wild, the City Solicitor in 2015, testified that Pawlowski recommended a particular attorney from Norris McLaughlin to work on a legal matter concerning a trust. *See* Trial Tr. Day 14 at 60-61, 71. The Government also presented evidence concerning Pawlowski's plan to award Norris McLaughlin a contract related to the parking authority in exchange for campaign contributions, raising the inference that he would have to direct Wild, who had the authority to award legal contracts, to do so.

Concerning Count 52, several witnesses testified that Pawlowski obtained lists of vendors who had City contracts and described how Pawlowski used these lists to solicit campaign contributions and determine how much in contributions each vendor should give. *See, e.g.*, Trial Tr. Day 3 at 51 (Dougherty's testimony describing Pawlowski's requests for lists of law firms that had City contracts or had otherwise received business from the City in order to identify potential campaign contributors); Trial Tr. Day 6 at 108 (City Purchasing Agent Beth Ann Strohl's testimony stating Dougherty asked her for a list of City vendors and the amount each vendor was compensated for City work); Trial Tr. Day 9 at 167-68 (Ruchlewicz's testimony explaining Pawlowski's use of vendor lists); Trial Tr. Day 13 at 176-77 (Fleck's employee Celeste Dee's testimony stating Pawlowski brought a thumb drive to Fleck's office containing the names of companies and individuals who had received City contracts). Contrary to Pawlowski's contention, this is more than sufficient evidence from which a reasonable jury could find that Pawlowski falsely stated he had never used vendor lists to determine the amount of campaign contributions to solicit from vendors.

As to Count 53, although Pawlowski argues he never requested the free meal or Eagles tickets he received from Northeast, the Government's evidence demonstrated he requested the

Eagles tickets through Ruchlewicz and did not offer to pay for the dinner with Northeast and Kilkenny at Del Frisco's Steakhouse. This is evidence from which a jury could have reasonably found that Pawlowski's statements with respect to the meal and Eagles tickets were false.

And as to Count 54, while Pawlowski contends he never took any official action related to Haddad, the Government's evidence shows a jury could have rationally found he impermissibly exerted pressure on Dougherty, Nemith, and Paulus to take official action as to Haddad's zoning and inspection matters. Finally, as to Count 55, Dougherty specifically testified that Pawlowski told him Stevens & Lee "fell out of favor" with him because of its lack of campaign contributions, raising the inference that Pawlowski steered legal work away from Stevens & Lee and toward other firms who had contributed. *See* Trial Tr. Day 3 at 206-07. This evidence is sufficient for a jury to have found that Pawlowski's statements were false as to Counts 54 and 55.[15]

---

[15] As previously noted, Pawlowski filed a Supplement to his Rule 29 motion, in which he argues "many of the overt acts charged" fail to satisfy *McCormick* and *McDonnell*. Suppl. 17. The Court construes his Supplement as a challenge to the sufficiency of the evidence as to Count 1, his conspiracy conviction.

A defendant is guilty of conspiracy under the federal conspiracy statute if he agrees with another "to commit any offense against the United States, or to defraud the United States," and at least one of the conspirators takes an act "to effect the object of the conspiracy." *See* 18 U.S.C. § 371. For a court to sustain a conspiracy conviction in the Third Circuit, the Government must show: "(1) the existence of an agreement to achieve an unlawful objective; (2) the defendant's knowing and voluntary participation in the conspiracy; and (3) the commission of an overt act in furtherance of the conspiracy." *United States v. Rigas*, 605 F.3d 194, 206 (3d Cir. 2010) (en banc) (internal quotation marks and citation omitted).

As explained above in the discussion of Pawlowski's various sub-schemes, the Government presented ample evidence of both (1) Pawlowski entering into an agreement with Fleck, Ruchlewicz, and Dougherty to commit the various substantive crimes of which he has been convicted and (2) his knowing and voluntary involvement in these crimes. Moreover, as the Court sustained Pawlowski's convictions as to the substantive offenses that were the objects of the conspiracy, the Government has presented more than sufficient evidence of overt acts in furtherance of the conspiracy. Pawlowski's arguments as to the specific deficiencies in the Government's proof as to the overt acts fail for the same reasons his challenges to his convictions for the underlying substantive offenses fail. To the extent Pawlowski argues he should be granted a judgment of acquittal as to Count 1, there is sufficient evidence from which a jury could find that

Because the Government presented sufficient evidence to sustain the convictions relating to conspiracy, false statements, and mail and wire fraud, and its evidence was sufficient to support a finding of a quid pro quo/explicit quid pro quo and an official act as to all of the convictions relating to federal program bribery, attempted Hobbs Act extortion under color of official right, honest services mail and wire fraud, and Travel Act bribery except as to those concerning Counts 11, 12, 13, and 14, the Court granted Pawlowski's motion for judgment of acquittal as to Counts 11, 12, 13, and 14, and denied it as to the balance of the counts.


BY THE COURT:


/s/    Juan R. Sánchez
Juan R. Sánchez, C.J.

---

he conspired to commit mail fraud, wire fraud, honest services mail fraud, honest services wire fraud, federal program bribery, or Travel Act bribery.

 In addition to challenging Count 1 in his Supplement, Pawlowski appears to suggest that campaign contributions cannot form the basis of a bribe, relying on *McCutcheon v. FEC*, 572 U.S. 185, 208 (2014). *See* Suppl. 19. The Court disagrees. As the *McCutcheon* Court specifically stated, "Spending large sums of money in connection with elections*, but not in connection with an effort to control the exercise of an officeholder's official duties*, does not give rise to [] quid pro quo corruption." 572 U.S. at 208 (emphasis added and removed). Contrary to Pawlowski's assertion, *McCutcheon* demonstrates the Supreme Court's ongoing concern with "precisely the type of dollars-for-official-action exchange that is at the core of the Government's allegations in this case." *Menendez*, 291 F. Supp.3d at 621; *see also Citizens United v. FEC*, 558 U.S. 318, 359-60 (2010) (noting the Government's interest in preventing quid pro quo corruption). The Court rejects Pawlowski's argument.