# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| DIANTHE MARTINEZ-BROOKS, | : | |
| REJEANNE COLLIER, | : | |
| JACKIE MADORE; and | : | |
| KENNETH CASSIDY, individually, | : | |
| and on behalf of all others similarly situated, | : | |
| | : | |
| Petitioners, | : | |
| | : | |
| v. | : | Civ. No. _____ |
| | : | |
| D. EASTER, Warden of Federal | : | |
| Correctional Institution at Danbury, and | : | |
| MICHAEL CARVAJAL, Director of the | : | April 27, 2020 |
| Federal Bureau of Prisons, in their official | : | |
| capacities | : | |
| | : | |
| Respondents. | : | |

## PETITION FOR WRIT OF HABEAS CORPUS PURSUANT TO 28 U.S.C. §2241 AND REQUEST FOR EMERGENCY ORDER OF ENLARGEMENT

### PRELIMINARY STATEMENT

The Federal Correctional Center at Danbury ("FCI Danbury") is a low security federal correctional institution located in Danbury, Connecticut. That city, within the New York City metropolitan area, is part of the epicenter of our nation's struggle with the novel COVID-19 virus and resulting coronavirus disease ("COVID-19").

As COVID-19 ravages the New York Metropolitan area, the risks posed by COVID-19 to people confined in prisons, working in prison, and their communities are stark and alarming. For reasons beyond their control, people in jails and prisons cannot practice social distancing, control their exposure to large groups, practice increased hygiene, wear protective clothing, obtain

1

specific products for cleaning or laundry, avoid high-touch surfaces, or sanitize their own

environment. And those problems are no more evident than at FCI Danbury, a prison consisting

of a men's low security complex, a women's low-security satellite facility, and a women's

minimum security satellite facility, which has been one of the hardest hit prisons run by the

Federal Bureau of Prisons nationwide.

Petitioners bring this action against the Warden of FCI Danbury and the Director of the

Federal Bureau of Prisons ("BOP") on behalf of themselves and the class of prisoners held at

FCI Danbury who are at imminent risk of contracting COVID-19, which feeds on precisely the

unsafe, congregate conditions in which they are held. Respondents are aware of the grave

dangers posed by COVID-19 and have failed to implement measures to comply with their

constitutional obligations to those in their custody. Because of their unlawful and

unconstitutional confinement, Petitioners seek emergency orders requiring a two-part response,

the immediate transfer of the most medically vulnerable individuals to home confinement or

other appropriate settings and immediate implementation for those who remain of the social

distancing and hygiene measures essential to lowering the risk of the disease and of death.

**PARTIES**

1.      Petitioner Dianthe Martinez-Brooks, BOP Register Number 71331-050, is a 50

year-old woman who, at all times relevant herein has been in the custody of the BOP at FCI

Danbury, and is currently housed in FCI Danbury's women's minimum-security camp (the

"camp"). Ms. Martinez-Brooks suffers from systematic lupus erythematosus, an inflammatory

autoimmune disease of the connective tissue, for which she takes corticosteroids that has resulted

in her being immunocompromised. Ms. Martinez-Brooks also suffers from asthma and

hypertension. All three of those diagnosed medical conditions place Ms. Martinez-Brooks at significantly heightened risk of severe illness or death in the event she becomes infected with COVID-19.

2.      Petitioner Rejeanne Collier, BOP Register Number 21263-05, is a 64 year-old woman who, at all times relevant herein, has been in the custody of the BOP at FCI Danbury, and is currently housed in FCI Danbury's women's minimum security camp. Ms. Collier is at heightened risk of mortality from COVID-19 because she suffers from lupus and hypertension and, while in custody, she has been treated for both intestinal cancer and a spot on her lung. She also suffers from hepatitis C and hypertension.

3.      Petitioner Jackie Madore, BOP Register Number 08721-036, is a 50 year-old woman who, at all times relevant herein, has been in the custody of the BOP at FCI Danbury, and is currently housed in the low security satellite facility ("FSL"). She transferred to that building to participate in the Residential Drug Abuse Program (RDAP), which is currently suspended. Ms. Madore is at heightened risk of mortality from COVID-19 due to hypertension. She also suffers from hypothyroidism, and hepatitis C.

4.      Petitioner Kenneth Cassidy, BOP Register Number 48169-054, is a 54 year-old man who, at all times relevant herein, has been in the custody of the BOP at FCI Danbury, and is currently housed in FCI Danbury's men's facility. Mr. Cassidy has significant cardiovascular issues, including ischemic heart disease, unstable angina, and hypertension. He has suffered three heart attacks. He has chronic bronchial asthma and other respiratory problems which have resulted in multiple bouts of pneumonia.  He is also morbidly obese. Each of these conditions

places Mr. Cassidy at dramatically heightened risk of death from COVID-19; the combination of all these conditions creates exponential danger.

5.      Respondent D. Easter is the Warden at FCI Danbury and has oversight responsibility for all three units in the facility. As Warden of FCI Danbury, Respondent Easter is responsible for and oversees all day-to-day activity at FCI Danbury, and all aspects of the operation and of the functioning of FCI Danbury. Her responsibilities include ensuring the safety of all in the institution and ensuring the orderly running of the institution. Respondent Easter is aware of the harms of COVID-19, but she has adopted and enforced a policy that leaves Petitioners and all those similarly situated exposed to infection, severe illness, and death due to COVID-19. Respondent Easter is the immediate physical custodian responsible for the detention of the Petitioners at FCI Danbury. She is sued in her official capacity.

6.      Respondent Michael Carvajal is the Director of the Federal Bureau of Prisons and, in that capacity, is responsible for the safety and security of all persons, including Petitioners and all proposed Class Members, serving federal sentences at BOP facilities, including FCI Danbury. He is sued in his official capacity.

## JURISDICTION AND VENUE

7.      This Court has jurisdiction over this action pursuant to 28 U.S.C. § 2241 because Petitioners seek relief from being held in custody in violation of the Eighth Amendment to the U.S. Constitution.

8.      In addition, the Court has subject matter jurisdiction over this Petition pursuant to 28 U.S.C. § 1331 (federal question) in that the Petitioners' claims arise under the federal statute providing for habeas corpus, 28 U.S.C. § 2241, and under Article I, § 9, cl. 2 of the U.S.

Constitution (Suspension Clause), as Petitioners are held in violation of the Eighth Amendment to the U.S. Constitution.

9.    Venue is proper in the District of Connecticut pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events and omissions giving rise to these claims occurred and continue to occur in this district.

## CLASS ACTION ALLEGATIONS

10.    Petitioners bring this representative habeas action pursuant to 28 U.S.C. § 2241 and as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on their own behalf and on behalf of all persons similarly situated.

11.    Petitioners seek to represent a class consisting of all individuals currently in custody at FCI Danbury or who will become in custody at FCI Danbury during the course of the COVID-19 pandemic (the "Class").

12.    Petitioners also seek to represent a subclass (the "Subclass") consisting of all individuals in custody at FCI Danbury or who will become in custody at FCI Danbury during the course of the COVID-19 pandemic who are aged 50 or over and/or who have serious underlying medical conditions that put them at particular risk of serious harm or death from COVID-19, including but not limited to people with respiratory conditions such as chronic lung disease or asthma; people with heart disease or other heart conditions; people who are immunocompromised as a result of cancer, HIV/AIDS, or for any other reason; people with chronic liver or kidney disease, or renal failure (including hepatitis and dialysis patients); people with diabetes, epilepsy, hypertension, blood disorders (including sickle cell disease), or an inherited metabolic disorder; people who have had or are at risk of stroke; and people with any

condition specifically identified by CDC, currently or in the future, as increasing their risk of contracting, having severe illness, and/or dying from COVID-19.

13.     The members of the Class and Subclass are too numerous to be joined in one action, and their joinder is impracticable. Upon information and belief, the class exceeds 1,000 individuals.

14.     Common questions of law and fact exist as to all Class and Subclass members and predominate over questions that affect only the individual members. These common questions of fact and law include but are not limited to: (1) whether the conditions of confinement described in this Petition amount to Constitutional violations; (2) what measures Respondents took in response to the COVID-19 crisis; (3) whether Respondents implemented an adequate emergency plan during the COVID-19 crisis; (4) whether Respondents' practices during the COVID-19 crisis exposed people at FCI Danbury to a substantial risk of serious harm; (5) whether the Respondents knew of and disregarded a substantial risk of serious harm to the safety and health of the Class; and (6) what relief should be awarded to redress the harms threatened to members of the Class as a result of the conditions.

15.     Absent class certification, individuals detained at FCI Danbury during the COVID-19 pandemic would face a series of barriers in accessing the relief sought. FCI Danbury has suspended visitation and FCI Danbury prisoners have limited access to communication with the outside world, impeding their ability to obtain legal representation and to pursue remedies, including through litigation. A large portion of the Class and Subclass has limited educational backgrounds. And a significant percent of them suffer from physical or mental impairments. For some, English is not their first language.

16. Respondents' practices and the claims alleged in this Petition are common to all members of the Class and Subclass.

17. The claims of Petitioners are typical of those of the Class and Subclass. Petitioners are threatened with imminent inhumane conditions of confinement at FCI Danbury.

18. The legal claims of Petitioners are the same or similar to those of all Class and Subclass members, and the harms suffered by them are typical of those suffered by all the other Class members.

19. Petitioners will fairly and adequately protect the interests of the Class and Subclass. The interests of Petitioners as class representatives are consistent with those of the Class and Subclass members. In addition, counsel for Petitioners are experienced in class action and civil rights litigation.

20. Counsel for Petitioners know of no conflicts of interest among Class or Subclass members or between the attorneys and Class members that would affect this litigation.

21. Prosecuting separate actions by individual class members would create a risk of inconsistent or varying adjudications that could establish incompatible standards of conduct for the party opposing the Class.

22. The party opposing the Class has acted and refused to act on grounds generally application to the Class, such that final injunctive and declaratory relief is appropriate as to the Class as a whole.

23. Use of the class action mechanism is superior to other available methods for the fair and efficient adjudication of the claims and will prevent the imposition of undue financial,

administrative, and procedural burdens on the parties and on this Court, which individual litigation of these claims would impose.

24.     This class action is superior to any other method for the fair and efficient adjudication of this legal dispute, as joinder of all Class and Subclass members is impracticable.

## STATEMENT OF FACTS

## I.     Petitioners Are Members of the Population Particularly Vulnerable to COVID-19

25.     Petitioners, current detained at FCI Danbury, are individuals who are particularly vulnerable to serious illness or death if infected by COVID-19.

26.     Petitioner Dianthe Martinez-Brooks is a 50-year-old female who suffers from asthma, hypertension, arthritis and systemic lupus erythematosus (SLE). She takes Atenolol for hypertension and has a Proventil emergency inhaler and Asmanex Twisthaler (mometasone furoate inhalation powder, 220 mg) for her asthma. Since her incarceration, she has been proscribed steroids once for the joint and muscle inflammation associated with her lupus. [Declaration of Dianthe Martinez-Brooks, submitted herewith as Exhibit C ("Martinez-Brooks Decl.") ¶ 2].

27.     As a result of her medical condition, Ms. Martinez-Brooks has effectively been condemned to serve her sentence at substantial risk of serious illness or death. As a result of her hypertension, Ms. Martinez-Brooks is significantly more vulnerable to complications should she contract COVID-19. Indeed, the WHO-China Joint Mission Report provided historical mortality rates for those who contracted COVID-19 with specific pre-existing conditions. For those with

hypertension, the mortality rate was 8.4%.[1] That same report indicates that the mortality rate for chronic respiratory disease such as asthma was 8.0%. *Id.*

28.     As a lupus patient, Ms. Martinez-Brooks is also at greater risk from COVID-19 in two respects. As with other lupus patients, Ms. Martinez-Brooks has been prescribed corticosteroids which weaken the immune system and render the patient immunocompromised. Both that compromised immune system and lupus itself are risk factors for an increased chance of infection and for the development of a more severe form of COVID-19.[2]

29.     Although the Judgment in her criminal case only sentences Ms. Martinez-Brooks to an additional two years in prison [Martinez-Brooks Decl. ¶ 3], as a result of her medical condition there is a grave risk that she will not make it out of FCI Danbury alive or will become terribly ill.

30.     Petitioner Rejeanne Collier is a 64-year-old female who suffers from systemic lupus erythematosus (SLE), hypertension and Hepatitis C. She has had surgery for intestinal cancer while in BOP custody and has been diagnosed with a spot on her lung. *See* Motion to Reduce Sentence, *United States v. Collier*, 6:12-cr-06003-CJS (N.D.N.Y. Apr. 16, 2020) (Doc. 64 at 13). As set forth above, these conditions condemn her to serve a sentence at substantial risk

---

[1] *See* Report of the WHO-China Joint Mission on Coronavirus Disease 2019 (COVID-19), World Health Organization (Feb. 28, 2020), at 12, https://www.who.int/docs/default-source/coronaviruse/whochina-joint-mission-on-covid-19-final-report.pdf (hereinafter "WHO-China Joint Mission Report").

[2] *See People who are at higher risk*, Centers for Disease Control and Prevention: Coronavirus Disease 2019 (COVID-19) (Apr. 15, 2020), https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-at-higher-risk.html; Amr H. Sawalha et al, *Epigenetic dysregulation of ACE2 and interferon-regulated genes might suggest increased COVID-19 susceptibility and severity in lupus patients*, Clinical Immunology (2020): 108410, https://www.sciencedirect.com/science/article/pii/S1521661620302394 ("propos[ing] that lupus patients might be at an increased risk for infection by SARS-CoV-2 and for developing a more severe form of COVID-19, independent of the possible effect of immunosuppressive medications").

of serious illness or death.  The mortality rate for COVID-19 with pre-existing hypertension is 8.4%; for cancer, the mortality rate is 7.6%.[3] She is also at significantly greater risk as a result of her lupus. To the extent that the as yet incompletely diagnosed spot on her lung represents either lung cancer or some other form of respiratory compromise, that condition will also place her at substantially elevated risk of significant illness or death in the event she contracts coronavirus. The Judgment in her criminal case sentences Ms. Collier to an additional four years in prison. As a result of her medical condition there is a grave risk that she will not make it out of FCI Danbury alive or will become terribly ill.

31.    Petitioner Jackie Madore is a 50-year-old female who suffers from hypertension, hypothyroidism, and Hepatitis C. As a result of her hypertension alone, without consideration of the complicating effects of her other conditions, she has a substantially elevated risk of severe illness or mortality in the event she contracts COVID-19 while confined at FCI Danbury.[4] As a result of her medical condition, Ms. Madore has effectively been condemned to serve her sentence at substantial risk of serious illness or death. The Judgment in her criminal case only sentences Ms. Madore to an additional 20 months in prison. As a result of his medical condition, there is a grave risk that he will not make it out of FCI Danbury alive or will become terribly ill.

32.    Petitioner Kenneth Cassidy is a 54-year-old male with a significant number of risk factors putting him at high risk of severe illness or death in the event he contracts COVID-19. Mr. Cassidy has significant cardiovascular issues, including ischemic heart disease (i.e., deficient blood supply from a narrowing of the blood vessels), unstable angina, and hypertension. He has suffered three heart attacks, including two in his thirties. He has chronic bronchial asthma and

---

[3] *See* WHO-China Joint Mission Report at 12.
[4] *See id.*

other respiratory problems which have resulted in his having contracted pneumonia at least 21 times in his life. He also has chronic gastrointestinal and gastroesophageal disease including diverticulosis and he is morbidly obese. He suffers significant food allergies and is on a restricted diet as a result of his diverticulosis. He is on numerous different medications/interventions for these conditions.

33.     As a result of his medical condition, Mr. Cassidy has effectively been condemned to serve his sentence at substantial risk of serious illness or death. Pursuant to the above-cited WHO-China Joint Mission Report, each of these conditions puts Mr. Cassidy at significantly elevated risk of mortality in the event he should contract COVID-19: The mortality rate for hypertension is 8.4%; the mortality rate for chronic respiratory disease is 8.0%, the mortality rate for cardiovascular disease is 13.2%.[5] Moreover, a recent study found that obesity was the single biggest chronic risk factor for hospitalization for COVID-19.[6] COVID-19 infection in a patient presenting with all four medical conditions will undoubtedly be deadly.[7]

34.     The Judgment in his criminal case only sentences Mr. Cassidy to an additional 11 months in prison.  [Declaration of Kenneth Cassidy, submitted herewith as Exhibit D ("Cassidy

[5] *See id,*
[6] Christopher M. Petrilli et. al., Factors Associated With Hospitalization and Critical Illness Among 4,103 Patients with COVID-1 Disease in New York City (Apr. 11, 2020), available at https://www.medrxiv.org/content/10.1101/2020.04.08.20057794v1.full.pdf; *see also* Tiernan Ray, *NYU scientists - Largest US study of COVID-19 finds obesity the single biggest 'chronic' factor in New York City's hospitalizations* (April 12, 2020), https://www.zdnet.com/article/nyu-scientists-largest-u-s-study-of-covid-19-finds-obesity-the-single-biggest-factor-in-new-york-critical-cases/
[7] Safiya Richardson, et al., Presenting Characteristics, Comorbidies, and Outcomes Among 5700 Patients Hospitalized with COVID-19 in the New York City Area, J. AM. MED. ASS'N (Apr. 22, 2020), available at https://jamanetwork.com/journals/jama/fullarticle/2765184 (in study of 5,700 patients, finding that the most common comorbidities with COVID-19 were hypertension (56.6%), obesity (41.7%), and diabetes (33.8%)).

Decl.") ¶ 3].  As a result of his medical condition, there is a grave risk that he will not make it out of FCI Danbury alive or will become terribly ill.

## II.    The Layout of the Facilities at FCI Danbury Gives Rise to an Urgent Need for Social Distancing that Remains Unmet More than Six Weeks into the National COVID-19 Pandemic

### A.    Physical Layout of FCI Danbury's Three Facilities

35.    As of April 23, 2020, the BOP reports that 1,046 people were held at FCI Danbury. They were divided among the units as follows: 165 women are incarcerated at the satellite prison, 153 women are incarcerated at the camp, and 728 men are incarcerated at the men's prison.[8]

### 1.    Women's FSL

36.    The women in the satellite facility ("FSL") are housed in a single dormitory-style room that accommodates approximately 160-170 beds. [Declaration of Christina Korbe, submitted herewith as Exhibit E ("Korbe Decl.") ¶ 8]. The room is divided into cubicles, each containing two bunk beds, separated by approximately four feet. [Declaration of Marius (Marie) Mason, submitted herewith as Exhibit F ("Mason Decl.") ¶ 7; Declaration of Kimberly Hoisington, submitted herewith as Exhibit G ("Hoisington Decl.") ¶ 4]. Beds in each cubicle are immediately adjacent to the cubicle wall, which does not reach to the ceiling. In some instances the wall does not even reach the top of the bunk bed, so women on the top bunk sleep right next to the woman on the top bunk in the adjacent cubicle. [Mason Decl. ¶ 7; Korbe Decl. ¶ 10].

---

[8]  See BOP, "Population Statistics" (last updated Apr. 23, 2020), https://www.bop.gov/about/statistics/population_statistics.jsp

12

a.  All of the women in the FSL share the same three bathrooms, each of which
    includes between 4-8 toilets, sinks, and showers. [Mason Decl. ¶ 10; Korbe Decl.
    ¶ 8].

b.  The FSL also includes a common area where the women have access to 6-12
    shared phones (not all of which are working) and 6 shared computers (only 4 of
    which are working), which are located in close proximity to one another. [Korbe
    Decl. ¶ 11; Mason Decl. ¶8].

c.  The women in the FSL eat meals together in the dormitory. Meals are brought to
    all of the prisoners in the dormitory at the same time.

d.  On April 25, around 40 women were moved from the dorm area to sleep in the
    dining hall/kitchen area.

e.  On information and belief, there is no medical staff permanently assigned to the
    FSL or available 24 hours a day. A doctor and a physician's assistant rotate
    between the three FCI Danbury facilities and are there during limited hours on
    weekdays. In order to request medical care, a requester must go to "pill call" in
    the morning, where a pharmacy technician dispenses medications, and fill out a
    sick call slip. The requester must then wait until she is called in to be seen, which
    can take weeks. Emergencies require a call from a correctional officer for a
    medical professional to come to the FSL. Prior to the pandemic, there were two
    psychologists who were at the FSL on a daily basis, but they have rarely been
    present since the pandemic (as psychology programming has been canceled).

13

2. <u>Women's Camp</u>

37.     The women at the camp occupy a single building divided into four dormitories,
each containing 25 cubicles with bunk beds sleeping two each, and nine rooms that can each
hold 4 to 5 women. Prior to the lockdown of the facility on April 15, there were approximately
43 women housed in the nine rooms. After the lockdown, those women were moved to the
dormitories. [Martinez-Brooks Decl. ¶¶ 4-5].

    a.  The cubicles in the dormitories—which currently house all of the women in the
        camp—have no doors and their dividing walls do not extend to the ceilings. In
        many cubicles, the beds are positioned perpendicular to the partitions and extend
        the full width of the cubicle. In this configuration, the partition is the only
        separation between the beds. Even where beds are placed parallel to the partition,
        there is not six feet of separation between them. [*Id*. ¶ 7].

    b.  As of April 21, 2020, A and B dorms each house 48 women; C dorm houses 47
        women and D Dorm houses 7. Each dorm has a common area containing toilets,
        sinks and showers. A dorm has 4 showers and three toilets. B dorm has 5 working
        toilets and 6 showers; C dorm has 5 toilets and 5 showers. D Dorm has 3 toilets
        and three showers.  [*Id*. ¶¶ 6-7].

    c.  There are four phones, 7 computers for email, and 3 working video-visiting
        machines, clustered together in a single common area shared by the entire
        population of the camp. The common area also contains hot water taps and sinks
        for washing dishes. [Martinez-Brooks Decl. ¶ 9].

14

a. The camp is currently on lockdown. Pursuant to the lockdown, the women in each dorm unit are permitted to leave the dorm for 45 minutes in the morning and one hour later in the day, at different times. They can use the facilities in the common room during these times. Within these short time periods, the 47-48 woman census of A, B, and C dorm must each negotiate the sharing of the four common phones, the 7 computers and 3 video chat machines. [Martinez-Brooks Decl. ¶ 11].

b. Recently, women who are out of their dorm during their designated recreation time have been going to visit friends in other dorms. [Martinez-Brooks Decl., ¶ 15].

d. There is no actual medical clinic in the camp and there is no medical staff permanently assigned to the camp or available 24 hours a day. Rather, there are a series of offices: two are used by medical staff, one by dental staff, and one by psychology. During this lockdown, a sick call request is made to physician's assistants when they come to the unit in the morning to dispense medications and the requester must wait until she is called in—often days later.  Emergencies require a call from a correctional officer for a medical professional to come to the camp.  [*Id*. ¶ 21].

3. <u>Men's Prison</u>

38. The men's facility contains 13 units, comprised of 10 units designed for dormitory-style housing and three units of individual cells. There is also a Special Housing Unit for solitary confinement.

a. The dormitory units (designated C through L Units) consist of rows of bunk beds lined in two rows three to four feet apart across a middle aisle, with no barriers between the beds.  [Cassidy Decl. ¶ 32]. A man in that unit would, therefore, sleep within 3-4 feet of five other men. [*Id.*]. The average dorm unit would also contain a bathroom with 5 stalls and a urinal, 5-6 sinks (generally consisting of five cold-water wash sinks and a single hot-water slop sink for washing eating utensils) and a shower area approximately two feet across a hall from the toilets with three to four showers. [*Id.* ¶ 33]. The sinks are located approximately four inches apart and people occasionally have to share the same sink.  [*Id.*].

b. The dorms also contain 2 television rooms, approximately 10 x 12 feet that can accommodate approximately 20 prisoners each and typically hold 15-20 people at a time.  [*Id.* ¶ 35]. There is also a small telephone room, approximately 3 x 8 feet, containing two telephones. The telephones, which are about eight inches apart, are almost always in use. When two prisoners are using the telephones, they have to stand within two feet of each other. Typically, there are two prisoners on the phones, and the rest wait in a line in the hallway, standing right next to each other, close enough to touch each other. [*Id.* ¶ 36].

c. There is also a small computer room in each dorm measuring approximately 8 x 10 feet containing three computers, an eating table and an ice dispenser. There are no barriers between the computers and, at any given time, there will be three people in the room using the computers, three people standing behind them in the

16

room waiting to use the computers, and several more lined up shoulder to shoulder outside the room. [*Id*. ¶ 37].

d.  The three units of individual cells (A, B and M Units) consist of two floors of cells measuring 8 x 4 feet, containing a bunk bed for two men with a toilet/sink. [Declaration of Rafael Almonte, submitted herewith as Exhibit H ("Almonte Decl."), ¶ 6]. Prior to the emergence of COVID-19 in the facility, only one of the cell block units (M Unit) was in use and housed primarily military veterans, older men and those with serious medical conditions. A second cellblock (A Unit) has since been devoted to prisoners who are positive for coronavirus.  [Almonte Decl. ¶ 17]. The facility has also activated one of the dorms (K Unit)—which had previously been emptied because of the need for asbestos remediation—to serve as an isolation unit at the prison. [*Id.* ¶ 4; Cassidy Decl. ¶ 42]. B Unit has since been converted to serve as a quarantine unit for individuals being released or sent to home confinement.

e.  The cellblock units also contain a TV room that can accommodate 30 men who sit close together and a computer room containing 3 stations right next to one another. There are also two small rooms containing one phone each. [Almonte Decl. ¶ 8].

f.  There is a single medical clinic for men at FCI Danbury. Before the outbreak, it was typically staffed by one physician and two physician assistants. The physician from the women's facilities would occasionally come to the men's prison to see patients. [Almonte Decl. ¶ 11]. Since the lockdown, a social worker is coming

17

into the units to conduct sick call triage of men exhibiting symptoms. [Cassidy Decl. ¶ 18]. At times she brings along the prison's dental hygienist. [*Id.*] The clinic is not staffed by medical staff 24 hours a day.

g.  There is also a dining hall in the men's prison that serves all of the units in the prison. The men's prison also includes an outdoor space for recreation ("rec yard"). The space is accessed through a single 4 foot wide door and men entering and exiting the rec yard must line up in close proximity to file through the door. During recreation, prisoners stand right next to one another and are unable to observe social distancing. [Cassidy Decl. ¶ 29].

**B.    COVID-19 Outbreak at FCI Danbury**

39.    FCI Danbury is in the center of the global COVID-19 storm. The United States currently has the greatest number of infections of any country in the world. As of April 27, 2020, there were approximately 966,000 reported COVID-19 cases and more than 55,000 deaths in the United States.[9] And, the New York City metropolitan area, in which FCI Danbury is located, is currently at the epicenter of the coronavirus pandemic in this country. As of April 27, 2020, there are over 422,000 positive cases of COVID-19 in New York, Connecticut and New Jersey. As of that date, there have been 30,000 deaths in those three states, representing 55% of the total confirmed deaths from COVID-19 reported nationwide.[10] In New York City and the seven counties most proximate to FCI Danbury (Westchester, Putnam, Dutchess and Nassau counties in New York and Fairfield, Litchfield and New Haven counties, Connecticut), there were an aggregate of 242,000 cases of COVID-19 and 21,000 deaths. *Id.* In Connecticut alone, the

---

[9]  COVID-19 Dashboard by the Center for Systems Science and Engineering (CSSE) at Johns Hopkins University (JHU), https://www.arcgis.com/apps/opsdashboard/index.html.

Connecticut Department of Public Health ("DPH") has reported that, as of April 27, 2020, in Connecticut, there were 25,269 confirmed cases and 1,924 deaths attributed to COVID-19. Fairfield County, where FCI- Danbury is located has the highest number of confirmed cases of COVID-19 and deaths attributed to COVID-19 in the state: as of April 27, 2020, there were 10,529 confirmed cases of COVID-19 and 707 COVID-19 associated deaths.[11]

40.     FCI Danbury is the site of one of the worst COVID-19 outbreaks at BOP facilities nationwide. As of April 15, at least 44 prisoners and 39 staff members have or had tested positive for COVID-19.[12] One person incarcerated at FCI Danbury has died of COVID-19. On April 24-26, 2020, at least two women from the FSL were brought to the hospital because of severe COVID-19 symptoms. On information and belief, at least ten more women in the FSL tested positive during those same days.

41.     The incidence rate at Danbury exceeds 2.8% of the total prisoner population at the facility—among the highest concentrations of positive tests per capita of any facility in the Bureau of Prisons network.

42.     The incidence of staff COVID-19 infections at FCI Danbury is likewise, among the highest incidence per capita of staff infections in the BOP system.

43.     The BOP reports the number of positive cases for inmates and staff at each facility on its website. But the BOP's numbers do not include people who previously tested

---

[10] *Id.*
[11] See https://portal.ct.gov/-/media/Coronavirus/CTDPHCOVID19summary4232020.pdf?la=en
[12] *See* Laura Cassels, *COVID-19 deaths in federal prisons rise to 15; about 700 staff and inmates* sick, Phoenix, April 15, 2020, https://www.floridaphoenix.com/2020/04/15/covid-19-deaths-in-federal-prisons-rise-to-15-about-700-staff-and-inmates-sick/

positive for COVID-19 and have since been deemed recovered by BOP.[13] The BOP provides no explanation as to what qualifies as "recovery."

44.    BOP's data does not state where the incarcerated people who tested positive have been housed, and who may have been exposed to staff members who have tested positive.

45.    As set forth in detail below, *see* paragraphs 131-141, there is ample evidence to indicate that FCI Danbury appears to be avoiding testing prisoners who present with symptoms of COVID-19 infection.

46.    COVID-19 is at Danbury and individuals are infected. What cannot be known is how many currently have the infection or exposure. In the absence of any information from the BOP about the number of tests actually administered at FCI Danbury and the criteria employed at that institution to determine whether and when to perform COVID-19 testing, no reliable information is public about the degree to which the infection has spread at FCI Danbury.

47.    Respondents have failed to prioritize medically vulnerable prisoners for release to home confinement or to other destinations appropriate to reduce population density at FCI Danbury and enhance opportunities for social distancing.

48.    On information and belief, Respondents have also reversed prior determinations to release medically vulnerable individuals pursuant to de-densification efforts and have advised medically-vulnerable individuals who had previously been notified that they were to be released to home confinement that they are no longer eligible for such release because they had not completed one-half of their sentences.

49.    Further, on information and belief, FCI Danbury has indefinitely suspended the administrative remedy process; staff informed prisoners that, due to the state of emergency under

_____

[13] Federal Bureau of Prisons, https://www.bop.gov/coronavirus/

which the facility is operating, staff are unavailable to review, investigate and respond to grievances. [Cassidy Decl. ¶ 25].

50.　　FCI Danbury is grossly ill-equipped to identify, monitor, and treat a COVID-19 epidemic. The combination of an epidemic striking a facility that houses over 1,000 people and FCI Danbury's inability to provide appropriate medical care under normal circumstances is likely to result in serious illness and death, if people remain confined there at current population levels and under current conditions.

51.　　At current facility population levels, prisoners at FCI Danbury cannot comply with the Centers for Disease Control and Prevention ("CDC") guidelines for physical distancing, a "cornerstone" of risk reduction in prisons.[14]

52.　　As long as prisoners are unable to practice physical distancing, any other mitigating steps will fail to decrease meaningfully the risk of COVID-19 infections at FCI Danbury.

53.　　The failure to implement appropriate social distancing measures has led to the creation of crisis conditions at FCI Danbury.

54.　　On April 24-26, 2020, several prisoners at the FSL have shared an account of a 43 year-old woman housed at the satellite facility whose serious symptoms, including profuse

---

[14] *See* CDC, *Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities* (Mar. 23, 2020), at 4 ("CDC Interim Correctional Facility Guidance") ("Although social distancing is challenging to practice in correctional and detention environments, it is a cornerstone of reducing transmission of respiratory diseases such as COVID-19"); *id.* ("Social distancing is the practice of increasing the space between individuals and decreasing the frequency of contact to reduce the risk of spreading a disease (ideally to maintain at least 6 feet between all individuals, even those who are asymptomatic."), available at https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidance-correctional-detention.html.

vomiting and dry heaving, over several hours, were disregarded by correctional staff before she was finally taken to the hospital. [See Korbe Decl. ¶¶ 16-17; Hoisington Decl. ¶¶ 16-17].

a. The woman at issue had been sick for a couple of weeks with a sore throat and body aches.

b. On April 24, she said that she couldn't breathe and that her lungs felt like they were filling with fluid. She began vomiting, and was vomiting, dry heaving, and violently struggling for air for hours. At one point she had to be wheeled in a wheelchair by a correctional officer from the bathroom because she couldn't walk.

c. Other prisoners tried to advocate for her to receive medical treatment and were told that the hospital can't take her unless she's dying, and that the prisoners would get disciplinary reports and get locked down if they continued advocating on her behalf. The prisoners were told that they were not doctors and were instigating the sick woman's behavior.

d. By late at night on April 24 or early morning on April 25, the sick woman had been taken to the hospital. At the hospital, she tested positive for COVID-19.

e. The next day on April 25, roughly 40 inmates who were determined to have had recent contact with the sick prisoner were moved out of the dormitory into a separate area of the facility and were tested for COVID-19.

f. On information and belief, at least ten of those inmates tested positive for COVID-19.

g.  Thereafter, all of the prisoners who had been removed from the dormitory returned for some time to gather their personal property, use phones and computers, use bathrooms, and take showers. On information and belief, even after they were removed to isolation, several of these women were able to return to the dormitory to gather snacks and other belongings.

h.  The phones, computers, and bathrooms were not sanitized immediately afterwards.

i.  The other inmates in the dormitory are using these same phone, computers, and bathrooms.

j.  Some inmates who had contact with the sick woman were not among those removed from the dormitory and are still living there.

k.  As a result of failure to implement social distancing and to plan for contagion within the facility, FCI Danbury had no appropriate location to isolate the women who newly-tested positive for COVID-19 and was required to take those women to sleep in the dining hall/kitchen.

l.  Prisoners have been warned that they will get disciplinary reports if they tell anyone about what is going on in the facility. A prisoner who relayed information about the sick woman to her attorney via phone was given a disciplinary report for sharing information about another prisoner.

55.  FCI Danbury is undergoing a serious outbreak and worse will likely follow with devastating consequences for Petitioners and other vulnerable prisoners, correctional staff, local health care workers, their families, and the broader community.

## III. Prisons Are Especially Susceptible to COVID-19 Contagion

56. The COVID-19 virus is highly infectious and can be spread "easily and sustainably" from person-to-person.[15] The virus can live on plastic and steel surfaces for up to 72 hours, and, powered by a single cough or sneeze, can be propelled in a gas cloud that extends up to 27 feet in length.[16]

57. To date, the virus is known to spread from person to person through respiratory droplets, close personal contact, and from contact with contaminated surfaces and objects, where the virus can survive for up to three days. Critically, people who are asymptomatic or pre-symptomatic can unknowingly transmit the virus, making it particularly difficult to slow its spread. [Declaration of Jaimie Meyer, M.D. submitted herewith as Exhibit A ("Meyer Decl.") ¶ 20].

58. There is no vaccine against COVID-19 and there is no known medication to prevent or treat infection from COVID-19. Social distancing, or remaining physically separated from known or potentially infected individuals, and vigilant hygiene, including washing hands with soap and water, are the only known effective measures for protecting vulnerable people from COVID-19.

59. As a result, the only assured way to curb the pandemic is through dramatically reducing contact for all. Consequently, every American institution—from schools to places of worship, from businesses to legislatures—has been exhorted or ordered to reduce the number of

---

[15] See Centers for Disease Control and Prevention, *How COVID-19 Spreads* (accessed Apr. 3, 2020), https://www.cdc.gov/coronavirus/2019-ncov/prepare/transmission.html.

[16] Neeltje van Doremalen et al., *Aerosol and Surface Stability of SARS-CoV-2 as Compared with SARS-CoV-1*, NEW ENG. J. MED., 2 (2020), available at https://doi.org/10.1056/NEJMc2004973 (accessed Apr 2, 2020); Lydia Bourouiba, *Turbulent Gas Clouds and Respiratory Pathogen Emissions: Potential Implications for Reducing Transmission of COVID-19*, JAMA (2020),

people in close quarters, if not to empty entirely.[17] People also have been told to undertake aggressive sanitation measures, such as cleaning and disinfecting all surfaces, using products with particular alcohol contents, and closing off any areas used by a sick person.[18]

60.     In light of this public health crisis, in late March 2020, the Governors of New York and Connecticut took the strictest measure yet to fight the virus's spread. In recognition that the most effective way to reduce the spread of the virus, they issued "stay at home" executive orders for all residents and banned all non-essential public gatherings.[19]

61.     People in congregate environments, where people live, eat, and sleep in close proximity, face increased danger of contracting COVID-19, as evidenced by the rapid spread of the virus in cruise ships and nursing homes.

62.     Indeed, the CDC has identified prisons, along with nursing homes, long-term care facilities, group homes, and cruise ships, as environments that are especially susceptible to rapid

---

https://jamanetwork.com/journals/jama/fullarticle/2763852 (accessed Apr 2, 2020).

[17]  Harry Stevens, *Why Outbreaks Like Coronavirus Spread Exponentially, and how to "Flatten the Curve,"* WASH. POST, (Mar. 14, 2020), https://cutt.ly/etYRnkz; Centers for Disease Control and Prevention, *Interim Guidance for Administrators of US K-12 Schools and Child Care Programs*, https://cutt.ly/ItRPq5n; Centers for Disease Control and Prevention, *Interim Guidance for Administrators and Leaders of Community- and Faith-Based Organizations to Plan, Prepare, and Respond to Coronavirus Disease 2019 (COVID-19)*, https://cutt.ly/KtRPk1k; Centers for Disease Control and Prevention, Interim Guidance for Businesses and Employers to Plan and Respond to Coronavirus Disease 2019 (COVID-19), https://cutt.ly/stRPvg4; Nat'l Conf. of State Legislatures, Coronavirus and State Legislatures in the News, https://cutt.ly/4tRPQne.  As of April 3, 2020, fully 311 million Americans were being urged by their City, County, Parish, Territory, and/or State governments to stay at home to reduce the spread of coronavirus.  See Sarah Mervosh, Denise Lu, Vanessa Swales, *Which States and Cities Have Told Residents to Stay at Home*, N.Y. TIMES (last updated Apr. 3, 2020), available at https://cutt.ly/CtDMZY0.

[18]  Centers for Disease Control and Prevention, *Cleaning and Disinfecting Your Facility*, https://cutt.ly/atYE7F9.

[19]  *Governor Cuomo Signs the 'New York State on PAUSE' Executive Order*, New York State (Mar. 20, 2020), https://www.governor.ny.gov/news/governor-cuomo-signs-new-york-state-pause-executive-order; *Gov. Ned Lamont announces ban on gatherings of more than 5 people as COVID-19 death toll hits 21 and unemployment claims surge to 148K*, HARTFORD COURANT (Mar. 26, 2020,

outbreaks of infection due to close person-to-person contact among large, confined populations.[20]

63.     Spaces within jails and prisons are often poorly ventilated; the lack of ventilation promotes highly efficient spread of diseases through droplets. [Meyer Decl. ¶ 9].

64.     Prisoners and staff interact in close proximity under cramped conditions that are designed to confine people rather than distance them; as a result, correctional facilities are highly susceptible to rapid transmission of the virus through contact, including asymptomatic carriers who show no signs of illness, and common surfaces.

65.     Absent significant de-densifying, people who are confined in prisons, jails, and detention centers, as well as staff, will find it impossible to engage in the necessary social distancing and hygiene required to mitigate the risk of transmission. [Meyer Decl. ¶¶ 9, 11].

66.     As one court, quoting another, recently summarized the problem: "Prisons are 'powder kegs for infection' and have allowed 'the COVID-19 virus [to] spread[] with uncommon and frightening speed,'" *United States v. Salvagno*, 5:02cr00051-LEK (N.D.N.Y. Apr. 23, 2020) (Doc. 1166 at 8) (quoting *United States v. Skelos*, No. 15-CR-317, 2020WL 1847558, at *1 (S.D.N.Y. Apr. 12, 2020)).[21]

---

10:21 pm), https://www.courant.com/coronavirus/hc-news-coronavirus-updates-0326-20200326-guqhxagmd5fidprf6el6wpvity-story.html.
    [20] *See* CDC Interim Correctional Facility Guidance, available at https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidance-correctional-detention.html.
    [21] Editorial, No One Deserves To Die of COVID-19 in Jail:  But More Than 100 Inmates Already Have, N.Y. Times, Apr. 23, 2020), available at https://www.nytimes.com/2020/04/23/opinion/coronavirus-prisons.html  ("Social distancing in prisons in nearly impossible."); U.S. Dep't of Justice, FY 2020 Performance Budget Congressional Submission, Federal Prison System, Buildings and Facilities (finding that the size of the inmate population in federal prisons exceeds their rated capacity by 12 to 19 percent), available at https://www.justice.gov/jmd/page/file/1144631/download

67.     Correctional settings also increase the risk of contracting and spreading an infectious disease, like COVID-19 because they typically house high numbers of people with chronic, often untreated underlying health conditions, such as diabetes, heart disease, chronic lung and liver diseases, asthma, and lower immune systems from HIV. This chronic underlying illness, in turn, is often exacerbated by minimal levels of sanitation, limited access of personal hygiene, limited access to medical care, and no possibility of staying at a distance from others.[22]

68.     Indeed, outbreaks of the flu regularly occur in prisons, and during the H1N1 epidemic in 2009, many jails and prisons dealt with high numbers of cases.[23]

69.     Prisons are not isolated from communities, and infections in prisons give rise to the risk of "community spread." Even when prison visitors are reduced, staff, contractors and vendors go from prisons to communities and can bring infectious diseases into facilities and then into communities. The turnover of prison populations means that people cycle in and out, as well as transfer from one facility to another.

70.     Such movement creates an ever-present risk that persons, including asymptomatic carriers, will carry the virus into and out of those facilities, spread infection, and trigger

---

[22] *See, e.g.*, Joseph A. Bick, *Infection Control in Jails and Prisons*, 45:8 Clinical Infectious Diseases 1047 (Oct. 2007), available at https://academic.oup.com/cid/article/45/8/1047/344842 (incarcerated people at increased risk for transmission of blood-borne pathogens, sexually transmitted diseases, certain antibiotic resistant infections, Staph. Infection, tuberculosis, influenza, and varicella-zoster); World Health Organization, Prisons and Health, *Infectious diseases in prison* at 73 (2014), available at http://www.euro.who.int/__data/assets/pdf_file/0005/249188/Prisons-and-Health.pdf?ua=1.

[23] *See Interim Guidance for Correctional and Detention Facilities on Novel Influenza A (H1N1) Virus*, CDC (May 24, 2009 at 6:00 pm), available at https://www.cdc.gov/h1n1flu/guidance/correctional_facilities.htm; Wen-Cheng Chao, Po-Yu Liu, Chieh-Liang Wu, *Control of an H1N1 outbreak in a correctional facility in central Taiwan*, 50:2 J. MICROBIOLOGY, IMMUNOLOGY AND INFECTION 175 (Apr. 2017), available at https://www.sciencedirect.com/science/article/pii/S1684118215007550; *H1N1 outbreak in 2013 inside Canada's largest correctional facility offers lessons on COVID-19: report*, NATIONAL POST (Mar. 24, 2020 at 12:00 am), available at https://nationalpost.com/news/h1n1-outbreak-in-2013-at-canadas-largest-correctional-facility-being-studied-to-fight-covid-19-inside-prisons.

outbreaks inside and in communities. Prison health is an issue of public health as what happens in prison has widespread ramifications beyond the walls of the prison. [Meyer Decl. ¶ 8.][24]

71.     Evidence of the degree of risk in prisons is mounting. The estimate is that recent outbreaks in the Cook County Jail in Chicago and at the Rikers Island Jail in New York are the highest transmission rates for COVID-19 in the world.[25] As of April 20, 2020, eight hundred New York City correctional employees had tested positive and eight had died. Including prisoners, there have been 10 deaths and more than 1,200 confirmed cases in New York City's jails.[26]

72.     In Arkansas, 38% of the positive COVID-19 cases in the state are concentrated in one prison, which has 850 confirmed cases.[27]

73.     As of April 26, 2020, at least 12,613 people in jails and prisons had tested positive for the illness.[28] The number of new cases among prisoners is more than doubling each week.

---

[24] *See* ACLU, *COVID-19 Model Finds Nearly 100,000 More Deaths Than Current Estimates, Due to Failures to Reduce Jails* (April 22, 2020), https://www.aclu.org/sites/default/files/field_document/aclu_covid19-jail-report_2020-8_1.pdf (epidemiological model indicating that, "as a result of the constant movement between jails and the broader community, our jails will act as vectors for the COVID-19 pandemic in our communities.").

[25] *See* Alleen Brown, *Inside Rikers: An Account of the Virus-Stricken Jail from a Man Who Managed to Get Out*, Intercept, April 21 2020, https://theintercept.com/2020/04/21/coronavirus-rikers-island-jail-nyc/; Timothy Williams & Danielle Ivory, *Chicago's Jail Is Top U.S. Hot Spot as Virus Spreads Behind Bars*, N.Y. Times, April 8, 2020, https://www.nytimes.com/2020/04/08/us/coronavirus-cook-county-jail-chicago.html.

[26] Deanna Paul & Ben Chapman, *Rikers Island Jail Guards Are Dying in One of the Worst Coronavirus Outbreaks*, Wall Street Journal, April 22, 2020, https://www.wsj.com/articles/rikers-island-jail-guards-are-dying-in-one-of-the-worst-coronavirus-outbreaks-11587547801

[27] *See* Zach Budryk, *38 percent of Arkansas COVID-19 cases concentrated in state prison*, The Hill, April 21, 2020, https://thehill.com/homenews/state-watch/493988-38-percent-of-arkansas-covid-19-cases-concentrated-in-states-prison

[28] Sharon Dolovich, "Covid-19 Jail/Prison Confirmed Cases & Deaths," *UCLA Covid-19 Behind Bars Data Project*, https://docs.google.com/spreadsheets/d/1X6uJkXXS-O6eePLxw2e4JeRtM41uPZ2eRcOA_HkPVTk/edit#gid=1197647409.

The "curve," which may be flattening due to social distancing in some localities, is not flattening in prison; to the contrary, the virus is soaring in prisons.[29]

74.     Sixteen prison systems—including the Federal Bureau of Prisons which has already experienced major outbreaks throughout its network—are not releasing information about how many prisoners they are testing.[30] Of the rest, only eight systems had tested more than 400 of the people in their custody by the week beginning April 20, 2020.[31]

75.     Therefore, the data of more than 12,000 people in prison and jails testing positive is most likely a significant undercount.

76.     In Ohio, mass testing of everyone at the Marion Correctional Institution revealed 1,828 confirmed cases among prisoners, which represents 73% of the population. One hundred and nine staff members at the facility were also positive.[32]

**IV.     COVID-19 Infection in the Prison Demographic Is Deadly**

77.     Many incarcerated individuals are at heightened risk of serious illness and death from COVID-19 because their demographic profile and histories make them part of a cohort that is especially vulnerable. People over the age of fifty face greater chances of serious illness or death from COVID-19. In a February 28, 2020, WHO-China Joint Mission Report, the preliminary mortality rate analyses showed that individuals age 60-69 had an overall 3.6% mortality rate and those 70-79 years old had an 8% mortality rate. For individuals 50-59, the

---

[29] *See* **Error! Main Document Only.**"Tracking the Spread of Coronavirus in Prisons" THE MARSHALL PROJECT, Apr. 24, 2020 3:05 pm, available at https://www.themarshallproject.org/2020/04/24/tracking-the-spread-of-coronavirus-in-prisons
[30] *Id.*
[31] *Id.*
[32] *See* Bill Chappell & Paige Pfleger, *73% Of Inmates At An Ohio Prison Test Positive For* Coronavirus, NPR, April 20, 2020, https://www.npr.org/sections/coronavirus-live-updates/2020/04/20/838943211/73-of-inmates-at-an-ohio-prison-test-positive-for-coronavirus

mortality rate was 1.3%. For individuals age 40-49, the mortality rate was 0.4%, and for individuals 40 years and younger, the mortality rate was 0.2%.[33]

78.    People of any age who suffer from certain underlying medical conditions, including lung disease, heart disease, chronic liver or kidney disease (including hepatitis and dialysis patients), diabetes, epilepsy, hypertension, compromised immune systems (such as from cancer, HIV, or autoimmune disease), blood disorders (including sickle cell disease), inherited metabolic disorders, stroke, developmental delay, and asthma, are at elevated risk as well.[34]

79.    The WHO-China Joint Mission Report provides that the mortality rate for those with cardiovascular disease was 13.2%, 9.2% for diabetes, 8.4% for hypertension, 8.0% for chronic respiratory disease, and 7.6% for cancer.[35]

80.    In many people, COVID-19 causes fever, cough, and shortness of breath. But for people over the age of fifty or with medical conditions that increase the risk of serious COVID-19 infection, shortness of breath can be severe.

81.    Most people in higher risk categories who develop serious illness will need advanced medical help and support. This level of supportive care requires highly specialized

---

[33] *Age, Sex, Existing Conditions of COVID-19 Cases and Deaths* Chart, https://www.worldometers.info/coronavirus/coronavirus-age-sex-demographics/ (data analysis based on WHO China Joint Mission Report); ICNARC Report on COVID-19 in Critical Care, at 19 (Apr. 17, 2020), available at https://www.icnarc.org/About/Latest-News/2020/04/04/Report-On-2249-Patients-Critically-Ill-With-Covid-19 (in study of 6,750 patients admitted to critical care, finding that majority of patients over 60 died in critical care).

[34] *Coronavirus disease (COVID-19) advice for the public: Myth buster*s, World Health Organization, https://www.who.int/emergencies/diseases/novel-coronavirus-2019/advice-for-public/myth-busters ("Older people, and people with pre-existing medical conditions (such as asthma, diabetes, heart disease) appear to be more vulnerable to becoming severely ill with the virus.").

[35] WHO-China Joint Report at 12, https://www.who.int/docs/default-source/coronaviruse/who-china-joint-mission-on-covid-19- final-report.pdf (finding fatality rates for patients with COVID-19 and co-morbid conditions to be: "13.2% for those with cardiovascular disease, 9.2% for diabetes, 8.4% for hypertension, 8.0% for chronic respiratory disease, and 7.6% for cancer").

equipment that is in limited supply, and an entire team of care providers, including 1:1 or 1:2

nurse to patient ratios, respiratory therapists, and intensive care physicians.[36]

82.     COVID-19 can severely damage lung tissue, which requires an extensive period

of rehabilitation, and in some cases, can cause a permanent loss of respiratory capacity. COVID-

19 may also target the heart muscle, causing a medical condition called myocarditis, or

inflammation of the heart muscle. Myocarditis can affect the heart muscle and electrical system,

reducing the heart's ability to pump. This reduction can lead to rapid or abnormal heart rhythms

in the short term, and long-term heart failure that limits exercise tolerance and the ability to

work.

83.     Emerging evidence also suggests that COVID-19 can trigger an over-response of

the immune system, further damaging tissues in a cytokine release syndrome that can result in

widespread damage to other organs, including permanent injury to the kidneys and neurologic

injury. These complications can manifest at an alarming pace. Patients can show the first

symptoms of infection in as little as two days after exposure, and their condition can seriously

deteriorate in as little as five days or sooner.

84.     Even some younger and healthier people who contract COVID-19 are susceptible

to severe strokes and may require supportive care, which includes supplemental oxygen, positive

pressure ventilation, and in extreme cases, extracorporeal mechanical oxygenation.[37]

---

[36]  Kevin McCoy and Katie Wedell, '*On-the-job emergency training': Hospitals may run low on staff to run ventilators for coronavirus patients*, USA TODAY (Mar. 27, 2020), available at https://bit.ly/2V7rLsS.

[37] *See Young and middle-aged people, barely sick with covid-19, are dying of strokes,* WASH POST. (Apr. 25, 2020 at 2:12 pm), available at https://www.washingtonpost.com/health/2020/04/24/strokes-coronavirus-young-patients/; *see also* Covid-19 causes sudden strokes in young adults, doctors say, CNN (Apr. 23, 2020 at 7:41 am), available at https://www.cnn.com/2020/04/22/health/strokes-coronavirus-young-adults/index.html.

85.     The need for care, including intensive care, and the likelihood of death, is much
higher from COVID-19 infection than from influenza. According to recent estimates, the fatality
rate of people infected with COVID-19 is about ten times higher than a severe seasonal
influenza, even in advanced countries with highly effective health care systems.[38] For people in
the highest risk populations, the fatality rate of COVID-19 infection is about 15 percent.

86.     Most people in high-risk categories who develop serious illness require advanced
medical support, including specialized equipment, such as ventilators, and large teams of highly
trained care providers, such as ICU doctors, nurses, and respiratory therapists. [Meyer Decl. ¶
22]. The artificial ventilation process is itself invasive and dangerous, and some patients must be
placed in medically induced comas for such treatment.

87.     Given the need for advanced and urgent intervention, often in an ICU
environment, people with severe cases of COVID-19 cannot be shackled or otherwise restrained,
nor can they be subjected to constant, close supervision by correctional staff, as they would be in
a typical correctional setting.

88.     FCI Danbury is not equipped to provide advanced support in an ICU setting with
ventilators, certainly not for a substantial group of seriously ill prisoners who may require such
specialized care.

89.     Patients who do not die from serious cases of COVID-19 may face prolonged
recovery periods, including extensive rehabilitation from neurologic damage, amputation due to

---

[38] Betsy McKay, *Coronavirus vs. Flu Which Virus is Deadlier*, WALL ST. J. (Mar. 10, 2020,
12:49 PM) https://www.wsj.com/articles/coronavirus-vs-flu-which-virus-is-deadlier-11583856879; World
Health Organization, Q&A: Similarities and differences – COVID-19 and influenza (Mar. 17, 2020),
available at https://www.who.int/news-room/q-a-detail/q-a-similarities-and-differences-covid-19-and-
influenza#:~:text=Mortality%20for%20COVID%2D19,quality%20of%20health%20care   (COVID-19
crude mortality ratio is between 3-4%; for seasonal influenza mortality is usually well below 0.1%);

clotting and reduced blood flow, loss of respiratory capacity, and tissue damage in other vital organs, including the heart and liver.[39]

90.　　In sum, to buffer against the outbreak of a highly infectious, deadly virus in a closed detention setting requires urgent and decisive action to protect the health of those confined in the prison, those who work there, and the medical professionals who will treat those who become infected.

## V.　Spread of Disease in BOP Facilities Requires De-Densifying and Providing Social Distancing for Those Who Remain

91.　　Available statistics reveal a public health disaster erupting across BOP facilities that worsens with each passing day.

92.　　From March 20 to April 25, confirmed COVID-19 cases among BOP prisoners and staff rose from 2 to 1047 across 42 facilities nationwide.

93.　　Severe outbreaks at FCI Oakdale in Louisiana, FCI Elkton in Ohio, and FCI Butner in North Carolina, already have resulted in dozens of confirmed COVID-19 infections among prisoners and staff, many more suspected but unconfirmed cases, and 22 prisoner deaths throughout the system.[40]

_____

[39] Centers for Disease Control and Prevention, *Interim Clinical Guidance for Management of Patients with Confirmed Coronavirus Disease (COVID-19)*, https://cutt.ly/etRPVRl; Melissa Healy, *Coronavirus infection may cause lasting damage throughout the body, doctors fear*, LA TIMES (Apr. 10, 2020), available at https://cutt.ly/htNrJ77; see also Di Wu et al., *Plasma Metabolomic and Lipidomic Alterations Associated with COVID-19*, MEDRXIV 2020.04.05.20053819 (2020); Declaration of Dr. Jonathan Golob, *Dawson v. Asher*, No. 2:20-cv-00409-JLR-MAT at ¶ 4 (W.D. Wash., Mar. 16, 2020), available at https://cutt.ly/AtNrFOl.

[40] Current information about the census of COVID-19 positive prisoners and staff in the Bureau of Prisons system is maintained on a COVID-19 resource page on the Federal Bureau of Prisons website available at https://www.bop.gov/coronavirus.  Historical statistics have been compiled and updated daily by the Federal Defenders of New York, Inc. and are available at https://federaldefendersny.org/.

94.     That surge of COVID-19 cases inside the federal prison system has dwarfed the national percentage increase in confirmed cases over the same time period.[41]

95.     According to CDC guidelines, only two measures are known to be effective in reducing the spread of this disease: (1) diligent "social or physical distancing," which involves keeping at least six feet of space between people to avoid transmission of the virus, and (2) vigilant hygiene practices, including frequently washing hands and regularly disinfecting surfaces. Physical distancing is a necessary predicate for hygiene practices to have any meaningful impact.[42]

96.     Because asymptomatic or pre-symptomatic people can transmit the virus to others, it is critical to follow CDC guidelines, including social distancing, even among people who show no signs of COVID-19 and appear to be healthy.

97.     The only effective way to minimize the potential devastation from COVID-19 in BOP facilities generally and at FCI Danbury in particular is to downsize immediately the incarcerated population and, for the prisoners who remain at the institution, to undertake aggressively the detection, prevention, and treatment measures that public health and medical experts have recommended, including effective social distancing.

98.     These measures are not possible in prisons, like FCI Danbury, without substantial reductions in the prisoner population.

99.     What some officials call "modified lockdowns" are not what self-quarantining and social distancing entails. Prisoners and staff interact in many ways, and when facilities have

---

[41] Comparisons of the respective increases in confirmed cases of COVID-19 over the last several weeks in the general and prison populations have likewise been compiled by the Federal Defenders of New York, Inc. and are available at https://federaldefendersny.org/.

[42] https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/social-distancing.html

34

dorm-like arrangements, prisoners sleep, eat, congregate, recreate, and receive medical treatment in close proximity.

100.    Implementation of necessary hygiene practices is also impossible, particularly when adequate supplies of free soap, sanitizers, disinfectants, and paper towels are not readily available in prisons. [Meyer Decl. ¶¶ 9, 11, 39].

101.    Correctional public health experts have recommended the release from custody of people most vulnerable to COVID-19 so as to protect them and permit risk mitigation for all people held or working in facilities. Release of the most vulnerable people from custody also reduces the burden on the region's health care infrastructure by reducing the likelihood that an overwhelming number of people will become seriously ill from COVID-19 at the same time.

102.    Calling for immediate and extensive "efforts to decarcerate" to protect both prisoners and the general public, the *New England Journal of Medicine* explained:

> The boundaries between communities and correctional institutions are porous, as are the borders between countries in the age of mass human travel. Despite security at nearly every nation's border, Covid-19 has appeared in practically all countries. We can't expect to find sturdier barriers between correctional institutions and their surrounding communities in any affected country. . . .To promote public health, we believe that efforts to decarcerate, which are already under way in some jurisdictions, need to be scaled up; and associated reductions of incarcerated populations should be sustained. The interrelation of correctional-system health and public health is a reality not only in the United States but around the world.[43]

---

[43]  Matthew J. Akiyama, M.D., Anne C. Spaulding, M.D., and Josiah D. Rich, M.D., *Flattening the Curve for Incarcerated Populations — Covid-19 in Jails and Prisons*, NEW ENGLAND JOURNAL OF MEDICINE (Apr. 9, 2020), available at https://www.nejm.org/doi/pdf/10.1056/NEJMp2005687?articleTools=true.

103.     Consistent with these public health recommendations, many jurisdictions have already taken steps to protect those in custody from the impending spread of COVID-19 by releasing people in an effort to reduce populations.[44]

104.     In New York City, public officials, the jail oversight board, and doctors working at Rikers Island have acknowledged that the City's jails are unsafe and that releasing people is the medically appropriate and humane option.[45] *See* Statement of New York City Board of Correction, March 17, 2020 (calling on the City to release people from criminal custody, prioritizing people over 50, those with underlying health conditions, detained for administrative reasons, and those who have been convicted and sentenced to one year or less).[46]

---

[44] For example, in Washington, the governor has, as of April 23, commuted almost 300 sentences, and more than 40 people have received work release furloughs; Kentucky's governor signed an executive order on April 2, 2020, commuting the sentences of 186 people convicted of felonies, and the state plans to release 743 others who are within 6 months of completing their sentences; the governor of Oklahoma has commuted the sentences of more than 450 people; the number of people being paroled from state prisons in Michigan has reportedly increased by about 1,000 people per month to reduce prison density during the pandemic; and the California Department of Corrections and Rehabilitation announced on March 31 that it would expedite the transition to parole for 3,500 nonviolent offenders with 60 days or less left on their sentences.  *See Responses to the COVID-19 pandemic*, Prison Policy Initiative (Apr. 24, 2020), https://www.prisonpolicy.org/virus/virusresponse.html. Numerous cities and counties have also taken steps to reduce jail populations, including: from March 18 to April 15, 2020, the Washington, D.C., jail population decreased by more than 21%; the San Mateo County Sheriff's Office in California has released 382 people from their two county jails, including those who are 65 and older; after an April 3, 2020, ruling from the Massachusetts Supreme Judicial Court, almost 300 people were released from jails across the state.  *Id*.

[45] *See* Ross MacDonald (@RossMacDonaldMD), Twitter (March 18, 9:51 p.m.) https://twitter.com/RossMacDonaldMD/status/1240455796946800641 (Dr. MacDonald is the Chief Medical Officer for Correctional Health Services ("CHS"), which provides healthcare to New York City's Department of Corrections); Rachel Bedard, (@rachelbedard), Twitter (March 18, 8:34 a.m.) https://twitter.com/rachelbedard/status/1240255196644741120 (Dr. Bedard is the Director of Geriatrics and Complex Care for CHS); Jonathan Giftos (@JonGiftosMD), Twitter (March 18, 10:37 p.m.) https://twitter.com/JonGiftosMD/status/1240467288198873088 (until January 2020, Dr. Giftos was the ClinicalDirector of Substance Use Treatment for CHS).

[46] *New York City Board of Correction Calls for the City to Begin Releasing People from Jail as Part of Public Health Response to COVID-19* (Mar. 17, 2020), https://www.nysenate.gov/newsroom/in-the-news/julia-salazar/nyc-board-correction-calls-city-begin-releasing-people-jail

105.     On March 20, 2020, Dr. Robert Cohen, a member of New York City's Board of Correction, said, "The most important thing we can do right now is discharge all of the people who are old and have serious medical issues — those people are likely to die from a coronavirus infection."[47]

106.     Several doctors working in New York City's jails have echoed the calls to release vulnerable people. Dr. Rachael Bedard, senior director of the geriatrics and complex care service at Rikers Island, has described depopulation as "[t] he only meaningful public health intervention."[48] In correctional facilities, "if you think about how many excess human contacts [there are], even compared to something like a shelter setting, you can imagine why viral spread in this environment is extra dangerous."

107.     Ross McDonald, the Chief Medical Officer for Correctional Health Services, which provides healthcare to New York City's Department of Corrections, said Rikers was a "public health disaster unfolding before our eyes." He stressed: "This is not a generational public health crisis, rather it is a crisis of a magnitude no generation living today has ever seen." He also warned that it was "unlikely" they will be able to stop the growth in the jail, and predicted that 20% of those infected would need hospital treatment and 5% would need ventilators. He called for the release of "as many vulnerable people as possible"[49]

---

[47] Jen Ransom and Alan Feuer, *'A Storm Is Coming': Fears of a Prisoner Epidemic as the Virus Spreads in the Jails*, N.Y. Times (March 20, 2020), https://www.nytimes.com/2020/03/20/nyregion/nyc-coronavirus-rikers-island.html

[48] Jennifer Gonnerman, *A Rikers Island Doctor Speaks Out to Save Her Elderly Patients From the Coronavirus*, New Yorker (Mar. 20, 2020), https://www.newyorker.com/news/news-desk/a-rikers-island-doctor-speaks-out-tosave-her-elderly-patients-from-the-coronavirus.

[49] Miranda Bryant, Coronavirus spread at Rikers is a 'public health disaster', says jail's top doctor, THE GUARDIAN (Apr. 1, 2020 10:36 am), Available at https://www.theguardian.com/us-news/2020/apr/01/rikers-island-jail-coronavirus-public-health-disaster

108.     Members of Congress have, likewise, recognized the urgency of reducing prison populations as a means of achieving social distancing in those institutions. On March 23, 2020, a bipartisan group of fourteen U.S. Senators sent a letter to U.S. Attorney General Barr and BOP Director Carvajal to express their "serious concern for the health and wellbeing of federal prison staff and prisoners . . . especially those who are most vulnerable to infection." The Senators wrote that they reviewed the BOP's COVID-19 Action Plan and noted that it did not include any measures to protect the most vulnerable staff and prisoners. The Senators urged DOJ and BOP to release to home confinement certain individuals who were elderly, ill, or incarcerated for non-violent offenses and are near release.

109.     Senator Dick Durbin of Illinois, founding Chairman and current member of the Senate Judiciary Committee's Subcommittee on Human Rights and the Law (subsequently renamed the Subcommittee on Constitution, Civil Rights, and Human Rights) and current ranking member on the Subcommittee on Immigration has called on the federal government to take action to protect staff and people detained in federal prisons. "Federal prisons will inevitably be a hotspot for the spread of coronavirus, especially among vulnerable staff and prisoners," Durbin said. "It is imperative for BOP to take immediate action to protect staff and prisoners at federal prisons throughout the country and ensure that facilities are prepared to address this threat."[50]

---

[50] *Durbin Discusses Coronavirus Threat At Federal Prisons With Council Of Prison Locals*, Dick Durbin United States Senator Illinois (Mar. 24, 2020), https://www.durbin.senate.gov/newsroom/press-releases/durbin-discussescoronavirus-threat-at-federal-prisons-with-council-of-prison-locals; Letter, https://www.durbin.senate.gov/imo/media/doc/Letter.%20to%20DOJ%20and%20BOP%20on%20COVID-19%20and%20FSA%20provisions%20-%20final%20bipartisan%20text%20with%20signature%20blocks.pdf

110.    On March 27, 2020, Congress enacted the Coronavirus Aid, Relief, and Economic Security Act (CARES Act, P.L. 116-136), which authorizes the BOP Director to lengthen the maximum amount of time for which a prisoner may be placed on home confinement "as the Director determines appropriate" when the Attorney General "finds that emergency conditions will materially affect the functioning" of BOP.

111.    The authority is limited to "the covered emergency period," which is defined as the period spanning from the President's declaration of a national emergency with respect to COVID-19 to the date that is 30 days after the date on which the declaration terminates.

112.    The United States Department of Justice has also called for urgent action to reduce prison populations in the BOP to achieve necessary social distancing. On March 26, 2020, Attorney General William Barr sent a memo to the Director of BOP "directing [him] to prioritize the use of [his] various statutory authorities to grant home confinement for prisoners seeking transfer in connection with the COVID-19 pandemic" because "for some eligible prisoners, home confinement might be more effective in protecting their health."[51]

113.    The Attorney General specifically recognized that "there are some at-risk prisoners who are non-violent and pose minimal likelihood of recidivism and who might be safer serving their sentences in home confinement rather than BOP facilities."[52]

114.    Attorney General Barr further identified "[t]he age and vulnerability of the prisoner to COVID-19, in accordance with the Centers for Disease Control and Prevention (CDC) guidelines," and "the security level of the facility," with "priority given" to prisoners

---

[51]  Memo from Attorney General to Director of Bureau of Prisons, March 26, 2020, https://www.bop.gov/coronavirus/docs/bop_memo_home_confinement.pdf

[52]  *Id.*

incarcerated "in low and medium security facilities," as two of the critical, discretionary factors for consideration.  *Id*.

115.    In an April 3, 2020, memorandum to Respondent Carvajal, following the dramatic increases in confirmed COVID-19 cases at FCI Danbury and two other BOP facilities (FCI Oakdale in Louisiana, and FCI Elkton in Ohio), Attorney General Barr affirmed the BOP's "profound obligation to protect the health and safety of all inmates."[53]

116.    Attorney General Barr stated: "As you know, we are experiencing significant levels of infection at several of our facilities, including FCI Oakdale, FCI Danbury, and FCI Elkton. We have to move with dispatch in using home confinement, where appropriate, to move vulnerable inmates out of these institutions. I would like you to give priority to these institutions, and others similarly affected, as you continue to process the remaining inmates who are eligible for home confinement under pre-CARES Act standards. In addition, the CARES Act now authorizes me to expand the cohort of inmates who can be considered for home release upon my finding that emergency conditions are materially affecting the functioning of the Bureau of Prisons. I hereby make that finding and direct that, as detailed below, you give priority in implementing these new standards to the most vulnerable inmates at the most affected facilities, consistent with the guidance below."

117.    Attorney General Barr further recognized that, despite "extensive precautions to prevent COVID-19 from entering [BOP] facilities and infecting our prisoners," those measures "have not been perfectly effective." Accordingly, he ordered the BOP to take more aggressive

---

[53]  Memo from Attorney General to Director of Bureau of Prisons, April 3, 2020,
https://www.bop.gov/coronavirus/docs/bop_memo_home_confinement_april3.pdf

steps, immediately, to transfer prisoners to home confinement, even if electronic monitoring will not be available.

118. Echoing the warnings of public health experts, Attorney General Barr stated: "Given the speed with which this disease has spread through the general public, it is clear that time is of the essence." *Id*.

## VI. Respondents Have Failed to Proceed as Promptly as Required in this Crisis to De-Densify and to Implement the Necessary Social Distancing at BOP Facilities and at FCI Danbury in Particular

119. Notwithstanding Attorney General Barr's statements, the recommendations of public health officials and the efforts of multiple state jurisdictions to decarcerate their prison populations, Respondents have failed to use the BOP's available statutory authority to reduce the population of FCI Danbury to mitigate the severe risk posed by COVID-19. Instead, the facility has reversed course, refusing to follow through with transfers to home confinement for individuals previously identified for such home confinement based on their medical vulnerability, and failing to timely respond to requests for emergency compassionate relief or to take other measures appropriate for a public health crisis.

120. According to the BOP's website, from March 26 (the date of Attorney General Barr's first memo) through April 25, the agency placed 1576 prisoners nationwide into home confinement—which would constitute only 0.9 percent of the approximately 171,000 prisoners currently held in BOP custody. However, the real number of those released to home confinement may well be less. As the Wall Street Journal reported on April 23: "The bureau said it has started placing at least 1,440 of the roughly 175,000 prisoners it holds into home confinement, but didn't say how many of those people have actually been released." Sadie

41

Gurman & Rebecca Davis O'Brien, *Confusion Hampers Coronavirus-Driven Inmate Releases*, Wall Street Journal, April 23, 2020;[54] *see also* Joseph Neff & Keri Blakinger, *Few Federal Prisoners Released Under COVID-19 Emergency Policies: A Federal Judge Called the Bureau of Prisons Release Process "Kafkaesque"*, The Marshall Project, Apr. 25, 2020 (only 1,027 more prisoners allowed to serve the rest of their sentence in home confinement since Attorney General Barr's April 3 urgent memo, "about half of 1 percent of the more than 174,000 people in the bureau's custody").[55]

121. The BOP has not disclosed the number of prisoners it typically released per day prior to Attorney General Barr's memos, nor has it disclosed how many new prisoners have entered BOP custody during the same time period. In short, data from the BOP demonstrate that it is not releasing enough prisoners to protect federal prisons from COVID-19.

122. Indeed, despite concerns by government officials and public health experts, the BOP continues to transfer people from facility to facility. Those transfers increase the likelihood that the virus will be transmitted within the incarcerated population.[56]

123. On information and belief, the first person at FCI Danbury (then housed in the M Unit of the men's prison) tested positive for COVID-19 on or about March 28, 2020. [Almonte Decl. ¶ 12].

---

[54] Available at https://www.wsj.com/articles/justice-department-clarifies-coronavirus-driven-inmate-releases-11587594242.

[55] Available at https://www.themarshallproject.org/2020/04/25/few-federal-prisoners-released-under-covid-19-emergency-policies.

[56] Luke Barr, *Despite Coronavirus Warnings, Federal Bureau of Prisons Still Transferring Prisoners: Sources*, ABC News (Mar. 23, 2020, 1:22PM), https://abcnews.go.com/Health/warnings-bureau-prisons-transporting-inmates-sources/story?id=69747416

124.    Prior to testing positive for COVID-19, the individual was in contact with many prisoners and staff, necessitating a proper public health response to contain the infection, including the immediate introduction of social distancing and enhanced hygiene measures.

125.    However, as set forth above, the very configuration of the confined prison space with sleeping quarters and all ancillary facilities in close physical proximity and multiple prisoners in the same physical space and requiring simultaneous access to the limited available resources, precludes the requisite social distancing without dramatic de-densification.  Under existing conditions, neither class members nor staff in any of the three units at FCI Danbury can stay at least six feet away from other people and, therefore, engage in effective social distancing, as called for by the CDC.

126.    Moreover, FCI Danbury has failed to take appropriate action as set forth in the relevant CDC Guidance in response to those tests confirming the existence of the virus within its population but rather, persisted in practices and policies which are contrary to social distancing directives and are inconsistent with the needs for enhanced hygiene.

127.    Respondents' failures to adopt and implement adequate policies and procedures to prevent and mitigate the spread of COVID-19 fall into several broad categories which are discussed below.

### A.    Failures to Triage Cases, Diagnose and Isolate Disease

128.    If an incarcerated person exhibits symptoms of COVID-19, the CDC Guidance calls for the individual to be immediately given a face mask, paced in isolation, provided a medical evaluation and treatment, and evaluated for possible testing.  By contrast, FCI Danbury has deliberately not sought out potential cases of coronavirus and has not implemented the

43

measures called for by the CDC Guidance. By failing meaningfully to isolate prisoners and staff who are positive for coronavirus, or who exhibit symptoms highly indicative of coronavirus and present a substantial risk of infecting other prisoners and staff in the unit, the Respondents have been deliberately indifferent to the known serious medical needs of the Petitioner class.

129.    Since the lockdown began, sick call triage in the men's facility is conducted by a social worker without medical training, and who is openly contemptuous of the men's needs. [Cassidy Decl. ¶ 18][57]

130.    At men's and women's facilities, prisoners who present for sick call who do not exhibit fever are denied access to any further medical follow-up. [*Id.*; Korbe Decl. ¶¶ 4-6, Hoisington Decl. ¶ 6].

131.    Prisoners who complain to staff of symptoms consistent with COVID-19— including coughing, congestion and shortness of breath—are routinely unable to obtain immediate medical examination, are not tested for COVID-19, and are returned to the general population until their symptoms worsen. [Hoisington Decl. ¶¶ 5-7, 14-15; Korbe Decl. ¶¶ 7, 12; Mason Decl. ¶ 19; Almonte Decl. ¶ 20].[58]

---

[57]   As Mr. Cassidy states:
> The social worker, Ms. Adamson, has told us "you are all fucking children with nothing more than a flu so stop your shit you're not going home early." She has said, "if you did the crime stop crying and do the time." She has said, "I don't need medical training to tell you you're not sick so go lay the fuck down." [Cassidy Decl. ¶ 18].

[58]   As Ms. Hoisington – who was subsequently hospitalized with confirmed COVID-19 infection and a temperature of 102 degrees on admission [Hoisington Decl. ¶ 5, 8] – recounts:
> I had been feeling sick for a couple weeks before I went to the hospital. I had put in a request to see medical, and had been given two different "idles" to miss programs because I was sick. On March 26 I reported to staff that I wasn't feeling well ... I went to the medical clinic, but after waiting there for 45 minutes without being seen, I returned to my bunk. A few hours later, I reported to staff on duty that I was feeling worse. I was told to lie back down. By early in the morning of March 27th, around 1 or 2am, I had such bad chest pain that I could

132.    FCI Danbury has further willfully refused to take temperatures or test for fever in order to avoid identifying cases of possible COVID infection.  [Almonte Decl. ¶ 15]

133.    When prisoners have presented with likely fever, Respondents have on occasion falsely discounted the readings of elevated temperatures in order to avoid taking appropriate follow-up action, including, in particular, isolating the prisoner from the general population and testing to confirm a coronavirus diagnosis.

134.    Methods employed by respondents to avoid appropriate follow-up in cases of likely fever include, (1) falsely attributing the reading to equipment error; (2) falsely attributing the reading to operator error; (3) falsely recording identical temperatures for every person tested on a given unit; (4) "resetting" the thermometer while pretending to take another reading; and (5) taking repeat temperature readings after first requiring the prisoner to drink a glass of ice water. [Cassidy Decl. ¶ 14; Mason Decl. ¶¶ 20, 21 (recorded temperatures are artificially low at between 96-97°F because temperature is taken with a remote scanner that is placed too remote from the body; prisoners made to drink cold water after registering elevated temperatures); Korbe Decl. ¶ 5; *see also* Hoisington Decl. ¶ 8 (reporting that she was transported to the hospital on an emergency basis after persistent symptoms consistent with COVID-19 and that she had a temperature of 102°F on admission after having been told by FCI Danbury staff that a

---

not sleep. I told the officer on duty, who called the command center, and then called an ambulance. [Id. ¶ 5-7]

Similarly, Ms. Korbe – who has been complaining of a headache, cough and lost sense of smell for over a week, has not been screened for COVID-19 and has been maintained in general population throughout. [Korbe Decl. ¶ 4]. Indeed, Ms. Korbe's cough was so extreme that one of the psychologist upon hearing the cough told Ms. Korbe that she should be tested because she could be infecting others. Notwithstanding that Ms. Korbe asked the one of the psychologists to assist her to obtain appropriate testing, she has not, to date, been tested for COVID-19. [*Id. ¶* 6].

temperature taken within an hour prior to her leaving in the ambulance had purportedly

registered a reading of 97°F)].[59]

135.    Even where prisoners have presented with *confirmed* fever, respondents have

failed to isolate the prisoner from the general population. Rather, in many instances, respondents

have returned the prisoner to his or her unit with instruction to take two to three Tylenol and will

only proceed to isolate the prisoner if his or her fever does not respond after that time. [Cassidy

Decl. ¶ 12; Mason Decl. ¶ 20].

136.    When temperatures are taken, they are often not being recorded in the medical

records.  [Mason Decl. ¶ 21].

137.    Prison staff have further denigrated or dismissed prisoners exhibiting clear

symptoms of coronavirus, telling prisoners with headache, body ache, shortness of breath or even

---

[59]  As Ms. Hoisington states, on April 17, after previously having tested positive for COVID-19,
she started to get symptoms again, including weakness, fever, terrible body pains, sweating and dry
heaving.  She was taken to the medical clinic where her temperature was recorded at 98 degrees (which
she believed to be incorrect but which was not re-taken despite her presenting symptoms).
Notwithstanding that her oxygenation only registered at 96 and her blood pressure was so high that the
nurse took it three times, the nurse instructed her to take Tylenol and return to her unit. [Hoisington Decl.
¶ 15].
        As Mr. Cassidy recounts:  "For the last couple weeks, prisoners with a fever are taken to medical.
Sometimes, however, a prisoner has a fever and the associate warden attributes the temperature reading to
equipment error.  When the temperature wand comes up with a low-grade fever, the associate warden will
'reset' it and pretend to take another reading.  He will announce another number, but he won't even aim
the wand at the prisoner's forehead.  The associate warden does not show the prisoners the LCD screen
on the wand that displays the temperature, so we have to go by whatever they tell us. … If the associate
warden acknowledges that a prisoner has a temperature, then he will escort the prisoner to medical.  At
medical, the prisoner is given two or three Tylenol and told that the device is not working properly and
that they do not have a fever.  This has happened to more than 20 prisoners in my unit.  One of the
prisoners has been vomiting blood all week.  When his temperature was taken in the unit, he was told he
has a 101.2 degree fever.  When he got to medical, he was given Tylenol, told that his temperature is 98.7
degrees, and sent back to the unit.  When he got back to the unit, he told us that they never took his
temperature in medical.  His forehead was hot.  [Cassidy Decl. ¶¶ 13-14].
        According to Ms. Korbe, staff members have been taking all of the inmates' temperatures every
day:  "They have us line up in rows to do this.  I have noticed that everyone in the same row is told that
they have the exact same temperature."  [Korbe Decl. ¶ 14].

chest pains that there is nothing that they can do, that the prisoner merely suffers from

"overblown flu," that the prisoner "did the crime" and should "do the time," and/or that the

coronavirus epidemic is not "going to get you out of prison." [Cassidy Decl. ¶¶ 9, 18; Korbe

Decl. ¶ 16 (staff criticized prisoners' concern about medical emergency in FSL, telling women to

"stay in our lane" because they weren't doctors)].

138.    Respondents' failure to de-densify the population at FCI Danbury and their

inadequate manner of responding to suspected COVID-19 cases places the putative class at an

unreasonable risk of contracting COVID-19.

**B.    Failure to Respond Adequately to Cases of Close Contact or Observe Appropriate Quarantine/Isolation**

139.    CDC Guidance directs prisons to implement 14-day quarantines/isolation of

prisoners or staff who have had contact with people known to have tested positive for COVID-

19, to monitor such Close Contact Cases for COVID-19 symptoms, and to keep staff members

out of the facility unless they are asymptomatic 14 days after their exposure to COVID-19.

Contrary to this Guidance, Respondents routinely fail to test or isolate prisoners with known

close contact with individuals subsequently diagnosed with coronavirus. [Cassidy Decl. ¶¶ 31,

41; Hoisington Decl. ¶¶ 14, 17 (recounting failure to test prisoners in close contact with prisoner

hospitalized with COVID-19 infection)].

140.    Prisoners who test positive for COVID-19 are frequently returned to the general

population far earlier than appropriate pursuant to CDC Guidance.[60] [Declaration of Tamika

Somerville, submitted herewith as Exhibit I ("Sommerville Decl.") ¶ 13 (women testing positive

---

for COVID-19 on Tuesday returned to the unit that same Friday); Madore Decl. ¶ 12; Cassidy
Decl. ¶ 15 (reporting that two individuals returned to the unit within 5-6 days after testing
positive for COVID-19, resulting in a substantial outbreak on the unit); Almonte Decl. ¶ 17;
Mason Decl. ¶ 18].

141.    Due to staff shortages, prisoners are often required to respond to a medical
emergency such as another prisoner collapsing on the unit. Notwithstanding that the collapse of a
grown man in the context of a pervasive outbreak is highly suggestive of a COVID-19 infection,
prisoners who respond in this fashion are not thereafter followed for possible infection or
otherwise isolated from the rest of the population.  [Cassidy Decl. ¶ 31; Hoisington Decl. ¶ 13
(women had to bang front door to facility to get attention of someone in parking lot when there
was no available officer to attend to women who was unconscious after hitting her head on
concrete floor)].[61]

142.    Contrary to CDC Guidance, prison staff, including those working in food
services, have not been allowed to call in and explain that they are sick or have returned to work
at times when medical professionals advised that they were still potential carriers. [Martinez-
Brooks Decl. ¶ 20; Mason Decl. ¶ 15 ("Officers have returned to work after being unable to get
their FMLA papers signed, but remain symptomatic. One officer stated that they still feel ill and
do not want to be at work, but were told to return.")].

143.    Working correctional officers who are sick or who were previously diagnosed as
positive for COVID-19 have advised prisoners to keep their distance since they do not know

---

[60] As set forth in the Declaration of Tamika Somerville, who is housed in the FSL, a woman in
her unit who tested positive for COVID-19 on a Tuesday was returned to the general population on
Friday, three days later. [Somerville Decl., ¶ 13].
[61] Mr. Cassidy has observed at least three prisoner medical emergencies that were addressed only

whether they are sufficiently recovered to no longer present a risk of infection to people with
whom they come in contact. [Mason Decl. ¶ 15].

144.    FCI Danbury has failed to observe appropriate isolation for new prisoners, and
prisoners have been permitted into the facility without observance of proper quarantine pursuant
to CDC Guidance.  [Martinez-Brooks Decl. ¶ 12].

145.    Respondents' failure to implement appropriate isolation procedures is reckless
and places the putative class at an unreasonable risk of contracting COVID-19.

### C.    Failure to Remediate Adequately Spaces with Known Coronavirus Contact and to Inform Prisoners of the Extent of Infection

146.    In the event a prisoner or staff member tests positive for COVID-19, CDC
Guidance calls for the facility to close off the areas used by that person.  These areas are to be
well ventilated for at least 24 hours before they are disinfected by people equipped with proper
personal protective equipment ("PPE").  Respondents have failed to implement any of these
measures.

147.    In addition, FCI Danbury has departed from CDC Guidance by not informing
incarcerated prisoners that someone in their unit has tested positive for COVID-19, thereby
depriving petitioners and the class members of the opportunity to exercise more vigilance in their
hygiene and cleaning habits when extra vigilance is needed most. Petitioners and the putative
class members have not been informed of the extent of the outbreak at FCI Danbury. [Mason
Decl. ¶ 16 (FSL prisoners learned about COVID-19 outbreak in the facility because it was
reported on the news)]; Declaration of Theresa Foreman, submitted herewith as Exhibit J

---

by other prisoners.

("Foreman Decl.") ¶ 19 (the Assistant Warden informed the women that they wouldn't be told if they were exposed to COVID-19)].

148.    Respondents know that these failures to adequately remediate spaces with known coronavirus contact or to advise petitioners and the putative class members of the extent of the outbreak at the facility unnecessarily heightens the risk that petitioners and the putative class members will contract COVID-19.

### D.    Failure to Implement Adequately Social Distancing Measures

149.    As set forth above, the very configuration of FCI Danbury precludes meaningful social distancing. The overwhelming majority of the facility's prisoners in each of the three facilities are housed dormitory-style and all prisoners in these configurations sleep within 3 to 4 feet of between 3 and 5 other prisoners. [Mason Decl. ¶ 7; Martinez-Brooks Decl. ¶ 7; Cassidy Decl. ¶ 31; Declaration of Ronald Harper, submitted herewith as Exhibit N (Harper Decl.) ¶ 4]. Prisoners use the same bathrooms and share a limited number of toilets, sinks and showers. [Mason Decl. ¶ 10; Martinez-Brooks Decl. ¶¶ 6, 10; Cassidy Decl. ¶ 32; Harper Decl. ¶ 4]. Prisoners further must share a limited number of telephones and computers which are located close together in a common area [Mason Decl. ¶ 8; Martinez-Brooks Decl. ¶ 9; Cassidy Decl. ¶¶ 35-36] and which are rarely cleaned or disinfected (and are not disinfected after each use). [Korbe Decl. ¶ 11; Cassidy Decl. ¶¶ 35-36].

150.    FCI Danbury has failed to implement adequate social distancing measures in other aspects of prison life.  For example, prisoners are regularly unnecessarily made to line up in close proximity to one another to receive their meals and when medications are dispensed. [Almonte Decl. ¶ 13; Cassidy Decl. ¶ 39 ("Staff give out medication twice a day. They shout

'medication' and stand outside the door. Prisoners form a pill line, standing right next to each other. If you don't hear 'medication' you don't get your medication for the day, so everyone comes up at the same time and crowds each other.")].

151.    Prisoners likewise mass together for commissary which, in the dorms in the men's units, is brought into the central dormitory hallway in a laundry bin. The men on the dorm then stand in the narrow hallway in close proximity to one another while waiting for their names to be called. [Cassidy Decl. ¶ 37].

152.    Prisoners further congregate in close proximity in unacceptably large numbers in recreation areas and in common areas to watch television, to use the telephones and computers, and for meals. [Declaration of Antrum Coston, submitted herewith as Exhibit K ("Coston Decl.") ¶ 4; Almonte Decl. ¶ 8; Mason Decl. ¶¶ 8-9].

153.    Staff move regularly between units, in contravention of proper social distancing practices, thereby exacerbating the spread of undiagnosed disease from one part of the facility to another. [Martinez-Brooks Decl. ¶ 19 (staff move between all four dorms in the camp for count, food delivery and commissary and staff at camp also work at the other two facilities at FCI Danbury)].

154.    Respondents have inappropriately moved prisoners from rooms where greater separation was possible into dorms in the women's camp, pushing the populations of A, B and C dorms to almost full capacity, thereby dramatically reducing the ability of occupants of those dorms to practice any form of social distancing. [Martinez-Brooks Decl. ¶ 5]. Despite the lockdown at the camp, women from one dorm out for recreation have been visiting friends in other dorms. [*Id.* ¶ 15].

51

155.     Respondents have further isolated prisoners nearing the end of their sentences and preparing for halfway house or other release, but subsequently rendered such isolation ineffective by moving other prisoners with unknown COVID-19 exposures onto those previously isolated units. [Martinez-Brooks Decl. ¶ 13].

156.     Respondents further initially isolated medically-vulnerable prisoners who were notified that they were going to be transferred to home confinement but, after reversing policy and putting such transfers on hold, have rendered those isolations ineffective—and have put medically-vulnerable prisoners at undue risk—by moving other prisoners with unknown COVID-19 exposures onto those previously isolated units. [*Id.*].

157.     Respondents' failure to implement adequate social distancing measures places petitioners and the putative class members at unnecessarily heightened risk of contracting COVID-19.

### E.     Failure to Implement Necessary Hygiene Measures

158.     CDC Guidance requires heightened hygienic, cleaning and disinfecting practices in order to prevent and mitigate COVID-19 infection. FCI Danbury has failed adequately to implement these heightened hygienic and cleaning practices. Petitioners do not have access to the cleaning supplies necessary to sanitize themselves, their personal items, or their living areas.

159.     Prisoners at FCI Danbury are responsible for cleaning their own cubicles or dormitory spaces. Prisoners do not have adequate cleaning supplies, shared living spaces throughout the facility are not regularly or properly disinfected to prevent the spread of COVID-19. [Madore Decl. ¶ 6].

160.     Common spaces are cleaned by prisoners who are assigned jobs as cleaners, but many women have quit their jobs and cleaning has been sporadic. [Martinez-Brooks Decl. ¶ 9; Almonte Decl. ¶ 22]. The common toilets, sinks and showers are not regularly or properly disinfected to prevent the spread of COVID-19.

161.     Telephones, computers and video calling equipment and televisions shared by hundreds of prisoners are not cleaned or disinfected between uses and the common areas in which that equipment is located is not regularly or properly disinfected to prevent the spread of COVID-19. [Cassidy Decl. ¶¶ 36-37].

162.     No professional or staff cleaners have sanitized the units where prisoners who tested positive have been housed, but instead those units are being cleaned by prisoner orderlies with the same cleaning supplies they regularly use and without provision of sufficient gloves and masks. [Martinez-Brooks Decl. ¶ 8; Mason Decl. ¶ 8; Almonte Decl. ¶ 22; Declaration of Shannon Benson, submitted herewith as Exhibit L (Benson Decl.") ¶ 8; Cassidy Decl. ¶ 33; Coston Decl. ¶¶ 7, 15).

163.     FCI Danbury has provided inadequate access to soap and sanitizers.  The prison has not created any hand-washing stations or provided prisoners with hand sanitizer. [Coston Decl. ¶ 15; Somerville Decl. ¶ 10; Mason Decl. ¶ 12].  Nor has hand sanitizer been available in the commissary for the duration of the current COVID-19 crisis. [Coston Decl. ¶ 15].  Liquid soap dispensers have only recently been installed in the men's prison, but they are not regularly restocked and the prisoners have to wait a day or two to get it refilled.  [Cassidy Decl. ¶ 34 (men's unit)].

164.    There are no paper towels or hand towels, so prisoners have to use toilet paper or their clothing to dry their hands.  [Cassidy Decl. ¶ 34; Martinez-Brooks Decl. ¶ 8].

165.     Soap must be purchased from the commissary and is unavailable to indigent prisoners. Prisoners are not provided with cleaning supplies either.[62] [Cassidy Decl. ¶ 34].

166.    The prison does not distribute shampoo, toothpaste or mouthwash which must be purchased from the commissary and are, therefore, unavailable to indigent prisoners. [*Id.*].

167.    Since the epidemic, laundry is done once a week (depending on the availability of hot water or staff to perform the function), leaving used clothing and bedding exposed to the virus. [Cassidy Decl. ¶ 20].

168.    Prisoners in the facility have further been assigned to handle laundry, mattresses and bedding of individuals isolated for COVID, exposing those prisoners in turn to possible infection.

169.    Isolation facilities are further inadequate and unhygienic. The isolation room at the FSL is cold and small, with just enough room for a bed and a toilet.  The bed has a one-inch thick mattress and no pillow.  The toilet's flush is controlled by the corrections officer and is only flushed a few times a day. [Hoisington Decl. ¶ 11].

170.    FSL subsequently required overflow isolation for individuals returning from hospital or with confirmed diagnosis positive for COVID-19 and was required to convert the visiting room at the facility. Four women were housed in the visiting room and were required to use the visiting room bathrooms and had to shower in a temporary stand-up stall built in the bathroom to enable them to bathe.  [*Id.* ¶ 13].

171.    Some prisoners who are in quarantine are held in a room with no running water.

172.    Men have been isolated in an observation cell where they do not have consistent access to meals and showers and often experience medication delays. Men isolated in observation cells were further unable to communicate with their families or other prisoners in the facility. [Declaration of Richard Johnson, submitted herewith as Exhibit M, ¶¶ 7-8].

173.    More than 40 women in the FSL are currently quarantined in the facility's dining hall/kitchen. [Hoisington Decl. ¶ 17].

174.    The FSL frequently has issues with water which is often shut off for a few hours or for as long as a day at a time, during which time nobody in FSL is able to wash their hands or flush the toilet. [Mason Decl. ¶ 11].

175.    Cleaning is now sporadic in many areas of the camp since prisoners who were previously assigned to clean different areas of the facility have either quit their jobs or have been isolated in different dorms from their assigned cleaning area. [Martinez-Brooks Decl. ¶ 8].

176.    These unsanitary conditions and inadequate levels of cleaning and disinfecting, which are in contravention of the CDC Guidance, place petitioners and the putative class members at an inexcusably higher risk of contracting COVID-19.

**F.    Failure to Plan Adequately to Prevent or Mitigate the Spread of COVID-19 Infection**

177.    CDC Guidance recommends that correctional facilities should develop contingency plans for reduced workforces due to staff absences. That Guidance also calls for the provision of PPE and contingency planning for shortages of PPE. FCI Danbury has failed to

---

[62] During the early weeks of the crisis, respondents actively confiscated spray bottles that prisoners used for cleaning. Those spray bottles are now only available to prisoners in the counselor's office. [Almonte Decl. ¶ 21].

adequately plan for either inevitable staff shortages or the need for PPE, placing petitioners and the putative class members at heightened risk.

178. As set forth above, respondents have required correctional staff who were ill—including correctional staff in close contact with individuals exposed to COVID-19 and correctional staff who were confirmed positive for COVID-19—to return to work before they were symptom-free and earlier than appropriate pursuant to applicable CDC Guidance. [Mason Decl., ¶ 15].

179. Prisoners at FCI Danbury were not provided with fabric masks until in or about mid-April. [Mason Decl. ¶ 13]. Prior to that time, prisoners were dependent on paper masks or had to fashion their own masks. [*Id.*]. However, in many parts of the facility, FCI Danbury only provides one mask per prisoner and, therefore, prisoners have no protection when their masks are being washed. [Somerville Decl. ¶ 11]. Several prisoners in the men's prison are dependent on paper disposable hospital masks that fall apart when they come in contact with water. [Cassidy Decl. ¶ 40].

180. Prisoners—including prisoners on cleaning duty—are not provided with gloves to protect their hands from exposed surfaces. [*Id.*; Foreman Decl. ¶ 16].

181. Correctional officers and staff, likewise were not provided with fabric masks until approximately mid-April. [Mason Decl. ¶ 14].

182. Moreover, usage of PPE is inconsistent and correctional staff does not enforce mask usage on prisoners who refuse to cover their faces, [Cassidy Decl. ¶40], nor does correctional staff consistently wear masks or gloves when they are on the units. [Martinez-Brooks Decl. ¶ 16; Cassidy Decl. ¶ 41].

### G. Failure to Implement the Training and Interventions Necessary to Prevent the Spread of COVID-19

183.    CDC Guidance states that correctional staff and incarcerated people should be trained on donning, doffing and disposing of PPE. CDC Guidance further recommends that correctional facilities post signage informing staff and incarcerated people how to report COVID-19 symptoms and advising staff to stay at home when sick.  FCI Danbury has failed adequately to implement either of these training and educational interventions. [*See*, *e.g.*, Cassidy Decl. ¶ 42 (staff go into quarantine units and then return to units that are purportedly COVID-free without changing gloves and masks or will remove gloves without washing hands)]. FCI Danbury has further failed to provide prisoners or staff with clear guidance on what to do to protect themselves and prisoners are often reluctant to report symptoms because they have no expectation that they will receive effective treatment and fear being isolated away from their friends and property in quarantine units that are often insufficiently hygienic. [Mason Decl. ¶ 22].

### H. Respondents' Failures to Respond to the COVID-19 Epidemic Have Further Put Petitioners and Putative Class Members at Unacceptably Heightened Risk of Injury and Illness Unrelated to COVID-19

184.    Respondents' failure to prepare adequately for the COVID-19 epidemic has also put petitioners and the putative class members at heightened risk of other injury and illness.

185.    FCI Danbury is experiencing significant staff shortages.  Many correctional officers are absent and those who are working are putting in significant overtime.

186.    The performance of the duties of correctional officers is being augmented by non-correctional staff (such as medical or educational staff) who cover units when there are insufficient correctional staff.  [Cassidy Decl. ¶ 30].

187.    As a result of staff shortages, correctional officers and other staff are often only available on the units for limited amounts of time, generally for count, resulting in significantly extended response times in the event of emergencies on the units. On at least one occasion, when a prisoner experienced chest pains on a unit in which no correctional officer was present, other prisoners on the unit were required to yell out the window in the hopes that a staff member could hear them and could respond to the medical emergency. [Cassidy Decl. ¶ 31; Hoisington Decl. ¶ 13 (on one occasion in isolation unit in FSL visiting room, one of the quarantined prisoners fell in the bathroom and hit her head on the concrete floor, rendering her unconscious. There was no nearby guard and the prisoners were required to bang on the locked front door to the facility; help only arrived because someone in the parking lot heard the prisoners and called control)].

188.    As a result of the increased attention to the COVID epidemic, non-virus medical needs have gone unattended.  The regular prison physicians have been absent or are no longer available to prisoners on the unit, prisoners who do not present with fever during sick call cannot be referred to a physician, and sick call requests for other than virus symptoms go unanswered for prolonged periods of time. [Cassidy Decl. ¶ 17; Martinez-Brooks Decl. ¶ 23].[63]

189.    Recently, the prison pharmacy has been closed. Medications must be shipped from another facility (USP Allenwood in Pennsylvania) resulting in delays in their delivery and disruption of medication regimens. [Cassidy Decl. ¶ 7 (two week delay in receipt of correct dosage of medication); Martinez-Brooks Decl. ¶ 23 (8 day delay in refill of hypertension medication)].

---

[63] Petitioner Kenneth Cassidy suffers from intestinal disease, including diverticulitis.  [Cassidy Decl. ¶ 5].  He has recently developed an abnormal growth in the rectum which has resulted on occasion in dark black blood in feces and obstruction of his bowel.  Although he has made at least three requests

190.    Special medical diets are not available to prisoners at FCI Danbury. As a result,

on repeated occasions, special-diet prisoners have received meals containing ingredients

dangerously harmful to their health, including, for example, delivery of meals containing peanut

products to allergic patients at risk of anaphylaxis, or delivery of meals containing rice and beans

to prisoners with diverticulosis. [Cassidy Decl. ¶¶ 20, 22; Martinez-Brooks Decl. ¶ 22 (peanut

butter was served multiple times in a dorm housing a woman with severe peanut allergy)].

191.    As a result of the epidemic, food service has been reduced below BOP guidelines

for caloric intake and nutritional value; food reductions put petitioners and putative class

members at heightened risk of adverse health effects. [Cassidy Decl. ¶ 21].[64]

192.    Respondents' failures to respond appropriately to the coronavirus outbreak in FCI

Danbury has, likewise, endangered prison staff.  In an "Imminent Danger Report" filed with the

Occupational Safety and Health Administration ("OSHA") on March 31, 2020, the President of

the union that represents many BOP staff reported health and safety hazards across many BOP

facilities – including FCI Danbury – related to COVID-19, including:

a.  Contrary to CDC guidelines, officials have directed staff throughout the BOP who

    have come into contact with, or been in close proximity to, individuals who show

    or have shown symptoms of COVID-19, to report to work and not self-quarantine

    for 14 days;

---

for a medical visit to assess and diagnose his condition, he has been advised that his condition is not an
emergency and that the medical team is currently unavailable to evaluate him. [*Id.* ¶ 17].

[64] The COVID-19 pandemic has also resulted in worrisome curtailment of prisoners' legal rights.
The prison law library has been closed and locked and the administrative remedy process has been
suspended indefinitely.  Legal mail is being delayed and at times not picked up due to staff shortages.
Legal calls are being denied  and legal requests from attorneys are often going unanswered, including for
open and pending cases that require access to attorneys such as the development of pleadings in
connection with motions for compassionate release. [Cassidy Decl. ¶¶ 25-27].

b. The BOP has violated CDC Guidelines by continuously moving prisoners by bus and/or airlift to various prison sites across the nation, including infected prisoners, prisoners suspected of being infected, and prisoners who have been in close contact with, or proximity to, infected prisoners;

c. The BOP has failed to introduce workplace controls to mitigate exposure or further exposure to the virus, such as high efficiency air filters to minimize the airborne nature of the virus or otherwise improve ventilation;

d. The BOP has failed to minimize contact within recreation areas, education areas, counseling/treatment rooms, resulting in prisoners and staff coming in dangerously close contact with each other; and

e. The BOP has failed to comply with OSHA Personal Protective Equipment Standards.[65]

## VII. FCI Danbury Is Not Prepared to Treat Individuals Who Contract Coronavirus

193. Prisoners who do contract COVID-19 are at higher risk for developing acute symptoms than if they were in the community, because FCI Danbury lacks the medical resources to care for symptomatic prisoners, creating a continuing unacceptable danger to petitioners and putative class members.

194. Now that COVID-19 is inside the facility, FCI Danbury will be unable to stop the spread of the virus throughout the facility given long-documented inadequacies in BOP's medical care and in light of how these facilities function.

---

[65] *Available at* https://www.afge.org/globalassets/documents/generalreports/coronavirus/4/osha-7-form-national-complaint.pdf .

60

195.    There is no separate medical unit or facility for ill prisoners at the men's facility or either facility for women. Unlike many Federal Correctional Institutions, FCI Danbury has no physical space in which an ill prisoner can convalesce that is separate from other prisoners, warm, clean and has access to fresh water and regular hand-washing.

196.    On information and belief, FCI Danbury has woefully inadequate numbers of nasal swab COVID-19 test kits, requiring correctional staff to ration those few available kits and to refuse testing to prisoners clearly exhibiting symptoms of COVID-19 infection. As a result of the lack of testing and confirmation of actual infections in the facility, FCI Danbury is failing to implement appropriate isolation practices thus accelerating the spread of the infection within the institution.[66]

197.    FCI Danbury currently has no ventilators and cannot intubate prisoners on-site. FCI Danbury does not have any specialized equipment or medical providers.

198.    On information and belief there are only 2 (and possibly fewer) doctors available at FCI Danbury to care for all 1,046 prisoners. Even this highly limited number is likely to decrease as doctors themselves go into quarantine. None of these doctors specializes in infectious diseases.

---

[66] Earlier in April 2020 the warden at Metropolitan Correctional Center in Manhattan, a BOP facility, advised in a letter to United States District Judge Paul Engelmayer that MCC could not test a defendant in a matter pending before that court exhibiting COVID-19 symptoms because "MCC New York does not have COVID-19 tests." *See No COVID-19 tests available for prisoners at center of New York outbreak, court documents show*, ABCNews (April 4, 2020, 6:00 am), available at https://abcnews.go.com/Health/covid-19-tests-prisoners-center-york-outbreak-court/story?id=69969077. At the same time, Bureau of Prisons officials confirmed to ABC news that FCI Oakdale prisoners showing symptoms in the middle of an outbreak at that facility wouldn't be tested because tests were too scarce. *Id.* At the same time, another federal facility in New York, the Metropolitan Detention Center in Brooklyn, court filings before U.S. District Judge Rachel Kovner revealed that only seven of 1,700 prisoners in that facility had been tested. *Id.*

199.     People who contract COVID-19 can deteriorate rapidly, even before a test result can be received. They need constant monitoring. Most people in the higher risk categories will require more advanced support: positive pressure ventilation, and in extreme cases, extracorporeal mechanical oxygenation. Such care requires specialized equipment in limited supply as well as an entire team of specialized care providers. FCI Danbury does not have that specialized equipment or specialized providers.

200.     FCI Danbury is short-staffed. As of April 25, 2020, 38 staff members have tested positive and several more are symptomatic; correctional officers are understandably hesitant to come to work. This staffing shortage will only increase as employees need to stay home to care for children whose schools are closed, elderly family members, and other personal health situations. With fewer staff, correctional officers are less able to monitor prisoners' health.

## VIII.   The Situation at FCI Danbury Imposes Undue Risks on the Surrounding Community that result in further harm to the Petitioner Class

201.     FCI Danbury is located in Fairfield County, Connecticut—the hardest hit area of the State with over 10,500 confirmed cases of COVID-19 infection and 707 deaths as of April 27, 2020.[67]

202.     Diseases in prison put staff and surrounding community at risk. When the COVID-19 virus is introduced to a prison, all persons within the facility – whether they are staff or incarcerated people – are at heightened risk of contracting the virus and, in turn, spreading the virus to others with whom they live or come into contact with in their own homes and neighborhoods.[68]  The harm caused by a COVID-19 outbreak in a correctional facility, therefore,

---

[67]  COVID-19 Dashboard by the Center for Systems Science and Engineering (CSSE) at Johns Hopkins University (JHU), https://www.arcgis.com/apps/opsdashboard/index.html
[68]  Peter Wagner & Emily Widra, *No need to wait for pandemics: The public health case*

is not confined to those who are incarcerated or work in that facility. Instead, this harm poses a serious health risk to the surrounding community on which Petitioner class needs to rely for health care as well as for general services through staffing of FCI.

203. For example, scarce community health resources like emergency departments, hospital beds, and ventilators would inevitably become more scarce in the event of a COVID-19 outbreak in a detention facility, because incarcerated people are more likely to have underlying medical conditions that carry a significantly increased risk of severe complications from COVID-19.

204. A COVID-19 outbreak would exceed the capacity of the local health infrastructure because treatment for serious cases requires significant medical intervention, including ventilator assistance and intensive care support. If the need for ICU beds and life-saving medical equipment exceeds supply, the death rate will increase for the entire population of Connecticut.

## CLAIM FOR RELIEF

### (Declaratory and Injunctive Relief for
### Violation of the Eighth Amendments)

205. Petitioners reallege and incorporate by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein

206. Respondents are holding Petitioners and all putative class members in violation of the Constitution by detaining them in the face of significant threats to their health and safety without taking sufficient steps to prevent that harm.

---

*for criminal justice reform*, Prison Policy Initiative (Mar. 6, 2020), https://www.prisonpolicy.org/blog/2020/03/06/pandemic/

207.     Respondents' failure to provide adequate medical care in response to a widespread outbreak of a contagious disease constitutes deliberate indifference to the serious, known medical needs of detainees, thereby establishing a violation of the Eighth Amendment of the United States Constitution.

208.     Because of the conditions at FCI Danbury, Petitioners are not able to take steps to protect themselves—such as social distancing, using hand sanitizer, washing their hands regularly, and disinfecting their surroundings—and the government has not provided adequate protections. As COVID-19 rapidly spreads at FCI Danbury in a matter of days, as experts predict, the already deplorable conditions at FCI Danbury will be exacerbated, and the ability to protect oneself will become even more impossible.

209.     Respondents' failure adequately to protect Petitioners from these punitive conditions, or release them from the conditions altogether, constitutes deliberate indifference to the serious known medical needs of Petitioners, and all members of the Class, thereby establishing a violation of the Eighth Amendment of the United States Constitution.

210.     Respondents were aware of the medical needs of the population and the pervasiveness of prisoners and staff exhibiting COVID-19 symptoms throughout the prison.

211.     Respondents knew of and disregarded an excessive risk to health and safety.

212.     Respondents failed to act with reasonable care to mitigate these risks.

213.     Because Respondents failed to act to remedy Petitioners' and the Class's degrading and inhuman conditions of confinement in violation of their Eighth Amendment rights, Petitioners seek relief under this Writ of Habeas Corpus.

214.     Because of the unlawful conduct of Respondents, Petitioners and the Class are threatened with imminent physical injury, pain and suffering, emotional distress, humiliation, and death.

215.     Petitioners have no adequate remedy at law and will suffer irreparable harm unless the court acts immediately to grant the relief requested herein.

### THE NEED FOR ENLARGEMENT AS A PROVISIONAL REMEDY

216.     Federal district courts have authority, when habeas actions are pending, to "enlarge" the custody of petitioners. Enlargement is not release. Rather, it is a provisional remedy that modifies custody by expanding the site at which it takes place, upon order of the court, from a particular prison to another setting; as requested here, to home confinement. *See* Exhibit B, Declaration of Professor Judith Resnik Regarding Enlargement and the Use of Provisional Remedies for Detained Individuals ¶¶ 28-29. The enlargement power stems from Congress's authorization of federal judges under the habeas statutes to "summarily hear and determine the facts, and dispose of the matter as law and justice require" as well as the courts' inherent powers. *See* 28 U.S.C. § 2243.

217.     To qualify for the enlargement remedy, an individual must show "extraordinary circumstances" and that the underlying claim raises "substantial claims." *Mapp v. Reno*, 241 F.3d 221, 226 (2d Cir. 2001).

218.     Petitioners and the putative Subclass members meet these requirements because of the extreme risk that COVID-19 poses, especially in light of their ages and medical conditions, and because of the particular conditions of confinement at FCI Danbury. If petitioners and putative Subclass members remain incarcerated, there is a high risk that they will

contract COVID-19 and, as a result, suffer severe illness or death. Immediate release to permit petitioners and putative Subclass members to serve their sentences on home confinement during the pendency of this action is thus the only way to effectuate the eventual habeas remedy.

### PRAYER FOR RELIEF

WHEREFORE, Petitioners and proposed class members respectfully request that this Court:

a. Certify the proposed Class and Subclass pursuant to Fed. R. Civ. Pro. 23(B)(1) and (B)(2);

b. Pursuant to 28 U.S.C. § 2243 and this Court's inherent powers, enlarge petitioners and Subclass members pending disposition of the underlying petition;

c. Pursuant to 28 U.S.C. § 2243 and issued "forthwith," issue an Order to Show Cause requiring Respondents to identify within twenty-four (24) hours of the Court's order, and submit to the Court a list of, all Subclass members, and requiring Respondents to answer as to why the habeas petition and relief sought herein should not be granted;

d. Issue a Writ of Habeas Corpus and/or pursuant to Fed. R. Civ. Pro. 65, enter a temporary restraining order, preliminary injunction, and permanent injunction requiring Respondents to release from custody or to home confinement members of the Subclass and requiring Respondents to provide medically adequate social distancing and health care and sanitation for members of the Class who remain;

e. Enter an order pursuant to 28 U.S.C. § 2201-2202, declaring that Respondents' policies and practices regarding COVID-19 violate the Eighth Amendment to the United States Constitution;

f.      Appoint a special master pursuant to Fed. R. Civ. Pro. 63 or an expert under

Federal Rule of Evidence 706 to make recommendations to the Court regarding

the number of incarcerated people that FCI Danbury can house consistent with

CDC Guidance on best social distancing and hygiene practices to prevent the

spread of COVID-19.

g.      Issue a Writ of Habeas Corpus and/or pursuant to Fed. R. Civ. P. 65 enter an

injunction requiring Respondents to:

    1.      Ensure that incarcerated individuals can remain six feet apart to

practice social distancing in compliance with CDC Guidance;

    2.      Ensure that each incarcerated individual receives a free and

adequate personal supply of: hand soap sufficient to permit frequent

hand washing, paper towels, facial tissues, cleaning implements such

as sponges or brushes, and disinfectant products that are effective

against COVID-19;

    3.      Ensure that all individuals have access to hand sanitizer containing

at least 60% alcohol;

    4.      Provide daily access to showers and clean laundry, including clean

towels after each shower;

    5.      Require that all FCI Danbury staff wear PPE consistent with the

CDC Guidance, including masks and gloves, when interacting with

visitors and incarcerated individuals or when touching surfaces in

common areas;

6.      Provide an anonymous mechanism for incarcerated individuals to report staff who violate these guidelines so that appropriate corrective action may be taken;

7.      Take each incarcerated person's temperature daily (with a properly disinfected and accurate thermometer) to identify potential COVID-19 infections;

8.      Assess each incarcerated individual daily through questioning to identify potential COVID-19 infections;

9.      Conduct immediate testing for anyone displaying known symptoms of COVID-19;

10.     Immediately provide clean masks for all individuals who display or report potential COVID-19 symptoms until they can be evaluated by a qualified medical professional or placed in non-punitive quarantine and ensure the masks are properly laundered with replacements as necessary;

11.     Ensure that individuals identified as having COVID-19 or having been exposed to COVID-19 are properly quarantined in a non-punitive setting, with continued access to showers, recreation, mental health services, reading materials, commissary, phone and video visitation with loved ones, communication with counsel, and personal property;

12.     Clean and disinfect frequently touched surfaces with disinfectant products effective against the virus that causes COVID-19 (at the

manufacturer's recommended concentration), as well as surfaces in

common areas, every two hours during waking hours, and at least once

during the night;

13.    Ensure incarcerated people are provided guidance on how to

protect themselves from COVID-19 and reduce COVID-19

transmission;

14.    Assure incarcerated people are told that they will not be retaliated

against for reporting COVID-19 symptoms;

15.    Respond to all emergency (as defined by the medical

community)requests for medical attention within an hour;

16.    Provide incarcerated individuals with sufficient and effective

cleaning supplies free of charge so that they may clean frequently

touched items, such as phones, before use;

17.    Provide frequent communication to all incarcerated individuals

regarding COVID-19, measures taken to reduce the risk of infection,

best practices for incarcerated people to avoid infection, and any

changes in policies or practices;

18.    Craft a mechanism to ensure compliance through the appointment

of an independent monitor with medical expertise to ensure

compliance with these conditions, and provide the monitor with

unfettered access to medical units, confidential communication with

detained individuals in and out of quarantine, and surveillance video of

public areas of the facilities;

h.      Retain jurisdiction over this case until Defendants/Respondents have fully

complied with the orders of this Court, and there is a reasonable assurance that

they will continue to comply in the future, absent continuing jurisdiction;

i.      Award appropriate attorneys' fees; and

j.      Grant such further relief as the Court deems just and proper.


Dated April 27, 2020                    Respectfully Submitted,

                                        _____/s/ David S. Golub_____
                                        David S. Golub, ct00145
                                        Jonathan M. Levine, ct 07584
                                        Silver, Golub & Teitell LLP
                                        184 Atlantic Street
                                        Stamford, CT 06901
                                        Phone: (203) 325-4491
                                        Email: dgolub@sgtlaw.com
                                                jlevine@sgtlaw.com

                                        Sarah French Russell, ct26604
                                        Tessa Bialek ct30582
                                        Legal Clinic, Quinnipiac University School of Law
                                        275 Mt. Carmel Avenue
                                        Hamden, CT 06518
                                        Phone: (203) 582-5258
                                        Email: sarah.russell@quinnipiac.edu
                                                tessa.bialek@quinnipiac.edu

                                        Marisol Orihuela, ct30543
                                        Jerome N. Frank Legal Services Organization
                                        P.O. Box 209090
                                        New Haven, CT 06520
                                        Phone: (203) 432-4800
                                        Email: marisol.orihuela@ylsclinics.org

Alexandra Harrington*
127 Wall Street
New Haven, CT 06511
Phone: 203-436-3532
alexandra.harrington@yale.edu

*Counsel for the Petitioners Dianthe Martinez-Brooks,
Rejeanne Collier, Jackie Madore, and Kenneth Cassidy*

*Application for Admission Pending

# EXHIBIT A

## Declaration of Dr. Jaimie Meyer

Pursuant to 28 U.S.C.§ 1746, I hereby declare as follows:

### I.  Background and Qualifications

1. I am Dr. Jaimie Meyer, an Assistant Professor of Medicine at Yale School of Medicine and Assistant Clinical Professor of Nursing at Yale School of Nursing in New Haven, Connecticut. I am board certified in Internal Medicine, Infectious Diseases and Addiction Medicine.  I completed my residency in Internal Medicine at NY Presbyterian Hospital at Columbia, New York, in 2008. I completed a fellowship in clinical Infectious Diseases at Yale School of Medicine in 2011 and a fellowship in Interdisciplinary HIV Prevention at the Center for Interdisciplinary Research on AIDS in 2012. I hold a Master of Science in Biostatistics and Epidemiology from Yale School of Public Health.

2. I have worked for over a decade on infectious diseases in the context of jails and prisons. From 2008-2016, I served as the Infectious Disease physician for York Correctional Institution in Niantic, Connecticut, which is the only state jail and prison for women in Connecticut.  In that capacity, I was responsible for the management of HIV, Hepatitis C, tuberculosis, and other infectious diseases in the facility.  Since then, I have maintained a dedicated HIV clinic in the community for patients returning home from prison and jail. For over a decade, I have been continuously funded by the NIH, industry, and foundations for clinical research on HIV prevention and treatment for people involved in the criminal justice system, including those incarcerated in closed settings (jails and prisons) and in the community under supervision (probation and parole).  I have served as an expert consultant on infectious diseases and women's health in jails and prisons for the UN Office on Drugs and Crimes, the Federal Bureau of Prisons, and others.  I also served as an expert health witness for the US Commission on Civil Rights Special Briefing on Women in Prison.

3. I have written and published extensively on the topics of infectious diseases among people involved in the criminal justice system including book chapters and articles in leading peer-reviewed journals (including Lancet HIV, JAMA Internal Medicine, American Journal of Public Health, International Journal of Drug Policy) on issues of prevention, diagnosis, and management of HIV, Hepatitis C, and other infectious diseases among people involved in the criminal justice system.  In making the following statements, I am not commenting on the particular issues posed this case. Rather, I am making general statements about the realities of persons in detention facilities, jails and prisons.

4. My C.V. includes a full list of my honors, experience, and publications, and it is attached as Exhibit A.

5. I was paid $1,000 for my time drafting an earlier version of this report filed in another case. I subsequently prepared this version of the report without receiving payment for my services.

6. I testified as an expert at a single trial or by deposition in the past four years: *State v. Frank Sanville*, Docket No. 263-3-18 Wrcr (Vermont) on April 21, 2020.

## II. Heightened Risk of Epidemics in Jails and Prisons

7. The risk posed by infectious diseases in jails and prisons is significantly higher than in the community, both in terms of risk of transmission, exposure, and harm to individuals who become infected. There are several reasons this is the case, as delineated further below.

8. Globally, outbreaks of contagious diseases are all too common in closed detention settings and are more common than in the community at large. Prisons and jails are not isolated from communities. Staff, visitors, contractors, and vendors pass between communities and facilities and can bring infectious diseases into facilities. Moreover, rapid turnover of jail and prison populations means that people often cycle between facilities and communities. People often need to be transported to and from facilities to attend court and move between facilities. Prison health is public health.

9. <u>Reduced prevention opportunities:</u> Congregate settings such as jails and prisons allow for rapid spread of infectious diseases that are transmitted person to person, especially those passed by droplets through coughing and sneezing. When people must share dining halls, bathrooms, showers, and other common areas, the opportunities for transmission are greater. When infectious diseases are transmitted from person to person by droplets, the best initial strategy is to practice social distancing. When jailed or imprisoned, people have much less of an opportunity to protect themselves by social distancing than they would in the community. Spaces within jails and prisons are often also poorly ventilated, which promotes highly efficient spread of diseases through droplets. Placing someone in such a setting therefore dramatically reduces their ability to protect themselves from being exposed to and acquiring infectious diseases.

10. <u>Disciplinary segregation or solitary confinement is not an effective disease containment strategy.</u> Beyond the known detrimental mental health effects of solitary confinement, isolation of people who are ill in solitary confinement results in decreased medical attention and increased risk of death. Isolation of people who are ill using solitary confinement also is an ineffective way to prevent transmission of the virus through droplets to others because, except in specialized negative pressure rooms (rarely in medical units if available at all), air continues to flow outward from rooms to the rest of the facility. Risk of exposure is thus increased to other people in prison and staff.

11. <u>Reduced prevention opportunities:</u> During an infectious disease outbreak, people can protect themselves by washing hands. Jails and prisons do not provide adequate opportunities to exercise necessary hygiene measures, such as frequent handwashing or use of alcohol-based sanitizers when handwashing is unavailable. Jails and prisons are often under-resourced and ill-equipped with sufficient hand soap and alcohol-based sanitizers for people detained in and working in these settings. High-touch surfaces (doorknobs, light switches, etc.) should also be cleaned and disinfected regularly with bleach to prevent virus spread, but this is often not done in jails and prisons because of a

2

lack of cleaning supplies and lack of people available to perform necessary cleaning procedures.

12. <u>Reduced prevention opportunities:</u> During an infectious disease outbreak, a containment strategy requires people who are ill with symptoms to be isolated and that caregivers have access to personal protective equipment, including gloves, masks, gowns, and eye shields. Jails and prisons are often under-resourced and ill-equipped to provide sufficient personal protective equipment for people who are incarcerated and caregiving staff, increasing the risk for everyone in the facility of a widespread outbreak.

13. <u>Increased susceptibility:</u> People incarcerated in jails and prisons are more susceptible to acquiring and experiencing complications from infectious diseases than the population in the community.[1] This is because people in jails and prisons are more likely than people in the community to have chronic underlying health conditions, including diabetes, heart disease, chronic lung disease, chronic liver disease, and lower immune systems from HIV.

14. <u>Jails and prisons are often poorly equipped to diagnose and manage infectious disease outbreaks.</u> Some jails and prisons lack onsite medical facilities or 24-hour medical care. The medical facilities at jails and prisons are almost never sufficiently equipped to handle large outbreaks of infectious diseases. To prevent transmission of droplet-borne infectious diseases, people who are infected and ill need to be isolated in specialized airborne negative pressure rooms. Most jails and prisons have few negative pressure rooms if any, and these may be already in use by people with other conditions (including tuberculosis or influenza). Resources will become exhausted rapidly and any beds available will soon be at capacity. This makes both containing the illness and caring for those who have become infected much more difficult.

15. <u>Jails and prisons lack access to vital community resources to diagnose and manage infectious diseases.</u> Jails and prisons do not have access to community health resources that can be crucial in identifying and managing widespread outbreaks of infectious diseases. This includes access to testing equipment, laboratories, and medications.

16. <u>Jails and prisons often need to rely on outside facilities (hospitals, emergency departments) to provide intensive medical care</u> given that the level of care they can provide in the facility itself is typically relatively limited. During an epidemic, this will not be possible, as those outside facilities will likely be at or over capacity themselves.

17. <u>Health safety:</u> As an outbreak spreads through jails, prisons, and communities, medical personnel become sick and do not show up to work. Absenteeism means that facilities can become dangerously understaffed with healthcare providers. This increases a number of risks and can dramatically reduce the level of care provided. As health systems inside facilities are taxed, people with chronic underlying physical and mental health conditions and serious medical needs may not be able to receive the care they need for these

---

[1] *Active case finding for communicable diseases in prisons*, 391 The Lancet 2186 (2018), https://www.thelancet.com/journals/lancet/article/PIIS0140-6736(18)31251-0/fulltext.

conditions. As supply chains become disrupted during a global pandemic, the availability of medicines and food may be limited.

18. Safety and security: As an outbreak spreads through jails, prisons, and communities, correctional officers and other security personnel become sick and do not show up to work. Absenteeism poses substantial safety and security risk to both the people inside the facilities and the public.

19. These risks have all been borne out during past epidemics of influenza in jails and prisons. For example, in 2012, the CDC reported an outbreak of influenza in 2 facilities in Maine, resulting in two inmate deaths.[2] Subsequent CDC investigation of 995 inmates and 235 staff members across the 2 facilities discovered insufficient supplies of influenza vaccine and antiviral drugs for treatment of people who were ill and prophylaxis for people who were exposed. During the H1N1-strain flu outbreak in 2009 (known as the "swine flu"), jails and prisons experienced a disproportionately high number of cases.[3] Even facilities on "quarantine" continued to accept new intakes, rendering the quarantine incomplete. These scenarios occurred in the "best case" of influenza, a viral infection for which there was an effective and available vaccine and antiviral medications, unlike COVID-19, for which there is currently neither.

## III.  Profile of COVID-19 as an Infectious Disease[4]

20.  The novel coronavirus, officially known as SARS-CoV-2, causes a disease known as COVID-19. The virus is thought to pass from person to person primarily through respiratory droplets (by coughing or sneezing) but may also survive on inanimate surfaces. People seem to be most able to transmit the virus to others when they are sickest but it is possible that people can transmit the virus before they start to show symptoms or for weeks after their symptoms resolve. In China, where COVID-19 originated, the average infected person passed the virus on to 2-3 other people; transmission occurred at a distance of 3-6 feet. Not only is the virus very efficient at being transmitted through droplets, everyone is at risk of infection because our immune systems have never been exposed to or developed protective responses against this virus. A vaccine is currently in development but will likely not be able for another year to the

---

[2] *Influenza Outbreaks at Two Correctional Facilities — Maine, March 2011*, Centers for Disease Control and Prevention (2012),
https://www.cdc.gov/mmwr/preview/mmwrhtml/mm6113a3.htm.
[3] David M. Reutter, *Swine Flu Widespread in Prisons and Jails, but Deaths are Few*, Prison Legal News (Feb. 15, 2010), https://www.prisonlegalnews.org/news/2010/feb/15/swine-flu-widespread-in-prisons-and-jails-but-deaths-are-few/.
[4] This whole section draws from Brooks J. Global Epidemiology and Prevention of COVID19, COVID-19 Symposium, Conference on Retroviruses and Opportunistic Infections (CROI), virtual (March 10, 2020); *Coronavirus (COVID-19)*, Centers for Disease Control, https://www.cdc.gov/coronavirus/2019-ncov/index.html; Brent Gibson, *COVID-19 (Coronavirus): What You Need to Know in Corrections*, National Commission on Correctional Health Care (February 28, 2020), https://www.ncchc.org/blog/covid-19-coronavirus-what-you-need-to-know-in-corrections.

4

general public.  Antiviral medications are currently in testing but not yet FDA-approved, so only available for compassionate use from the manufacturer.  People in prison and jail will likely have even less access to these novel health strategies as they become available.

21. Most people (80%) who become infected with COVID-19 will develop a mild upper respiratory infection but emerging data from China suggests serious illness occurs in up to 16% of cases, including death.[5]  Serious illness and death is most common among people with underlying chronic health conditions, like heart disease, lung disease, liver disease, and diabetes, and older age.[6]  Death in COVID-19 infection is usually due to pneumonia and sepsis.  The emergence of COVID-19 during influenza season means that people are also at risk from serious illness and death due to influenza, especially when they have not received the influenza vaccine or the pneumonia vaccine.

22. The care of people who are infected with COVID-19 depends on how seriously they are ill.[7]  People with mild symptoms may not require hospitalization but may continue to be closely monitored at home.  People with moderate symptoms may require hospitalization for supportive care, including intravenous fluids and supplemental oxygen.  People with severe symptoms may require ventilation and intravenous antibiotics. Public health officials anticipate that hospital settings will likely be overwhelmed and beyond capacity to provide this type of intensive care as COVID-19 becomes more widespread in communities.

23. COVID-19 prevention strategies include containment and mitigation.  Containment requires intensive hand washing practices, decontamination and aggressive cleaning of surfaces, and identifying and isolating people who are ill or who have had contact with people who are ill, including the use of personal protective equipment.  Jails and prisons are totally under-resourced to meet the demand for any of these strategies.  As infectious diseases spread in the community, public health demands mitigation strategies, which involves social distancing and closing other communal spaces (schools, workplaces, etc.) to protect those most vulnerable to disease.  Jails and prisons are unable to adequately provide social distancing or meet mitigation recommendations as described above.

24. The time to act is now.  Data from other settings demonstrate what happens when jails and prisons are unprepared for COVID-19.  To date, few  state or federal prison systems have adequate (or any) pandemic preparedness plans in place. Systems are just beginning to screen and isolate people on entry and perhaps place visitor restrictions, but this is wholly inadequate when staff and vendors can still come to work sick and

---

[5] *Coronavirus Disease 2019 (COVID-19): Situation Summary*, Centers for Disease Control and Prevention (March 14, 2020), https://www.cdc.gov/coronavirus/2019-ncov/summary.html.
[6] *Clinical course and risk factors for mortality of adult inpatients with COVID-19 in Wuhan, China: a retrospective cohort study.*  The Lancet (published online March 11, 2020), https://www.thelancet.com/journals/lancet/article/PIIS0140-6736(20)30566-3/fulltext
[7] *Coronavirus Disease 2019 (COVID-19): Interim Clinical Guidance for Management of Patients with Confirmed Coronavirus Disease*, Centers for Disease Control and Prevention (March 7, 2020), https://www.cdc.gov/coronavirus/2019-ncov/hcp/clinical-guidance-management-patients.html.

potentially transmit the virus to others.

25. Systems are challenged to respond to COVID-19 guidelines that are modified on a near-daily basis. It may be impossible to adequately respond to the COVID-19 pandemic, while also respecting the rights and dignity of people who are incarcerated.

## IV. Possible Risks of COVID-19 in Federal Bureau of Prisons Facilities in Danbury, Connecticut

26. From approximately 2017-2018, I volunteered to provide AIDS Awareness Programming for all women housed at the Camp and the Satellite Low (FSL) facilities at FCI Danbury. In doing so, I interacted with the resident inmates in common meetings areas on a monthly basis in groups as small as 10 and as large as 100. I have additionally toured all areas of the FSL facility in January 2018 with leadership from the National Association of Women Judges. I last entered the facilities in approximately Summer 2018.

27. The FSL facility is comprised of a single large dormitory style room, in which all of the women sleep on bunks. There is also a library, a laundry room, a group meeting area, and a space for exercise. In the adjoining building, there are multiple classrooms and meeting spaces. There was an infirmary staffed intermittently by a physician or nurse practitioner, who was available for sick call. For other medical needs, women were brought into the men's facility to see the healthcare provider by appointment. All serious medical needs and specialty visits were referred to the nearby Danbury Hospital. Per the BOP webpage, as of April 23, 2020, there were 165 women housed at FSL. The layout of the space would make it impossible for these women to practice social distancing.

28. When I last visited the Camp, it was comprised of a single floor of cells, each of which held 2-3 women. I understand that the building has since been reconfigured and the women are now housed in large dormitory style rooms. Per the BOP webpage, as of April 23, 2020, there were 153 women housed at the Camp. Dormitory style housing makes it impossible for prisoners to practice social distancing.

29. Per BOP reports, as of April 23, 2020, there are 15 inmates with confirmed COVID-19 infection, 32 staff members, and 1 death. These numbers do not include the number of inmates and staff who previously tested positive and have since recovered. For example, on April 15, a news article said that BOP reported 44 inmates and 39 staff infected at FCI Danbury. It is unclear in which compound the COVID+ inmates resided on the Danbury BOP campus. Given that all spaces in both women's facilities on the Danbury BOP campus are communal, there is high likelihood that if a single case entered the facility, many more will follow in what some have called a "tinderbox scenario." The large number of cases in FCI Danbury to date reflects widespread disease in the surrounding community and is evidence that FCI Danbury is unable to mitigate or contain the spread of disease.

30. During my visit to FSL in January 2018, I had the opportunity to meet with many of the women to discuss their experiences of confinement without any correctional officers present. The women I met with had significant medical issues, including serious

cardiovascular, neurologic, and psychiatric conditions.  They described significant delays in receiving medical attention for issues both large and small.  Any delays in access to care that already exist in normal circumstances will only become worse during an outbreak, making it especially difficult for the facilities to contain any infections and to treat those who are infected.

31. Failure to provide individuals with continuation of the treatment they were receiving in the community, or even just interruption of treatment, for chronic underlying health conditions will result in increased risk of morbidity and mortality related to these chronic conditions.

32. Failure to provide individuals adequate medical care for their underlying chronic health conditions results in increased risk of COVID-19 infection and increased risk of infection-related morbidity and mortality if they do become infected.

33. People with underlying chronic mental health conditions need adequate access to treatment for these conditions throughout their period of detention.  Failure to provide adequate mental health care, as may happen when health systems in jails and prisons are taxed by COVID-19 outbreaks, may result in poor health outcomes.  Moreover, mental health conditions may be exacerbated by the stress of incarceration during the COVID-19 pandemic, including isolation and lack of visitation.

34. Failure to keep accurate and sufficient medical records will make it more difficult for facilities to identify vulnerable individuals in order to both monitor their health and protect them from infection.  Inadequate screening and testing procedures in facilities increase the widespread COVID-19 transmission.

35. Many women at FSL spoke only Spanish and reported significant challenges participating in groups and classes, which were at the time only offered in English. Language barriers will similarly prevent the effective identification of individuals who are particularly vulnerable or may have symptoms of COVID-19. Similarly, the failure to provide necessary aids to individuals who have auditory or visual disabilities could also limit the ability to identify and monitor symptoms of COVID-19.

36. Facilities with a track record of neglecting individuals with acute pain and serious health needs under ordinary circumstances are more likely to be ill-equipped to identify, monitor, and treat a COVID-19 epidemic.

37. Similarly, facilities with a track record of failing to adequately manage single individuals in need of emergency care are more likely to be seriously ill-equipped and under-prepared when a number of people will need urgent care simultaneously, as would occur during a COVID-19 epidemic.

38. For individuals in facilities that have experienced these problems in the past, the experience of an epidemic and the lack of care while effectively trapped can itself be traumatizing, compounding the trauma of incarceration.

## V.     Conclusion and Recommendations

39. Reducing the size of the population in jails and prisons is crucial to reducing the level of risk both for those within those facilities and for the community at large. As such, from a public health perspective, it is my recommendation that individuals who can safely and appropriately remain in the community not be placed in BOP facilities at this time. I also recommend that individuals who are already in these facilities should be evaluated for release.

40. This is more important still for individuals with preexisting conditions (e.g., heart disease and hypertension, chronic lung disease, chronic liver disease, suppressed immune system, morbid obesity, diabetes) or who are over the age of 65.

41. Health in jails and prisons is community health. Protecting the health of individuals who are detained in and work in these facilities is vital to protecting the health of the wider community.

I declare under penalty of perjury that the foregoing is true and correct.

April 24, 2020                                    _____
Wilton, Connecticut                               Dr. Jaimie Meyer

# EXHIBIT B

Case 5:17-cv-00300-JS   Document 303   Filed 05/21/20   Page 82 of 142
Case 3:20-cv-00569   Document 102   Filed 04/27/20   Page 2 of 14

1

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF CONNECTICUT

## DECLARATION OF PROFESSOR JUDITH RESNIK REGARDING ENLARGEMENT AND THE USE OF PROVISIONAL REMEDIES FOR DETAINED INDIVIDUALS

I have been asked to make this declaration to explain my understanding of the remedies, both provisional and permanent, that federal judges can provide to people who are incarcerated and facing the threat of COVID-19. Because I have practiced in the District of Connecticut for decades and represented prisoners before the federal court here, I have had personal experience with the use of enlargement in habeas corpus cases. Given that this provisional remedy is not regularly discussed in reported decisions or in academic analyses, I believe that my experiences and knowledge can be useful to the Court. This opinion is mine and is not that of the institutions with which I am affiliated. I declare that the following is a true and accurate account of my own work as a lawyer, of the pertinent legal principles as I understand them, and of how these precepts can apply in this unprecedented context.

### My Background

1.    I have worked on occasion as a lawyer, including in the clinical programs at Yale Law School and at U.S.C. I have appeared before the United States Supreme Court and in federal district and appellate courts. I have also been appointed by federal judges to assist in issues arising in large-scale litigation. Below, I provide a few aspects of my work particularly relevant to this declaration. I attach my resume as Exhibit A to this Declaration.

2.    From 1977 until 1980, I was a supervising attorney at Yale Law School's clinical program, which then provided legal services to federal prisoners housed at F.C.I. Danbury.

3.    I am now the Arthur Liman Professor of Law at Yale Law School where I teach courses, including on federal and state

Case 5:17-cv-00390-JS   Document 303   Filed 05/21/20   Page 83 of 142
Case 3:20-cv-00569   Document 112   Filed 04/27/20   Page 3 of 14

2

courts; procedure; large-scale litigation; federalism; and incarceration.

4.    I have taught law for decades. Much of my focus has been on the role and function of courts, and the relationship of governments to their populations. I regularly teach the class entitled Federal and State Courts in the Federal System. Readings for students include materials on habeas corpus and on civil rights litigation.

5.    In 2018, I was awarded an Andrew Carnegie Fellowship to work on a book, tentatively entitled *Impermissible Punishments*, which explores the impact of the 1960s civil rights revolution on the kinds of punishments that governments can impose on people convicted of crimes. Central to this book is the role that access to courts played for people held in detention.

6.    I am the Founding Director of the Arthur Liman Center for Public Interest Law. The Liman Center teaches classes yearly, convenes colloquia, does research projects, supports graduates of Yale Law School to work for one year in public interest organizations, and is an umbrella for undergraduate fellowships at eight institutions of higher education.

7.    I write about the federal courts; adjudication and alternatives such as arbitration; habeas corpus and incarceration; class actions and multi-district litigation; the judicial role and courts' remedies; gender and equality; and about transnational aspects of these issues. In recent years, I have spent a good deal of time doing research related to prisons. I have helped to develop a series of reports that provide information nation-wide on the use of solitary confinement.

8.    In February of 2019, I testified before the U.S. Commission on Civil Rights at its hearing on women in prison and co-authored a statement related to the isolation of many facilities for women, their needs for education and work training, and the discipline to which they are subjected. *See* Statement submitted for the record, *Women in Prison: Seeking Justice Behind Bars*, before the U.S. Commission on Civil Rights, March 22, 2019. The report, published a few months ago, reference this testimony. See U.S. Commission on Civil Rights, *Women in Prison: Seeking Justice Behind Bars* (February 2020), available at https://www.usccr.gov/pubs/2020/02-26-Women-in-Prison.pdf.

Case 5:17-cv-00390-JS   Document 302   Filed 05/21/20   Page 84 of 142
Case 3:20-cv-00569   Document 103   Filed 04/27/20   Page 4 of 14

3

### Remedies Available in the Federal Courts:
### Habeas Corpus, Civil Rights Litigation, and Enlargement

9.   In light of my knowledge of the federal law of habeas corpus, state and federal court relations, procedure, and remedies, I have been asked by counsel for the petitioners/plaintiffs to address the range of responses available to judges presiding in cases that raise claims related to COVID-19.

10.   As I understand from public materials on the health risks of this disease, COVID-19 poses a deadly threat to the well-being and lives of people who contract this disease. To reduce the risk and spread of this disease, our governments have instructed us to stay distant from others and to take measures that are extraordinary departures from our daily lives and routines.

11.   Applying these urgent medical directives to prisons poses challenges in every jurisdiction. Governing legal principles about prisoners' access to courts were not framed to address COVID-19's reality: that being inside prisons that are densely populated can put large numbers of people (prisoners and staff) at risk of immediate serious illness and potential death.

12.   These unprecedented risks from and harms of COVID-19 in prison raise a new legal question: whether COVID-19 has turned sentences which, when imposed, were (or may have been) constitutional into unconstitutional sentences during the pendency of this crisis.

13.   When sentencing people to a term of years of incarceration, judges had no authority to impose putting a person at grave risk of serious illness and death as part of the punishment for the offense. Now, such grave risks and harms can arise from the fact of incarceration.

14.   A recent Supreme Court case, *Montgomery v. Louisiana*, 136 S.Ct. 718 (2016), provides an analogous situation - a constitutional-when-sentenced but unconstitutional-now sentence. The Court determined that, in light of new understandings of the limits of brain development in juveniles, sentences of life without parole (LWOP) imposed on individuals who had committed crimes under the age of eighteen were lawful when issued but became unconstitutional. As a consequence, parole boards or courts had to reconsider whether LWOP remained appropriate. COVID-19 raises a parallel question, as it requires courts to address whether sentences lawful at imposition can (at least temporarily) no longer

Case 5:17-cv-00390-JS   Document 302   Filed 05/21/20   Page 85 of 142
Case 3:20-cv-00569   Document 103   Filed 04/24/20   Page 3 of 14

4

be served in prisons because otherwise, the sentence would become an unconstitutional form of punishment. In normal times, using *Montgomery v. Louisiana* as a guide, federal judges could remit eligible individuals to state courts and parole boards. But in these abnormal times, the speed at which decisions are made is critical. Therefore, as I discuss below, provisional remedies (enabling enlargement and release for some individuals and de-densifying for others) are necessary.

15.   The classic and longstanding remedy for relief from unconstitutional detention, conviction, and sentences is habeas corpus. The Constitution enshrined the remedy of habeas corpus, which has a substantial common law history and is codified in federal statutes. *See generally* Paul D. Halliday, *Habeas Corpus* (Harvard U. Press, 2012); Amanda L. Tyler, *Habeas Corpus in Wartime* (Oxford U. Press, 2017); Randy Hertz and James Liebman, *Federal Habeas Corpus Practice and Procedure* (2 volumes, 2019); Hart & Wechsler, *The Federal Courts and the Federal System*, Chapter X1, 1193-1164 (Richard H. Fallon, Jr, John F. Manning, Daniel J. Meltzer & David Shapiro, 7th ed., 2015). These citations are the tip of a vast and substantial literature that aims to understand the history and law of habeas corpus.

**The Legal Thicket**

16.   As is familiar, in federal courts, federal petitioners file under 28 U.S.C. §2255 (post-conviction motions) and under §2241 (the general habeas statute), both of which are civil actions.

17.   For example, when I worked at Yale Law School in its clinical program in the late 1970s, we filed lawsuits for federal prisoners predicated on 28 U.S.C. §2241 as well as (in appropriate situations) on 28 U.S.C. §1331 (general question jurisdiction) and 28 U.S.C. §1361 (mandamus), and in several instances, we filed cases as class actions. In the mid-1970s, the Supreme Court provided rules and forms for §2254 and §2255 filings. The Federal Rules of Civil Procedure supplement those rules.

18.   Congress has recognized that federal judges are authorized under the habeas statutes to "summarily hear and determine the facts, and dispose of the matter as law and justice require." *See* 28 U.S.C. §2243. In addition to this statutory authority, federal judicial power is predicated on the constitutional protection of the writ and on the common law.

Case 5:17-cv-00390-JS   Document 303   Filed 05/21/20   Page 86 of 142
Case 3:20-cv-00569   Document 32   Filed 04/27/20   Page 6 of 14

5

19.  Congress has channeled and circumscribed some of federal judicial authority through the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) and, relatedly, under the Prison Litigation Reform Act (PLRA) of 1996. Moreover, the Supreme Court has issued many decisions interpreting the prior habeas statutes, the 1996 revisions in AEDPA, and the intersection of habeas and civil rights claims brought under 42 U.S.C. §1983. The result is a dense arena of law and doctrine that can be daunting for litigants and jurists alike.

20.  Some Supreme Court decisions, written to address claims by state prisoners, have delineated litigation focused on the fact or duration of confinement, for which release is the remedy and habeas is the preferred route, from challenges to conditions of confinement, for which the Court has required use of 42 U.S.C. §1983. *See, e.g., Preiser v. Rodriguez*, 411 U.S. 475 (1978); *Heck v. Humphrey*, 512 U.S. 477 (1994).  Yet that distinction is hard to apply, and many opinions have identified that the overlap, as exemplified by *Mohammad v. Close*, 540 U.S. 744 (2004), *Wilkinson v. Dotson*, 544 U.S. 74 (2005), and by other Supreme Court and lower court decisions.

21.  COVID-19 poses a new and painful context in which to undertake that analysis. Some reported decisions addressing the constitutional right of prisoners that officials not be "deliberately indifferent to serious medical needs" consider those Eighth Amendment claims to be appropriate for §1983 because they relate to conditions. But this deadly disease turns ordinary conditions into potentially lethal threats of illness for which the remedy to consider is release of at least some prisoners because density puts people at medical risk.

22.  Because COVID-19 can end people's lives unexpectedly and abruptly, COVID-19 claims turn the condition of being incarcerated into a practice that affects the fact or duration of confinement. In my view, COVID-19 claims, therefore, collapse the utility and purpose of drawing distinctions between what once could more coherently be distinguished.

23.  Courts need also to consider how COVID-19 fits (or not) with provisions of AEDPA and the parameters of the PLRA. Again, new problems have emerged. For example, in some contexts for state and federal prisoners, a question of exhaustion of remedies arises. Often one issue is the ability of the executive branch to respond quickly. In the COVID context, day by day, the risk of illness increases for prisoners and staff, which endanger health care resources. Exhaustion would be "futile" if other branches of

Case 5:17-cv-00390-JLS   Document 303   Filed 05/21/20   Page 87 of 142
Case 3:20-cv-00569   Document 302   Filed 04/27/20   Page 86 of 14

6

government are not prompt in response and if people become sick, risks skyrocket, and deaths occur.

24.   "Futility" thus needs to be analyzed in terms not only of the capacity of institutions but in terms of the likelihood that the people seeking relief will be well enough to have the capacity to do so, and that the remedy provided will be effective given the alleged harm.

25.   Other legal issues include when class actions are appropriate and the criteria of Rule 23 are met; the merits of arguments about unconstitutional sentences and conditions; and the range of remedies.

## The Availability of Provisional Remedies

26.   The reason to flag some of the many issues that litigation of both habeas petitions and civil rights cases entail is to underscore the importance of considering provisional remedies when cases are pending. In general, time is required for lawyers to brief and for judges to interpret and apply the law. But waiting days in a world of COVID infections can result in the loss of life.

27.   While courts have not faced COVID before, they have faced urgent situations, which is why provisional legal remedies exist. Courts have two ways to preserve the *status quo* – which here means protecting to the extent possible the health of prisoners, staff, and providers of medical services. One route is the use of temporary restraining orders and preliminary injunctions. These remedies require no explanation because they are familiar procedures. *See* Fed. R. Civ. Pro. 65.

28.   Another option is an aspect of federal judicial power that is less well known. District courts have authority when habeas petitions are pending to "enlarge" the custody of petitioners. "Enlargement" is a term that, as far as I am aware, is used only in the context of habeas. (More familiar terms for individuals permitted to leave detention are "release" and "bail," and some decision that "enlarge" petitioners use those words rather than enlargement).

29.   The distinction is that enlargement is not release. The person remains *in custody* – even as the place of custody is changed and thus "enlarged" from a particular prison to a hospital, half-way house, a person's home, or other setting. Enlargement is a

Case 5:17-cv-00390-JS   Document 303   Filed 05/21/20   Page 88 of 142
Case 3:20-cv-00569   Document 102   Filed 04/27/20   Page 8 of 14

7

provisional remedy that modifies custody by expanding the site in which it takes place. In some ways, enlargement resembles a prison furlough.

30.   Enlargement has special relevance when the PLRA has application. As I understand the PLRA's rules on the "release" of prisoners, enlargement would not apply, as enlargement is not a release order. And, of course, interpreting the many directives of the PLRA in light of COVID entails more elaboration that my comments here.

31.   The need to work through that statute and case law is another reason why the availability of provisional remedies is so important. Enlargement provides an opportunity for increasing the safety of prisoners, staff, and their communities while judges consider a myriad of complex legal questions.

32.   I first encountered the provisional remedy of enlargement in the 1970s, when I represented a prisoner – Robert Drayton – who was confined at F.C.I. Danbury and who filed a habeas petition alleging that the U.S. Parole Commission had unconstitutionally rescinded his parole.

33.   The Honorable T.F. Gilroy Daly, a federal judge sitting in the District of Connecticut, granted Mr. Drayton's request for enlargement while the decision on the merits was pending. Mr. Drayton returned to his home in Philadelphia and came back to Connecticut for the merits hearing. Judge Daly thereafter ruled in his favor; that decision was upheld in part and reversed in part. *See Drayton v. U.S. Parole Commission*, 445 F. Supp. 305 (D. Conn. 1978), *affirmed in part*, *Drayton v. McCall*, 584 F.2d 1208 (2d Cir. 1978).

34.   Judge Daly did not write a decision explaining the enlargement.  Given that I knew that the use of enlargement was not always recorded in published decisions and that enlargement had special relevance here, I decided I should learn more about other courts' discussion of this provisional remedy.

35.   The provisional district court remedy of enlargement is not mentioned directly in in federal rules governing the lower federal courts. In contrast, at the appellate level, Federal Rule of Appellate Procedure (FRAP) 23 provides in part that:

    While a decision not to release a prisoner is under review, the court or judge rendering the decision, or the court of appeals, or the Supreme Court, or a judge or justice of

Case 5:17-cv-00390-JS Document 302 Filed 05/21/20 Page 89 of 142
Case 3:20-cv-00569 Document 33-2 Filed 04/27/20 Page 9 of 14

8

either court, may order that the prisoner be: (1) detained
in the custody from which release is sought; (2) detained in
other appropriate custody; or (3) released on personal
recognizance, with or without surety. While a decision
ordering the release of a prisoner is under review, the
prisoner must – unless the court or judge rendering the
decision, or the court of appeals, or the Supreme Court, or
a judge or justice of either court orders otherwise – be
released on personal recognizance, with or without surety.

As that excerpt reflects, the Rule uses language familiar in the
context of bail and provides that appellate courts may also
determine that a petitioner be detained in "other appropriate
custody."

36.   Federal courts at all level are authorized by Congress
to decide habeas cases "as law and justice requires." 28 U.S.C.
§2243. The case law also references that, at the district court
level, the authority to release a habeas petitioner pending a
ruling on the merits stems from courts' inherent powers. *See, e.g.*,
*Mapp v. Reno*, 241 F.3d 221, 226 (2d Cir. 2001). And, as I noted,
in these reported decisions, the terms "bail" or "release" are
sometimes used instead of or in addition to "enlargement."

37.   In the last weeks, the saliency of enlargement has
prompted me to review more of the law surrounding it. To gather
materials and opinions on enlargement, I asked two law students,
Kelsey Stimson of Yale Law School and Ally Daniels of Stanford Law
School, to help me research what judges have said about enlargement
and what others have written. Below I detail some of the governing
case law. The Hertz & Liebman *Treatise on Habeas* also has a section
(§14.2) devoted to this issue.

38.   Some of the decisions involve requests for release when
habeas petitions were pending from state prisoners, and others
from federal prisoners, or from people in immigration detention.
Further, several appellate cases address the issue of whether a
district court order on enlargement was appealable as of right or
subject to mandamus.

39.   My central point is that, amidst these various debates
about appealability and the test for enlargement/release, most
circuits have recognized that district courts have the authority
to order release. *See e.g.*, *Woodcock v. Donnelly*, 470 F.2d 93, 43
(1st Cir. 1972); *Mapp v. Reno*, 241 F.3d 221, 226 (2d Cir. 2001);
*Landano v. Rafferty*, 970 F.2d 1230, 1239 (3d Cir. 1992); *Calley v.
Callaway*, 496 F.2d 701, 702 (5th Cir. 1974); *Dotson v. Clark*, 900

Case 5:17-cv-00308-JS Document 303 Filed 05/21/20 Page 90 of 142
Case 5:20-cv-00065 Document 13-3 Filed 04/27/20 Page 100 of 142

9

F.2d 77, 79 (6th Cir. 1990); *Cherek v. United States*, 767 F.2d
335, 337 (7th Cir. 1985); *Martin v. Solem*, 801 F.2d 324, 329 (8th
Cir. 1986); *Pfaff v. Wells*, 648 F.2d 689, 693 (10th Cir. 1981):
*Baker v. Sard*, 420 F.2d 1342, 1342-44 (D.C. Cir. 1969).

40.    The Fourth and Eleventh Circuits appear, albeit less
directly, to recognize enlargement authority. *See Gomez v. United
States*, 899 F.2d 1124, 1125 (11th Cir. 1990); *United States v.
Perkins*, 53 F. App'x 667, 669 (4th Cir. 2002). A Ninth Circuit
opinion from 1989 likewise appears to recognize the power of
district courts to grant release pending a habeas decision where
there are "special circumstances or a high probability of success."
*See Land v. Deeds*, 878 F.2d 318 (9th Cir. 1989). Thereafter,
another decision, *In re Roe*, described the Circuit as not having
ruled on the issue in terms of state prisoners. *See* 257 F.3d 1077
(9th Cir. 2001).[1]

41.    A discrete question is the standard for enlarging
petitioners. To obtain an order for release pending the merits of
habeas decision, the petitioner must demonstrate "extraordinary
circumstances" and that the underlying claim raises "substantial
claims." *See e.g. Mapp v. Reno*, 241 F.3d 221, 226 (2d Cir. 2001).
Courts have also discussed that release is appropriate when
"necessary to make the habeas remedy effective." *Mapp*, 241 F.3d at
226*; see also Landano v. Rafferty*, 970 F.2d 1230, 1239 (3d Cir.
1992). As that Third Circuit decision explained, release was
"available 'only when the petitioner has raised substantial
constitutional claims upon which he has a high probability of
success, and also when extraordinary or exceptional circumstances
exist which make the grant of bail necessary to make the habeas
remedy effective.'"

42.    Some judges have interpreted the "substantial questions"
prong to require the underlying claim to have a "high probability
of success." *See Hall v. San Francisco Superior Court*, No. C 09-
5299 PJH, 2010 WL 890044, *1 (N.D. Cal. Mar. 8, 2010); *In re
Souels*, 688 F. App'x 134, 135 (3d Cir. 2017). That test resembles
standards for preliminary injunctive relief and for stays, which

---

[1] Subsequent lower court cases debated whether district courts do possess such
authority. *See, e.g., Hall v. San Francisco Sup. Ct.*, 2010 WL 890044, at *2
(N.D. Cal. Mar. 8, 2010) ("Based on the overwhelming authority [of other circuit
courts] in support, the court concludes for purposes of the instant motion that
it has the authority to release Hall pending a decision on the merits."); *United
States v. Carreira*, 2016 U.S. Dist. LEXIS 31210, at *4, (D. Haw. Mar. 10, 2016)
("[T]his Court declines to address the merits of Petitioner's bail requests in
the absence of definitive guidance from the Ninth Circuit regarding the scope
of this Court's bail authority.").

Case 5:17-cv-00308-JS  Document 303  Filed 05/21/20  Page 91 of 142
Case 3:20-cv-00065  Document 13-3  Filed 04/27/20  Page 11 of 14

10

include an assessment of the likelihood of success on the merits
and of whether the balance of hardships tips in favor of altering
the status quo. (And, of course, more can be said about the nuances
of these bodies of law as well.)

43.  A few cases focus on the health of a petitioner as
central to the conclusion that "extraordinary circumstances"
exist. For example, in *Johnston v. Marsh*, the petitioner, Alfred
Ackerman, brought a habeas claim alleging that he was convicted in
Pennsylvania through a trial that lacked "due process." 227 F.2d
528 (3d Cir. 1955). Ackerman asked for release pending a decision
on the merits of his habeas petition; he argued that he had
advanced diabetes and was "rapidly progressing towards total
blindness." *Id.* at 529. The district court authorized Ackerman to
be released to a private hospital. The prison warden (Frank
Johnston) went to the Third Circuit invoking sought  writs of
prohibition and mandamus to order the district court (Judge Marsh)
to change his ruling. Rejecting the petitions, the Third Circuit
affirmed that district courts possessed the  authority to order
relocation while the habeas petition was pending*. Johnson v. Marsh*
has been cited in more recent cases to illustrate that findings of
extraordinary circumstances may "be limited to situations
involving poor health or the impending completion of the prisoner's
sentence." *Landano*, 970 F.2d at 1239.

44.  The court in *In re Souels* addressed what showing of
health problems constituted extraordinary circumstances. *See* 688
F. App'x at 135-36. Sean Souels, who was serving a 46-month federal
prison sentence, petitioned for a writ of mandamus directing the
court to rule on his writ of habeas corpus and sought release
pending the decision. *Id.* at 134. The court denied Souels bail
because "he [did] not describe his medical conditions in any detail
or explain how he cannot manage his health issues while he is in
prison." *Id.*

45.  Health is not the only extraordinary circumstance that
has been the basis for enlargement. For example, in *United States
v. Josiah*, William Josiah brought a writ of habeas corpus after
the Supreme Court invalidated the residual clause of the Armed
Career Criminal Act (ACCA) and altered the method for determining
whether prior convictions qualify as violent felonies under the
ACCA. 2016 WL 1328101, at *2 (D. Haw. Apr. 5, 2016). Josiah, who
was serving a federal prison sentence argued that his prior
convictions did not qualify as violent felonies and that he should
not be subject to the fifteen-year mandatory minimum. The district
court concluded that because the issue of retroactivity was pending
before the Supreme Court and Josiah would have served his full

Case 5:17-cv-00808-JS Document 303 Filed 05/21/20 Page 92 of 142
Case 5:20-cv-00865 Document 103 Filed 04/27/20 Page 12 of 14

11

sentence if the Court held its prior ruling retroactive, release pending the higher court's ruling was appropriate. *Id.* at *4-6.

46. In circumstances similar to *Josiah*, a district judge sitting in the Central District of Illinois issued three orders granting release, termed bail, to petitioners pending resolution of their habeas claims. See *Zollicoffer v. United States*, No. 15-03337, 2017 WL 79636 (C.D. Ill. Jan. 9, 2017); *United States v. Jordan*, No. 04-20008, 2016 WL 6634852 (C.D. Ill. Nov. 9, 2016); *Swanson v. United States*, No. 15-03262, 2016 WL 5422048 (C.D. Ill. Sept. 28, 2016).

47. Another case involved enlargement in the context of the military. *See Gengler v. U.S. through its Dep't of Def. & Navy*, 2006 WL 3210020, at *6 (E.D. Cal. Nov. 3, 2006). As that court explained, a "district court has the inherent power to enlarge a petitioner on bond pending hearing and decision on his petition for writ of habeas corpus." *Id.* at *5. The judge also noted that a "greater showing must be made by a petitioner seeking bail in a criminal conviction habeas 'than would be required in a case where applicant had sought to attack by writ of habeas corpus an incarceration not resulting from a judicial determination of guilt.'" The court used the test of "exceptional circumstances and, at a minimum, substantial questions as to the merits." *Id.* at 13. The court found exceptional circumstances" based on the fact that the petitioner had been admitted to business school, had been granted permission by his commanding officer to attend, and would be forced to drop out if his custody were not enlarged. The court also ruled that "substantial questions as to the merits" existed because of alleged government's errors in drafting the petitioner's service agreement. *Id.* at *6.

48. As of this writing, I have located three reported cases on COVID. (Given the pace of litigation, I assume that more may have been filed and some decided.)

49. On April 7, the Honorable Jesse Furman, sitting in the Southern District of New York, granted on consent a motion styled "for bail" (the term used in the Second Circuit *Mapp* decision). Judge Furman ordered immediate release under specified conditions, pending the adjudication of the Section 2255 Motion. *See United States v. Nkanga,* No. 18-CR-00730 (S.D.N.Y., Apr. 7, 2020).

50. A second case involves a class action filed by Craig Wilson and others. *See Wilson v. Williams*, No. 4:20-cv-00794-JG, 2020 WL 1940882, at *1 (N.D. Ohio Apr. 22, 2020). Seeking to represent a class of all current and future prisoners of the Elkton

Case 5:17-cv-00306-JS Document 303 Filed 05/21/20 Page 93 of 142
Case 5:20-cv-00065 Document 132 Filed 04/27/20 Page 13 of 14

12

Federal Correctional Institution (FCI) and a subclass of the medically vulnerable population, they sought relief because their continued incarceration subjected all FCI prisoners to substantial risk of harm in violation of the Eighth Amendment.

51.   On April 22, 2020, the federal district court granted in part the request by the *Wilson* class for emergency relief, which included enlargement of a subclass of prisoners challenging the manner in which the sentence was served and hence cognizable as a habeas petition. *See Wilson v. Williams*, No. 4:20-cv-00794-JG, 2020    WL    1940882    (N.D.    Ohio    Apr.    22,    2020)

52.   The third case has less relevance as it was brought by an unrepresented litigant, Richard Peterson, who had originally sought habeas corpus relief on a claim about education credits and then filed an emergency request for release from a California state prison due to COVID-19. No. 2:19-CV-01480, 2020 WL 1640008, at *1 (E.D. Cal. Apr. 2, 2020). The district court noted that a class action raising COVID claims was pending in another federal court in California and that, while the court had the authority to release a person while a habeas petition was pending, Mr. Peterson had not provided evidence sufficient to meet the test to do so.

### Conclusion

53.   In sum, COVID-19 is an unprecedented event that, in my view, raises the legal question of whether, in light of the government mandates for social distancing, sentences (that had been lawful when they were imposed) cannot lawfully be served when the setting puts an individual in a position of untenable risk. Thus, habeas corpus – which addresses the constitutionality of sentences and offers the possibility of release and enlargement – properly provides a jurisdictional basis and remedies for this situation.

54.   I need also to note that, in recent years, the Supreme Court has raised questions in many contexts about the remedial powers of federal judges. Whether the topic is nationwide injunctions or commercial contracts, debates have occurred within the Court about the authority of federal judges.

55.   Those cases do not address the extraordinary and painful moment in which we are all living. Ordinary life has been up-ended in an effort to keep as many people as possible alive and not debilitated by serious illness. Moreover, Supreme Court opinions have not focused on the relevance of remedial debates to the situation were confinement can put entire staffs and detained

Case 5:17-cv-00808-JS  Document 303  Filed 05/21/20  Page 94 of 142
Case 3:20-cv-00869  Document 12  Filed 04/27/20  Page 14 of 14

13

populations at mortal risk. Therefore, judges have the obligation
and the authority to interpret statutes and the Constitution to
preserve the lives of people living in and working in prisons. It
is my hope that this account of earlier uses of enlargement in
this District and the dense account of case law and doctrine will
be of service to this Court and to the parties in understanding
the meaning and import of American law.


Dated:    April 23, 2020




_____
Judith Resnik

# EXHIBIT C

## Declaration of Dianthe Martinez-Brooks

1. I am currently in custody at Danbury FCI in the minimum security women's camp (the "Camp." My Bureau of Prisons ("BOP") Register Number is 71331-050.

2. I am 50 years old. I have asthma, hypertension, arthritis, and systemic lupus erythematosus (SLE), an autoimmune disease. I take Atenolol for hypertension. For my asthma, I have a Proventil emergency inhaler and use an Asmanex Twisthaler (mometasone furoate inhalation powder, 220mg). Since my incarceration began, I have been prescribed steroids once for the joint and muscle inflammation associated with my lupus.

3. I am serving a sentence of 48 months for wire fraud. My release date is 6/25/2022.

4. At the Camp, there are rooms and dorms containing bunk beds. There are 9 rooms, each that can hold 4 to 5 women. There are four dorms: Dorms A, B, C, and D.

5. Before the lockdown on April 15, there were approximately 43 women in the 9 small rooms. On April 15, these women from the rooms were moved to the dorms.

6. I am currently housed in Dorm A. Dorm A has 48 women in it right now, who share 4 showers and 3 toilets. Dorm B has 48 women sharing 5 toilets and 6 showers. In Dorm C, 46 women share 5 toilets and 5 showers. In Dorm D, 7 women are currently sharing 3 showers and 3 toilets.

7. In the dorms, women sleep on bunk beds, with 2 women per bunk bed. The bunk beds are in cubicles. In many of the cubicles, the beds are positioned so they reach from one end of the cubicle to the other—so the only separation between the bed in one cubicle and the bed in the next is the wall of the cubicle, which does not reach to the ceiling. Beds positioned parallel to the wall of the cubicle are also not six feet away from beds in the next cubicle.

8. All cleaning in the Camp is done by prisoners, and cleaning has been sporadic. Many women have quit their jobs. Women are responsible for cleaning their own cubicles.

9. There is a common area in the Camp containing phones, computers, video chat machines, sinks for dishwashing, and hot water taps. There are also common recreation rooms containing tables, chairs, cards, and games. Women also share ice machines where they scoop out ice.

10. There are open bathrooms that can be used by all on the upper level and in the old visiting room.

1

11. We are currently on a lockdown at the Camp.  Each dorm has 45 minutes of recreation in the morning and 1 hour of recreation later in the day. These are the only times of day that we can access the common areas in the Camp with the phones, recreation rooms, etc.

12. I know of two women who self-surrendered to the Camp at the end of March. One came straight into the Camp and the other was quarantined first.

13. Some women have been told that they are on a list for home confinement and would be quarantined before released. On April 6, 23 women were put in Dorm C for quarantine. On April 7, 5 more women were put in Dorm C. On April 10, they moved some women from Dorm C into Dorm D and then added an additional 28 women to both Dorm C and Dorm D.  On April 15, they took all the women who were housed in the rooms and added them to Dorms A, B, and C. At that time, the Camp went into lockdown.

14. Of the approximately 56 women placed in quarantine in the first 2 weeks of April, I am aware of only 4 that have left from Dorm D and one that has left from Dorm C. One of these women was granted compassionate release by the court. I understand that 2 of the other releases were COVID-19 related. The others were at or near the end of their sentences.

15. Even though there is a lockdown, women from different dorms are continuing to comingle. During recreation, women are visiting friends who live in different dorms.

16. Not all staff are regularly wearing masks and gloves.

17. There is no hand sanitizer for use by prisoners or staff.

18. Staff are serving meals. Prisoners are used to assist in food preparation, cooking, and cleaning the kitchen.

19. Each day, staff move between all four dorms in the Camp for count, food delivery, and commissary. We have staff in the Camp that have been at the other two facilities at FCI Danbury. Medical staff see prisoners at all three facilities.

20. Three correctional officers who have been at the Camp have said that they had COVID-19, including one who works in food service.

21. There is no actual medical clinic in the Camp. Instead, there are a series of offices: two are used by medical staff, one by dental staff, and one by psychology. RNs come for pill line in the morning and in the late afternoon. If you are sick, you must go to morning pill line and fill out a sick call request. You then must wait to be called in and it can take days. If there is an emergency, a correctional officer must call for a medical professional to come to the Camp because there is not a medical professional at the Camp 24 hours a day.

2

22. I have a severe peanut allergy. I had a reaction on April 15 when peanut butter was served for dinner and I had to leave the dorm. To date, peanut butter has been served in the dorm 7 times. Medical staff have told me that I should leave for at least an hour to allow the dorm to air out. I have expressed my concerns about this to staff repeatedly.

23. Since I have been incarcerated at FCI Danbury, I have had multiple problems accessing basic medical care. In October 2019, I had difficulty being seen for an upper respiratory infection and my daughter had to contact the facility. It took 8 days for me to be seen and 11 days to get the medication that I needed. In February 2020, I was left without my asthma medication for more than 4 weeks when my prescription ran out. My daughter again needed to contact the facility. My blood pressure medicine ran out on April 2 and my prescription did not reach me until April 10.

24. Since my incarceration, I have only been prescribed steroids once for the joint and muscle inflammation associated with my lupus and have not been brought to see a rheumatologist. I also suffer from migraines and TMJ and have not received treatment for those conditions in BOP custody.

25. On March 26, 2020, I asked the warden for compassionate release.

26. I was given paperwork to sign on April 19 relating to home confinement and/or a halfway house. Then a new memo came out on 4/21/20 saying that if you haven't completed 50% of your sentence you are ineligible. Another memo came out on 4/23/20 saying you must have completed 25% of your time and have 18 months or less remaining on your sentence.

27. There has been no access to the law library for women working on current legal cases and no copy cards available to purchase.

28. I declare under the penalty of perjury that the contents of this declaration are true and correct to the best of my knowledge. I will sign a hard copy of this declaration at my earliest opportunity.


_____/s/_____
Dianthe Martinez-Brooks

April 26, 2020

# EXHIBIT D

**Declaration of Kenneth Cassidy**

I, Kenneth Cassidy, am over the age of 18 and fully competent to make the following

declaration:

1.      I am currently incarcerated at FCI Danbury.  My Bureau of Prisons ("BOP")

Register Number is 48169-054.  I arrived at FCI Danbury on January 21, 2020, my 54th

birthday.

2.      I am assigned to D Unit.  D Unit is a dorm unit, can accommodate up to 80

prisoners, and currently houses approximately 66 prisoners.

3.      I am serving a sentence of 5 years arising from a conviction for conspiracy to

commit wire fraud and willful failure to file an income tax return.  I have no violent offenses on

my record.  The BOP calculates my release date to be March 31, 2021.  My projected home

confinement release date is October 1, 2020.  At sentencing, the Court recommended to the BOP

that I serve the final year of my sentence at a halfway house.

4.      While in the BOP, I have completed the 40-hour non-residential drug treatment

program and taken courses on diabetes and personal finance.  I am on waiting lists to take

courses to become an OSHA-certified laborer and legal assistant.  I have never had an incident

report while in BOP.

5.      I have had three heart attacks.  I have had pneumonia in my right lung more than

20 times, and have been told that I have the lungs of a 70-year-old.  I suffer from many serious

chronic medical conditions including asthma, coronary artery disease, hypertension, Prinzmetal

angina, cervical disc disease, lumbar disc disease, gastroesophageal reflux disease (GERD),

Barrett's esophagus, and diverticulitis resulting in a hernia in the colon wall.  I have a soft tissue

mass on my upper cervical spine resulting in partial paralysis that requires immediate surgery

upon my release. I cannot digest rice, beans or greens. I am severely allergic to ragweed, shellfish, trees and chlorophyll (including in green vegetables). I am morbidly obese.

6.  My current medications include an albuterol inhaler, Lisinprol, Metropolol, Atorvastatin, Nitroglycerin, Docusate and Lasix, as well as breathing treatments and oxygen treatments in the medical department as needed.

7.  Our pharmacy is currently closed because the pharmacist is out. Our medication is being shipped in from FCC Allenwood with several days' delay. As a result, I did not receive the correct dose of my medication for two weeks in April.

8.  The COVID-19 virus has ravaged FCI Danbury. Approximately 80% of prisoners in my unit show flu-like symptoms including fever, coughing, body aches, shortness of breath, chest pressure, and headaches.

9.  The prison staff's response has been disrespectful, degrading, dehumanizing and threatening. Social worker Adamson has said to me, "It's not that big. Don't worry about it. We got it under control," "This is nothing more than an overblown flu. You guys are all becoming hypochondriacs. You're paranoid after watching too much television. Stop watching the TV. Stop watching the news because it's only going to make you guys paranoid over nothing," "Stop being a hypochondriac, it's not going to get you out of prison," and "Lay down, take a Tylenol, there's nothing we can do."

10.  Warden Easter and Associate Warden Comstock told us, in effect, we know it's difficult for you guys to social distance, so just try your best to do what you can. That is the only instruction we have received on social distancing.

11.  For the last couple of weeks, an associate warden has come through the unit daily to take prisoners' temperatures. He approaches prisoners one at a time and aims a temperature

wand at our foreheads.  He stands so close to you that you could kiss him.  When a prisoner's temperature is taken, and there is no fever, he states the number loudly so that others are at ease. When a prisoner has a fever, he states the number softly so that only the prisoner can hear, if he states it at all.

12.     Just because you have a fever doesn't mean you are taken off the unit.  In the beginning, there was such chaos that the staff couldn't handle the influx and even if you had a fever, you stayed in the unit.  Until recently, a prisoner with a low-grade fever of 100 or 101 degrees would be given Tylenol for 2 or 3 days to see if the Tylenol can break the fever.

13.     For the last couple weeks, prisoners with a fever have been taken to medical. Sometimes, however, a prisoner has a fever and the associate warden attributes the temperature reading to equipment error.  When the temperature wand comes up with a low-grade fever, the associate warden will "reset" it and pretend to take another reading.  He will announce another number, but he won't even aim the wand at the prisoner's forehead.  The associate warden does not show the prisoners the LCD screen on the wand that displays the temperature, so we have to go by whatever he tells us.

14.     If the associate warden acknowledges that a prisoner has a temperature, then he will escort the prisoner to medical.  Prisoners who have gone to medical have told me what happens there.  At medical, the prisoner is given two or three Tylenol and told that the wand is not working properly and that they do not have a fever, and then sent right back to the unit. One of the prisoners who went to medical and came right back has been vomiting blood all week.  When his temperature was taken in the unit, he was told that he has a 101.2 degree fever. When he got to medical, he was given Tylenol, told that his temperature is 98.7 degrees, and sent

back to the unit.  They never took his temperature in medical.  When he got back to the unit and told us all this, his forehead was hot.

15.     Although most of us are sick, only three prisoners with a fever have been taken out of the unit and quarantined.  These prisoners were taken to A Unit, a cell-based isolation unit. Two of these three prisoners returned to our unit about 8-10 days after testing positive for COVID-19.  One was taken out on March 27 and the other was taken out on March 29. I understand that when they were in the isolation unit, they were given two Tylenol per day. Otherwise, they did not receive any medical treatment.  Shortly after they both returned to my unit on April 6, the unit became deathly sick.  Prisoners were up in the middle of the night coughing and gasping for air.  It was at its worst from approximately April 7 to April 12. The third prisoner remains in isolation.

16.     The prison recently opened another isolation unit, K Unit, which was condemned last winter for asbestos.  Even though the BOP was supposed to renovate this unit and remove the asbestos, and has not done so, the prison is justifying its use as a temporary.

17.     The COVID-19 virus has decimated the medical department.  I was told by the assistant health administrator, Mr. Dakote, and a physician assistant, Mr. Quest, that our regular physicians have been out for weeks.  Sick call requests have been going unanswered for weeks. In the last month, I have made three requests regarding an abnormal tumor near my rectum, and was told "that's not an emergency" even though there is dark black blood in my bowels on occasion.  The tumor has grown in the past month, obstructing my bowels, and medical has still not evaluated me.  If you don't have a fever, you have no access to a physician.

18.     All sick call triage for our unit is being handled by a social worker who has no formal medical training.  The social worker, Ms. Adamson, has told us "you are all fucking

children with nothing more than a flu so stop your shit you're not going home early." She has said, "if you did the crime stop crying and do the time." She has said, "I don't need medical training to tell you you're not sick so go lay the fuck down." Prisoners who present for sick call triage who do not have a fever are denied access to any further medical treatment. Sometimes Ms. Adamson brings along the dental hygienist from the facility to help with the triage.

19.    Ms. Adamson is also the staff member handling all CARES Act and compassionate release requests.

20.    Before the pandemic, we ate in the mess hall with several other units. From approximately March 29 until April 5, we ate in the mess hall with another unit. From approximately April 6 until April 10, our unit ate in the mess hall by itself. Since then, we have been eating all meals in our unit.

21.    Food service is closed. The COs are preparing our food. Food is delivered on a bread rack and is placed in your unit directly on your chair or on your bed. We only have laundry once a week at the most, and only if there is hot water and a staff member available. As a result, we cannot clean the stains on our bedding and clothes from when staff drop the trays on our chairs and beds.

22.    Our meals are smaller. The portions were cut in half and we are not meeting the nutritional guidance of 2,000 calories per day. Breakfast will be one sour milk with one small piece of half-cooked cake batter. Lunch will be some type of hot food with a green vegetable or half-cooked rice as filler. Lunch the other day was four ounces of some type of cream salad with green peas. For dinner we are given a hamburger bun and a piece of meat, or four ounces of tuna with one piece of bread.

23.     All special medical diets are suspended indefinitely.  I was prescribed a special medical diet by Dr. Greene and Dr. Febregas-Schindler on January 21, which was updated and modified by Dr. Febregas-Schindler on March 11.  I am on a special medical diet of no green vegetables or plants due to my allergy to chlorophyll, and no rice and beans due to my diverticulosis.  Despite this I have been given food with greens, rice and beans.  I informed Ms. Adamson about my special medical diet not being met, and she responded, "Mr. Cassidy, I have other more important things to address with this virus being widespread than worry about what you can or cannot eat."

24.     My chronic medical conditions have deteriorated as a result of not being given my special medical diet.

25.     The prison closed and locked the law library indefinitely, and has suspended the administrative remedy process indefinitely.  The staff has stated that they are short-handed to review, investigate and respond to every grievance under the state of emergency the facility is operating in.  This resulted in me being unable to access administrative remedy and compassionate release procedures.

26.     Legal mail is being delayed and at times not picked up due to staff shortages. According to the local post office this has been an ongoing issue with several bins being left behind by prison staff.  I know this because we have a prisoner in my unit who gets mail from England, and he hasn't been getting his magazines for the last month and a half.  His family called the local postmaster in Danbury, and the postmaster informed his family that this has been an ongoing problem with Danbury for 37 years but that it has gotten worse in the last month and a half.  The postmaster informed his family that prison staff leave behind a couple of bins, say

they're going to come back, and never come back, so they're always a couple days behind on the bins.

27.     Legal calls are being denied for open and pending cases that require access to attorneys.  I filed a written request to call my attorney and was told that a compassionate release motion is not a legal matter that is recognized.  The case manager informed me that in her view the matter did not meet the criteria she was told by the unit manger to be considered a legal matter.  Legal requests from attorneys are going unanswered because, per the staff, they "don't have time to handle these nonsense calls with all they are dealing with all the futile compassionate release requests."

28.     Until approximately March 29, our unit took rec with the rest of the prison, and we had access to both an indoor rec area and the outside rec yard.  After around April 6, we were no longer allowed to use the indoor rec area.  Instead, we used the outside rec yard with two other units, E Unit and F Unit.  That lasted for about a week.  For the last two weeks, our unit has gone to the outside rec yard by ourselves.   When we go out to the rec yard, prisoners move out at the same time, standing next to each other, through the same 4' wide door.  During rec, prisoners stand right next to each other.  There is no social distancing.

29.     We are experiencing serious staff shortages and they keep getting worse and worse.  There are way fewer COs than normal.  95% of the time, there is no officer in the unit.  Sometimes we only see staff on the unit during count.  You see the same guys working 80-100 hour weeks.  I estimate that there are only about 40 COs on the entire compound.  The COs are being "augmented," meaning that a random staff member from medical, education, etc. has to cover units when COs are short-handed.

30.     If there is a medical emergency, and we cannot find a CO, the prisoners respond and help the prisoner.  When prisoners collapse, it is the other prisoners who carry the prisoner to his bed.  In order to get a CO, we have to yell out the window hoping that somebody hears us.  I have witnessed at least three prisoner medical emergencies that were addressed only by other prisoners.

31.     Social distancing is impossible in here.  All 66 prisoners in my unit sleep in the same room in bunk beds.  When I am sleeping, I am within one foot of the prisoner sleeping above me, and only about three or four feet away from the four prisoners in the two bunks on either side of me.  There are no barriers between the beds.

32.     In my unit there are five toilets, one urinal, three showers, and six sinks, including five cold-water wash sinks and one hot-water slop sink for washing eating utensils.  The slop sink is right next to the other sinks.  The sinks are about four inches apart.  Sometimes two people have to share the same sink.  The showers are two feet across the hall from the toilets.  The tiles in the showers are corroded and filthy with mold.  There are holes in the rotted woods in the ceiling above the showers, exposing rusted pipes, and when the prisoners above us in Unit C use their showers, water leaks down on us.

33.     There is one liquid soap dispenser that was just put up last week.  When we run out of liquid soap, we have to wait a day or two for it to get refilled.  There are no paper towels or hand towels.  We use toilet paper to dry our hands.  There is no communal bar soap in the bathroom.  You have to buy your own bar of soap from commissary.  Indigent prisoners do whatever they have to do to get themselves a bar of soap.  The prison does not give out shampoo, toothpaste, or mouthwash to indigent prisoners, either.  We are also not provided with any cleaning supplies.

8

34.     There are two television rooms in the unit.  Each room is about 10' by 12' with two televisions.  The rooms can hold about 20 people and there are typically about 15-20 people in each of them.  There is no ventilation in the television rooms.

35.     There is a small telephone room, approximately 3' by 8', containing two telephones.  The telephones are about eight inches apart.  Both telephones are almost always in use.  When two prisoners are using the telephones, they have to stand within two feet of each other.  Typically, there are two prisoners on the phones, and the rest wait in a line in the hallway, standing right next to each other, close enough to touch each other.  Since they started giving us free calls two weeks ago, there is always a line to use the telephones.  The telephones are not cleaned between use.

36.     There is also a small computer room, approximately 8' by 10', containing three computers, an eating table, and an ice dispenser.  The amount of mold that is built up in the ice dispenser is incredible.  The computers are in constant use.  There are no barriers between the computers.  At any given time, there will be three people in the room using the computers, three people standing behind them in the room waiting to use the computers, and several more people lining up shoulder-to-shoulder outside the room, right next to each other.  The computers are not cleaned between use.

37.     The commissary is open, but they are out of 50% of the items and a lot of the items are past their due date.  They bring the commissary into a hallway in a laundry bin, and then the entire unit stands in the hallway and we wait for our names to be called.  The hallway is narrow and no more than 20 feet long.  We stand right on top of each other.  If you miss your name then you have to wait until the end of commissary, so everyone comes out into the hallway at the same time.

9

38.     Staff give out medication twice a day.  They shout "medication" and stand outside the door.  Prisoners form a pill line, standing right next to each other.  If you don't hear "medication" you don't get your medication for the day, so everyone comes up at the same time and crowds each other.

39.     On April 9, staff gave the prisoners in my unit one mask each.  A week later, they gave us a second mask.  We haven't received a mask in the last week.  These masks are thin, papery disposable hospital masks that you cannot clean.  They fall apart if you wet them.  There is one prisoner with chronic obstructive pulmonary disease (COPD) and a beard who does not wear a mask.  He is not being made to wear a mask.

40.     Staff have not provided us with gloves.  Staff do not wear gloves regularly.

41.     Staff wear masks in our unit.  But we see them take them off when they leave the unit and put them back on when they come back into the unit.  Staff will go into the A Unit or K Unit, the two units with people who are positive with the virus, and come back into our unit without changing their gloves, or they'll take off their gloves outside the unit but won't wash their hands and won't change their masks. The entrances to A Unit and K unit are both on the first floor, so my whole unit can see staff going in and out of those units.

42.     On March 13, I submitted a request to the Warden through Unit Manager Moore for compassionate release.  Around March 20, I learned that that she had tested positive for COVID-19. She is still not back in the facility. On April 1, I asked for an administrative remedy and was told that the administrative remedy process was suspended.  On April 24, I received a denial of my compassionate release request from the warden.

43.     I have a secure and stable home environment that I can go to immediately if I am released.  I would be confined to my family residence of the last 16 years in Brooklyn, New

York with my brother, Donald Cassidy.  I would stay at home and would not be out in the

community.  My brother Michael Cassidy and sister Dorothy Peters both will assist with any

financials.  I also have employment secured with Quick Call Medical Answering Service.

I have reviewed the information contained in this declaration with counsel by telephone

and correspondence.  I declare under the pains and penalties of perjury that the contents are true

and correct to the best of my knowledge.  I will sign a hard copy of this declaration at my earliest

opportunity.

/s/ Kenneth Cassidy (by consent)
Kenneth Cassidy


April 26, 2020



# EXHIBIT E

## <u>Declaration of Christina Korbe</u>

1.  I am currently in custody at Danbury FCI in the low security satellite prison ("FSL"). My Bureau of Prisons ("BOP") Register Number is 30233-068.

2.  I have been incarcerated in the BOP for almost 12 years. My release date is set for May 18, 2022.

3.  I am 51 years old. I have been diagnosed with degenerative disc disease and post-traumatic stress disorder.

4.  In early April, I began experiencing symptoms consistent with COVID-19. My symptoms included a severe headache, body aches, fever, shortness of breath, and a terrible cough. I also lost my appetite and my sense of smell. The cough was the worst cough I have ever had. At one point, I coughed so hard that I was afraid I had fractured a rib.

5.  I spoke to the medical department multiple times about my symptoms. When I coughed so hard that I feared I had fractured a rib, I submitted a request for an x-ray. In response, I was called to medical, but I was not given an x-ray. Medical told me that my vitals were good and that I was "healthy," and that I probably just pulled a muscle rather than fractured a rib. I was given no treatment. I bought Tylenol from the commissary for my pain.

6.  My symptoms lasted for approximately three weeks. Upon hearing how hard I was coughing, one of the psychologists commented that I should be tested because I could be infecting other people. I responded, "Could you please make that happen?"

7.  I was never offered a test for COVID-19.

8.  I was also never quarantined in response to my symptoms. Instead, I was kept in general population.

9.  At the FSL, all of us live in one dormitory-style room, which is like a big "warehouse," with about 160 to 170 inmates total. The dormitory is divided up into cubicles with two bunkbeds in each. The dormitory also contains our common area with televisions, hair care, laundry, phones, and computers, as well as our bathrooms and showers.

10. There are currently three people, including me, living in my cubicle. Many of the cubicles have four people. My cubicle is approximately 10 feet by 10 feet. Within the cubicle, the two bunkbeds are approximately 6 feet apart. Most of the cubicles are separated by a partition about an inch thick; however, some of the partitions do not reach

all the way up to the top bunk, so in some cases, two people on top bunks in separate cubicles are sleeping right next to one another.

11. In the common area, there are 12 phones, but not all of them are working. There are 6 computers, but only 4 of them are working. These are shared among the 160 to 170 women who live here. The phones and computers are not being cleaned in between each use; rather, they are being cleaned at most three times per day, and sometimes less frequently.

12. There are 24 showers for all of us, but not all of them are working. The showers are cleaned once per day.

13. FSL has canceled all classes and programming, as well as indoor recreation, and we are being called to meals in waves. However, this has not made much of a difference in our daily contact with one another, because we are still living side by side in the crowded dormitories, and standing side by side in line for meals. We share countless items that we all touch many times per day, including, for example, the phones, computers, laundry, ice machine, door handles, and a hot water spigot that we use to make coffee and food.

14. Staff members here have been taking the inmates' temperature every day. They go down our rows of cubicles to do this, but on quite a few occasions, I have noticed that everyone in the same row is told that they have the exact same temperature. Sometimes, I and other women have not gotten out of bed to have our temperature taken, and no one seems to notice or care.

15. Before April 24, 2020, I was aware of only four women in the FSL who had been tested for COVID-19, at least two of whom tested positive. But many more people were sick. I have personally observed many other prisoners with symptoms similar to mine. Many staff members have been absent. Although a few women were placed into quarantine, the majority of women with symptoms were not.

16. On April 24, 2020, a woman in the FSL became extremely sick. She was vomiting and struggling for air. Other inmates were around her, trying to help her, without wearing any gloves or masks. She was sick for hours, and throughout the night. We did not understand why staff did not take her to the hospital. In response to concern among the inmates, a correctional officer (a lieutenant) came into the dormitory and announced that anyone who used the phone to contact people on the outside about this incident would get a disciplinary violation. He said that he would be listening to our phone calls, and that we needed to "stay in our lane," because we "are not doctors." The woman who was sick was eventually taken to the hospital on April 25.

17. On April 25, many of the women who had been in contact with the woman who was taken to the hospital were tested for COVID-19. At least ten of them have tested positive,

and all of them have been quarantined. That night, the women who were being placed in quarantine were allowed to come into the dormitory to get their personal belongings and take showers.

18. As of April 26, 2020, I still have a cough and a headache. I am terrified for my health and safety.

19. I declare under the penalty of perjury that the contents of this declaration are true and correct to the best of my knowledge. I will sign a hard copy of this declaration at my earliest opportunity.

<u>/s/ Christina Korbe</u>

April 26, 2020

3



# EXHIBIT F

**Declaration of Marius (Marie) Mason**

1. I am currently in custody at Danbury FCI in the low security satellite prison ("FSL"). My Bureau of Prisons ("BOP") Register Number is 04672-061.

2. I am 58 years old.

3. I am serving a sentence of 21 years and 10 months for conspiracy and arson. My release date is set for May 4, 2027.

4. On Tuesday I submitted a request to the Warden for compassionate release. I also asked to be considered for home confinement. I was approached by a staff member and informed that if I persisted in my request for compassionate release I might be moved to a medical facility. This would seem to me to confirm that I am in fact a candidate for compassionate release.

5. I have a history of breast and uterine cancer, as well as an enlarged heart, hypertension, and borderline diabetes.

6. At FSL it is not possible for me to maintain distance from other prisoners. I am housed in a large dormitory style room with approximately 168 other women.

7. The dormitory in which I am housed is divided into cubicles. Each cubicle holds two bunk beds, with up to four prisoners per cubicle. Each bunk bed is about two to four feet from the bed in the same cubicle. Each bed is about two to four inches from the bunk bed on the other side of the cubicle wall. The cubicle wall does not reach the top of the bunk beds, so a prisoner on the top bunk is right next to the prisoner on the top bunk on the other side of the cubicle wall.

8. All of the prisoners at FSL must share 6 or 7 working phones and 4 working computers. They are not cleaned between uses. The phones and computers are located close together in a common area.

9. Prisoners in my housing unit eat meals together in the unit. About 10-20 people are seated at each table. Five tables are filled at a time for meals.

10. All of the prisoners in the FSL use three bathrooms, which each include 5 toilets, 5 sinks, and 4 showers.

11. There are frequently issues with the water in the FSL, and water will be shut off for a few hours or more than a day at a time. In early April, the water was shut off for about seventeen hours. During this time no one was able to wash their hands or flush the toilet.

12. Prisoners are not given hand sanitizer.

13. Prisoners were given paper masks a few weeks ago. Before then we were not given masks. In mid-April, we were given fabric masks.

14. Staff began wearing masks and gloves around mid-April. Before that time they weren't wearing protective equipment.

15. Some staff have been out sick. More than one correctional officer tested positive for COVID-19, was out of work for a week, and then came back to work. One of our cooks is still out. Officers have returned to work after being unable to get their FMLA papers signed, but remain symptomatic. One officer stated that they still feel ill and do not want to be at work, but were told to return.

16. On March 30, 2020, inmates in FSL found out about the first COVID-19 case in our facility because it was reported on the news. A women from our facility was taken to the hospital and tested positive.

17. In total, I am aware of three people from FSL who have tested positive for COVID-19. One of those individuals couldn't breathe and passed out. One had asthma. One had a persistent fever that wouldn't go down. They were all taken to the hospital, where they were tested and found to be positive.

18. Those inmates that tested positive for COVID-19 have returned to the facility. One was away from the unit for about two weeks, and others were out for only about 7 days.

19. Inmates who are coughing, congested, or short of breath are not being tested for COVID-19. They are not being separated from other inmates. I am not aware of any prisoner in the FSL being tested for COVID-19 except those who were tested at the hospital.

20. Staff are checking temperatures but inmates who have had high temperatures have not being separated from the rest of the population. Recently, however, nobody has had a normal temperature, because they take our temperatures with a remote scanner, a plastic wand with a digital readout. It does not touch on our body and people's temperatures read artificially low: as low as 96, but often around 97.

21. Previously, they used an oral mercury thermometer. When a person's temperature was elevated, staff would retake the temperature several times. A number of people had highly elevated temperatures, ranging from 103 and above. Staff told those individuals to drink cold water and then immediately retook their temperatures, at which point the temperature would appear to have dropped, although it was still above normal. Nothing was done after that as a result of the temperatures. Our temperatures were not and are not being recorded.

22. While we are supposed to report symptoms, we are all aware that if we complain of symptoms we are unlikely to get effective treatment, and that we may be isolated away from our friends and our belongings, in cells that do not have ready bathroom access. Neither prisoners nor staff have any clear guidance on what to do to protect ourselves or what should be done if we are ill.

23. I have reviewed the information contained in this declaration by telephone with my lawyer, Moira Meltzer-Cohen. I declare under the penalty of perjury that the contents are true and correct to the best of my knowledge. I authorize my attorney to sign this declaration on my behalf.

_/S/_____

Marius Mason

April 23, 2020

I, Moira Meltzer-Cohen, certify that I have reviewed this declaration with Mr. Mason by telephone on April 23, 2020, and that he certified that the information contained in this declaration was true and correct to the best of his knowledge.

Moira Meltzer-Cohen

# EXHIBIT G

## **Declaration of Kimberly Hoisington**

1. I am currently in custody at Danbury FCI in the low security satellite prison ("FSL"). My Bureau of Prisons ("BOP") Register Number is 11764-082.

2. I am serving a sentence of 85 months for conspiracy to distribute cocaine. My release date is set for November 1, 2021.

3. I am 61 years old. I have chronic asthma, which requires the use of two prescribed inhalers.

4. At FSL I am housed in a dormitory style room at with about 150 other prisoners. The room is divided into cubicles with two bunkbeds each. I am in a cubicle with three other prisoners. Our beds are at most four and a half feet apart, and the top bunks are closer together, at most two feet, to the top bunks on the other side of the cubicle wall.

5. On March 27th I was hospitalized with COVID-19. I had been feeling sick for a couple weeks before I went to the hospital. I had put in a request to see medical, and had been given two different "idles" to miss programs because I was sick.

6. On March 26th I reported to staff that I wasn't feeling well, and asked to be excused from participating in programs that day. I went to the medical clinic, but after waiting there for 45 minutes without being seen, I returned to my bunk. A few hours later, I reported to staff on duty that I was feeling worse. I was told to lie back down.

7. By early in the morning of March 27th, around 1 or 2am, I had such bad chest pain that I could not sleep. I told the officer on duty, who called command center, and then called an ambulance.

8. Upon arrival at the hospital, my temperature was taken and registered at 102 degrees. My temperature had been taken at the facility within an hour earlier. I was told it had registered 97.

9. At the hospital I was tested for COVID-19 and tested positive. I believe I was released from the hospital on April 1st. It was a Wednesday. I was told that I would have to test negative twice before they would release me. I was tested most recently the Tuesday before I was released from the hospital. I got the results on Wednesday: I was positive for COVID-19. I was released that afternoon.

10. FSL has two isolation rooms. After I returned from the hospital, I was placed in one of the isolation rooms. Another prisoner who I was told had tested positive for COVID-19 was in the other isolation room. I remained in that room for 24 hours.

11. The isolation room was cold and small, with just enough room for my bed and a toilet. The bed had a one-inch thick mattress and no pillow. The toilet's flush was controlled by the corrections officer from outside the room and was only flushed a few times a day.

12. After 24 hours, I was placed in the facility's visiting room for five days. There were four of us in the visiting room. While we were there, we used the visiting room bathrooms. Each woman had her own toilet stall, but we shared the same shower, a temporary stand-up stall built in order for us to be able to bathe.

13. At one point when we were in the visiting room, one of the other women fell when she was in the bathroom and hit her head on the concrete floor. She was unconscious, and we tried to get help for her. There was no guard outside the door. We tried to yell for help, but nobody came. We went to the locked front door and started beating on the door and yelling to try to get someone's attention. Someone who was in the parking lot heard us and told control. A Commander came into the visiting room and we told him what had happened and that the woman who fell needed medical attention.

14. I returned to the general population housing unit on April 7.

15. I have continued to feel unwell since I returned to the unit. On April 17th I felt weak, had a fever and terrible body pains, and was sweating and dry heaving. That weekend I continued to feel terribly sick. I had a stomach ache that lasted at least 8 hours, horrible body aches, and my eyes burned. I was scared. I notified correctional officers, and I was taken to the medical clinic. My temperature was taken and registered 98 degrees, but I believe this was incorrect. My oxygenation was 96 and my blood pressure was so high that the nurse took it three times. The nurse instructed me to take Tylenol and return to my room.

16. Another prisoner in the unit was very sick and was taken to the hospital last night. She couldn't stop dry heaving for three or four hours before she was sent to the hospital.

17. Today maybe 40 people were taken from the unit into the Rec room. I was told they were being tested for COVID-19. Some people who had been in contact with the prisoner who went to the hospital were still in the unit and not among the people in the Rec room.

18. I have reviewed the information contained in this declaration by telephone. I declare under the penalty of perjury that the contents of this declaration are true and correct to the best of my knowledge. I will sign a hard copy of this declaration at my earliest opportunity.

/S/ Kimberly Hoisington

April 25, 2020



# EXHIBIT H

# Declaration of Rafael Almonte

1. I am 47 years old.

2. I was incarcerated at FCI Danbury from May 2017 until April 9, 2020, when the Court granted my motion to reduce my sentence. I served a little more than 15 years for a federal drug and gun convictions. My BOP Register Number was 16296-014.

3. There are 13 total housing units for men at FCI Danbury. The units are named A through M. There is also a SHU Unit.

4. At the time the COVID-19 crisis began, the A, B, and K Units were not in use. My understanding is that the K Unit has not been used recently because asbestos was found in the auditorium that is beneath that unit.

5. For most of my time at FCI Danbury, including immediately before my release, I was housed in the M Unit.

6. In July 2019, the M Unit was converted into a unit to house primarily veterans, elderly inmates, and inmates with serious medical conditions. I suffer from spinal stenosis that has resulted in cervical myelopathy.

7. At the time of my release, the M Unit housed approximately 75 prisoners. Housing is in cells, with two men to a cell. Each cells contain a bunk bed and a toilet/sink. The cells are approximately 8 feet by 4 feet, with no room for a desk. The cell blocks are on two tiers in the Unit.

8. The M Unit has a TV room that can hold around 30 men, all sitting close together. There is a computer room containing 3 stations right next to each other. There are also two small rooms containing one phone each.

9. My understanding is that Unit A and Unit B are cellblock units. Units C through L are dormitory-style units. In July

approximately 125 people. It is a huge room with a bunch of bunk beds. Each bed is about four feet apart from the next one. We all shared a bathroom with 5 toilet stalls and 5 sinks. Five shower stalls are adjacent to the bathroom. There is a small room in the unit with two phones in it, and a computer room with 3 stations, all right next to each other.

10. In 2017, I was housed for one week in the D Unit. The D unit has the exact same layout as the J Unit. My understanding is that all the units with dorms are configured in the same way.

11. There is one medical clinic for men at FCI Danbury. It is usually staffed by one doctor (Dr. Febregas-Schindler) and two Physician Assistants. Sometimes Dr. Greene would come from the women's facilities to the men's facility to see patients.

12. My understanding is that the first positive COVID-19 test at FCI Danbury was a man from my unit (the M Unit). They moved him to the A Unit, which was empty at the time. This happened on or around March 28.

13. For more than a week after the first positive test, we went to the pill line and mingled there with men from other units.

14. After the first positive test, we started eating some meals in the unit rather than in the chow hall. When we went to the chow hall, we went just with our unit.

15. About a week after the first positive test in my unit, they took everyone's temperature for a few days. Two more men had positive tests at that time. One of these men was one of the tutors and had been interacting with a lot of people on the compound. After a few days they stopped taking temperatures.

16. In Unit M, officers come into the unit every 15 to 30 minutes to walk around. If someone is in urgent medical distress in the unit, there is no way for them to tell an officer unless the officer is coming through the unit at that time.

17. ... from my unit who tested positive returned to my unit in less than 14 days.

18. Within about 10 days of the positive test we stopped going to the pill line with other units and started going one unit at a time to the pill line.

19. Staff did not begin wearing masks until early April. They handed out masks to prisoners around that time. They also installed soap dispenses in the unit then.

20. Numerous men in my unit had symptoms of COVID-19 but were never tested and diagnosed.

21. Around the time the pandemic started, Assistant Warden Comstock ordered that all the spray bottles that prisoners used for cleaning be confiscated. We didn't have the bottles for 4 to 5 days. After that, they made the bottles available to us in the counselor's office.

22. During the outbreak, my unit continued to be cleaned only once a day by prisoner workers.

23. Before my release on April 9, two men in my unit were selected for home confinement. They were healthy men who were close to going home anyway.

24. BOP started using the B Unit to quarantine men who they had selected for home confinement.

25. While I was incarcerated at FCI Danbury, I had great difficulty accessing medical care that I urgently needed to address the compression on my spinal cord. In granting my motion to reduce my sentence, the Judge Underhill of the U.S. District Court for the District of Connecticut concluded:

> The foregoing illustrates that Almonte suffers from a serious physical condition that has begun to substantially diminish his ability to care for himself and from which—given the BOP's failure to address Almonte's condition—Almonte will not improve or recover under current circumstances. *Cf. Romero*, 2020 WL 364275, at *3; U.S.S.G. § 1B1.13 cmt. n.1(A)(ii). The BOP

normal circumstances, and there is no reason to think that that will change. See U.S. Dep't of Justice, Office of the Inspector General, *The Impact of an Aging Inmate Population on the Federal Bureau of Prisons* 18 (Feb. 2016), https://oig.justice/gov/reports/2015/e1505.pdf (noting waitlists for inmates to see outside specialists and reporting as 114 days the average wait time at one facility). In fact, the BOP's indifference will almost surely get worse: With the current threat of COVID-19, there is little hope that Almonte will promptly get the attention that he needs.

I declare under the penalty of perjury that the contents of this declaration are true and correct to the best of my knowledge.

Rafael Almonte

April 25, 2020

3

# EXHIBIT I

### Declaration of Tamika Somerville

1. I am currently in custody at Danbury FCI in the low security satellite prison ("FSL"). My Bureau of Prisons ("BOP") Register Number is 33746-068.

2. I am 40 years old. I am 5'9" and I weigh approximately 220 pounds. I use the pronouns he/him.

3. I have asthma and hypertension.

4. I am serving a sentence of 15 years for possessing a firearm as a convicted felon. I was subject to a 15-year mandatory minimum based on having three prior drug convictions. My release date is set for March 20, 2025.

5. In early April I submitted a request to the Warden for compassionate release, and I submitted through my Federal Public Defender a request for home confinement.

6. At FSL it is not possible for me to social distance. I can try to keep to myself, but I am housed in a dorm style unit with 198 beds. The unit is divided into cubes like office cubicles with four people to a cube. The walls of the cubicles are about 4-5 feet high and do not reach the ceiling. The beds are not six feet apart.

7. Our unit has 3 bathrooms for all of the prisoners in our dormitory. Each bathroom has 6-8 toilet stalls and 6-8 showers. Not all of the showers are functional.

8. Meals are brought to all the prisoners in the unit at the same time; meal times are not staggered. They are brought on Styrofoam trays. There are not enough places for everyone to sit to eat.

9. The counselor's office has hand sanitizer that I can use when I make a legal call. Hand sanitizer is not available in the units.

10. The prisoners have one fabric washable mask each. There are washing machines available to us to clean the masks. We do not have another mask to wear while our mask is being cleaned.

11. A woman in my unit was removed for fever. She reported that she tested positive for COVID-19 on a Tuesday. She was returned to our unit that same Friday. She sleeps in a cubicle that touches mine on the top bunk. I sleep on the bottom bunk. After she returned from the hospital, I slept with my head away from the wall to try to protect myself.

12. I declare under the penalty of perjury that the contents of this declaration are true and correct to the best of my knowledge. I will sign a hard copy of this declaration at my earliest opportunity.

I, Renee Pietropaolo, Assistant Federal Public Defender, certify that I reviewed the information in this declaration with Mr. Somerville by telephone on April 23, 2020, and that he certified that the information contained in this declaration was true and correct to the best of his knowledge.

*s/ Renee Pietropaolo*
Renee Pietropaolo
Assistant Federal Public Defender
Western District of Pennsylvania
April 27, 2020

# EXHIBIT J

## Declaration of Theresa Foreman

1. I am currently in custody at Danbury FCI in the minimum-security women's satellite camp ("Camp").  My Bureau of Prisons ("BOP") Register Number is 26224-014.

2. I am 58 years old and African American. I am 5 feet 7 inches tall and I weigh approximately 240 pounds.

3. I have a medical history of hypertension, for which I am currently taking Hydrochlorothiazide and Aspirin.

4. I am serving a sentence of imprisonment of a year and a day for tax evasion—my first and only criminal conviction—and the BOP calculates my release date to be January 4, 2021, but I have been advised that I may be eligible for release to home confinement on November 30, 2020.

5. I self-surrendered to FCI Danbury on February 28, 2020.

6. On April 17, 2020, I submitted a request by U.S. Mail to Warden Easter for compassionate release, or, in the alternative, immediate transfer to home confinement. As of today, I have not received a response.

7. At the Camp, it is not possible for me to maintain physical distance from other women. I can try to keep to myself, but I am housed in a dorm style unit with about 47 other women.  We sleep in a common space that is divided into open cubicles, each with a bunk bed that sleeps two women. The walls of the cubicles are about 4-5 feet high and do not reach the ceiling. The bunk beds are close enough that if I reached out my hand, I could touch the hand of the person in the bed next to me.

8. Camp prisoners are responsible for cleaning our own cubicles.  Our shared living spaces in our dorm are not regularly disinfected.

9. Our unit has 5 toilets, 6 sinks and 6 showers that are currently shared by approximately 48 women.  Our common toilets, sinks, and showers are not regularly cleaned or disinfected.

10. There are four dorms at Camp: A, B, C, and D.  I am in Dorm B.  Currently, I believe that the A, B and C dorms each house approximately 47-50 people.  I believe that the D dorm houses 12 people.

11. Staff move throughout the day between all four of the dorms, including for count, food delivery, and commissary.  Staff also rotate between the men's prison, the FSL, and Camp, interacting with prisoners at each location.

12. Among other duties, staff serve us our meals in our cubicles three times per day.

13. Several staff members that typically have shifts at the Camp have been out sick. Two staff members in particular have been out for several weeks, and their offices, which are usually cleaned by inmates, have been thoroughly disinfected, floors mopped, and furniture cleaned—I haven't seen this type of cleaning before, and it goes far beyond the sanitation and cleaning practices throughout the rest of the Camp facility.

14. Cleaning throughout the rest of the Camp has been sporadic lately, as some prisoners have quit their jobs and some are quarantined in different dorms from their assigned cleaning areas. We do not have adequate cleaning supplies. I am not aware of any part of the Camp being sanitized or disinfected other than the two staff offices.

15. The Camp contains one common area with telephones, computers, and "video-visiting" machines. These items are shared by women housed in all four dorms; for the entire Camp, there are a total of 4 phones, 7 computers, and 3 video machines currently operational. The common area also includes hot water taps and sinks for dishwashing. The phones, computers, and video machines are clustered close together in the shared common space. They are not cleaned or disinfected between uses. There is cleaning solution available in the phone area, but not in the computer room. When we have access to the common area to make phone calls or use the computers, we often have to wait in line because they are in high demand. While we wait, we are not able to social distance from each other.

16. Prisoners have been given 2 surgical masks and 3 material masks in the last two weeks. We have not been given gloves.

17. Since April 15, the Camp has been on lockdown. Under this lockdown, the women in each dorm are let out of the dorm for one hour a day at different times of day. This is our only time for recreation and access to the common area. During the time we are confined to our dorm, we are instructed to remain in our cubicles. Since the walls between the cubicles are only 4 to 5 feet tall, we are still able to speak to other prisoners in our dorm over the wall.

18. There are a limited number of prisoners doing jobs, and those prisoners continue to move around the facility and between the dorms. Three times a week, my entire unit (all 48 of us) will move through the facility to the laundry room and deliver our laundry to prisoners who will do the laundry. We wait in line to drop it off, and we are not able to social distance while we wait in line.

19. On April 16, the Assistant Warden visited the Camp and was asked if we would be informed if we were exposed to COVID-19.  She said that we would not be told if we were exposed.

20. Every day, the lieutenant comes by and takes our temperature using a sensor thermometer, but since staff tries to get it as close to our heads as possible, it sometimes touches our head.  The same thermometer is used for each inmate, and I do not see it being disinfected between uses.  There is no screening for other symptoms such as coughing.

21. Although some women at the Camp have been told that they are on a "list" for home confinement, these women have not been released.  I only know of two releases resulting from COVID-19 from Camp: a pregnant woman and a woman with Parkinson's disease.

22. I have not been told that I am on the list for home confinement.

23. I declare under the penalty of perjury that the contents of this declaration are true and correct to the best of my knowledge. I will sign a hard copy of this declaration at my earliest opportunity.


___/s/_____
Theresa Foreman
April 26, 2020

Case 3:20-cv-00569   Document 31-11   Filed 06/12/20   Page 1 of 5



# EXHIBIT K

## Declaration of Antrum Coston

I, Antrum Coston, am over the age of 18 and fully competent to make the following declaration:

1.　　I was incarcerated at FCI Danbury from April 2019 until April 17, 2020, when the Court granted my motion to reduce my sentence.  I served a little more than two years for federal drug and gun convictions.  My BOP Register Number was 15278-014.

2.　　I was housed in H Unit, a congested, second-floor dorm-style unit which houses about 75 prisoners.

3.　　All prisoners in H Unit sleep in bunk-beds in the same room.  The bunk-beds are in rows, both side-by-side and front-to-back.  Side-by-side, there is a distance of approximately 3' between beds.  I could stretch out my arms and touch the bunk next to me.  Front-to-back, there is a distance of approximately 6' between beds.

4.　　All 75 men in the unit share the same bathroom, which has one urinal, four or five toilets, five or six sinks, and a shower area with four showers.  The unit also has two television rooms, a computer room with three computers, and a telephone room with two telephones.  The television rooms can accommodate approximately 20 prisoners and it is not unusual for 15 or more prisoners to be in the same television room at the same time.  The two phones in the telephone room are next to each other and if two prisoners are using the phones they have to stand right next to each other.

5.　　Most units in FCI Danbury are dorm-style.  There are three cell units.  One of the cell units is for the drug program, one is for mainly ex-military prisoners, and one (A Unit) was recently emptied and converted into a quarantine unit.  Each cell has a bunk-bed for two prisoners, a sink and a toilet.

6.　　In February, many prisoners in my unit got very sick.  Staff explained the outbreak as chicken pox, pneumonia, or shingles.  The prison temporarily closed the gym in response to the outbreak.  The gym was reopened in March.  When the gym reopened, it was packed because prisoners had gone so long without working out.

7.　　In the beginning of March, prison staff took away prisoners' spray bottles, which until then had been allowed.  We were told that we could get spray bottles from a CO, but the CO was never on the block.  In early April, we got our spray bottles back.

8.　　In mid-March, the prison cancelled all visits and split the jail in half.  Although before then the entire prison would have rec at the same time, after mid-March half the prison would have rec at one time, and the other half would have rec at a different time.

9.　　Before mid-March the entire prison would eat around the same time, on staggered shifts.  There would be about four units in the chow hall at any given time.  After mid-March, only one unit would go to the chow hall at a time.

10.     In early April, the prison closed the gym and the law library and my unit was locked down.  It was still locked down when I was released.  My unit was allowed out of the dorm for one hour per day for rec.  Some time after that, my unit started going to rec by itself, with no other units.  People did not observe social distancing in the rec yard.

11.     In early April, prison staff started allowing prisoners to wear mask.  They did this because we were making our own masks.  In the two weeks before I was released, the prison staff started providing prisoners with masks.

12.     In mid-April, my unit stopped going to the chow hall entirely.  All meals were brought to the unit.  The prison switched from hot meals to bagged meals.

13.     On approximately April 13, the prison started mandatory temperature-taking for prisoners.  Before then, prison staff would come through the dorm and asked if anyone wanted to get their temperature checked.  Having a high temperature would not necessarily result in any further action being taken.  There were prisoners with 103-degree temperatures who were not taken out of the unit.  Generally, if prisoners in the unit get sick, they just get sick.  A couple extremely sick prisoners were taken out of the unit and transferred to A Unit.  But you had to be falling down to get any help.

14.     Medical has been no help.  Before the crisis, prisoners could go to sick call in the morning, fill out a slip, and, depending on the severity of their condition, could expect to see a doctor a day or two later.  For the last month, prisoners have been filling out slips but have not been hearing back from medical or getting appointments.   I put in a slip approximately one month before I was released, and never heard back from medical.

15.     The prison put up a few signs reminding people to wash their hands.  They did not create any hand-washing stations or provide any prisoners with hand sanitizer or soap.  There is no hand sanitizer available in the commissary.  They used to have it, but they weren't selling it to us for the last two months.

16.     When I was released on April 17, there was no social distancing at the prison.  Prisoners frequently stood directly next to each other when waiting in crowded, congested lines, including to receive medications, to use the commissary, and to get meals.  At this time, some guards wore masks and some guards did not.

I declare under the penalty of perjury that the contents of this declaration are true and correct to the best of my knowledge.

/s/ Antrum Coston (by consent)
Antrum Coston

April 26, 2020

# EXHIBIT L

### Declaration of Shannon Benson

1.  I am currently incarcerated at FCI Danbury. My Bureau of Prisons ("BOP") Register Number is 43247-061.

2.  I am a 39 year old man. I suffer from Graves' disease and Hashimoto's disease.

3.  I am in G Unit at FCI Danbury. The unit is full of bunk beds. Each bed is about 3 feet away from the next bed. All the men in the unit share a bathroom that has one urinal and 5 individual stalls. We all share 2 phones and 3 computers.

4.  Last week, a man passed away from COVID-19 who had been housed in my unit.

5.  People with symptoms including coughing, chest restriction, headaches, and loss of taste and smell are not being taken up to medical or tested for the virus. You have to have a high temperature to be seen by medical. There are people in my unit right now who have serious symptoms and haven't been seen by medical or removed from the unit.

6.  I experienced loss of taste and smell, and had profuse cold sweats. I had headaches for 4 to 5 days. I was not tested for the virus. I was told that if you didn't have an elevated temperature then it may have been a common cold or flu I was experiencing.

7.  Around March 13, 2020, I was scheduled to go to a specialist due to my T4 levels being elevated to the point of danger. Due to COVID-19, I was unable to be seen by the specialist. I did not receive any blood work here at the institution until April 24 to see if in fact my thyroid condition had leveled out. I am concerned my medication is not performing correctly because of my elevated levels.

8.  They didn't start passing out masks or install a soap dispenser until about 2 weeks ago. We only recently got regular access to cleaning supplies. Our shower area is heavily coated with fungus and mildew, there are several significant leaks. FCI Danbury has had a history of asbestos.

9.  I declare under the penalty of perjury that the contents of this declaration are true and correct to the best of my knowledge. I will sign a hard copy of this declaration at my earliest opportunity.

_____/s/_____
Shannon Benson

April 26, 2020

1

# EXHIBIT M

## Declaration of Richard Johnson

1. I am currently incarcerated at FCI Danbury.  My Bureau of Prisons ("BOP") Register Number is 44910-054.

2. I am a 65 year old man.

3. I am serving a 48-month sentence. My release date is October 14, 2021.

4. My understanding is that I was the first person placed in isolation at FCI Danbury for the COVID-19 virus.

5. Before I got sick, I was housed in the M Unit. I began feeling symptoms but wasn't able to be seen by medical for about two days. On March 27, 2020, I pushed my way to medical and demanded to be seen.

6. When I was seen at medical, they had just received 22 COVID-19 tests and I was immediately given one.

7. I was then locked up in an observation cell. There were long periods of time that no one came to see me. I even missed meals.

8. I was later moved to a celled unit. For a period of 6 days, I was not given a shower or my medications. I was also not allowed to communicate with my family during that period of time.

9. After 12 days of isolation, I was released from quarantine back to the M Unit. When I returned to my unit, many men were ill.

10. I am still experiencing residual effects of the virus including swollen knees and joint pain.  I am also now on medication for high blood pressure (which I wasn't on before) and I use a respirator pump.

11. I declare under the penalty of perjury that the contents of this declaration are true and correct to the best of my knowledge. I will sign a hard copy of this declaration at my earliest opportunity.


_____/s/_____
Richard Johnson

April 26, 2020

1

# EXHIBIT N

**Declaration of Ronald Harper**

1. I am currently incarcerated at FCI Danbury. My Bureau of Prisons ("BOP") Register Number is 05758-055.

2. I am a 54 year old man. My release date is January 28, 2021.

3. I suffer from diabetes, asthma, kidney disease, high blood pressure, high cholesterol, and COPD (chronic obstructive pulmonary disease).

4. I am in H Unit at FCI Danbury. There are about 70 inmates housed here. The unit is dorm style with bunk beds. All the men share a bathroom. There are four toilets and two urinals. There are six sinks and four showers. It is not enough for the number of inmates in the unit. We also share phones and computers.

5. I had a sore throat and a cough a few weeks ago. I talked to medical staff and they told me to buy some cough syrup from the commissary. I was not tested for COVID-19 and they kept me in the unit

6. When an inmate has symptoms of the virus they were leaving them in the unit. Now they are taking some to another unit. But there are still inmates with symptoms of the virus in the unit.

7. I feel very vulnerable here. There is no space for social distances. Medical staff are not checking on the inmates like they should.

8. I declare under the penalty of perjury that the contents of this declaration are true and correct to the best of my knowledge. I will sign a hard copy of this declaration at my earliest opportunity.


_____/s/_____
Ronald Harper

April 26, 2020

1