In the United States District Court
Eastern District of Pennsylvania
Allentown Division

| | | |
|---|---|---|
| Edwin Pawlowski | ) | |
| Defendant, | ) | |
| | ) | |
| -Vs- | ) | Crim. No. <u>17-390</u> |
| | ) | |
| United States of America | ) | |
| Respondent, | ) | |
| _____ / | | |

Defendant, Pawlowski Demand for an Evidentiary Hearing Contingent Upon Newly Discovered

Exculpatory Brady Type Material to Determine the Extent of the Discovery Violation,

Likelihood of a New Trial, and for an Affidavit Affirming or

<u>Denying the Occurrences of Prosecutorial Unlawful Acts</u>

Defendant, Edwin Pawlowski, pro se, hereby respectfully demand this Honorable Court

to conduct an evidentiary hearing contingent upon newly discovered exculpatory Brady type

material to determine the extent of the discovery violation, the likelihood of a new trial as a

result of the discovery, pursuant to Fed. R. Cr. P. 33, § 3504 affirming or denying the

occurrences of prosecutorial unlawful acts in relation to the new evidence in question.  The

accompanied memorandum of points and authorities is submitted in support thereof.

Respectfully Submitted on This

_____ Day of February, 2020.

By: _____

Edwin Pawlowski, pro se

In the United States District Court
Eastern District of Pennsylvania
Allentown Division

Edwin Pawlowski                    )
     Defendant,               )
                    )
                    )
-Vs-                                )                    Crim. No. <u>17-390</u>
                    )
United States of America            )
     Respondent,              )
_____/

Memorandum of Points and Authorities in Support of Mr. Pawlowski's Demand for an
Evidentiary Hearing and for an Affidavit Affirming or
<u>Denying the Occurrences of Prosecutorial Unlawful Acts</u>

<u>I.</u>     <u>Preamble</u>

This memorandum of points and authorities is an action brought by Defendant, Edwin Pawlowski, through his attorney, Jack McMahon, Esq. (Hereinafter, "Mr. Pawlowski") to respectfully demand this Honorable Court to rightfully conduct an evidentiary hearing contingent upon newly discovered exculpatory <u>Brady</u> type material, as required by <u>Brady v. Maryland,</u> 373 U.S. 83, 87, 83 S, ct, 1194, 1196, 10 L.ed. 2d 215 (1963), to determine the extent of the discovery violations, the likelihood of a new trial as a result thereof, pursuant to Fed. R, Cr. P. 33, and for an affidavit from the government, pursuant to 18 U.S.C. § 3504 either affirming or denying the occurrences of the prosecutorial misconduct or acts in question.

Since this evidentiary hearing demand is being filed within the 3-year statutory limitation time frame for pursuing a new trial under Rule 33, Mr. Pawlowski has demonstrated due diligence in filing same, and the mere fact that he is entitled to relief, this motion should be granted in the interest of justice and where justice so requires.[1] Rule 33 states, in relevant part

---

[1] In <u>United States v. Johnson,</u> 327 U.S. 106, 112, 66 S.ct. 464, 90 L. ed. 2d 562 (1946), the Supreme Court has recognized that Rule 33 affords a defendant more time in which to file a motion for a new trial based on newly discovered evidence than is permitted for a motion for a new trial on any other basis in order to "afford relief

that, "upon the defendant's motion, the court may vacate any judgement and grant a new trial if the interest of justice so requires," but "any motion for a new trial grounded on newly discovered evidence must be filed within 3-years after the verdict or finding of guilt." Fed. R. Crim. P. 33 (a).

## II.    Procedural Posture

On July 25, 2017, Mr. Pawlowski was indicted for conduct related to soliciting campaign contributions for various political elections in return for government contracts or favorable government treatment. Mr. Pawlowski was charged with fifty-five counts: 18 U.S.C. § 371, 18 U.S.C. § 1952 (three counts); 18 U.S.C. § 666 (a)(1)(b) (fourteen counts), 18 U.S.C. §666 (a)(2), 18 U.S.C. § 1341 (nine counts), 18 U.S.C. § 1343 (nine counts), 18 U.S.C. § 1341, 46 (two counts), 18 U.S.C. §1343, 46 (six counts), 18 U.S.C. § 1951 (three counts), 18 U.S.C. § 1001 and 18 U.S.C. § 2.

On March 2, 2018, a jury sitting in the Federal District Court, Eastern District of Pennsylvania found Mr. Pawlowski guilty of counts 1, 4-6, 8, 10-15, 18, 20-22, 26-28, and 29-55. The jury found Mr. Pawlowski not guilty of counts 2, 3, 7, 9, and 23-25.

On October 22, 2018, the trial court granted Mr. Pawlowski's Rule 29 of Fed. R. Crim. P. motion as to counts 11, 12, 13, and 14. On November 6, 2018, the government filed a motion which was granted by the trial court to dismiss counts 29, 31-32, and 38-39.

On October 23, 2018, the Honorable Juan Sanchez, Judge, sentenced Mr. Pawlowski on the remaining counts to 180 months imprisonment, three years of supervised release, and restitution liability in the amount of $93,749.00. On October 25, 2018, a timely notice of appeal was filed. This case is currently pending before the Third Circuit Court of Appeals.[1]

## III.    Factual Basis of the

---

where despite the fair conduct of the trial, it later clearly appears to the trial judge that because of facts [un]known at the time of trial substantial justice was not done." Id.373 U.S. at 106-07.

[1] If an appeal is pending, the court may not grant a motion for a new trial until the appellate court remands the case. Fed. R. Crim. P. 33 (b)(1).

Newly Discovered Evidence

Scott Curtis was a 22-year Federal Bureau of Investigation (FBI) Special Agent. Mr. Curtis was also the lead investigating agent in Mr. Pawlowski's case with whom gathered all the intelligence to sum up the evidence from beginning to end, including but not limited to the interview of potential witnesses; recruitment of confidential informants (CI); overview wire taps, secret tape recordings and audio surveillance; carried out the search warrant executions; seizure of properties; and prepared evidence and appeared before the grand jury to corroborate such evidence to obtain the indictment. He was also the lead-case-agent who assisted the government, first hand, in orchestrating the evidence in preparation and in support of its case-in-chief at trial before the petit jury in this case.

Following the jury's March 2, 2018 guilty verdict conviction and this court's October 23, 2018 180 month sentencing, Special Agent Scott Curtis appeared live on the Jerri Williams' podcast show and engaged in an interview with host, Ms. Williams concerning, inter alia, the FBI's retired case files and his personal involvement as Special Agent in the Pawlowski case in relation to those retired files. See, Exhibit A attached hereto. At which time, he reiterated his involvement in detail, but in the same vein, revealed newly discovered exculpatory evidence, some not disclosed upon Mr. Pawlowski's request and others just straightout not disclosed to him so that he could properly defend himself at trial.

First, during the podcast interview Special Agent Curtis revealed for the first time, that he had seized and downloaded information or data from various iPods, laptop computers, and cell phone devices from the government's principal witness, Sam Ruchlewicz, while surveilling him in San Francisco, California. The contents contained on these electronic devices (albeit unknown at this time) are newly discovered evidence, because they were all readily available in the government's possession, but not disclosed to Mr. Pawlowski upon his request for discovery and trial purposed.

The May 2, 2019 podcast interview, denoted: ("PCI") provides in pertinent part:

Host: "So don't tell me you approached him in San Francisco when he was going to be proposing to his girlfriend? You must have ruined the whole plan for him.

SC: ...So yea, I flew out to San Francisco, checked into the same hotel that I knew he was at. Part of any plan to approach somebody, covertly, about cooperating with your investigation, is to have some contingent plan in place.... So what we planned to do, as part of this contingency, was to get warrants to search Allentown City Hall, MF's office, and several other locations, in the event that SR told us he didn't want to cooperate, and that he was going to notify MF and EP that the FBI was conducting this investigation....[2] We also had warrants to seize SR's electronic devices that he had with him out in California: his laptop computer, his iPad, and his cellular telephone because again, if he decided not to cooperate we knew there was a chance a lot of that data was going to be deleted, and to prevent that, we wanted to seize those devices, and have our computer resources there with the Bureau download all the data there so it was preserved, so we could further analyze that to try to corroborate a lot of other information we obtained throughout the investigation.... At that point I knocked on his door, identified myself, seized his electronic devices...." (PCI @ 6-7).

Second, Special Agent Curtis also revealed, for the first time, that he had obtained a warrant authorizing the execution of a Title III wire tap surveillance against two cell phones belonging to Michael Fleck, Mr. Pawlowski's campaign manager and consultant: "Cell phone 1" and "Cell phone 2". However, only Cell phone 2 and its contents was disclosed for discovery (albeit known at this time) Cell phone 1 and its contents is newly discovered evidence because it was readily available, but not disclosed to Mr. Pawlowski upon his request for discovery and trial purposes, which provides in relevant part:

Host: "Explain why did the Bureau not allow you to purchase or bid on property?

SC: So, we were able to go up on Title III on MF's phone in November 2013. Unfortunately, bad luck that MF decided to change cell phones and numbers within 2

---

[2] MF is abbreviated for Michael Fleck, EP for Edwin Pawlowski, SR for Sam Ruchlewicz, and UC for Under Cover Officer.

weeks of us getting Title III, but we were about to get another one on the new phone mainly because we still had the UC agent, and the original source interacting with MF. So whenever we needed freshening up probable cause...

Host: When you talk about authorization, can you give us a little bit of what that means and the probable cause to get the judge to authorize a wire tap?

SC: To do Title III you need to prove that individual is engaging in criminal violations, and to prove that he is using that telephone in furtherance of that violation...." (PCI @3 P 2).

Third, continuing on, Mr. Curtis revealed, for the first time, that he recruited a CI or UC to make direct contact with an unknown Public Official who was associates with Mr. Fleck and Mr. Ruchlewicz, in an attempt to eventuate a further direct contact or introduction with Mr. Pawlowski within two months of the investigation in this case. In the interim, tape recordings were made between the CI and the unknown Public Official's conversations. However, neither the Public Official's person and/or name were disclosed nor the content of the conversations on the recordings. This information is also newly discovered evidence, because it was readily available, but not disclosed upon Mr. Pawlowski's request for discovery and trial purposes, which provides in pertinent part:

SC: "When I showed up in Allentown in March 2013, my initial marching orders that I was given was that there were stories going around, a lot of rumors going on, that there were corruption related activities in Allentown. There was no criminal case opened up at that time. Just a gathering of intelligence.... Task force members working in our office had a confidential source, who was well aware of the conflict of interest and the news stories that were being highlighted in Allentown, volunteered the fact that he could be introduced to a Public Official (PO) in the area who could potentially make an introduction to MF and his business. So armed with that information we debriefed that source and he agreed to wear a recording device for us and have discussions with the PO that he was friendly with and that PO agreed to introduce the source to MF and his

partners at that time, Sam Ruchlewicz.  So that introduction happened within the first two months of the investigation...." (PCI @2).

Fourth, continuing on, Mr. Curtis further revealed, for the first time, that during the investigation in this case he deliberately and maliciously obtained a warrant from the Magistrate to seize [all] the remaining contributions from Mr. Pawlowski's campaign accounts, to prevent him from hiring an attorney of his choice to represent and defend himself once he (Special Agent Curtis) orchestrated his arrest.  The intent of the monetary seizure warrants were never disclosed for discovery and trial purposes, which provides in pertinent part:

Host: "You do a search on July 2015.  When was it you charged the Mayor?  Could you answer the question what were you doing during that two year period?

SC: July 2017, almost two years later....  Another thing we did during this period is we obtained a warrant to seize all the remaining contributions out of Mayor Pawlowski's campaign accounts, because I also realized, as soon as we went overt in this investigation, that he could utilize these campaign funds to pay for attorneys to defend himself in this investigation.  So we wanted to minimize his opportunity to do that and cut off funding there.  So, we got a warrant from the court to seize his campaign contributions, which was, I think, one of the only or few times that has occurred too." (PCI @14).

Fifth, continuing on, Mr. Curtis furthermore revealed, for the first time, that his entire investigatory tactics in this case were set out and set forth to deliberately "entrap" Mr. Pawlowski into quid-pro-quo agreements by inducing proposed quid pro quo proposition even though Mr. Pawlowski was not predisposed to those quid pro quo agreements or propositions.  Special Agent Curtis' entrapment tactics or strategies are newly discovered evidence because they were readily available, but not disclosed to Mr. Pawlowski during the pre-trial, trial, or sentencing stages, nor were they disclosed in any discovery material provided to Mr. Pawlowski, which provides in relevant part:

Host: "I can definitely see the conflict of interest there. A 'friend of Ed' situation.

SC: Yea, these articles would point out the fact that certain people were getting contracts, approvals, and those same individuals were highlighted as being donors to Mr. Pawlowski's political campaign—public information. The reporters were doing their due diligence. That in itself does not prove that bribery, or any corruption related activity was going on. But it showed there was some conflict of interest and some ethical violations going on, that needed to be further scrutinized...." (PCI @ 2).

Once we knew we could get this intro to MF and his business, understanding the importance that MF and his consulting company had with the Mayor of Allentown, and their significance of their involvement of potential corruption in the area, we started formulating an under cover operation to have an agent act as a potential developer for Allentown, and have the source introduce the UC Agent to MF and his company with the hopes that MF would facilitate a potential project and take the steps necessary to introduce the UC to the Mayor and come to some quid-pro-quo agreement where they would require the UC to provide something of value to the Mayor, and in return the Mayor, through MF, would facilitate this redevelopment...." (PCI @2)

We were able to in a handful of these face to face meetings "How can you help me in this process, in the redevelopment project, and how can the Mayor help me, and what is MP going to expect in return, if anything, and what are you going to expect in return, if anything. And then we would follow up by telephone to reiterate some of the things discussed face to face. If a UC agent, by telephone, for Title III, that will be significant probable cause with the court to get authorization...." (PCI @3)

Host: So basically, you were looking for kind of pay to play scheme.
SC: Yes, quid-pro-quo involved. The agreement to pay, make payment in some form, in exchange for the Mayor taking official action. So you're paying for the ability for the

elected official to take official action to benefit something that you're looking for that he has direct or indirect authority over." (PCI @4)

## IV. Arguments

As a threshold matter, based on the above factual basis of newly discovered evidence, Mr. Pawlowski has made a prima facie showing or case of prosecutorial misconduct or acts. That is, the prosecution knew or should have known of Mr. Curtis' overzealous misconduct to obtain a quid pro quo agreement with Mr. Pawlowski; illegal investigatory tactics; illegal searches and seizures of properties and gathering of evidence to obtain Mr. Pawlowski's arrest, indictment, and conviction. But, the government failed to correct the illegality and unconstitutionality of the misconduct or acts notwithstanding having a meaningful opportunity to do so.

In lieu of providing the above new evidence, Mr. Pawlowski has also demonstrated that the evidence were deliberately withheld and by being withheld it affected Mr. Pawlowski's substantial rights. He is entitled to relief because he has now "rebut the presumption" of correctness of the trial court's finding of facts and the prosecutor's discharge of its official duties. Put differently, sufficient facts has herewith been established to raise the presumption that the (unknown) evidence in question, exculpates Mr. Pawlowski to the extent a "rebuttable presumption" has been established by federal law. And thus, the evidence would have made a difference in the outcome of the trial, but for its' nondisclosure. Therefore, the presumption is sufficient enough to conduct an evidentiary hearing and even [re]new the trial proceedings under Rule 33.

Because of these reasons, this court should conduct an evidentiary hearing to determine the extent of the discovery violation, the likelihood of a new trial within meaning of Brady, supra, and under §3504, should order the prosecution to issue an affidavit affirming or denying the occurrences of the above unlawful acts, in question. An evidentiary hearing is also required, where, as here, the above discovery violations are not clearly developed in the trial record, but are materialized and thus colorable in this motion.

A. Legal Standards

presumption of correctness of the trial court's finding of facts and the prosecution's discharge of its official duties, based on the newly discovered evidence as described above, and are further demonstrated below:

1. Rebuttable Presumption of Brady Type Material

Under Brady and its' progeny, prosecutors have an affirmative duty to disclose evidence that would "tend to exculpate" the defendant or "reduce the penalty to be imposed upon him." Id. at 87-88. In Brady, the Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." Brady, 373 U.S. at 87. Evidence is "material" if there is "a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." See, United States v. Bagley, 473 U.S. 667, 681, 87 L.ed. 2d 481, 105 S.ct. 3375 (1984). The Supreme Court has extended Brady, holding that the duty to disclose exists even if there has been no request by the accused. See, United States v. Agurs, 427 U.S. 97, 107, 49 L.ed. 2d 342, 96 S.ct. 2392 (1976).

Furthermore, in Giglio v United States, 405 U.S. 150 , 154, 31 L.ed. 2d 104, 92 S.ct. 763 (1972), the Supreme Court held that the Brady rule includes evidence that might be used to impeach the credibility of an important witness. The "essential elements" of a Brady claim require a petitioner to prove that: 1) the prosecution failed to disclose evidence; 2) the evidence was of favorable character for the defense; and 3) the evidence was material. See, United States v. Joseph, 996 F.2d 36, 39 (3ᵈ Cir. 1993) (Citing, Brady, 373 U.S. at 87).

However, Mr. Pawlowski is not required to prove all the Brady, Agurs, Giglio, and Bagley elements at this juncture, rather he must merely demonstrate that, if the facts are fully developed through discovery of the requested and non-disclosed information, in question, he would be able to prove Brady/Giglio's violations and therefore would be entitled to relief. See, Harris v. Nelson, 394 U.S. at 299, 22 L.ed. 2d 89 S.ct. 1082 (1969).

Mr. Pawlowski has satisfied the above burdens by making a clear and convincing – prima facie showing of Brady/Giglio violations, and by meeting all three prerequisites set forth by the Third Circuit Court of Appeals in Joseph, supra.  Particularly, the February 20, 2018 trial record, denoted: ("Tr") clearly demonstrates the development of newly discovered withheld evidence which the prosecution failed to disclose upon Mr. Pawlowski's request.

The subject of non-disclosed emails or all the previous requested discovery materials were first approached during a side bar by defense counsel, Jack McMahon on Special Agent Curtis on redirect. (Tr. 9). By establishing that all discovery were not disclosed upon his request he (Mr. McMahon) also established that the government failed to disclose all the emails it retained from its key cooperating informants, Mr. Fleck and Mr. Ruchlewicz, post their cooperation.  That is, post June, 2014.  But, the government [mis]represented at trial that there were no post cooperation emails and it had not advised Mr. McMahon in a text message that post cooperation emails existed. (Tr. 10).

The non-disclosed emails post the informants' cooperation and the exculpatory nature of the content of those emails became the focus-point of the sidebar. (Tr. 10).  The trial court or Judge Sanchez conceded that albeit there was massive discovery in the case, the emails or surveillance communications, in question, were not included in all the discovery. (Tr. 10-11).

Judge Sanchez tried to resolve the conflict via encouraging both parties to stipulate to the vexatious matter.  (Tr. 4, 11, and 24).  Agent Curtis admitted under oath on the witness stand, that all "emails" post the informants' cooperation were turned over to the defense. (Tr. 12-13).  Mr. McMahon provided the trial court with a weekend text message exchanged between he and AUSA, Anthony Wzorek, which confirmed that the government did, in fact, advise him there were no emails after the June 2014 cooperation involving its informants. (Tr. 15-17, 23).

Mr. McMahon's redirect finally goaded agent Curtis into admitting that there were, in fact, emails belonging to or involving its cooperating information that the government did not turn over in the discovery upon his request. (Tr. 20-22). The government, in turn, while not

being candid, provided just a plausible response that there are additional emails which were not disclosed post June, 2014. (Tr. 24).

Notwithstanding, the information Special Agent Curtis disclosed in his May 2, 2019 podcast interview is newly discovered evidence to the extent it substantiates that subsequent emails post the informants' June, 2014 cooperation, do, in fact, exist to this date which wasn't disclosed to the defense upon its request. However, there's a rebuttable presumption that the withheld emails, in question, would have exculpated Mr. Pawlowski had they (emails) been disclosed and that is the sole reason for failure to disclose them.

Having very well established that the "evidence is new", and "were not disclosed", a hearing is required. Most important, a hearing is required where the evidence [is connected] to the instant case by clear and convincing evidence. Since Mr. Pawlowski is entitled to relief, this court should conduct a hearing to determine the extent of the due process violations. Moreover, because it is clear this is not an "open-ended fishing expedition," a hearing should be held. See, United States v. MacFarlane, 759 F. Supp. 1163, 1168 (W.D. Pa. 1991)("[T]he prosecutor is not required to make files available to the defendant for an open-ended fishing expedition for possible Brady material") (Citing, United States v. Davis, 752 F. 2d 963 (5ᵗʰ Cir. 1985)).

2. Rebuttable Presumption of Brady and Bagley Exculpability
   and Materiality Requirements

   The constitutional obligation to provide exculpatory evidence under Brady, is not measured by the moral culpability of the prosecutor, since the prosecutor is charged with knowledge of the significance of evidence in his/her files "even if he has actually overlooked it." Agurs, supra. Id 427 U.S. at 98-99. It is the character of the evidence, not the character of the prosecutor, that is determinative of the question of whether the suppression of evidence results in constitutional error. Id.

   There is a rebuttable presumption that, the character of the "new evidence" provided by Special Agent Curtis on the Jerri Williams' podcast show interview

exculpates Mr. Pawlowski, and is material to the extent that it would have made a difference in the outcome of the jury's guilty verdict had it been disclosed.

i.  The Information and Date Contained on Mr. Ruchlewicz's Electronic Devices in California Exculpates Mr. Pawlowski

In his own words, agent Curtis admitted that he rushed to seize Mr. Ruchlewicz's electronic devices from him in his hotel room in San Francisco, California to prevent or avoid the chance of pertinent data being deleted, if Mr. Ruchlewicz decided not to cooperate, which provides in relevant part:

> SC: We also had warrants to seize SR's electronic devices that he had with him out in California – his laptop computer, his iPad, and his cellular telephone because again, if he decided not to cooperate we knew there was a chance a lot of that data was going to be deleted, and to prevent that, we wanted to seize those devices, and have our computer resources there with the Bureau download all the data there so it was preserved, so we could further analyze that to try to corroborate a lot of other information we obtained throughout the investigation. (PCI @ 6-7).

It's an [ir]rebuttable presumption that the data contained on the electronic devices seized from Mr. Ruchlewicz, as described above, exculpated Mr. Pawlowski once it were downloaded by the Bureau, and that was the sole reason as to why the data were not disclosed.

ii.  The Information or Data Contained on Mr. Fleck's Cellphone Exculpates Mr. Pawlowski

Similarly, the information or data contained on Mr. Fleck's first telephone, "Cellphone 1" which Special Agent Curtis had obtained a Title III wire tap surveillance on exculpates Mr. Pawlowski. According to Special Agent Curtis, within two weeks of surveillance, on Cellphone 1, Mr. Fleck arbitrarily changed his cellphone and number.

At which time, Special Agent Curtis had to obtain a second warrant surveillance on "Cellphone 2" and so forth. (PCI @ 3).

However, the government only disclosed the information or data on Cellphone 2. Thus, there's an irrebuttable presumption that the data contained on Cellphone 1 and other non-disclosed wire tap surveillance after Cellphone 2 exculpates Mr. Pawlowski and that's the reason why they were not disclosed.

iii.    The Unknown Public Official and the Content of His Information also Exculpates
        Mr. Pawlowski

Similarly, during the podcast interview, Special Agent Curtis also indicated that within the first two months of the investigation there were tape recorded conversations between an "[un]known" Public Official (PO), Mr. Fleck, and another one of the government's confidential source (CS). The other CS, who had known the PO was being used as a linchpin to have the PO introduced the CS directly to Mr. Pawlowski to instigate some form of quid pro quo agreement which otherwise would have not existed. To wit:

> SC: "… Task force members working in our office had a confidential source, who was well aware of the conflict of interest and the news stories that were being highlighted in Allentown, volunteered the fact that he could be introduced to a Public Official (PO) in the area who could potentially make an introduction to MF and his business.  So armed with that we debriefed that source and he agreed to wear a recording device for us and have discussions with the PO that he was friendly with and that PO agreed to introduce the source to MF and his partner at that time, Sam R.  So that introduction happened within the first two months of the investigation….  We started formulating an undercover operation…to introduce the UC to the Mayor and come to some quid pro quo agreement…."
> (PCI @2).

Having not disclosed the recorded conversations between the unknown PO, CS, and Mr. Fleck in the previous requested discovery material, agent Curtis' podcast interview is the first time in which the recordings were disclosed. Thus, the recordings are newly discovered. There's a rebuttable presumption that the content of those recordings would have exculpated Mr. Pawlowski and that is the primary reason why the recordings were not released or included in the discovery material.

iv.     The Entrapment Information Special Agent Curtis Provided Exculpate Mr. Pawlowski

An "entrapment defense" would have made a difference in the outcome of Mr. Pawlowski's trial and exculpated him had he (Mr. Pawlowski) been privy to such information. Based on the evidence adduced at trial and the information provided by Special Agent Curtis in his podcast interview, its unequivocal that he (Special Agent Curtis) induced proxy "quid pro quo agreements and other alleged crimes" via his informants to entice Mr. Pawlowski to commit crimes for which he otherwise would not have been predisposed of, but for Special Agent Curtis's entrapment tactics. To wit:

> SC: "…We started formulating an under cover operation to have an agent act as a potential developer for Allentown, and have the source introduce the UC Agent to MF and his company [WITH THE HOPES] that MF would facilitate a potential project and take the steps necessary to introduce the UC to the Mayor and come to some quid-pro-quo agreement where they would require the UC to provide something of value to the Mayor, and in return the Mayor, through MF, would facilitate this redevelopment…." (PCI @2).

> SC: …we were able to, in a handful of these face to face meetings "how can you help me in this process, in the redevelopment project, and how can the Mayor help me, and what is MP going to expect in return, if anything, and what are you going to expect in return, if anything". And then we would follow up by telephone to reiterate some of the things discussed face to face." (PCI @3).

Entrapment occurs when a defendant who was not predisposed to commit the crime does so as a result of the governments' inducement. See, United States v. Dennis, 826 F. 3d 683 (3ᵈ Cir. 2016) (Citing, United States v. Jannetti, 673 F. 2d 578, 597 (3ᵈ Cir. 1982)). There are two elements of proof: "inducement" by the government to commit the crime, and the defendant's lack of "predisposition" to commit the crime. See, Dennis, 826 F. 3d at 691 (Citing, United States v. Wright, 921 F.2d 42, 44 (3ᵈ Cir. 1990)).

Had Mr. Pawlowski been disclosed to Special Agent Curtis' podcast entrapment statements at trial, he could have raised and proved the entrapment elements of government's "inducement", when the evidence had already proved that he was not "predisposed" to committing the alleged quid pro quo agreement or crimes, and thus, exculpated himself by satisfying both entrapment elements as required by Dennis, supra.

Moreover, by establishing that Special Agent Curtis deliberately withheld all of his entrapment-tactics from the defense, Mr. Pawlowski has also overcome his "burden of presumption" that Mr. McMahon's actions in failure to raise an entrapment defense, including failure to request for an entrapment jury instruction, was not a trial strategy. Rather, it was [forced ineffective assistance of counsel] due to the withheld "induced-entrapment" evidentiary statement made by Special Agent Curtis. Therefore, a hearing should be held to distinguish the extent of the entrapment withheld evidence, and the likelihood of a new trial under Rule 33.

v.    The Unlawful Freezing of Mr. Pawlowski's Assets and Seizure of his Funds to Deliberately Prevent Him from Retaining an Attorney of his Choice Exculpates Him.

In his own words, Special Agent Curtis stated that he deliberately went beyond the typical line of duty to have Mr. Pawlowski's assets frozen, so that he could seize the funds from his bank accounts to deprive him of his Sixth Amendment rights to retain an attorney of his choice.

Subsequent to the seizure of Mr. Pawlowski's bank account funds, Mr. McMahon filed numerous motions in April of 2016, challenging the validity of the government's

unlawful seizure of said funds: one from Mr. Pawlowski's state campaign fund account and the other from his federal fund account. The motions moved the court to release Mr. Pawlowski's frozen assets because neither the court nor government provided him proper notice of the seizures.

Up until Special Agent Curtis's podcast interview, Mr. Pawlowski had absolutely no idea whatsoever as to why his assets were frozen and funds seized from his bank accounts. He merely assumed that the funds were seized under the government's false belief that the (funds) were traceable proceeds from ungotten gains of the alleged crimes. However, during Special Agent Curtis's recent podcast interview, Mr. Pawlowski learned for the first time that his funds were frozen and seized to solely prevent him from retaining an attorney of his choice, without the government first establishing that the funds were tainted, and therefore without having probable cause to seize the funds as being connected to the underlying alleged criminal activity. To wit:

> SC: "Another thing we did during this period is we obtained a warrant to seize all the remaining contributions out of Mayor Pawlowski's campaign accounts, because I also realized, as soon as we went overt in this investigation, that he could utilize these campaign funds to pay for attorneys to defend himself in this investigation. So we wanted to minimize his opportunity to do that and cut off funding there. So, we got a warrant from the court to seize his campaign contributions, which was, I think, one of the only or few times that has occurred too." (PCI @14).

In Luis v. United States, the United States Supreme Court held that, the Sixth Amendment's right to counsel extends to a defendant's right to compensate his chosen counsel with untainted funds. 136 S.ct. 1083, 1102, 194 L.ed. 2d 256 (2016). The holding Luis is very clear: "The Government may not restrict the property of a criminal defendant when there has been no finding of probable cause or property has not been traced to an offense contained within the indictment, and the defendant wishes to use those funds to retain a counsel of his choice. See, Luis, 136 S.ct. at 1092.

The pretrial restraint of legitimate, untainted assets needed to retain counsel of choice violates the Sixth Amendment. Luis, 136 S.ct. at 1088; See, also, Id at 1096. The Luis court's analysis ultimately turned on whether the assets were tainted, or in other words, connected to the underlying alleged criminal activity. Id. At 1088-90.

Mr. Pawlowski hereby make affidavit under penalty of perjury that, he had very few assets other than the restrained ones, in question, and needed the seized funds to retain the attorney of his choice. But, because of unlawful seizures in light of Luis, supra, he was unable to do so. Similarly, the unlawful seizure of the untainted funds in this case, deprived Mr. Pawlowski from sufficiently funding his defense, by preventing him from adequately challenging the illegal tape-recording; wire taps, emails, and text messages surveillances; illegal search and seizures of evidence and property; the ability to subpoena potential exculpatory witnesses and other pertinent discovery; challenge the defective indictment and grand jury's proceedings, including but not limited to entrapment and the chain-of-custody of wire taps and tape recording evidences in violation of Fed. R. Evid. 901.

Moreover, Mr. Pawlowski seeks the release and return of the total amount of $80,000 to $100,000 in funds that were seized from both his state and federal bank accounts. Simply, because "the government has yet to prove that these assets were tainted by any crimes Mr. Pawlowski allegedly committed." And, the funds should be returned so that he can retain an attorney of his choice in lieu of a new trial, where he has no alternative unrestrained assets to fund the counsel of his choice. See, e.g., United States v. Bonventre, 720 F.3d 126, 133 (2ᵈ Cir 2013).

Based on the above, Mr. Pawlowski has met the burden which entitles him to an adversarial hearing to further offer evidence that the funds seized in this case were untainted, and for the funds to be released for a new trial. To obtain such a hearing, Mr. Pawlowski is required: (1) "to demonstrate to the court's satisfaction that he has no assets other than those restrained," and (2) "to make a prima facie showing of a bona fide

reason to believe the grand jury erred in determining that the restrained assets constitute or are derived, directly or indirectly, from gross proceeds traceable to the commission of the offense." See, e.g. United States v. Yusef, 199 Fed. App'x 127, 132 (3ª Cir. 2006). Since he has satisfied the Yusuf's burdens, Mr. Pawlowski is owed an adversarial hearing in this matter.

C. An Order for an Affidavit Affirming or Denying the Prosecutorial Unlawful Acts, in Question, and for a Nunc Pro Tunc Disclosure of Discovery are Required.

Pursuant to 18 U.S.C. § 3504 and Fed. R. Crim. P. 16 (a)(1)(C), this collateral attack court should order an affidavit from the government affirming or denying the prosecutorial unlawful misconduct or acts as described above, and for a nunc pro tunc comprehensive disclosure of [all] the non-disclosed discovery material concerning the unknown Public Official and the contents of the conversation he had with Mr. Fleck; the secret tape recordings; wire taps; emails; text messages; surveillances, including entrapment tactics and unlawful seizures of assets and funds, in which Special Agent Curtis elaborated on or disclosed in his May 2, 2019 interview on the Jerri Williams podcast show.

In addition, this court should order the disclosure of the grand jury minutes under Fed. R. Crim. P. 6, and Freedom of Information (FOI) under 5 U.S.C. § 552 to support the claims raised in this collateral complaint. Mr. Pawlowski has particularized the reasons for the requested affidavit and the release for discovery material to support his above "rebuttable presumption claims." Based on the prima facie showing of his claims, the foregoing § 3504 and Rule 16 requests should be granted in lieu of an evidentiary hearing and accompanied new trial. Moreover, Mr. Pawlowski moves this collateral court to [re]new his previous filed collateral motion for discovery which is currently outstanding and pending before this court.

V.     Prayers for Relief

Wherefore premises are considered Mr. Pawlowski pray that the foregoing relief sought is hereby granted respectively:

a.  Assume subject matter jurisdiction over this collateral motion for an evidentiary hearing and an affidavit affirming or denying the unlawful acts, in question, for a new trial, pursuant to Brady, supra, 18 U. S. C. § 3504, Rule 16, and Rule 33.

b.  Order the release of the requested discovery material.

c.  Conduct an evidentiary hearing.

d.  Order Mr. Pawlowski's release on bond pending the outcome of this motion where he is entitled to relief.

e.  Order the release and return of Mr. Pawlowski's seized bank account funds, so that he can retain an attorney of his choice.

f.  Order either a belayed mistrial, new trial, discharge, or allow Mr. Pawlowski to plea anew with time served.

Respectfully Submitted

Edwin Pawlowski, pro se

<u>VI.</u>    Conclusion

The Third Circuit Court of Appeals has well established five (5) requirements a defendant must meet before he may be granted a new trial on the basis of newly discovered evidence: (a) the evidence must be in fact, newly discovered, i.e., discovered since the trial; (b) facts must be alleged from which the court may infer diligence on the part of the defendant; (c) the evidence relied on, must not be merely cumulative or impeaching; (d) it must be material to the issues involved; and (e) it must, and of such nature, as that, on a new trial, the newly discovered evidence would probably produce an acquittal. See, United States v. Lannelli, 528 F. 2d 1290, 1292 (3ʳ Cir. 1976)

Although Rule 33 does not itself provide a mechanism for discovery in connection with a motion for a new trial, a court may allow discovery where the movant shows "good cause".

See, e.g. United States v. Brown, 2008 U.S. Dist. LEXIS 13286 (Md. D. Pa. 2008), aff'd. 595
F. 3d 498 (3ᵈ Cir. 2010)(Applying Rule 6 (a) of the Rules Governing § 2254 Cases in the
United States District Courts, which states that "[a] judge may, for good cause, authorize a
party to conduct discovery under the Federal Rules of Civil Procedures and may limit the
extent of discovery" while noting that there appears to be no provision in the Federal Rules
of Criminal Procedures for discovery after trial").

Good cause exists "where specific allegations before the court show reason to believe
that the movant may, if the facts are fully developed, be able to demonstrate that he
is…entitled to relief." Bracy v. Gramley, 520 U.S. 899, 908-09, 117 S.ct. 1793, 138 L.ed. 2d
97 (1997). For these reasons, this collateral attack court should grant a new trial after it order
an evidentiary hearing and release of the requested discovery mentioned above.

Submitted by,

Edwin Pawlowski, pro se

## VII.   Declaration

I hereby declare under penalty of perjury that the above statement of facts are true and correct to the best of my knowledge.  28 U.S.C. § 1746

Dated: _____; Signature: _____

## VIII.   Certificate of Services

I hereby certify that on this _____ day of February, 2020, copies of the foregoing was mailed to the following:

Anthony Wzorek, AUSA
Office of the U.S. Attorney
615 Chestnut St., Suite 1250
Philadelphia, PA 19106

Respectfully Submitted

Edwin Pawlowski, pro se

# EXHIBIT

# (A)

**LAW OFFICES**
**OF**
**JACK MCMAHON**
_____

**Jack McMahon, Esquire**
Telephone: 215-985-4443
Cell: 215-808-9007
Facsimile: 215-985-4416
mcmahonlaw@hotmail.com

**Two Penn Center Plaza**
**1500 JFK Boulevard, Suite 520**
**Philadelphia, PA 19102**

**Mailing Address:**
139 North Croskey Street
Philadelphia, PA 19103

**Emily Cherniack, Esquire**
Telephone: 215-914-6909
Cell: 215-990-0364
Facsimile: 215-914-6960
ebchern@gmail.com

May 24, 2019

**VIA E-MAIL**

Anthony Wzorek, AUSA
Office of the United States Attorney
615 Chestnut Street, Suite 1250
Philadelphia, PA 19106

Re:    USA v. Edwin Pawlowski
       Criminal Docket No. 5:17-cr-00390

Dear Tony:

Pursuant to our conversation the other day, Agent Curtis participated in a podcast regarding the Allentown investigation. I'll send you the link. Three things in this podcast regarding discovery (see attached summary).

1. When Agents confronted Sam in San Francisco, Agent Curtis says he downloaded Sam's I-Pad, Laptop and cell phone.

2. Fleck had a phone (1st phone) that was subject to Title III before he replaced that phone and obtained the one we heard numerous conversations on.

3. Agent Curtis talks of two months of tapes with an "unknown politician" and Fleck.

My review of discovery does not show these items. Could you please look into this matter?

Sincerely,

*Jack McMahon*

Jack McMahon

Attachment: As stated.

Page 1

"FBI Retired Case File Review with Jerri Williams" Podcast, May 2, 2019

Episode164: Scott Curtis – Mayor of Allentown, Campaign Contribution Bribery

Host: A Show who the FBI is, and what the fbi does.  Today Scott Curtis, 22yr fbi

Scott C spent most of his career in the NY office working on an organized crime squad, investigating the Colombo Elsian family

Currently employed    Associate Director of Global Investigations and Compliance for Navagant Consulting

Toward the end of the interview we have a conversation about the expectation of jurors of video and audio recordings.  New Procedures about custodial interviews.

I learned some things and I'm going to have to change some things in my new book FBI Myths and Misconceptions about to come out.

Host: I've been following the case through the media.  Please tell us about it:

...

SC: Allentown, 3rd largest city, enjoyed an industrial and manufacturing past, which evaporated in the 70s, and nothing replaced those businesses.  The central business district was primarily vacant.  The State proposed , in 2011, the NIZ...  Taxes would boomerang back to the city to help pay down debts for development.  That created the opportunity for public officials to use this influx of public money into the city for their own personal benefit, improve themselves financially, or politically.

Host: Was the main purpose of the funding to bring new industry?

SC: Make it easier for developers to finance developments.  AAA franchise, arena, to be the hub of redevelopment. ...

Host: So I can already see where the problem is, in the decision as to whose gonna get this money.

SC: Right from the start there were news articles highlighting some of the preferential treatment that appeared to be going on.  Part of this focus spotlighted this consulting firm, ran by Mike Fleck, who also happened to be the campaign manager to M Pawlowski, and was also his best friend.  It created this very apparent conflict of interest where this consulting company, involved in the political financing of the Mayor was also involved with businesses and developers who were looking to get contracts within the city.

Host: I can definitely see the conflict of interest there.  A 'Friend of Ed' situation.

SC: Yea, these articles would point out the fact that certain people were getting contracts, approvals, and those same individuals were highlighted as being donors to M Pawlowski's political campaigns—public info.  The reporters were doing their due diligence.  That in itself does not prove that bribery, or any corruption related activity was going on, but it showed there was some conflict of interest and some ethical violations going on, that needed to be further scrutinized.

Host: Whose decision was it to scrutinize it on a criminal basis.  As you had just mentioned journalists were questioning it.  At what time did you begin to look at it?

SC: When I showed up in Allentown in March 2013, **my initial marching orders that I was given was that there were these stories going around, a lot of rumors going on, that there were corruption related activities going on in Allentown.** There was no criminal case opened up at that time. Just **a gathering of intelligence. I was instructed** to see if I can find enough evidence and info to 1) to justify and predicate an investigation, and then from there utilize whatever investigative techniques I could to try to gather evidence to prove there was corruption related activities going on.   Part of the process – I had to do a lot of quick learning and institutional knowledge about who the individuals who may be involved were, also identify and research how the city was set up – how the NIZ was set up and supposed to be conducted and orchestrated. And also do some **surgical interviews with individuals who may have an incentive to cooperate with this investigation,** and give me some additional intelligence about the conflict of interest or evidence that they may have heard or witnessed.  I was lucky that in one of the interviews I did of a city employee, they went back and told the city solicitor that the FBI showed up at their house to interview them.  **And that city solicitor decided to bury that information and not tell Ed Pawlowski about the fact that the FBI was inquiring about things.    If that solicitor had done something different and told the Mayor at that point the investigation may not have gone further at that point.**  So, that was a bit of luck that helped move this investigation along.

The other bit of luck was task force members working in our office had a confidential source, who was well aware of the conflict of interest and the news stories that were being highlighted in Allentown, volunteered the fact that he could be introduced to a Public Official (PO) in the area who could potential make an intro to MF and his business.  So armed with that information we debriefed that source and he agreed to wear a recording device for us and have discussions with the PO that he was friendly with and that PO agreed to introduce the source to MF and his partner at the time, Sam R.  So that introduction happened within the first 2 mo of the investigation. Once we knew we could get this intro to MF and his biz, understanding the importance that MF and his consulting co had with the Mayor of Atown, and their significance of their involvement of potential corruption in the area – we started formulating an under cover operation to have an agent act as a potential developer for Atown, and have the source intro the UC Agent to MF and his company with the hopes that MF would facilitate a potential project and take the steps necessary to introduce the UC to the Mayor and come to some quid pro quo agreement where they would require the UC to provide something of value to the Mayor, and in return the Mayor, through MF, would facilitate this redevelopment.  We started working toward this plan, operation, MF and his business were happy to engage the UC and take a monthly consulting fees, but they always seemed to keep the UC at arm's length.  They didn't want to bring the UC around and have them interact with the Mayor directly.  And I was hampered with constraints by the Bureau that I didn't understand initially was going to happen in the fact that we weren't going to be allowed to purchase property, which we would need in order to do a project there, or able to bid on any redevelopment projects there.   So once I understood those constraints were going to hamper our ability to proceed, I shifted focus to develop probable cause to go up on a Title 3 on Mike Fleck's cell phone

Host: Explain why did the Bureau not allow you to purchase or bid on property?

SC  Because they didn't want to create a situation where innocent individuals could potentially be victimized, or denied opportunity here. So we didn't want to put our uc in a situation where Mayor and MF were manipulating a process for the benefit of the government, essentially, and screwing over individuals    who legitimately wanted to bid on property or redev projects.

So, at that point int eh Fall of 2013, my mission turned to developing probable cause to wire tap MF cell phone, because it was also pretty clear that MF was a 'weak link' in the sense that he loved to talk a lot, and he loved to broadcast what he was doing, he liked to promote what the mayor was doing, and he liked to highlight everything he was capable of doing to help circumvent the system or the processes, in exchange for their support of Mayor P. Those people are key because you're able to maximize any evidence you'll generate by title 3. They will incriminate themselves, and incriminate co conspirators that are also involved in the illicit activities.

So we were able to go up on title 3 on MF phone in Nov 2013, unfortunately bad luck that MF decided to change cell phones and numbers within 2 weeks of us getting title 3, but we were able to get another one on the new phone mainly because we still had the UC agent, and the original source interacting with MF.   So whenever we needed freshen up probable cause, we would have those agents make phone calls or have meetings with MF and SR to get probable cause we needed.

Host: When you talk about authorization, can you give us a little bit of what that meant and the probable cause to get the judge to authorize a wire tap?

SC: To do title 3 you need : prove that individual is engaged in criminal violations, and to prove he is using that telephone in furtherance of that violation.    We were able to  - in a handful of these face ot face meetings "How can you help me in this process, in the redevelopment project, and how can the Mayor help me, and what is MP going to expect in return, if anything, and what are you going to expect in return, if anything.  And then we would follow up by telephone to r3eitierate some of the things discussed face to face.  If a UC agent, by telephone, for title 3, that will be significant probable cause with the court to get authorization.

Host: Mention predication. Because you'll have To show that the individual you're targeting were already predicated to do this type of activity.

SC: Yes, this was something different that I wasn't used to in NY.  In NY those individuals I investigated had a history of criminal activity, a lot of them had criminal records. In Allentown you're dealing with individuals who've never been arrested before, never really been in trouble before, who are public officials that, for the most part, the public thinks that they have these outstanding reputations. So it's a little more incumbent on you to prove that their involved in some nefarious activity.  Again, we started with the conflict of interest to show that the general set up of their activities and the way MF's business was set up, was inherently a conflict, in the fact that the business clients he had were turning around and making campaign officials whom MF also worked for in running their campaigns.  Tools I used for predication was: surgical interviews.  One in particular, that helped out significantly , was a former political client of MF who I'd learned was not happy with the way MF handled the campaign that was involved.  I interviewed the individual and got some info about MF conducted a political campaign and how MF in the discussions in running the campaign, connected political donations with the possibility of some official act that the elected official may be able to do at some point in the future. Establishing that connection is obviously a foundation of corrupt activities there, because you want to say there is this quid pro quo, right? This give and take with a public official. Another thing that interview provided me with was a cancelled check that was used to pay MF for services.  So with that I was able to identify his bank account info for MF, then once I could …subpoena, that was the first subpoena I got to get MF's financial records for MF individual and business accounts. And through the financial aspect of things, just like with most of the FBI's investigations, following the money is a key component, because that's

what is obviously fueling the activity that is going on.  In this case because the case centered around campaign contributions in exchange for official action, a lot o the information about the campaign finances was publicly available through campaign finance reports that were filed.  Those we could easily obtain, review, analyze, schedule them out, and id suspicious patterns of activity.  Then once we could subpoena financial records that corresponded with those campaigns, then we were able to get deposit info there, who was making contributions, match it up with campaign finance reports, and also it leads for other financial records to pursue.

Host: So basically you were looking for kind of pay to play scheme.

SC: Yes, quid pro quo involved, the agreement to pay, make payment in some form, in exchange for the mayor taking official action.  So you're paying for the ability for the elected official to take official action to benefit something that you're looking for that he has direct or indirect authority over.

Host: Retired agents were monitoring the title 3.

SC: a wire tap is labor intensive operation.  Has to be monitored in real time, and you have to make a determination within 2 minutes or less that each conversation is pertinent or not.  And if its not pertinent you're required to minimize those.  In order to monitor someone's cell phone who you know is using for potentially16-20 hours per day, you need to have agents in the office that are monitoring the phone calls  as they are happing, and are also skilled in the ability to identify whether these calls are pertinent to the investigation or not, minimize accordingly if not pertinent, and to also summarize each of the phone calls as they are happening so me as the case Agent can go back later on, the next day, and identify the most pertinent conversations that occurred for further analysis or potential transcription so 1, we can build probable cause for the next 30 day authorization, because you only get 30 days of authorization per court order.  So by day 15 or 20 of that authorization you have to start piecing together the affidavit fo the next 30 days.  So on top of that you're also using other investigative techniques to corroborate the conversations.  I learned that the Philadelphia division was using retired agents to assist in monitoring title 3s, and other types of activities, to support investigations that were going on.  So I looked at that as a huge multiplier in resources.....continuity, pertinency, over the course of the investigation.   Some phone calls were minimized, unfortunately, because of the lack of continuity in the monitoring o the calls.

So the title 3 of MF's phone developed a lot of good initial evidence of pay to play in Allentown.  It developed some contracts that appeared to be rigged toward preferred vendors – businesses that have had agreed to make campaign contributions to MP and also identify illegal activities that MF involved in including tax fraud and tax evasion where he was utilizing his business accounts for personal expenses.  He wasn't paying the necessary wage taxes for his employees for his company, he was over inflating expenses that he was reporting on his tax returns.  So that was good info to know when and if we would approach him.

A couple of things that stood out during this initial period of intercepting these phone calls, which I had clearly was in tune with, based on my organized crime experience in NY, was a little surprised to encounter such conduct in the public corruption realm, and that was when they clearly were involved in counter surveillance, using code words, to conceal their activities making it more difficult for law enforcement to intercept conversations, avoid talking about things on the telephone.  One of the code words that was used was when MF and EP knew they were going down the road of potentially

incriminating themselves in conduct that would show pay to play or bribery or extortion, would throw out the code word of "we'll talk about it when we take the kids to school". And that was code for 'we'll get together in person to further talk about whatever that conversation was alluding to in terms of pay to play.

Host: Were they suspicious that law enforcement was after them, or was this all related to the fact that the media was also generating complaints and accusations?

SC: They were aware of the news stories for sure, they also took steps to try to misdirect the news to other areas. They also would supply fake news about things they were doing, or rationalize or justify things they were doing to try to push the news media off the scent of further scrutinizing their pay to play activities. But they clearly were also paranoid that law enforcement could be investigating them. **They had no direct knowledge at this point, that law enforcement had an active investigation.** But, clearly they knew what they were doing was illegal, so they were going to take the steps to insulate their activity and protect themselves from law enforcement intercepting the conversations they we4re having.

Another aspect that caught my attention was the fact that MF and SR were happy to be the buffer and insulation for MP – and MP obviously was using them for that purpose also to create this layer of separation, so that the Mayor could minimize his direct contact with individuals – especially individuals that they didn't thoroughly trust. And that's where we got the indication that we would never be in a situation where they would thoroughly trust our UC, and even our initial confidential source. So we knew we had to utilize other techniques to gather evidence we would need to prove there was corruption going on, besides this UC operation that was initially proposed. So the title 3 on MF's cell phone continued till the spring of 2014. We also identified that SR's partner at the consulting company was an important player, and somebody that MF used as a buffer for himself, by communicating a lot of the intentions of the public officials. So I decided that I also needed to get on SR's cell phone because we were missing part of the overall story – part of the conversations that were going on in connecting campaign contributions to public contracts. So we started the title 3 on SR's phone in the spring of 2014, and just like I had guessed, MF would give him certain instructions, then SR would communicate a lot of those elected officials, including Mayor Pawlowski, that they were working with, and to vendors that were seeking contracts in Allentown and elsewhere. Also, a side note here, we learned that the city of Reading, and the Mayor of the city or reading was involved in the same type of activity that was part of this overall investigation, but that's probably a discussion for another time, because there were little caveat's regarding that investigation that separated itself from what was going on in Allentown.

By June of 2014 we decided we would take some action to stir up conversation on the title 3s, which is important, because they are very labor intensive, so you try to avoid using this technique for a significant extended period of time.

We knew that MF, SR & MP had used an inaugural transition fund as another vehicle for pay to play, but a vehicle that made it harder for us to scrutinize this quid pro quo. Because that transition funds, unlike the campaign finance reports, they're not reportable. So anybody that was donating to this inaugural transition fund could do so and have some protection and insulation in the sense that unless you saw those bank records you would not know they made those donations. But based on the wiretaps we knew certain people, companies that were making these campaign contributions, and some of them were looking for something in return from MP.

Page 6

Host: So when you say they're not reportable, they don't have to fill out a document to send it in to the government, but you're still able to trace these funds, I take it, because a legitimate donors are still going to pay by check.

SC: True, but the newspapers would not have the ability to identify, that's what's different from a campaign contribution for a campaign for elected official.  Campaign finance reports are publicly available, and are required.  These transition funds, there is no requirement to report anywhere, they're not available for the public.  The only way that anybody would know who donated and where the money was going would be if you had subpoena power and were able to subpoena those records, which obviously we were able to do, so once we learned about this through one of the title 3 wire taps, that was one of the leads that was generated through the Grand Jury subpoenas to get those financial records.  And in analyzing and reviewing those records, we saw who gave contributions and were able to match up on the phones those businesses were looking for some assistance from MP.  Also, MF took a chunk of that money for himself as a bonus for running MP's most recent Mayoral campaign.  So we also looked at that as a potential area to see if he was going to claim that as income on his taxes.  So one little facet of this that we didn't know about until we stirred up conversation was the fact that SR had embezzled money from this transition fund.  And when we **conducted an interview** of Ed Pawlowski's wife, because she was listed as the President of this inaugural and Transition fund, and we also gave her a subpoena for all the documents and records of the fund, so when MF learned about **this interview** and subpoena one of his first phone calls was to SR to let him know what was going on, and because SR was the treasurer and in charge of all the records regarding that fund.  Through those conversations SR admitted to MF that he embezzled some money from this fund.  What also occurred during this time and thought about doing was approaching SR to gain his cooperation.  And it just so happened that during that week SR had planned a trip to San Francisco with his girlfriend to propose to her, and to have a vacation.  So We looked at that as a good opportunity to approach him, because he would be separated from MF, EP, and make it harder for him to consult with him after we approached him in asking them what to do, and tipping them off about the fact that the FBI was conducting an investigation.  Something I utilized in the past, too, was to create a good degree of separation there, to give you a better chance of gaining the cooperation of someone you're approaching.

Host: So don't tell me you approached him in San Francisco when he was going to be proposing to his girlfriend.  You must have ruined the whole plan for him.

SC: Well, I did ruin the trip, but I think now he would look back and say it was the best thing that could have happened to him.  And we'll follow up with the reasons why later on.  So yea, I flew out to San Francisco, checked into the same hotel that I knew he was at.  Part of any plan to approach somebody, covertly, about cooperating with your investigation, is to have some contingency plans in place.  Because if that individual decides not to cooperate, and decides to sound the alarm that the FBI is conducting an investigation, you want to make sure that you can obtain whatever evidence that is available at that point to help your investigation, knowing that the covert stage of the investigation is probably over.  So what we planned to do, as part of this contingency, was to get warrants to search Allentown City Hall, MF's office, and several other locations, in the event that SR told us that he didn't want to cooperate, and that he was going to notify MF and EP that the FBI was conducting this investigation.  So obviously that required a lot of resources.  We had approximately 100 agents standing by to execute these searches, in the event that SR told me that he wasn't going to cooperate.  We also had warrants to seize SR's electronic devices that he had with him out in California — his laptop computer, his iPad, and his

cellular telephone because again, if he decided not to cooperate we knew there was a chance a lot of that data was going to be deleted, and to prevent that, we wanted to seize those devices, and have our computer resources there with the Bureau download all the data there so it was preserved, so we could further analyze that to try to corroborate a lot of other information we obtained throughout the investigation.

So we had an additional UC agent involved in the scenario who was ironically situated in California, so we arranged for that UC agent to have a lunch meeting with SR to get him apart from his girlfriend for a couple of hours, and that's when we had planned to make the approach to gain his cooperation and to seize his devices and download those, as we were having this discussion with him about the benefits to him and his future is he decided to cooperate, as opposed to taking his chances and dealing with the potential ramifications of not cooperating.  Unfortunately the warrants didn't get signed in time, so we had to restage everything fo the following day, to try to make an attempt to separate SR from his girlfriend, because we didn't want her knowing what was going on because we didn't trust that she would be able to contain this information.  So we only wanted him to know what was going on, and minimize the exposure for the investigation.  So I created another ruse the following day for the UC agent to link up with SR again, to ask for some documentation that Sam had promise him, and Sam had to proceed up to his room to get this data for the UC agent.  At that point I knocked on his door, identified myself, seized his electronic devices, and told SR if you want to know if you want to know any information about what's going on here I'd recommend you following me to my hotel room, and I'll give you additional details of what was going on.  Luckily he decided to cooperate within the first ½ hour of the discussion, as I had personnel downloading information from his electronic devices, and trying to get this done in a timely manner, before his girlfriend would get suspicious as to why he disappeared for this period of time.

When he got back from his trip I instructed him that everything he did in his daily business with MF and MP, and the other people who were part of the consulting business, everything was going to be on tape. So basically Monday – Friday, and sometimes on the weekends, I would be meeting him in the morning, we'd go over his itinerary for the day, I'd give him a recording device and turning it on, he would go about his business during the day, meeting with various business executives and elected officials, in discussing a lot of pay to play activities, and potential pay to play activities.  And in the end of each day I would link up with him, turn off the recording device, get a summary of who he met with and what was discussed, and every day those basically 8+ hours of recordings, would then have to be reviewed by someone in the office to again identify pertinent conversations, to develop leads, to figure out how to follow up on certain discussions that were going on for the next conversations that SR could have, so this was a daily process that went on for 13+ months.

Host: My question would be, I know you had contingencies in place in case he turned you down, but you obviously had some type of confidence that you had chosen the right person to ask about cooperation and he would most likely do it.  Why did you believe that?

SC: You want to identify what would motivate somebody to cooperate, and hopefully its more than one motivation.  In this instance, there were a few motivations we had identified through the title 3 wiretaps.  1. The fact that he was involved in illegal activities.  2. MF really didn't treat him well, as a partner in this business, and in some ways MF was setting him up really, to take the blame for a  lot of the activities for the pay to play that was going on, and then 3. It helped me that he was making a

commitment to marry his girlfriend, and that became his priority in life.  As opposed to being loyal to MF and EP.

Host: Obviously you chose well.

SC: I had some reservations, based on my experience, at this point SR was 25 years old.  In my experience you don't have a lot of luck with young people because they're typically infatuated and enamored with this lifestyle they're in, they enjoy it, they don't have other priorities in life as opposed to people who are middle aged, who at that point are married, have kids, are looking at life differently.  To have that intelligence about what SR was experiencing at that point, and also knowing that he was going to make this commitment to this girl that he had been dating for several years, was motivation enough to say "I don't have any loyalty to MF and EP, I'm going to do what's necessary to protect myself and try to minimize my exposure and my punishment in what I've already done to this point.  In those weeks and months that SR was making these recordings for us…

We developed a lot of good evidence of pay to play in Allentown.  One of the things we focused a little more intently on was the fact that there were certain public contracts that were rigged to certain vendors, and I identified that as other related conduct that was associated with the bribery conspiracy, and looked at it as a mail and wire fraud count, because a lot of these companies that were bidding on these contracts, would not have spent the time, money and effort that was required to put together proposals and presentations if they had known that the contracts were predetermined toward a preferred vendor.  So I looked at it as those vendors were defrauded by MP and MF, because EP's conduct and his decision to give the contract, to rig it to a vendor who had made a campaign contribution, was perpetrating fraud on any competitor that thought this process was legitimate and fair and an honest process.  So we identified at least a half dozen of these contracts that were being rigged to a preferred vendor.  The one thing that everyone needs to understand with regard to this investigation is that these contracts do not happen overnight.  They're not developed, proposed, or funded overnight.  The selection process that's involved doesn't happen in a day or two either.  Some of these contracts had been in discussion for many months, some even before this investigation even began.  And so to gather the evidence that would show the complete story from start to finish that these contracts were predetermined to go to a specific vendor and the reason was because that vendor had made a campaign contribution, or given something of value to MP, that we had to understand that it could take many weeks and months to intercept all the conversations related to this process.

Host: As this is going on, I was reading articles in the Inquirer, and it seemed like it was going on forever.  That there was a continuing list of articles in the paper, and you were just waiting for the other shoe to drop and someone to be charged.  I'm wondering how this media attention effected your investigation.

SC: Before that happened , as part of the covert phase. 1. EP decided to run for Senate.  And in making that decision, he decided he would have to show he had the ability to generate a lot of campaign contributions to be a viable candidate.  He established a goal of $1,000,000, within the first 90 days of the campaign.  To accomplish that, he had to start putting pressure on the vendors who had received contracts from the city of Atown, and demand that they reward him for the action of getting them those contracts.  Any ability that MP had at this point to approve a new contract with a vendor, in exchange for campaign contributions for senate, he was going out of his way to accelerate that process.

We also, by March of 2015, decided to make a run at MF, in getting him to cooperate in this investigation. It was very clear that EP was MF's best friend, and his sole confidant in anything and everything MP was involved in, and in order to close the loop on some of these schemes we knew we had to get these direct conversations between EP and MF on tape. We created a similar plan, with contingency plans in case he didn't cooperate. We set up a ruse with MF where we had him show up at diner, for an alleged meeting with the original source of the investigation we had, and we were waiting for him in the parking lot, identified ourselves, and asked that he come down to the hotel down the street, so we could explain to him what was going on, and get him to cooperate in this investigation. Initially he told us he wanted to cooperate, wanted to wear a wire, we fitted him with a recording device when he left the hotel that day, but as part of the contingencies and part of the risk analysis that we did in doing this approach, we knew we still had SR out there wearing a recording device. So SR was our quality control to monitor what MF was going to do after we approached him. Unfortunately within 24 hours MF told SR that the FBI approached him, and he was wearing a wire at that instance, and he wanted to have a meeting with SR and another employee later that day to explain what was going on, and later that day he told SR the details of what had occurred. And again, SR was wearing a recording device, unbeknownst to MF, so we were able to know exactly what was going on, then we had to insert ourselves to MF as to his actions after he left the hotel, without giving up SR as a source at that time. Luckily, MF decided to seek counsel, and that attorney reached out to us, and set up an appointment to set up the initial proffer session, and we were able to right the ship, and MF was able to covertly record conversations with EP for 3.5 mo time period.

HOST: I take it you're doing it because MF, in the past, insulated MP from any opportunities you would have to record him. So the only way to get to Pawlowski was to go through him?

SC: Right, we understood that the strongest incriminating conversations we were going to get were going to be between MF and EP. Because SR was a layer removed. We had some good conversations, and we were building a good investigation, case at this point, but we knew that to solidify a lot of things we would dneed to gain MF's cooperation, and do it covertly where we could get these conversations on tape. And that, coupled with the decision by EP to run for Senate , which was feuling his desire to give contracts , but also feuling his desire to shake down vendors who previously got contracts for campaign contributions, created a lot of opportunity for explicit conversations between him and MF, basically identifying what actions the Mayor had taken, to help these vendors out, and have EP explicitly instruct MF and SR to confront vendors who were reluctant to make campaign contributions and pressure them into doing so.

Host: Do you have any examples of some of these conversations?

SC: One of the vendors who was involved was a law firm, Norris McLaughlin Allentown, who did a lot of legal work for the city of Atown, and for affiliated  entities, these Authorities that were part of the city's operations. One of the attorneys, Scott Alinson, wanted to be the point person at the law firm who would get credit for a lot of the work that was coming out of Allentown. In exchange, he wanted to be the person who the campaign contributions would flow through, to EP so he could be in control of what was provided in this thing of value to the Mayor, and also get the credit for the legal work that was generated by the city. So he was a little resistant to providing additional campaign contributions because he felt that EP had not rewarded his law firm with contracts that they thought they were deserving of. He also thought that the fact that the city had a new solicitor in place that was not friendly

with their law firm, in his opinion, would also make it more difficult to get these future legal contract. So one meeting that was recorded between MF, SR and EP, recorded by SR before MF was cooperating, where this reluctance by Scott Alinson was explained to EP, and EP instructed MF & SR to confront that attorney, about the fact that he should be willing to cough up whatever campaign contributions that were asked of him, because that law firm had been given over $1,000,000 of legal work. So MF & SR proceeded to carry out those instructions, and conversations ensued for the next 4 months about getting Allinson and his law firm to make a campaign contributions, and setting the foundation for future legal work that would be rewarded to their law firm.

Host: that's pretty clear an arrangement of quid pro quo.

SC: Allinson, advising on the recording, that he understood that law firms don't get these contracts because they are good law firms, or good attorneys, right, they're getting them because their getting something in return, to MP. So he was pretty explicit about this arrangement, and what it would take to guarantee future legal work for the law firm.

Host: And you have that right on tape?

SC: Yes, this tape was played during the 6 week trial and S Allinson was convicted on both counts he was charged with, and EP was convicted of 47 of the 54 counts that he was charged with.

Your question about the period of time during the covert phase of the investigation, and the Mayor being charged in an indictment, this was a period where 1. We had to hastily pull the plug on the covert phase because the rumors of MF cooperating were slowly circulating around Pennsylvania and the Lehigh Valley, because that initial 24 hour period he also told another employee that the FBI approached him. That individual started slowly leaking out this information about the approach and the FBI's involvement. Words slowly filtered back toward EP and it culminated on July 2, 2015 in a breakfast meeting in Allentown between MF, EP, and F Daugherty…, where MF was confronted about the fact that he was approached by the FBI, and he was wearing a wire. Right after that meeting MP followed him back to MF's office, and in the elevator patted him down looking for a recording device.

Host: And did he find anything?

SC: No, no one has ever found any of my recording devices in 22 years. The Mayor had no clue where the device was, and so this exchange is also memorialized on recording.

Host: Now, they're supposed to be best friends, right?

SC: Yes.

Host: So, I'm just wondering if MF ever expressed to you if it was difficult for him to record his best friend.

SC: It was difficult. And that's what caused him to take those initial actions the first 24 hours by tipping off SR and this other employee, because of that deep loyalty he had to EP. They vacationed together, they watched each other's kids, they interacted dozens of times every day. So we knew it was a strong personal connection, it wasn't just a business or political connection here, but it was a very close personal connection. So that loyalty was hard to overcome. Now again identifying motivations to convince MF that it was better for him to cooperate, was the fact that it was clear that EP was very

selfish, and if anybody was going to go down in an investigation, EP was going to turn and blame everything on MF, and he would be the fall guy for this activity that was going on. So I took the time to make it clear to Mike that he had a wife, and a child, and that should be his priority, and not protecting EP.

Host: I'm looking at a particular transcript of the recording between SR & EP. It's pretty clear that he's doing something illegal and he is concerned that he was going to get caught.

SC: There was a couple of these conversations, which showed the intent, right, or MP's activities. Where he understood what he was doing was wrong. And so a couple of these instances, like this one in particular, where they had just finished meeting with a potential donor/vendor, and were looking to help him get a contract in exchange for campaign contributions. As they're leaving the meeting, SR says "Well that went well". And EP says "Yea, I've got to be careful, I can't get uncomfortable when we start talking about Hey, we're gonna just give you this. Who has the contract process. I'm so scared these days. Who knows who is wearing a wire. Who's tapped, who's not. You know what I mean. I think we've got to be really careful when we talk about this stuff. So this happened on more than one occasion where he was paranoid about law enforcement scrutinizing his activities, and either using court authorized wire taps to intercept his conversations or having people wear a wire, recording conversations that people would have with EP. And again, the irony is he is saying this to SR, who is wearing a wire.

Host: Very ironic.

SC: After the covert phase of the investigation was terminated on July 2, 2015, we had a lot of work to do in reviewing the recordings we had accumulated . We also executed searches on City Hall, MP's house, a lot of electronic devices, and there was a lot of data we needed to comb through to piece together the criminal schemes we believed were going on which we believed, centered around the exchange on campaign contributions for public contracts. As part of the agreement to bribe EP was the conduct of rigging these contracts for these preferred vendors. I was also approaching other coconspirators that we had evidence and good recordings on to try to gain their cooperation in the investigation, which included Fran Daughterty, that just about everything flowed through him, and the Mayor used him as another person who could insulate conversations that the Mayor didn't need to have directly with department heads in the city to make sure these contracts went to the predetermined vendors. So I got Fran D to cooperate, I got MaryEllen Koval, who was the City Controller, that position is supposed to be neutral and independent, and is supposed to ensure that the city is following all the appropriate procedures and guidelines, but she was an elected official, and he campaign was run by MF, and she used that relationship for her own benefit, and was facilitating the activities of Mayor P with her position there. So getting   to cooperate, who would corroborate a lot of the conversations and data to piece together matrixes of each scheme, which would have combination of recordings, surveillance, documents, email, texts, that would put together a pretty complete story that would shot that scheme was corrupt. And it was corrupt for these reasons: either a bribe was paid, or the vendor was pressured to make a contribution, that the process involving the public contract was rigged, this is how it was rigged, this is how competitors were misrepresented and defrauded as part of that process.

Host: I'm wondering how they were able to do it. Because I have always assumed there were sealed bids for different projects.

SC: That's how the process is supposed to be. The City has a procurement code, and as part of that code there is a request for proposal process, and that process is supposed to be confidential, where you request bids from vendors, and those bids are supposed to be sealed by a select committee, confidentially, and that committee is supposed to evaluate those bids on their merit, based on the qualifications outlined in the RFPs, and select the best vendor for that project. Unfortunately what was going on here was Daugherty in his role of Managing Director, he was the boss of every department head in the city. And a lot of these contracts were generated out of the Public Works department where Fran would inquire about the status of these projects and the RFP processes, and also we had MF, a consultant for the preferred vendor, who was bidding on this process, and James Hickey, also a business consultant, and during this one street light contract, he was the consultant for the preferred vendor who was ultimately awarded the contract. So they would get the inside information through Fran or the consultants about the status of the process. And on a few instances, Jim Hickey would actually write the RFP for the city. With the ability to do that they were able to view the RFP and eliminate most of the competition, who wouldn't be able to qualify for the project in the first place. Now the Public Works department, they knew there was this intention to rig the contract, they were not happy with that decision. They tried to alter the request for proposal once they got it from the consultant to Fran to their department. Fran learned about that, and instructed them to rewrite it and send it out so they could help this preferred vendor. So there was a lot of machinations going on to facilitate the rigging of these contracts. Unfortunately some people who didn't want to be caught up in this corrupt process- they ended up being key witnesses for us at trial. But Fran's position and his importance was able to control a lot of the activity that was going on, and communicate a lot of intentions of MP without the Mayor having to directly communicate those to the departments involved.

Host: Very sneaky.

SC: Yea, again, because of using all the techniques at our disposal we were able to put together a very complete investigation, mainly built on recordings, which showed the intent of EP and was very good evidence of connecting the exchange of campaign contributions for EP's official action in awarding the contracts to these vendors and clearly the jury, a couple of them mentioned after the trial in news articles highlighted the fact that in the recordings it was clear the exchange of campaign contributions for official action.

Also, the first time I've used it that the Bureau recently implemented, was the ability to covertly record a non custodial interview....   For years the FBI's policies were when you interviewed somebody it was a process of taking notes and summarizing the results of that interview in a FD302 Summary report of that interview. The FBI, within the last 5-6 years, mandated that if you interview somebody who is under arrest, in custody, that you have to now record that interrogation. Even after that they gave us the ability to record covertly, non custodial interviews. I was a little hesitant to be involved in, because I had been schooled for a number of years in taking notes and summarizing. But this paid huge dividends for us in the trial when we asked Ed P to come down to the office to be interviewed. He came voluntarily, we explained to him we had been conducting an investigation. We asked him some questions and we focused the line of questioning toward Fran D to kind of put EP at ease, and so for 3 hour period EP was answering our questions as to the process involved in awarding contracts, his relationship to vendors and campaign contributors, and we were able to slowly weave our way down a road where we could confront him about whether he had ever engaged in demanding bribes from vendors, involved in pay to play activities, rigging of contracts. Of course we had all this evidence on tape, so we knew the answers

to these questions, unbeknownst to him.  And so because we were recording this interview there was no doubt about what he said to us in response to us, to our questions.  Whereas in the past if we charged somebody with 1001, which people have been reading about in the news in other investigations, has been utilized lately in people making false statements to the FBI, in this instance here the evidence was so strong because his answers were on tape, when we asked him if he ever connected campaign contributions to city contracts.  Whether he ever demanded campaign contributions to anybody, whether was ever involved in the rigging of contracts.  He denied his involvement in all those questions, and we had, obviously evidence to the contrary based on the recordings of SR & MF.  So clearly he was lying to us about his conduct.  We were able to charge him with 7 counts of making false statements to the FBI.

Host: I don't know if others caught what you said, this was covertly.  He knew you were taking notes and definitely knew he was lying to you, but he did not know you were also recording his answers.

SC: Exactly, in the past if we didn't record an interview like that, the Agents took the stand to testify as to what he said.  Now we could just have an agent go up there, give the back story, and hit the play button, and let the recording speak for itself.

Host: I wasn't eve aware of this.  I'm retired 10 years, and we couldn't record these conversations.  Would you say that it's a sign of the times of people not being trusting of law enforcement in general, and the FBI.

SC: This is the expectation now.  The days of any investigation when you're parading a bunch of witnesses in a trial to testify about events is probably in the past.  The expectation is you'll have audio and video.  The public expects of the types of evidence we should have at trial.

Host: this relates to police body cams...

SC: It eliminates any doubt about what transpired, or at least minimizes some defense argument about what actually occurred.  Now there is little question about what happened.  I learned that at some point in early to mid 2000s where getting as much as you can on tape was the key to any successful investigation.  That was the strongest evidence you could obtain.  You had to be proactive, so if conduct was continuing to occur you had to focus on that and being proactive about obtaining evidence, as opposed to piece together something that happened in the past.

Host: I could imagine if MP is confronting MF, that the case is now going to come to a conclusion pretty quickly with the main subject becoming suspicious of your secondary target, who is now cooperating.

SC: We had, in the recordings, obtained some suspicion of that in the days proceeding that, so we were anticipating having to pull the plug on the covert phase of things, and were also planning on getting search warrants.  There are also discussions on tape where EP was instructing MF and SR to start deleting electronic communications that they had.  We knew if we didn't act quickly, a lot of that evidence would be destroyed.  It was important for us to do those searches on July 2nd, that was a holiday weekend, so we knew if we waited any longer by next Monday who knows what would have been destroyed or deleted at that point.

SC: We knew we wanted to interview EP, we didn't want him to have the opportunity to consult with, whoever, about what he should do now that he had a pretty good idea there was an investigation going on.

Host: This was 2015. The media always seems to be aware when investigation at seat of government.

SC: It took them a little bit to know what was going on because we had to scramble and put things together at the last minute, this day before the holiday weekend. Slowly they learned what was going on, they learned that MF had been cooperating. The media started submitting their own Right to Know requests based on what they knew we were inquiring about or searching for in City Hall to try to do their own investigation, to see if they could guess and piece together the schemes and what some of the crimes we were investigating were.

Host: You do a search on July 2015. When was it you charged the Mayor? Could you answer the question what were you doing during that 2 year period?

SC: July 2017, almost 2 years later.   Reviewing evidence, interviewing, trying to get cooperation of co-conspirators that we knew were involved. On a legal side that caused some delay was USC vs. McDonnell decision, where the supreme court threw out the convictions of Gov. McDonnell and more specifically defined what an official act should be when you're talking about a bribery scheme. So we had to review that and make sure that our evidence was still strong enough to overcome this new definition.

Another thing we did during this period is we obtained a warrant to seize all the remaining contributions out of MP's campaign accounts, because I also realized, as soon as we went overt in this investigation, that he could utilize those campaign funds to pay for attorneys to defend themselves in this investigation, so we wanted to minimize his opportunity to do that and cut off the funding there. So we got a warrant from the court to seize his campaign contributions, which was, I think, one of the only or few times that has occurred too.

Host: I imagine, a lot of the defense, especially friends and relatives of his, who wanted to minimize his guilt, was that 'it doesn't appear he used these funds for personal gain'. He wasn't out there buying cars and yachts and taking vacations, but he was using the bribe money he got to fund his campaign. So he did it more to increase his power and influence than he did to for personal gain.

SC: That's true, and that's why the bulk of the case centered around campaign contributions for official action. He had this desire for higher office, and so wanted to utilize his position as mayor to set himself up to gain higher office, and in order to do that he would need to cultivate a lot of influential donors. He used his time as mayor to establish this relationship with people he thought could help fund future campaigns.

He did take things for personal gain throughout the investigation. He accepted tickets to Eagles playoff football games, he accepted a lot of free meals – I don't think he ever paid for a meal himself during the course of the investigation, he accepted vacation home in Key West, FL – so things like that that he personally benefitted from, he was also willing to accept.

Host: That just tells us that campaign financing reform is needed. If this is what you have to do in order to get the financing that you think you need, its unacceptable.

SC: And its not being made any easier, unfortunately, cause now with other recent Supreme Court decisions, which is further enhancing the fact that this is a First Amendment right that you can donate money to whoever you choose. Now, on the federal level, there are limits, as there are in other lower level municipalities, but people are going to find ways to circumvent those limits through super pacs,

independent expenditures, where there going to find a way to finance, influence, and gain access to an elected official, even if its not directly.

Host: Then the problem is that candidate feels beholden to those donors, and now they get access and advantages that the regular people are not going to be able to obtain. That's not democracy.

SC: No, it all begins with putting yourself in a position to get access. And then from there a lot of times it progresses to the point where it becomes a quid pro quo or bribery scheme. Peopole that have the ability to finance a candidate are going to have a benefit over people who don't have that ability.

Host: We've talked about MF, SR, and EP. I understand there were a number of people who were caught up in this bribery fraud scheme.

## The rest is summarized, or omitted because she and Scott were praising his talent.

SC: (Ed got ...counts, Fran pled, MEKoval, Gary Strathern, Dale Wiles...they were all prosecuted as city officials. There were 5 separate vendors, one developer, SAlinson, MF & J Hickey,

Host: What was the final sentencing?

SC: 15 years and trying to appeal. SAlinson sentenced but out on an appeal.

Host: You started in 2013, didn't finish till 2018.

SC: it was the shortest investigation I've ever been involved in in my career., complex cases, multiple years, sophistated criminals, cultivate good sources, probable cause, sophisticated techniques, 17 years of experience gave me the expertise to do this case, complete and good investigation.

Host: other similar cases in PA at the same time.

SC: Mccord, Mayor of Reading, allegations of other officials., how corrupt the state of PA was compared to other states, 4th or 5th most corrupt, favorable laws to a corrupt culture, unlimited donations, culture of corruption for years unchecked, hopefully this serves as a good example.

Host: in Philly, investigated, Seth Williams and Chaka Fatah...similar type conduct, very busy during this time period.

SC: there was overlap and leads and evidence generated that helped, good coordination

...

General framework in these cases were the same, just different people.








RECEIVED
MAY - 4 2020

Clerk of Court
Federal Court House
501 Market Street, Room 2609
Philadelphia, PA 19106

<>76166-066<>
Federal Correctional Inst.
Ed Pawlowski 76166-066
33 1/2 Pembroke RD
Danbury, CT 06811-3099
United States